## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CHICAGO BOARD OPTIONS EXCHANGE, INCORPORATED,

Plaintiff,

v.

INTERNATIONAL SECURITIES EXCHANGE, LLC,

Defendant.

Case No. 07-cv-00623

Hon. Joan H. Lefkow, U.S.D.J.
Hon. Jeffrey Cole, U.S.M.J.


## CHICAGO BOARD OPTIONS EXCHANGE, INCORPORATED'S
## OPENING BRIEF ON CLAIM CONSTRUCTION

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ...................................................................................................1

II.  THE LAW OF CLAIM CONSTRUCTION .........................................................2

    A.   The Claims the Specification ........................................................................2
    B.   Means Plus Function Claims.........................................................................2
    C.   The Patent Prosecution History.....................................................................3
    D.   Claim Scope Disavowal .................................................................................3
    E.   Extrinsic Evidence ........................................................................................4

III. TERMS TO BE CONSTRUED .............................................................................4

    A.   "Automated Exchange" (Claims 1-6, 9-10, 22-24, 27, 35-36, 43, 45, 56-58, 61)......4
    B.   "Public Customer Orders" (Claims 1-6, 9-10, 22-24, 27, 35-36, 43, 45, 56-58, 61)..7
    C.   "Professional Orders" (Claims 1-6, 9-10, 22-24, 27, 35-36, 43, 45, 56-58, 61)........7
    D.   "Order" (Claims 1-6, 9-10, 22-24, 27, 35-36, 43, 45, 56-58, 61) ...............................7
    E.   "Quotation" (Claims 1-6, 9-10, 22-24, 27, 35-36, 43, 45, 56-58, 61 .......................8
    F.   "Allocating" (Claims 1-6, 9-10, 22-24, 27)................................................................8
    G.   "Allocating Parameters" (Claims 1-6; 9-10; 22-24; 27; 35-36, 43, 45; 56-58; 61) .....9
    H.   "Parameters For Allocating A First Portion Of The Incoming Order Or Quotation Against Previously Received Customer Orders" (Claims 1-6; 9-10) .....................10
    I.   "Matching" ..................................................................................................11
    J.   "Allocating A Remaining Portion . . ." (Claims 1-3; 6; 9-10) .....................13
    K.   "Pro Rata" (Claims 2, 36) ..........................................................................14
    L.   "The Remaining Portion" (Claims 2 and 3) ...............................................15
    M.   "Processor Means..." (Claims 1-6; 9-10) .................................................16
    N.   "Processor Means..." (Claims 22-24; 27) .................................................18
    O.   "Book Memory Means..." (Claims 1-6; 9-10; 22-24; 27).........................19
    P.   "System Memory Means..." (Claims 1-6; 9-10; 22-24; 27) ......................21
    Q.   "Means for Matching..." (Claim 2) ...........................................................22
    R.   "Means for Matching..." (Claim 3) ...........................................................23
    S.   "Means for Matching..." (Claim 4) ...........................................................24
    T.   "Means for Matching A First Portion..." (Claim 4) ..................................26
    U.   "Away Market Querying Means..." (Claim 22).........................................27
    V.   "Away Market Process Means..." (Claim 23).............................................28
    W.   "Alerting Means..." (Claim 27)..................................................................29

IV.  CONCLUSION ....................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*ACTV, Inc. v. Walt Disney Co.*,
   346 F.3d 1082 (Fed. Cir. 2003).......................................................................... passim

*AFG Indus., Inc. v. Cardinal IG Co., Inc.*,
   239 F.3d 1239 (Fed. Cir. 2001)...............................................................................6, 11

*Applied Medical Resources Group v. U.S. Surgical Corp.*,
   448 F.3d 1324 (Fed. Cir. 2006)........................................................................... passim

*Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*,
   521 F.3d 1328 (Fed. Cir. 2008)........................................................................... passim

*Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.*,
   288 F.Supp. 2d 562 (S.D.N.Y. 2003).......................................................................6, 11

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
   388 F.3d 858 (Fed. Cir. 2004)....................................................................................5

*CCS Fitness, Inc. v. Brunswick Corp.*,
   288 F.3d 1359 (Fed. Cir. 2002)..................................................................................5

*Chimie v. PPG Indus., Inc.*,
   402 F.3d 1371 (Fed. Cir. 2005)..................................................................................5

*CVI/Beta Ventures, Inc. v. Tura LP*,
   112 F.3d 1146 (Fed. Cir. 1997)..................................................................................5

*Energizer Holdings, Inc. v. Int'l Trade Com'n*,
   435 F.3d 1366 (Fed. Cir. 2006)................................................................................31

*GTE Wireless, Inc. v. Qualcomm, Inc.*,
   188 F.Supp.2d 1201 (S.D. Cal. 2002).......................................................5, 19, 21, 25

*Honeywell Int'l Inc. v. ITT Indus., Inc.*,
   452 F.3d 1312 (Fed. Cir. 2006)...............................................................................6, 7

*Kemco Sales v. Control Papers Co.*,
   208 F.3d 1352 (Fed. Cir. 2000).................................................................5, 19, 21, 25

*Medical Instrumentation and Diagnostics Corp. v. Elekta AB*,
   344 F.3d 1205 ...........................................................................................................4, 5

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003)..............................................................................4, 18, 22, 23

*Phillips v. AWH Corporation*,
    415 F.3d 1303 (Fed. Cir. 2005)........................................................................................ passim

*Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*,
    563 F.3d 1358 (Fed. Cir. 2009)............................................................................................6, 7

*Ripmax Ltd. v. Horizon Hobby, Inc.*,
    2008 WL 4534068 (C.D. Ill. Oct. 7, 2008)...............................................................................6

*Scimed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001)............................................................................................6, 7

*Standard Oil Co. v. Am. Cyanamid Co.*,
    774 F.2d 448 (Fed. Cir. 1985)....................................................................................................5

*Voice Techs. Group, Inc. v. VMC Systems Inc.*,
    164 F.3d 605 (Fed. Cir. 1999)....................................................................................................6

## STATUTES

35 U.S.C. § 1 *et seq.*..................................................................................................................3

35 U.S.C. § 112, ¶ 6............................................................................................................ passim

## OTHER AUTHORITIES

U.S. Patent No. 6,618,707........................................................................................................ passim

## I.  Introduction

Pursuant to the Scheduling Order dated February 10, 2009, Plaintiff Chicago Board Options Exchange, Incorporated ("CBOE") respectfully submits its Opening *Markman* Brief in support of CBOE's proposed claim constructions for the disputed claim terms of U.S. Patent 6,618,707 (the "'707 patent," attached as Exhibit 1[1]).

The Court's construction of a number of the disputed claim terms may well lead to summary judgment motions of non-infringement and/or invalidity under 35 U.S.C. § 1 *et seq.* One of the most important claim terms submitted for interpretation is "automated exchange."  In fact, a decision supporting CBOE's proposed claim construction for "automated exchange" could well be dispositive of the infringement issues in this case.

The financial exchange operated by Defendant International Securities Exchange, LLC ("ISE") is a fully automated electronic exchange whereas the exchange operated by CBOE is a hybrid exchange in which all orders are executed either manually in open outcry, electronically or by a combination of both.  CBOE's position is that the claim term "automated exchange" is properly construed to mean a fully automated exchange in which no orders are executed manually in open outcry.

"A court construing a patent claim seeks to accord a claim the meaning it would have to a person of ordinary skill at the time of the invention."  *Phillips v. AWH Corp.,*  415 F.3d 1303, 1313 (Fed. Cir. 2005) *(en banc)* *(quoting Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.,* 381 F.3d 1111, 1116 (Fed. Cir. 2004)).  Thus, in support of CBOE's proposed claim construction for "automated exchange," CBOE submits herewith the Declaration of Dr. Benn Steil, a financial services industry expert, who states his opinion that a person of ordinary skill in exchange trading would understand the term "automated exchange" to mean a fully automated exchange with no floor-based, or open outcry, trading.

This brief is organized in the following manner: each of the disputed claim terms and the parties' positions on those claim terms are set forth below in a box; beneath the box is a discussion of both parties' positions on the disputed claim terms.

## II.  The Law of Claim Construction

---

[1] "Exh. __" refers to attachments to the Declaration of Brian J. Doyle, Esq., filed herewith.

A.      The Claims and the Specification

"[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips v. AWH Corp., Id at* 415 F.3d at 1314. For example, in the absence of evidence to the contrary, the use of two terms in a claim requires that they connote different meanings. *See Applied Medical Resources Group v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 (Fed. Cir. 2006). But "[t]he claims, of course, do not stand alone. Rather, they are part of 'a fully integrated written instrument,' consisting principally of a specification that concludes with the claims. For that reason, claims 'must be read in view of the specification, of which they are a part.'" *Phillips,* 415 F.3d. at 1315 (citations omitted). "As [the Federal Circuit] stated in *Vitronics*, the specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (citation omitted). Indeed, should the patent specification indicate that a special definition is given to a claim term, the inventor's lexicography governs. *Id.*

B.      Means Plus Function Claims

The specification is of particular importance when so-called "means plus function" limitations under 35 U.S.C. § 112, ¶ 6 are being construed. In *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1321 (Fed. Cir. 2003), the Federal Circuit reiterated the two-part process for construing means plus function limitations, a process that focuses heavily on the specification:

> Section 112, paragraph 6 allows a patentee to recite a function to be performed as a claim limitation rather than reciting structure or materials for performing that function. The construction of a means-plus-function limitation follows a two-step approach. First, we must identify the claimed function, staying true to the claim language and the limitations expressly recited by the claims. Once the functions performed by the claimed means are identified, we must then ascertain the corresponding structures in the written description that perform those functions. A disclosed structure is corresponding "only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." (Internal citations omitted)

The requirement that structure must be clearly linked or associated with the claimed function is the quid pro quo for the convenience of claiming in functional terms. *Medical Instrumentation and Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1219 (Fed. Cir.

2

2003). For the claims to serve their proper function of providing the public clear notice of the scope of the patentee's property rights, a patentee cannot claim in functional terms essentially unbounded by any reference to what one of skill in the art would understand from the public record. *Id.* The structure must be disclosed in the written description portion of the specification; corresponding structure allegedly disclosed in the claims is ineffectual. *See Kemco Sales v. Control Papers Co.*, 208 F.3d 1352, 1360 (Fed. Cir. 2000) ("Once a court establishes a means-plus-function limitation is at issue, it must construe that limitation, thereby determining what the claimed function is and what structures disclosed in the written description correspond to the 'means' for performing that function."); *GTE Wireless, Inc. v. Qualcomm, Inc.*, 188 F.Supp.2d 1201, 1210-1 (S.D. Cal. 2002) ("the [Federal Circuit] case law requires the corresponding structure of a claim must be disclosed in the written description portion of the specification, not the claims").

     C.     <u>The Patent Prosecution History</u>

     "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317 (citations omitted). "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985). Courts should consult the prosecution history for disclaimers to "ensure[] that claims are not construed one way in order to obtain their allowance and in a different way against accused infringers." *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005).

     D.     <u>Claim Scope Disavowal</u>

     "In construing claims, the problem the inventor was attempting to solve, as discerned from the specification and the prosecution history, is a relevant consideration." *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1160 (Fed. Cir. 1997); *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004). Similarly, the proper construction will account for intrinsic evidence that reveals that the patentee distinguished the invention from prior art or expressly disclaimed subject matter. *See Phillips*, 415 F.3d at 1316; *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366-67 (Fed. Cir. 2002). The specification of a patent may

3

reveal an intention by the patentee to disavow or disclaim certain subject matter from the scope of the claimed invention. *See, e.g., Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.,* 563 F.3d 1358, 1368 (Fed. Cir. 2009) (noting that it is well-established that the specification may reveal an intentional disclaimer or disavowal of claim scope by the inventor) (citing *Phillips,* 415 F.3d at 1316); *Honeywell Int'l Inc. v. ITT Indus., Inc.,* 452 F.3d 1312, 1320 (Fed. Cir. 2006) (holding that repeated derogatory statements in the specification denigrating one previously used material in favor of another is "the equivalent of disavowal of that subject matter from the scope of the patent claims"); *Scimed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.,* 242 F.3d 1337, 1344 (Fed. Cir. 2001) (holding that where the patentee had distinguished a prior art configuration as having disadvantages that were overcome by the patented invention, this is a "clear case of disclaimer of subject matter that, absent the disclaimer, could have been considered to fall within the scope of the claim language").

     E.    Extrinsic Evidence

     Although the Federal Circuit has emphasized the importance of intrinsic evidence in claim construction, it has also authorized district courts to rely on extrinsic evidence, which consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises. *Phillips,* 415 F.3d at 1317. The inventor, in particular, "is a competent witness to explain the invention." *Voice Techs. Group, Inc. v. VMC Systems Inc.,* 164 F.3d 605, 615 (Fed. Cir. 1999); *see also Ripmax Ltd. v. Horizon Hobby, Inc.,* 2008 WL 4534068, at *12 (C.D. Ill. Oct. 7, 2008) (finding "the deposition testimony and writings of [] the inventor of the [patent-in-suit] particularly instructive" to the issue of claim construction). Inventor testimony is particularly probative of the proper claim construction when it is against interest. *See, e.g., AFG Indus., Inc. v. Cardinal IG Co., Inc.,* 239 F.3d 1239, 1249 (Fed. Cir. 2001) (reversing district court for failure to base claim construction on admissions against interest of party); *Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.,* 288 F.Supp. 2d 562, 586 (S.D.N.Y. 2003) ("The testimony of the inventors against interest in this case is relevant and persuasive to inform the court's claim construction.").

**III.    Terms to be Construed**

     A.    "Automated Exchange" (Claims 1-6, 9-10, 22-24, 27, 35-36, 43, 45, 56-58, 61)

| Claim term | CBOE's Construction | ISE's Construction |
|---|---|---|
| "automated exchange" | An "automated exchange" is a fully automated exchange in which no | An exchange that includes a system that automatically matches incoming |

4

| | matching or allocating is performed manually in open outcry. | orders and quotations with stored orders and quotations. |
|---|---|---|

The term "automated exchange" appears in the preamble of every asserted independent claim and is a claim limitation that needs to be construed by the Court.[2]

CBOE's proposed construction of "automated exchange" as "a fully automated exchange in which no matching or allocating is performed manually in open outcry" comes *directly* from the specification of the '707 patent, which repeatedly distinguishes the invention of the '707 patent from prior floor-based exchanges that were partially, but not *fully*, automated. CBOE's proposed construction is also consistent with how a person skilled in the art would understand that term. *See* Steil Decl. at ¶ 5 ("One skilled in the art of markets for the exchange of financial securities in and around 1997 would have understood the term "automated exchange" to mean a trading platform in which the matching and execution of buy and sell orders is done entirely by computer, without human intervention such as one would find on a trading floor").

It is well-established that the specification of a patent may reveal an intentional disclaimer or disavowal of claim scope by the inventor. *See, e.g., Revolution Eyewear, Inc.,* 563 F.3d at 1368 (*citing Phillips,* 415 F.3d at 1316). This is particularly so where as here the patentee has denigrated prior art solutions, pointing out their disadvantages, and has described his own invention as overcoming those disadvantages. *See, e.g., Honeywell Int'l Inc.,* , 452 F.3d at 1320 (holding that repeated derogatory statements in the specification denigrating one previously used material in favor of another is "the equivalent of disavowal of that subject matter from the scope of the patent claims"); *Scimed Life Systems, Inc.,* 242 F.3d at 1344 (holding that where the patentee had distinguished a prior art configuration as having disadvantages that were overcome by the patented invention, this is a "clear case of disclaimer of subject matter that, absent the disclaimer, could have been considered to fall within the scope of the claim language.").

The specification of the '707 patent clearly disavows from the scope of the invention floor-based exchanges having automated systems. In the "Background of the Invention" section of the '707 patent the specification briefly describes existing floor-based open outcry exchanges,

---

[2] Despite appearing only in the preamble, the parties do not dispute that "automated exchange" should be deemed a limitation on each of the asserted claims. Both parties have identified "automated exchange" as a limitation requiring construction by the Court.

admitting that "[a]lthough some processes that take place on these floor-based exchanges have been automated or partially automated, they are not fully integrated and, in fact, many processes continue to function manually." Exh.1, '707 patent at 1:37-40.

Later in the specification, the '707 patent describes its "automated exchange" invention as being "particularly advantageous over *less automated systems* because many of the routine decisions made by professionals in charge of a series of options can be defined in advance and applied automatically." *Id.* at 6:53-58 (emphasis supplied)  That is to say, the invention claimed in the '707 patent was never intended to encompass floor-based, *i.e.*, open outcry, exchanges that included automated systems but also used manual processes (*i.e.*, exchanges that were *less* automated). ███████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████ Rather, the '707 patent was intended to cover only non-floor-based, *fully* automated exchanges.

Consistent with the disavowal in the specification of any coverage of a floor-based exchange, the provisional application that led to the '707 patent states unequivocally that "[t]here are no floor brokers on an electronic exchange as the broker/dealer interacts directly with the exchange with no need for a middleman." Exh. 2, Provisional Application at p. 17.  The only invention disclosed in the '707 patent is a fully electronic exchange. ███████████████

███████████████████████████████████████████████████████

███████████████████ Accordingly, even the provisional application that led to the '707 patent makes clear that the invention disclosed in the '707 patent does not encompass floor-based exchanges.

CBOE's proposed construction of "automated exchange" is also supported by the deposition testimony of ███████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████

███████████████████████

Thus, the phrase "automated exchange" was not intended to encompass prior art floor-based exchanges in which some trading is performed in an automated fashion and other trading is performed manually in open outcry. The "automated exchange" claimed in the '707 patent embraces only fully automated exchanges in which trading activities are not performed manually in open outcry on the floor of the exchange.

B.     "Public Customer Orders" (Claims 1-6, 9-10, 22-24, 27, 35-36, 43, 45, 56-58, 61)

| Claim Term | CBOE's Construction | ISE's Construction |
|---|---|---|
| "public customer orders" | Orders entered on behalf of any party that is not a registered broker-dealer. | ISE agrees with CBOE's construction. |

No dispute.

C.     "Professional Orders" (Claims 1-6, 9-10, 22-24, 27, 35-36, 43, 45, 56-58, 61)

| Claim Term | CBOE's Construction | ISE's Construction |
|---|---|---|
| "professional orders" | Orders entered on behalf of registered broker-dealers, including Primary Market Makers (PMMs), Competitive Market Makers (CMMs) and Electronic Access Members (EAMs). | Orders entered on behalf of registered broker-dealers. |

The specification of the '707 patent explicitly states that "Orders entered on behalf of registered broker-dealers, including PMMs, CMMs and EAMs, are referred to herein as professional orders." Exh. 1, '707 Patent at col. 7:9-11. Accordingly, the inventor's lexicography controls. *See Phillips,* 415 F.3d. at 1315. ██████████████████

██████████████████████

ISE's construction deviates from the explicit definition in the specification and should be ejected. Moreover, since the terms "PMM" and "primary market maker" appear in other claims at issue, CBOE's construction is more helpful to the jury.

D.     "Order" (Claims 1-6, 9-10, 22-24, 27, 35-36, 43, 45, 56-58, 61)

| Claim Term | CBOE's Construction | ISE's Construction |
|---|---|---|
| "order" | An instruction on behalf of a professional or a public customer to purchase or sell an instrument, the order having a size associated therewith. | ISE agrees with CBOE's construction. |

No dispute.

E.    "Quotation" (Claims 1-6, 9-10, 22-24, 27, 35-36, 43, 45, 56-58, 61)

| Claim Term | CBOE's Construction | ISE's Construction |
|------------|--------------------|--------------------|
| "quotation" | An indication by a market maker of the price at which it is willing to buy or sell an instrument for which it has been assigned to create a market, the quotation having a size associated therewith. | ISE agrees with CBOE's construction. |

No dispute.

F.    "Allocating" (Claims 1-6, 9-10, 22-24, 27)

| Claim Term | CBOE's Construction | ISE's Construction |
|------------|--------------------|--------------------|
| "allocating" | Dividing portions of the incoming order or quotation among the previously received orders and quotations. "Allocating" is a process that is distinct from "matching." | Dividing the incoming order or quotation among the previously received orders and quotations. |

The parties disagree about two aspects of the construction of "allocating," but only CBOE's construction is supported in the intrinsic record and the testimony of the sole named inventor.

That, "allocating" is a process that is distinct from "matching" is clear from the claims themselves, which recite both "matching" and "allocating." For example, independent claim 1 recites a "processor means for allocating," but a separate "means for matching" is added by dependent claim 2. The "presence of a dependent claim that adds a particular limitation gives rise to the presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1315. Also, since claim 2 recites both "matching" and "allocating," a difference in meaning is presumed because the use of two terms in a claim requires that they connote different meanings. *See Applied Medical Resources*, 448 F.3d at 1333.

Moreover, unlike ISE's construction, CBOE's construction is consistent with the specification which describes "matching" and "allocating" as distinct processes:

> According to another option, incoming orders are preferentially *allocated* to the primary market maker by providing a minimum allocation percentage to the primary market maker's quotations *before matching* orders and quotations among other professionals. Exh. 1, '707 patent at col. 6:9-13.

8



Mr. Katz's testimony, which contradicts ISE's proposed construction, amounts to an admission against interest. Such admissions are particularly probative of the proper claim construction. *See, e.g., AFG Indus., Inc.*, 239 F.3d at 1249 (reversing district court for failure to base claim construction on admissions against interest of party); *Bristol-Myers Squibb Co.*, 288 F.Supp.2d at 586 ("The testimony of the inventors against interest in this case is relevant and persuasive to inform the court's claim construction").

ISE disagrees with the phrase "dividing *portions* of the incoming order or quotation" and favors "dividing the incoming order or quotation." CBOE's construction is more consistent with the claim language, which recites "allocating *portions* of the incoming order or quotation among the *plurality* of previously received orders and quotations." *See, e.g.*, Claim 1.

Because CBOE's construction is consistent with the intrinsic record and the admissions of the sole named inventor and ISE's is not, the Court should adopt CBOE's construction of this term.

G.     "Allocating Parameters" (Claims 1-6; 9-10; 22-24; 27; 35-36, 43, 45; 56-58; 61)

| Claim Term | CBOE's Construction | ISE's Construction |
|---|---|---|
| "allocating parameters" | Parameters for dividing portions of the incoming order or quotation among the | Algorithms for allocating an incoming order or quotation |

| | previously received orders and quotations. | among previously received orders and quotations. |
|---|---|---|

The dispute concerning the construction of "allocating parameters" (aside from the parties' different constructions of "allocating") is ISE's replacement of the word "parameters" with the word "algorithms." CBOE's construction is supported by the intrinsic record.

First, there is no support in the specification to construe "parameters" to mean "algorithms." In the '707 patent, the only "algorithms for allocating" among customer and professional orders are the steps of FIGS. 4A - 5B.[4] The specification also makes numerous references to "parameters" which are configured, for example, to reflect the trading rules of the entity administering the exchange.[5] The specification of the '707 patent uses the terms "algorithm" and "parameter" differently; ISE should not be permitted to use them interchangeably in its claim construction.

Moreover, in the prosecution history, the named inventor (1) characterized his invention as having "allocating parameters"—not "allocating algorithms"; (2) attempted to distinguish prior art numerous times due to its alleged failure to disclose "allocating parameters"—not "allocating algorithms" and (3) when his representatives conducted an *in person* interview with the Examiner, the topic was "allocating parameters"—not "allocating algorithms." *See, e.g.,* Exh. 5, 4/4/01 Amendment at pp. 29-31(ISE0000243-245); Exh. 5, 5/21/01 Amendment at pp. 35-37 (ISE0000286-288); Exh. 5, 1/14/02 Request for Continued Examination at pp. 2-5 (ISE0000388-391); Exh. 5, 3/15/02 Interview Summary (ISE0000469); Exh. 5, 7/19/02 Katz Declaration at ¶¶ 12-14 (ISE0000467-469); Exh. 5, 8/2/02 Amendment at pp. 18-24 (ISE0000599-605).

Finally, from being inconsistent with the intrinsic record, ISE's use of the term "algorithm" does not help the jury. "Algorithm" simply replaces "parameter" with a technical term that is subject to varying interpretation.

---

[4] *See also* Exh. 1, '707 patent at col. 16:24-26 ("The bid matching process then applies the allocation algorithm as illustrated in FIG. 4(b)."); col. 27:53-58 ("The allocation algorithm described in FIG. 4(b) is applied at steps S667 and S687 and the allocation algorithm described in FIG. 5(b) is applied in steps S671 and S694.")

[5] *See, e.g.,* Exh. 1, '707 patent at col. 8:66-9:2 ("The order process 25 first checks to see if the order or quotation is valid according to programmable parameters that reflect the particular trading rules of the entity administering the invention."); *see also* col. 9:10-13; col. 9:46-51.

H.    "Parameters For Allocating A First Portion Of The Incoming Order Or Quotation Against Previously Received Customer Orders" (Claims 1-6; 9-10)

| Claim Term | CBOE's Construction | ISE's Construction |
|---|---|---|
| "parameters for allocating a first portion of the incoming order or quotation against previously received customer orders" | Parameters for allocating a first portion of the incoming order or quotation against previously received customer orders. | Algorithms for allocating a first portion of the incoming order or quotation against previously received customer orders. |

Similar to the dispute concerning "allocating parameters," the dispute here concerns ISE's replacement of the word "parameters" with the word "algorithms." Once again, there is no support in the specification to construe "parameters" to mean "algorithms." For the same reasons set forth in section III.G, the Court should adopt CBOE's construction of this term.

I.    "Matching"

| Claim Term | CBOE's Construction | ISE's Construction |
|---|---|---|
| "matching" | Identifying a counterpart order or quotation for an incoming order or quotation based on price. "Matching" is a process that is distinct from "allocating." | Identifying a counterpart previously received order or quotation for receiving a portion of an incoming order or quotation. |

ISE's proposed construction of "matching" was first devised after counsel had seen CBOE's final proposed construction of this term. In violation of the Court's scheduling order and agreements between the parties, ISE waited an hour after having received CBOE's final proposed constructions before deciding to advance *any* construction of "matching." *Compare* Exh. 6, ISE's 5 PM Supplemental Preliminary Claim Construction (timely served and without a construction of "matching") with Exh. 7, ISE's 6 PM Supplemental Preliminary Claim Construction at pp. 9-10 (untimely served and with a construction of "matching"). Although CBOE's counsel sought an explanation from ISE's counsel for the late filing, none was provided aside from it being an "inadvertent oversight." For this reason, CBOE moves to strike ISE's proposed construction of "matching."

In the event the Court does consider ISE's construction, the two points of disagreement between the parties should be resolved in CBOE's favor because only CBOE's construction is supported in the intrinsic record and the testimony of the sole named inventor.

First, CBOE's construction is consistent with the claims themselves, which make clear that "matching" is a process that is distinct from "allocating." For example, independent claim 1 recites a "processor means for allocating" dependant claims adds a separate and distinct "means for matching." The "presence of a dependent claim that adds a particular limitation gives rise to the presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1315. Also, since claim 2 recites both "matching" and "allocating," a difference in meaning is further presumed because the use of two terms in a claim requires that they have different meanings. *See Applied Medical Resources*, 448 F.3d at 1333.

Furthermore, unlike ISE's construction, CBOE's construction is consistent with the specification which describes "matching" and "allocating" as distinct processes:

> According to another option, incoming orders are preferentially *allocated* to the primary market maker by providing a minimum allocation percentage to the primary market maker's quotations *before matching* orders and quotations among other professionals. Exh. 1, '707 patent at col. 6:9-13.



> The order process 25 initiates the bid matching process 34 and the offer matching process 36, which contain rules that give priority to public customer orders *at the best price*, then allocate any remaining part of an incoming order or quotation among the professional orders and quotations on a pro rata basis. Specifically, incoming orders that *match* a public customer order on the book are traded first against the public customer order. Exh. 1, '707 patent at col. 14:53-60.

> For example, if the best order or quotation to buy in the book memory 33 is 4 [dollars] for a total size of 20, a limit order to sell 10 at a stated price of 3 1/2 [dollars] will *match* at 4 [dollars]. *Id.* at col. 14:67-15:2.

The [bid matching process 34 and the offer matching process 36] will continue until there is no more volume left in the incoming order, or there is no longer an order or quotation in the book memory 33 that can *match* the *price* of the incoming order. *Id.* at col. 15:10-13.

Assume a public customer limit order to buy 2 contracts at 3 1/8 [dollars] is entered. Step S29 of the bid *matching* process 34 shown in FIG. 3(b) determines that this order cannot trade because there are no offers to sell at less than 3 1/4 [dollars]. *Id.* at col. 23:21-25.

The execution price is determined in step S668 as *the highest price* at which the entire order can be *matched*, which in this example is 3 7/8 [dollars]. *Id.* at col. 29:4-6.

*See also id.* at cols. 6:4-8; 9:64-10:3; 15:19-22; 28:19-23.

J.       "Allocating A Remaining Portion . . ." (Claims 1-3; 6; 9-10)

| Claim Term | CBOE's Construction | ISE's Construction |
|---|---|---|
| "allocating a remaining portion of the incoming order or quotation preferentially against professional orders and quotations with larger size" | Allocating larger portions of the remaining incoming order or quotation to professionals quoting or ordering larger size. | Algorithms for allocating a remaining portion of the incoming order or quotation in a preferred manner against professional orders and quotations that are larger in size than other professions [sic] orders and quotations in the book memory means. |

The claim language "preferentially against professional orders and quotations with larger size" was not added to claim 1 until an amendment filed August 2, 2002. *See* Exh. 5, 8/2/02 Amendment (ISE0000582,ISE0000599-605).  Aside from claim 1, this language does not appear in the specification and the specification does not explain what the term "preferentially" means. However, when the named inventor Katz so amended claim 1, he represented:

> According to one embodiment, the allocating parameters include parameters for "allocating a remaining portion of [an] incoming order or quotation preferentially against professional orders and quotations with larger size." *See* claims 1 and 35. *By allocating larger portions of the incoming order against professionals quoting larger size*, the exchange according to the present invention gives an incentive to professionals to quote a deeper and more liquid market.

Exh. 5, 8/2/02 Amendment at p. 18 (ISE0000599).  "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim

scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317.  Here, Mr. Katz was explaining the import of his amendment to claim 1, which for the first time recited "allocating a remaining portion of [an] incoming order or quotation preferentially against professional orders and quotations with larger size."  Accordingly, Mr. Katz's representation—which CBOE's construction recites but ISE's ignores—should control.

Moreover, CBOE's construction is consistent with the specification, which discloses several formulas for pro rata (*i.e.*, in proportion according to size) allocation of orders. *E.g.*, Exh. 1, '707 patent at Equation 1, col. 16:36 (including a pro rata formula).

In contrast, ISE construes this language to refer to "allocating a remaining portion of the incoming order or quotation in a preferred manner."  This construction sheds absolutely no light on ISE's term "preferred."  It is of no assistance to the jury, and ignores Mr. Katz's explanation in the prosecution history.

K.    "Pro Rata" (Claims 2, 36)

| Claim Term | CBOE's Construction | ISE's Construction |
|---|---|---|
| "pro rata" | In proportion according to size. | Based on a percentage of the size of a professional's order or quotation with reference to the total size of the professional orders and quotations at the same price. |

The plain and ordinary meaning of "pro rata" determines CBOE's construction.  The specification of the '707 patent does not redefine the plain and ordinary meaning of "pro rata," but, consistent with the plain and ordinary meaning, it gives two mathematic examples which indicate that "pro rata" means "in proportion according to size":

The remainder of the order is filled by the professionals, PRO #1 and PRO #2 on a pro rata basis. . . . PRO #2 has 20 out of the 30 contracts of the orders placed by the two professionals at the lowest offer and is entitled to 66% of the 6 remaining contracts, or 4 contracts. Exh. 1, '707 patent at col. 18:1-8.

The balance of 36 contracts are allocated among the three professionals on a pro rata basis. In this case, PRO #1 and PRO #2 have the same size, which is greater than PRO #3. . . . PRO #1 has 40% of the orders among the professionals (20/50) and is entitled to 15 contracts, leaving 21 contracts. PRO #2 has now has the largest size and 66% of the size at the highest bid (20/30) and is matched for 14 contracts, leaving 7 contracts. *Id.* at col. 18:61-19:4.

All three of the following definitions of "pro rata," indicative of its plain and ordinary meaning, support CBOE's construction:

*Proportionately according to an exactly calculable factor (as share or liability).* Exh. 8, Merriam Webster's Collegiate Dictionary (10th ed. 1993) at 936.

*In proportion, according to a factor that can be calculated exactly.* Exh. 9, The American Heritage Dictionary (1997) at 1098.

*A Latin term which means "in proportion." The proportional division of a total amount, such as the division of a dividend among the stockholders relative to the number of stocks in their possession, or the division of the overhead costs among products, etc.* Exh. 10, Dictionary of Finance (1988) at 374.

ISE's construction is incorrect insofar as it requires calculation of the "percentage" of total size that a professional's order or quote represents. An example of a pro rata calculation in the specification makes no mention of such a calculation. *See* Exh. 1, '707 patent at col. 18:1-8.

Moreover, ISE's construction seems to suggest that "pro rata" need only be "based" on size. CBOE is unable to identify any support in the '707 patent for such a construction, and notes that the mathematic examples in the specification cannot be squared with such a construction. Such a definition would also be inconsistent with the extrinsic evidence set forth above.

ISE's constructions reveal that ISE appears to disagree with its own construction of "pro rata." In its proposed construction of "means for matching the remaining portion based on a formula that allocates the minimum allocation percentage…," ISE indicates that one aspect of the structure is an "algorithm" that calculates the primary market maker's "pro rata allocation of the remaining portion." *See* Exh 6 at 3. Reference to the entire '707 patent and, in particular, the support relied upon by ISE for that construction, reveals that the only disclosure of calculating the primary market maker's "pro rata allocation" is by dividing the PMM's size by the total size represented by the PMM's order and other professional orders. *See* Exh. 1; '707 patent at FIGS. 4A-5B, Equations 1-3. Such disclosure, like the other intrinsic evidence, is consistent with CBOE's construction but inconsistent with ISE's.

L.   "The Remaining Portion" (Claims 2 and 3)

| Claim Term | CBOE's Construction | ISE's Construction |
|---|---|---|
| "the remaining portion" | The "remaining portion" recited in claim 1. | The portion allocated in a preferred manner against professional orders and quotations that are larger in size than other professional orders and quotations in |

15

|  |  | the book memory. |
|--|--|-----------------|

Putting aside the differences that arise from the parties' different constructions of "preferentially," CBOE's issue with ISE's construction is that it is needlessly complex. Claim 1 recites "a remaining portion." Dependent claims 2 and 3 refer back to *the* "remaining portion" of claim 1, which created antecedent basis for the term "the remaining portion" in claims 2 and 3. Therefore, as set out in claim 1, "the remaining portion" is simply the portion that is allocated "preferentially against professional orders and quotations with larger size."

M.    "Processor Means…" (Claims 1-6; 9-10)

| Claim Term | CBOE's Construction | ISE's Construction |
|------------|---------------------|---------------------|
| "processor means for allocating portions of the incoming order or quotation among the plurality of previously received orders and quotations in the book memory means based on the allocating parameters in the system memory means" | Function:  The processor means, which is separate and distinct from the system memory means and book memory means, allocates portions of the incoming order or quotation among the plurality of previously received orders and quotations in the book memory means based on the allocating parameters in the system memory means. <br> Structure:  A general-purpose computer or a network of general-purpose computers programmed to perform the steps of FIG. 4(a) for bids and FIG. 5(a) for offers. | Function:  Allocating portions of the incoming order or quotation among the plurality of previously received orders and quotations in the book memory means. <br> Structure:  A general purpose computer, a network of general purpose computers, or a system of interconnected parallel processors including an algorithm that divides the incoming order and quotation among the previously received orders and quotations. |

The parties agree that this limitation is subject to 35 U.S.C. § 112, ¶ 6.  The construction of a means-plus-function limitation follows a two-step approach.  First, the claimed function is identified, staying true to the claim language and the limitations expressly recited by the claims. *Omega Eng'g, Inc.*, 334 F.3d at 1321.  The Federal Circuit has ruled that 35 U.S.C. § 112, ¶ 6 does not permit limitation of a means-plus-function claim by adopting a function different from that *explicitly* recited in the claim.  *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1087 (Fed. Cir. 2003).  Once the functions performed by the claimed means are identified, then the corresponding structures in the written description are ascertained that perform those functions. *Omega Eng'g, Inc.*, 334 F.3d at 1321.  A disclosed structure is corresponding "only if the specification or prosecution history clearly links or associates that structure to the function

recited in the claim." *Id.* In cases involving a computer-implemented invention, such as this one, the Federal Circuit "has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor." *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). Instead, the corresponding structure for a computer-implemented function is the algorithm disclosed in the specification. *Id.*

First, the claims make clear that the "processor means" is separate and distinct from the "system memory means" and "book memory means" (other claim terms). Claim 1, for example, separately recites "processor means," "system memory means" and "book memory means." The use of different terms in a claim requires that they mean different things. *See Applied Medical Resources,* 448 F.3d at 1333. Also, the specification separately describes and illustrates the "system memory" and "book memory" as distinct terms. *See* Exh. 1, '707 patent at FIG. 2 ("system memory 26" and "book memory 33").

Second, whereas CBOE adopts the function explicitly set forth in the claim, ISE seeks to broaden its claims by omitting "based on the allocating parameters in the system memory means." This is improper. *See ACTV, Inc.*, 346 F.3d at 1087 (35 U.S.C. § 112, ¶ 6 "does not permit limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim").

Third, CBOE properly adopts as the corresponding structure "the algorithm disclosed in the specification." In the '707 patent, the only "algorithms" disclosed for "allocating portions of the incoming order or quotation among the plurality of previously received orders and quotations in the book memory means based on the allocating parameters in the system memory means" are the steps of FIGS. 4A – 5B. In particular, FIGS. 4A and 5A set forth how public customers receive trades and incorporate the "allocation algorithm" of FIGS. 4B and 5B, which set forth how professionals receive trades. *See* Exh. 1, '707 patent at col. 15:32 – col. 19:4; FIGS. 4A – 5B (circle labeled "allocation algorithm").

In contrast, ISE simply takes a portion of the function set forth in the claim and inserts the word "algorithm." This is likewise improper. The Federal Circuit has rejected attempts by patentees to rely on the functional statement in a means-plus-function as disclosure of the corresponding structure. *Aristocrat Techs. Australia Pty Ltd.*, 521 F.3d at 1334 (the functional statement "simply describes the function to be performed, not the algorithm by which it is

17

performed"). Moreover, the Federal Circuit has made clear that it is the written description—and *not* the claims—that the Court must look to when identifying the disclosed corresponding structure. *See Kemco Sales*, 208 F.3d at 1360 ("Once a court establishes a means-plus-function limitation is at issue, it must construe that limitation, thereby determining what the claimed function is and what structures disclosed in the written description correspond to the 'means' for performing that function."); *GTE Wireless, Inc.*, 188 F.Supp. 2d at 1210-1 (reviewing the Federal Circuit case law and concluding that "the case law requires the corresponding structure of a claim must be disclosed in the written description portion of the specification, not the claims").

There is no disclosure in the written description of the generic algorithm to which ISE points.

N.      "Processor Means…" (Claims 22-24; 27)

| Claim Term | CBOE's Construction | ISE's Construction |
|---|---|---|
| "processor means for allocating portions of the incoming order or quotation among the plurality of previously received orders and quotations in the book memory means based on the allocating parameters in the system memory means . . . the processor means determines a best price for the instrument and compares the best price with the away market price, and, if the best price is as good or better than the away market price, the processor means executes the trade" | Function: The processor means, which is separate and distinct from the system memory means, book memory means and away market querying means, allocates portions of the incoming order or quotation among the plurality of previously received orders and quotations in the book memory means based on the allocating parameters in the system memory means and also determines a best price for the instrument and compares the best price with the away market price, and, if the best price is as good or better than the away market price, executes the trade. Structure: A general-purpose computer or a network of general-purpose computers programmed to perform step S37 of FIG. 3(b) or step S49 of FIG. 3(c) or steps S108 and S112 of FIG. 3(d) and then perform the steps of FIG. 4(a) for bids and FIG. 5(a) for offers. | Function: Allocating portions of the incoming order or quotation among the plurality of previously received orders and quotations in the book memory means. Structure: A general purpose computer, a network of general purpose computers, or a system of interconnected parallel processors including an algorithm that divides the incoming order and quotation among the previously received orders and quotations. |

The parties agree that this limitation is subject to 35 U.S.C. § 112, ¶ 6.

The "processor means" is separate and distinct from the "system memory means," "book memory means" and "away market querying means" (other claim terms). This construction is

mandated by the claims themselves.  Claim 22, for example, separately recites "processor means," "system memory means," "book memory means," and "away market querying means." The use of different terms in a claim requires that they mean different things.  *See Applied Medical Resources*, 448 F.3d at 1333.  Also, the specification illustrates the "system memory" and "book memory" as distinct items.  *See* Exh. 1, '707 patent at FIG. 2 ("system memory 26" and "book memory 33").

CBOE adopts the function explicitly set forth in the claim.  ISE, on the other hand, seeks to broaden its claims by omitting "based on the allocating parameters in the system memory means" and that "the processor means determines a best price for the instrument and compares the best price with the away market price, and, if the best price is as good or better than the away market price, the processor means executes the trade."  This is improper.  *See ACTV, Inc.*, 346 F.3d at 1087.

CBOE adopts as the corresponding structure "the algorithm disclosed in the specification."  In the '707 patent, the only "algorithms" disclosed for the function of this claim are the steps that CBOE identifies in FIGS. 3B-3D and the steps of FIGS. 4A – 5B.  In particular, FIGS. 4A and 5A set forth how public customers receive trades and incorporate the "allocation algorithm" of FIGS. 4B and 5B, which set forth how professionals receive trades.  *See* Exh. 1, '707 patent at col. 15:32 – col. 19:4; FIGS. 4A – 5B (circle labeled "allocation algorithm").

In contrast, ISE simply takes a small portion of the function set forth in the claim and inserts the word "algorithm."  This is improper.  The Federal Circuit has rejected attempts by patentees to rely on the functional statement in a means-plus-function as disclosure of the corresponding structure.  *Aristocrat Techs. Australia Pty Ltd.*, 521 F.3d at 1334.  Moreover, the Federal Circuit has made clear that it is the written description—and *not* the claims—that the Court must look to when identifying the disclosed corresponding structure.  *See Kemco Sales*, 208 F.3d at 1360; *GTE Wireless, Inc.*, 188 F.Supp.2d at 1210-1.

There is no disclosure in the written description of the generic algorithm to which ISE points.

O.    "Book Memory Means…" (Claims 1-6; 9-10; 22-24; 27)

| Claim Term | CBOE's Construction | ISE's Construction |
|---|---|---|
| "book memory means for storing a plurality of previously received orders | Function: The book memory means, which is separate and distinct from the system memory means and processor | Function: Storing a plurality of previously received orders and |

| or quotations to trade a corresponding plurality of quantities of the instrument, the previously received orders and quotations each having a size associated therewith and the previously received orders including public customer orders previously entered for public customers and professional orders or quotations previously entered for one or more professionals" | means, stores a plurality of previously received orders or quotations to trade a corresponding plurality of quantities of the instrument, the previously received orders and quotations each having a size associated therewith and the previously received orders including public customer orders previously entered for public customers and professional orders or quotations previously entered for one or more professionals. <u>Structure</u>: A general-purpose computer or a network of general-purpose computers. | quotations to trade a corresponding plurality of quantities of the instrument. <u>Structure</u>: Memory |
|---|---|---|

The parties agree that this limitation is subject to 35 U.S.C. § 112, ¶ 6.

As set forth by the claims themselves, the "book memory means" is separate and distinct from the "system memory means" and "processor means" (other claim terms). Claim 1, for example, separately recites "processor means," "system memory means" and "book memory means." The use of different terms in a claim requires that they mean different things. *See Applied Medical Resources*, 448 F.3d at 1333. Also, the specification illustrates the "system memory" and "book memory" as distinct items. *See* Exh. 1, '707 patent at FIG. 2 ("system memory 26" and "book memory 33").

Whereas CBOE adopts the function explicitly set forth in the claim, ISE seeks to broaden its claims by omitting the phrase that "the previously received orders and quotations each having a size associated therewith and the previously received orders including public customer orders previously entered for public customers and professional orders or quotations previously entered for one or more professionals." This is improper. *See ACTV, Inc.*, 346 F.3d at 1087.

CBOE adopts as the corresponding structure the only structure in the specification that one of skill the art would understand as even having a memory—a general-purpose computer or a network of general-purpose computers. *See* Exh. 1, '707 patent at col. 8:44-55 ("The exchange 1 may be implemented on a general-purpose computer under the control of a software program. . . . Alternatively, the exchange 1 can be implemented on a network of general-purpose

20

computers."). ISE, on the other hand, points to an undisclosed generic "memory."[6]   Because
there is no disclosure in the patent-in-suit of the generic "memory" structure to which ISE points,
its construction is improper because a structure is corresponding "only if the specification or
prosecution history clearly links or associates that structure to the function recited in the claim."
*See Omega Eng'g, Inc.*, 334 F.3d at 1321.

P.      "System Memory Means..." (Claims 1-6; 9-10; 22-24; 27)

| Claim Term | CBOE's Construction | ISE's Construction |
|---|---|---|
| "system memory means for storing allocating parameters for allocating trades between the incoming order or quotation and the previously received orders and quotations" | Function: The system memory means, which is separate and distinct from the book memory means and processor means, stores allocating parameters for allocating trades between the incoming order or quotation and the previously received orders and quotations. Structure: A general-purpose computer or a network of general-purpose computers. | Function: Storing allocating parameters. Structure: Memory |

The parties agree that this limitation is subject to 35 U.S.C. § 112, ¶ 6.

The claims require that the "system memory means" be separate and distinct from the
"book memory means" and "processor means" (other claim terms). Claim 1, for example,
separately recites "processor means," "system memory means" and "book memory means." The
use of different terms in a claim requires that they have different meanings. *See Applied Medical
Resources*, 448 F.3d at 1333. Also, the specification illustrates the "system memory" and "book
memory" as distinct items. *See* Exh. 1, '707 patent at FIG. 2 ("system memory 26" and "book
memory 33").

While CBOE adopts the function explicitly set forth in the claim, ISE omits from the
function that the "allocating parameters" are "for allocating trades between the incoming order or
quotation and the previously received orders and quotations." This is improper. *See ACTV, Inc.*,
346 F.3d at 1087.

CBOE adopts as the corresponding structure the only structure in the specification that
one of skill the art would understand as even having a memory—a general-purpose computer or
a network of general-purpose computers. *See* Exh. 1, '707 patent at col. 8:44-55 ("The exchange

---

[6] The failure clearly to link the "book memory means" with the general purpose computer will result in
this limitation rendering the claims in which it appears invalid as being indefinite. *See Aristocrat Techs.
Australia Pty Ltd.*, 521 F.3d at 1333.

1 may be implemented on a general-purpose computer under the control of a software program. .

. . Alternatively, the exchange 1 can be implemented on a network of general-purpose

computers."). ISE, however, points to an undisclosed generic "memory."[7]   Because there is no

disclosure in the patent-in-suit of the generic "memory" structure to which ISE points, its

construction is improper because a structure is corresponding "only if the specification or

prosecution history clearly links or associates that structure to the function recited in the claim."

*See Omega Eng'g, Inc.*, 334 F.3d at 1321.

     Q.     "Means for Matching..." (Claim 2)

| Claim Term | CBOE's Construction | ISE's Construction |
|---|---|---|
| "means for matching the remaining portion with professional orders or quotations in the book memory means on a pro rata basis" | Function:  Matching the remaining portion with professional orders or quotations in the book memory means on a pro rata basis.<br>Structure:  A general-purpose computer or a network of general-purpose computers, but there is no disclosure of the steps such general-purpose computer(s) would perform. | Function:  Matching the remaining portion with professional order [sic] or quotations in the book memory means on a pro rata basis.<br>Structure:  A general purpose computer, a network of general purpose computers, or a system of interconnected parallel processors including an algorithm comprising the step of matching the remaining portion based on a percentage of the size of a professional's order or quotation with reference to the total size of the professional orders and quotations at the same price. |

     The parties agree that this limitation is subject to 35 U.S.C. § 112, ¶ 6, and the parties

also agree on the function of this limitation.  Putting aside the disagreement that arises from

parties' different constructions of "pro rata," the only disagreement on this term pertains to the

corresponding structure.

     The only structure in the specification which could be capable of performing this function

is the general-purpose computer identified by CBOE.[8]  *See* Exh. 1, '707 patent at col. 8:44-55

("The exchange 1 may be implemented on a general-purpose computer under the control of a

---

[7] The failure clearly to link the "system memory means" with the general purpose computer will result in this limitation rendering the claims in which it appears invalid as being indefinite. *See Aristocrat Techs. Australia Pty Ltd.*, 521 F.3d at 1333.

[8] The failure clearly to link a disclosed algorithm to the "means for matching" will result in this limitation rendering the claims in which it appears invalid as being indefinite. *See Aristocrat Techs. Australia Pty Ltd.*, 521 F.3d at 1333.

software program. . . . Alternatively, the exchange 1 can be implemented on a network of general-purpose computers.").

There is no disclosure of a structure, *i.e.*, an algorithm, in the written description that performs the claimed function of "matching . . . on a pro rata basis." Therefore, ISE argues that the corresponding structure is an undisclosed algorithm. ISE simply takes the function set forth in the claim and replaces "pro rata" with its proffered construction of that claim term. This is improper. The Federal Circuit has rejected attempts by patentees to rely on the functional statement in a means-plus-function as disclosure of the corresponding structure. *Aristocrat Techs. Australia Pty Ltd.*, 521 F.3d at 1334. Moreover, the Federal Circuit has made clear that it is the written description—and *not* the claims—that the Court must look to when identifying the disclosed corresponding structure. *See Kemco Sales*, 208 F.3d at 1360; *GTE Wireless, Inc.*, 188 F.Supp.2d at 1210-1.

The specification, in one instance, merely recites that "professional orders and quotations are matched on a pro rata basis," but never describes how. *See* Exh. 1, '707 patent at col. 6:2-3. Instead, all of the specific disclosure in the specification is of *allocation* "on a pro rata basis." *See id.* at col. 16:24-26; col. 27:53-58; FIGS. 4A-5B, Equations 1-3. By proffering different constructions of "allocation" and "matching," ISE tacitly admits that matching and allocating are different functions. *See* Exh. 6 at 8-9. ██████████████████████

██████████████████████████████████

R.    "Means for Matching..." (Claim 3)

| Claim Term | CBOE's Construction | ISE's Construction |
|---|---|---|
| "means for matching the remaining portion based on a formula that allocates the minimum allocation percentage of the remaining portion to the quotation identified with the primary market maker" | Function: Matching the remaining portion based on a formula that allocates the minimum allocation percentage of the remaining portion to the quotation identified with the primary market maker. Structure: A general-purpose computer or a network of general-purpose computers programmed to perform the steps of FIG. 4(b) for | Function: Matching the remaining portion based on a formula that allocates the minimum allocation percentage of the remaining portion to the quotation identified with the primary market maker. Structure: A general purpose computer, a network of general purpose computers, or a system of interconnected parallel processors including an algorithm that matches a minimum allocation percentage to a primary market maker comprising the following steps: 1) calculating a primary market maker's minimum allocation percentage of the remaining portion; 2) calculating the primary market maker's pro rata allocation of the remaining portion; and |

23

| | bids and FIG. 5(b) for offers. | 3) matching the greater of the two to the quotation identified with the primary market maker. |
|---|---|---|

The parties agree that this limitation is subject to 35 U.S.C. § 112, ¶ 6, and the parties also agree on the function of this limitation. The only disagreement pertains to the corresponding structure.

The algorithms of FIGS. 4B and 5B, which set forth a process for allocating to a Primary Market Maker ("PMM") one of several "minimum allocation percentages" depending on the circumstances (*e.g.*, how many other professionals have orders at the same price), are the corresponding structures for this limitation. *See also* Exh. 1, '707 patent at Equations 1 – 3 (setting forth formulae of FIGS. 4B and 5B which allocate the greater of a minimum percentage or pro rata allocation to a PMM). ISE, on the other hand, again takes the position that the corresponding structure is an algorithm that is not disclosed in the specification. While ISE's three-step algorithm may or may not be an approximation of the steps set forth in the algorithms of FIGS. 4B and 5B, they are not one and the same. ISE is not free, under the guise of claim construction, to rewrite its patent. Claim limitations subject to 35 U.S.C. § 112, ¶ 6 are limited to the *disclosed* structures. *Aristocrat Techs. Australia Pty Ltd.*, 521 F.3d at 1333 (*quoting Harris Corp. v. Ericsson Inc.,* 417 F.3d 1241, 1249 (Fed.Cir.2005)) ("[T]he corresponding structure for a § 112 ¶ 6 claim for a computer-implemented function is the algorithm *disclosed* in the specification.") (emphasis added). In this case, ISE's claims are limited to the algorithms *disclosed* in FIGS. 4B and 5B. ISE's construction, which points to an *undisclosed* algorithm, must fail. Further these steps would require a separate construction.

S.     "Means for Matching…" (Claim 4)

| Claim Term | CBOE's Construction | ISE's Construction |
|---|---|---|
| "means for matching the remaining portion based on a formula that allocates the minimum allocation percentage of the remaining portion to the quotation identified with the primary market maker, and wherein the minimum allocation percentage is N% and the percentage of the remaining portion | Function:  Matching the remaining portion based on a formula that allocates the minimum allocation percentage of the remaining portion to the quotation identified with the primary market maker, and wherein the minimum allocation percentage is N% and the percentage of the remaining portion allocated to the order | Function:  Matching the remaining portion based on a formula that allocates the minimum allocation percentage of the remaining portion to the quotation identified with the primary market maker. Structure:  A general purpose computer, a network of general purpose computers, or a system of interconnected parallel |

| | | |
|---|---|---|
| allocated to the order identified with the primary market maker is:<br><br>X% = Max[N%, siz[pmm] / (siz[pmm]+siz[pro])]<br><br>where siz[pmm] is the size of the order identified with the primary market maker, and size[pro] is the sum of the sizes of the professional orders not identified with the primary market maker." | identified with the primary market maker is:<br><br>X% = Max[N%, siz[pmm] / (siz[pmm]+siz[pro])]<br><br>where siz[pmm] is the size of the order identified with the primary market maker, and size[pro] is the sum of the sizes of the professional orders not identified with the primary market maker.<br>Structure:  A general-purpose computer or a network of general-purpose computers. | processors including an algorithm that matches a minimum allocation percentage to a primary market maker comprising<br>the following steps:<br>1) calculating a primary market maker's minimum allocation percentage of the remaining portion;<br>2) calculating the primary market maker's pro rata allocation of the remaining portion; and<br>3) matching the greater of the two to the quotation identified with the primary market maker. |

The parties agree that this limitation is subject to 35 U.S.C. § 112, ¶ 6, but disagree as to the function and corresponding structure.

While CBOE adopts the function explicitly set forth in the claim, ISE seeks to impermissibly broaden its claims by omitting from the function how the "minimum allocation percentage" is allocated.  This is improper.  *See ACTV, Inc.*, 346 F.3d at 1087.

As for the corresponding structure, CBOE is unable identify any algorithm in the specification of the '707 patent that performs the claimed function.  The claimed function is to, *inter alia*, "allocat[e] the minimum allocation percentage of the remaining portion to the *quotation* identified with the primary market maker . . . [wherein] the percentage of the remaining portion allocated to the *order* identified with the primary market maker is X%= Max[N%, siz[pmm] / (siz[pmm]+siz[pro])] where siz[pmm] is the size of the *order* identified with the primary market maker."  CBOE is unable to identify any disclosure in the '707 patent, except from the words of claim 4, of a process in which the remaining portion allocated to the PMM's *quotation* is determined by calculating a portion allocated to the PMM's *order*.[9]  The only structure in the specification which could be capable of performing this function is the general-purpose computer identified by CBOE.[10]  *See* Exh. 1, '707 patent at col. 8:44-55

---

[9] Although the term "order" is not used consistently in this portion of claim 4, ISE sought, and obtained, a Certificate of Correction for the '707 patent that does address this inconsistency.

[10] The failure clearly to link a disclosed algorithm to the "means for matching" will result in this limitation rendering the claims in which it appears invalid as being indefinite. *See Aristocrat Techs. Australia Pty Ltd.*, 521 F.3d at 1333.

(indicating that the "exchange 1 may be implemented on a general-purpose computer" or "on a network of general-purpose computers").

Apparently recognizing the same thing, ISE adopts an algorithm that is not disclosed in the specification. "[T]he corresponding structure for a § 112 ¶ 6 claim for a computer-implemented function is the algorithm *disclosed* in the specification." *Aristocrat Techs. Australia Pty Ltd.*, 521 F.3d at 1333 (*quoting Harris Corp. v. Ericsson Inc.,* 417 F.3d 1241, 1249 (Fed.Cir.2005)) (emphasis added). ISE's construction, which does not point to a *disclosed* algorithm, must fail. *See* Section III.R. Further these steps would require a separate construction.

T.　　"Means for Matching A First Portion..." (Claim 4)

| Claim Term | CBOE's Construction | ISE's Construction |
|---|---|---|
| "means for matching a first portion of the incoming order or quotation against customer orders and a remaining portion of the incoming order or quotation against professional orders and quotations" | Function: Matching a first portion of the incoming order or quotation against customer orders and a remaining portion of the incoming order or quotation against professional orders and quotations.<br><br>Structure: A general-purpose computer or a network of general-purpose computers programmed to perform the steps of FIG. 4(a) for bids and the steps of FIG. 5(a) for offers. | Function: Matching a first portion of the incoming order or quotation against customer orders and a remaining portion of the incoming order or quotation against professional orders and quotations<br>Structure: A general purpose computer, a network of general purpose computers, or a system of interconnected parallel processors including an algorithm that matches a first portion of an incoming order or quotation against customer orders and a remaining portion of the incoming order or quotation. Wherein the algorithm comprises the steps of:<br>1) determining whether there are customer orders stored in the book memory means, and if so;<br>2) matching a first portion of the incoming order or quotation against customer orders;<br>3) determining whether there are any remaining portions of the incoming order, and if so;<br>4) matching a remaining portion (after step 2) against professional orders and quotations. |

The parties agree that this limitation is subject to 35 U.S.C. § 112, ¶ 6. The parties also agree on the function of this limitation, but disagree as to the corresponding structure.

In the '707 patent, the only "algorithms" disclosed for "matching a first portion of the incoming order or quotation against customer orders and a remaining portion of the incoming order or quotation against professional orders and quotations" are the steps of FIGS. 4A – 5B. In particular, FIGS. 4A and 5A set forth how public customers receive trades and incorporate the

"allocation algorithm" of FIGS. 4B and 5B, which set forth how professionals receive trades. *See* Exh. 1, '707 patent at col. 15:32 – col. 19:4; FIGS. 4A – 5B (*see* circle labeled "allocation algorithm").

ISE, on the other hand, again proposes an algorithm that is not disclosed in the specification. "[T]he corresponding structure for a § 112 ¶ 6 claim for a computer-implemented function is the algorithm *disclosed* in the specification." *Aristocrat Techs. Australia Pty Ltd.*, 521 F.3d at 1333 (*quoting Harris Corp.,* 417 F.3d at 1249) (emphasis added). The four-step algorithm that ISE created for the purpose of this litigation may or may not be an approximation of the steps set forth in the algorithms of FIGS. 4A and 5A, but they are not one and the same. Further these steps would require a separate construction.

U.    "Away Market Querying Means…" (Claim 22)

| Claim Term | CBOE's Construction | ISE's Construction |
|---|---|---|
| "away market querying means for determining an away market price for the instrument" | Function: The away market querying means, which is separate and distinct from the processor means, determines an away market price for the instrument.<br><br>Structure: A general-purpose computer or a network of general-purpose computers. | Function: Determining an away market price for the instrument<br><br>Structure: A general purpose computer, a network of general purpose computers, or a system of interconnected parallel processors including an algorithm comprising the steps of querying a reporting entity for an away market price for an instrument and receiving an away market price for such instrument. |

The parties agree that this limitation is subject to 35 U.S.C. § 112, ¶ 6. The parties largely agree on the function of this limitation, but disagree as to the corresponding structure.

The "away market querying means" is separate and distinct from the "processor means" (another claim term). This is commanded by the claims themselves. Claim 22, for example, separately recites a "processor means" and an "away market querying means." The use of different terms in a claim requires that they connote different meanings. *See Applied Medical Resources*, 448 F.3d at 1333.

The only structure in the specification which could be capable of performing the claimed function is the general-purpose computer identified by CBOE.[11] *See* Exh. 1, '707 patent at col.

---

[11] The failure clearly to link a disclosed algorithm to the "away market querying means" will result in this limitation rendering the claims in which it appears invalid as being indefinite. *See Aristocrat Techs. Australia Pty Ltd.*, 521 F.3d at 1333 .

8:44-55 ("The exchange 1 may be implemented on a general-purpose computer under the control of a software program. . . . Alternatively, the exchange 1 can be implemented on a network of general-purpose computers."). In contrast, ISE again proposes a structure that is not disclosed in the specification. "[T]he corresponding structure for a § 112 ¶ 6 claim for a computer-implemented function is the algorithm *disclosed* in the specification." *Aristocrat Techs. Australia Pty Ltd.*, 521 F.3d at 1333 (*quoting Harris Corp.,* 417 F.3d at 1249) (emphasis added). The structure that ISE points to, putting aside whether it qualifies as an "algorithm" at all, is not a *disclosed* algorithm.

In fact, the only disclosure in the specification is a reiteration of the claimed function, but no structure: "the order process 25 checks the price on the away market 17 as reported by the reporting entity 19." Exh. 1, '707 patent at col. 9:40-43. Such a description of the function does not meet the 35 U.S.C. § 112, ¶6 requirement for a disclosure of structure. *See Aristocrat Techs. Australia Pty Ltd.*, 521 F.3d at 1335 (rejecting patentee's identification of corresponding structure because "[t]hey are simply examples of the results of the operation of an unspecified algorithm.").

V.   "Away Market Process Means..." (Claim 23)

| Claim Term | CBOE's Construction | ISE's Construction |
|---|---|---|
| "away market process means for entering a matching quotation at the away market price if the processor means determines that the away market price is better than the best price" | Function: Entering a matching quotation at the away market price if the processor means determines that the away market price is better than the best price<br><br>Structure: A general-purpose computer or a network of general-purpose computers programmed to perform the steps of FIG. 9. | Function: Entering a matching quotation at the away market price if the processor means determines that the away market price is better than the best price on the automated exchange.<br><br>Structure: 1) A general purpose computer, a network of general purpose computers, or a system of interconnected parallel processors including an algorithm comprising the steps of:<br>A) determining the price difference between the away market price and the best price;<br>B) determining the number of contracts that a market maker is willing to execute at the price differential determined in Step 1; and<br>C) if the size of the incoming order or quotation is less than or equal to the number identified in Step 2, execute the trade for the number of contracts at the away market price.<br><br>or |

| | | 2) Computer workstations, personal computers, minicomputers, mainframe computers, personal digital assistants, or web TV boxes. |
| --- | --- | --- |

The parties agree that this limitation is subject to 35 U.S.C. § 112, ¶ 6. The parties largely agree on the function of this limitation, but disagree as to the corresponding structure.

The corresponding structure is the algorithm of FIG. 9, which the specification clearly links with the claimed function. *E.g.*, Exh. 1, '707 patent at col. 24:24-25:10 ("The operation of the away market process 28 is illustrated in FIG. 9."). While the multi-step algorithm[12] that ISE crafted for purposes of this litigation may or may not be an approximation of the steps set forth in the algorithm of FIG. 9, they are not one and the same. The structure that ISE points to is not a *disclosed* algorithm and is therefore improper.

ISE also proposes, as an alternative structure, "Computer workstations, personal computers, minicomputers, mainframe computers, personal digital assistants, or web TV boxes." But adopting ISE's alternative construction will result in rendering claim 23 invalid as being indefinite. *Aristocrat Techs. Australia Pty Ltd.*, 521 F.3d at 1333 (affirming district court holding of invalidity for indefiniteness because "this court has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor").

W.    "Alerting Means..." (Claim 27)

| Claim Term | CBOE's Construction | ISE's Construction |
| --- | --- | --- |
| "alerting means for generating an alert signal if the size is greater than the matching size" | <u>Function</u>: Generating an alert signal if the size is greater than the matching size.<br><br><u>Structure</u>: A general-purpose computer or a network of general-purpose computers. | <u>Function</u>: Generating an alert signal if the size is greater than the matching size.<br><br><u>Structure</u>: A general purpose computer, a network of general purpose computers, or a system of interconnected parallel processors including an algorithm that comprising the steps of determining that the order or quotation size at the exchange is greater than the order or quotation size at the away market with the best price and sending a notification message. |

---

[12] There is at least one internal inconsistency in ISE's crafted algorithm: it refers to a "Step 2" that does appear to be exist.

29

The parties agree that this limitation is subject to 35 U.S.C. § 112, ¶ 6.  The parties agree on the function of this limitation, but disagree as to the corresponding structure.

There exists no antecedent basis for the term "matching size."  This renders claims 27 invalid as indefinite because it is indeterminable what "the matching size" is.  *Cf. Energizer Holdings, Inc. v. Int'l Trade Com'n*, 435 F.3d 1366, 1370-1371 (Fed. Cir. 2006).  Because the scope of this limitation is not discernable, CBOE's best estimation is that the only structure in the specification which could be capable of performing this function is a general-purpose computer.  *See* Exh. 1, '707 patent at col. 8:44-55 ("The exchange 1 may be implemented on a general-purpose computer under the control of a software program. . . . Alternatively, the exchange 1 can be implemented on a network of general-purpose computers").

## IV.    Conclusion

For the foregoing reasons, the Court should adopt the constructions advanced by CBOE.

Dated:  July 8, 2009

By:  s/Ayad P. Jacob
    Jonathan A. Marshall
    David Francescani
    Eric Roman
    Irene Hudson
    Michael T. Zoppo
    Brian Doyle
    **FISH & RICHARDSON P.C.**
    Citigroup Center - 52nd Floor
    153 East 53rd Street
    New York, NY 10022
    Telephone: (212) 765-5070
    Facsimile: (212) 258-2291

    Paul E. Dengel
    Stacie R. Hartman
    Ayad P. Jacob
    **SCHIFF HARDIN LLP**
    6600 Sears Tower
    233 South Wacker Drive
    Chicago, IL 60606-6473
    (312) 258-5500
    (312) 258-5600 (*facsimile*)

    *Attorneys for Plaintiff Chicago Board*
    *Options Exchange, Incorporated*

    Joanne Moffic-Silver
    Jordan Newmark
    **CHICAGO BOARD OPTIONS**
    **EXCHANGE, INCORPORATED**
    400S. LaSalle Street
    Chicago, IL 60605
    Telephone: (312) 786-7909

31

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing CHICAGO BOARD OPTIONS EXCHANGE, INCORPORATED'S OPENING BRIEF ON CLAIM CONSTRUCTION was served on the Defendant by sending copies by Federal Express:

Parker H. Bagley, Esq.
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Telephone: (212) 813-8800
Facsimile: (212) 355-3333
PBagley@goodwinprocter.com

Michael Denny Huber, Esq.
Cray Huber Horstman Heil &
VanAusdal LLC
303 West Madison Street
Suite 2200
Chicago, IL 60606
Telephone: (312) 332-8450
Facsimile: (312) 332-8451
mdh@crayhuber.com

on July 8, 2009.

Neil Ramsaroop