# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

Chicago Board Options Exchange, Inc.,

        Plaintiff,

        v.

International Securities Exchange, LLC,

        Defendant.

Civil Action No. 07-cv-623

The Hon. Joan H. Lefkow, U.S.D.J.
The Hon. Jeffrey Cole, U.S.M.J.


## DEFENDANT INTERNATIONAL SECURITIES EXCHANGE, LLC'S
## OPENING CLAIM CONSTRUCTION BRIEF


COUNSEL FOR DEFENDANT
INTERNATIONAL SECURITIES EXCHANGE, LLC

Michael D. Huber
Cray Huber Horstman Heil & Van Ausdal LLC
303 W Madison, Suite 2200
Chicago, IL  60606
Telephone No.:  (312) 332-8450
Facsimile No.:   (312) 332-8451

Parker Bagley
Michael S. DeVincenzo
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York  10018
Tel.:  212.813.8800
Fax:  212.355.3333

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................................1

II.    TECHNOLOGY BACKGROUND .............................................................................1

III.   PRINCIPLES OF CLAIM CONSTRUCTION ..........................................................2

IV.    MEANS-PLUS-FUNCTION CLAIM LIMITATIONS ..............................................4

V.     "AUTOMATED EXCHANGE"..................................................................................5

VI.    MEMORY MEANS.....................................................................................................10

       A.    "Book Memory Means".....................................................................................10

       B.    "System Memory Means"..................................................................................13

VII.   COMPUTER IMPLEMENTED MEANS ...................................................................14

       A.    "Means for Matching . . . on a Pro Rata Basis"..............................................15

       B.    "Means for Matching . . . [With a] Minimum Allocation Percentage" .................17

       C.    "Means for Matching a First Portion . . . and a Remaining Portion"....................19

       D.    "Processor Means"............................................................................................21

       E.    "Away Market Querying Means"......................................................................23

       F.    "Away Market Process Means"........................................................................24

       G.    "Alerting Means".............................................................................................26

VIII.  ADDITIONAL TERMS ..............................................................................................27

       A.    "Professional Order".........................................................................................27

       B.    "Allocating a Remaining Portion . . ."..............................................................27

       C.    "Pro Rata".........................................................................................................28

       D.    Allocating/Matching .........................................................................................29

**Cases**

*Acromed Corp. v. Sofamor Danek Group, Inc.*,
   253 F.3d 1371 (Fed. Cir. 2001) ............................................................. 14

*AllVoice Computing PLC v. Nuance Communs., Inc.*,
   504 F.3d 1236 (Fed. Cir. 2007) ............................................................. 16

*Amgen, Inc. v. Hoechst Marion Roussel, Inc.*,
   314 F.3d 1313 (Fed. Cir. 2003), *aff'd in part and rev'd in part on other grounds*,
   469 F.3d 1039 (Fed. Cir. 2006) .................................................... 3, 7, 8, 10

*Asyst Techs., Inc. v. Empak, Inc.*,
   268 F.3d 1364 (Fed. Cir. 2001) ............................................................... 5

*BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC*,
   303 F.3d 1332 (Fed. Cir.2002) ................................................... 11, 19, 22

*Borgwarner, Inc. v. New Venture Gear, Inc.*,
   237 F. Supp. 2d 919 (N.D. Ill. 2002) ...................................................... 15

*CCS Fitness, Inc. v. Brunswick Corp.*,
   288 F.3d 1359 (Fed. Cir. 2002) ............................................................... 3

*Creo Prods. v. Presstek, Inc.*,
   305 F.3d 1337 (Fed. Cir. 2002) ............................................................. 25

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*,
   424 F.3d 1293 (Fed. Cir. 2005) ............................................................. 28

*E-Pass Techs., Inc. v. 3Com Corp.*,
   343 F.3d 1364 (Fed. Cir. 2003) ............................................................... 9

*Finisar Corp. v. DirecTV Group, Inc.*,
   523 F.3d 1323 (Fed. Cir. 2008) ............................................................. 14

*Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l*,
   389 F.3d 1370 (Fed. Cir. 2004) ............................................................. 30

*Garmin LTD. v. TomTom, Inc.*,
   Civ. A. No. 06-C-0062-C, 2006 WL 6005801 (W.D. Wisc. Aug. 24, 2006) .......................... 15

*Gart v. Logitech Inc.*,
   254 F.3d 1334 (Fed. Cir. 2001) ............................................................. 29

*General Foods Corp. v. Studiengesellschaft Kohle mbH*,
   972 F.2d 1272 (Fed. Cir. 1992) ............................................................... 2

*Generation II Orthotics Inc. v. Medical Tech. Inc.*,
    263 F.3d 1356 (Fed. Cir. 2001) ...................................................................................... 14

*Golden Voice Tech. & Training v. Rockwell Fisrtpoint Contact Corp.*,
    267 F. Supp. 2d 1190 (M.D. Fla. 2003) ...................................................................... 11, 19

*Harris Corp. v. Ericsson Inc.*,
    417 F.3d 1241 (Fed. Cir. 2005) ............................................................................... passim

*Housey Pharm. Inc. v. AstraZeneca UK Ltd.*,
    366 F.3d 1348 (Fed. Cir. 2004) ........................................................................................ 3

*IMS Tech., Inc. v. Haas Automation Inc.*,
    206 F.3d 1422 (Fed. Cir. 2000) ........................................................................................ 5

*Intel Corp. v. U.S. Int'l Trade Comm'n*,
    946 F.2d 821 (Fed. Cir. 1991) .......................................................................................... 9

*Invitrogen Corp. v. Clontech Labs., Inc.*,
    429 F.3d 1052 (Fed. Cir. 2005) ...................................................................................... 10

*KCJ Corp. v. Kinetic Concepts, Inc.*
    223 F.3d 1351 (Fed. Cir. 2000) ...................................................................................... 28

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004) .......................................................................................... 3

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996) ................................... 3, 6

*Medical Instrumentation and Diagnostics Corp. v. Elekta AB*,
    344 F.3d 1205 (Fed. Cir. 2003) ........................................................................................ 4

*MercExchange, L.L.C. v. eBay, Inc.*,
    401 F.3d 1323 (Fed. Cir. 2005), *vacated and remanded on different grounds by*
    126 S. Ct. 1837 (2006) ...................................................................................................... 6

*Micro Chem. Inc. v. Great Plains Chem. Co.*,
    194 F.3d 1250 (Fed. Cir. 1999),
    *rev'd in part and vacated in part on other grounds*, 318 F.3d 1119 (Fed. Cir. 2003) ...... passim

*Network Appliance, Inc. v. Bluearc Corp.*,
    Civ. A. No. 03-5665, 2005 WL 6225197 (N.D. Cal. Jan. 7, 2005) .......................................... 22

*Northrop Grumman Corp. v. Intel Corp.*,
    325 F.3d 1346 (Fed. Cir. 2003) ................................................................................. 14, 22

*NTP, Inc. v. Research in Motion*, Ltd.,
    418 F.3d 1282 (Fed. Cir. 2005) ........................................................................ 11

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ................................................................. passim

*PIN/NIP, Inc. v. Platte Chem. Co.*,
    304 F.3d 1235 (Fed. Cir. 2002) ......................................................................... 3

*Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*,
    318 F.3d 1143 (Fed. Cir. 2003),
    *rev'd on other grounds*, 412 F.3d 1284 (Fed. Cir. 2005) ...................................... 12

*ResQNet.com, Inc. v. Lansa, Inc.*,
    346 F.3d 1374 (Fed. Cir. 2003) ....................................................................... 10

*Rodime PLC v. Seagate Tech., Inc.*,
    174 F.3d 1294 (Fed. Cir. 1999) ................................................................ 18, 25

*Saunders Group, Inc. v. Comfortrac, Inc.*,
    492 F.3d 1326 (Fed. Cir. 2007) ......................................................................... 9

*Sorensen v. U.S. Int'l Trade Comm'n*,
    427 F.3d 1375 (Fed. Cir. 2005) ....................................................................... 10

*Southwall Techs., Inc. v. Cardinal IG Co.*,
    54 F.3d 1570 (Fed. Cir. 1995) ................................................................. 17, 19

*Transclean Corp. v. Bridgewood Services, Inc.*,
    290 F.3d 1364 (Fed. Cir. 2002) ....................................................................... 19

*Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*,
    473 F.3d 1173 (Fed. Cir. 2006) ......................................................................... 9

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ....................................................................... 3, 4

*Voda v. Corids Corp.*,
    536 F.3d 1311 (Fed. Cir. 2008) ......................................................................... 8

*Vulcan Eng'g Co. v. FATA Aluminum Inc.*,
    278 F.3d 1366 (Fed. Cir. 2002) ......................................................................... 4

*WMS Gaming, Inc. v. Int'l Game Tech.*,
    184 F.3d 1339 (Fed. Cir. 1999) ....................................................................... 14

**Statutes**

35 U.S.C. § 112.............................................................................................. passim

iv

## I.    INTRODUCTION

Defendant International Securities Exchange, LLC ("ISE") respectfully submits this Opening Claim Construction Brief, pursuant to the Court's February 10, 2009 Scheduling Order.[1]  In this case, ISE asserts Plaintiff Chicago Board Options Exchange, Inc. ("CBOE") infringes claims 1–6, 9–10, 22–24, 27, 35–36, 43, 45, 56–58 and 61 of U.S. Patent No. 6,618,707 ("the '707 Patent").

To the extent this Court elects to construe the disputed claim terms, ISE's proposed constructions are correct.  Specifically, each of ISE's proposed constructions conforms to the ordinary meaning of the claim language and is consistent with both the specification and the prosecution history of the asserted patent.  By contrast, CBOE's proposed constructions indiscriminately read into the claims features from particular embodiments, and in some instances, dispense with the intrinsic evidence altogether, relying on extrinsic evidence and presumably attorney argument to incorporate features not found within the intrinsic record of the '707 Patent.  In doing so, CBOE ignores the Federal Circuit's admonition against this practice, as well as the presence of a broader disclosure in the patent.  For these reasons and those discussed in detail below, this Court should adopt ISE's proposed constructions.

## II.    TECHNOLOGY BACKGROUND

The '707 Patent is entitled "Automated Exchange for Trading Derivative Securities" and relates "broadly, [to] an exchange for matching securities [that] stores a plurality of orders from public customers and market professionals, as well as quotations from market makers in a book memory and automatically matches incoming orders and quotations with those stored orders and quotations."  DeVincenzo Decl. Ex. B at 5:60–65.  Specifically, the disclosed exchange provides incentives for professionals to make and maintain deep, liquid markets for trading financial instruments.  *Id.* 2:28–59.  Conventional options exchanges used some automated systems to trade options.  *Id.* 1:37–39.  Those exchanges, however, did not store previously received—but unfulfilled—customer orders and professional orders and quotations in a memory for allocation.  *Id.* 3:27–48.  Nor did they allocate incoming orders with the previously received orders and

---

[1] This brief is intended to be read in conjunction with the Joint Claim Construction Statement containing the proposed claim constructions of each party.  It is attached as Exhibit A to the accompanying Declaration of Michael S. DeVincenzo, Esq. (the "DeVincenzo Decl.").

quotations based upon predefined allocation parameters that reward customers for placing orders and professionals for placing orders and/or quotations with larger size.  *Id*. 3:27–48, 3:66–4:16.

The '707 Patent discloses various processes for allocating and matching incoming orders and quotations with previously received ones.  For example, the patent discloses an interface for receiving incoming orders and quotations from public customers or market professionals.  *Id*. 5:60–6:21, 8:55–63.  The incoming order is sent to an exchange engine that determines if it is marketable—that is, immediately executable against previously received orders.  *Id*. 8:64–9:6. The previously received orders are stored in a memory along with their associated size (quantity of security ordered).  *Id*. 5:60–65.  If the incoming order is marketable, it is executed according to predefined allocation parameters.

The '707 Patent also discloses a number of allocation parameters, including parameters giving priority or preference to public customer orders, large professional orders, or certain types of professionals.  *Id*. 14:50–15:32.  The patent also discloses parameters for allocating incoming orders on a pro rata basis based upon the size of the previously received orders and quotations. *Id*. 17:25–18:9.

Just as the patent discloses multiple allocation parameters, it also discloses multiple processes for executing trades based on certain market conditions.  Specifically, the '707 Patent discloses a general bid-matching and offer-matching process, an away-market process, a Tick-worse process, FARMM order process, fast market process, and a block order and/or facilitation process.  *Id*. 14:49–29:51.  These processes are executed, depending on the market conditions, to ensure a deep, fair, and liquid market for all market participants.  *Id*. 4:55–59.

## III.   PRINCIPLES OF CLAIM CONSTRUCTION

"Claims[] define or delimit the scope of the legal protection which the government grant gives the patent owner, the patent 'monopoly.'"[2]  "It is a 'bedrock principle' of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude."[3]

---

[2] *General Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1274 (Fed. Cir. 1992) (citations and internal quotations omitted).
[3] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotations omitted).

In a jury case, the court interprets or "construes" disputed claim language as a matter of law.[4]  The jury then applies the claims, as construed by the court, to the accused product or process to decide the factual question of infringement.[5]

"Claim construction begins with the language of the claims.  When construing patent claims, there is a **heavy presumption** that the language in the claim carries its ordinary and customary meaning amongst artisans of ordinary skill in the relevant art at the time of the invention."[6]  Claim construction should consider all intrinsic evidence including a patent's specification, the written description of the patent, as well as the record of proceedings in the Patent Office, referred to as the "prosecution history."[7]  "Because the claims are best understood in light of the specification of which they are a part . . . courts must take extreme care when ascertaining the proper scope of the claims, lest they simultaneously import into the claims limitations that were unintended by the patentee."[8]  "Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using '**words or expressions of manifest exclusion or restriction**.'"[9]

---

[4] *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996) (stating that courts have the "power and obligation to construe as a matter of law the meaning and language used in the patent claims.").

[5] *See PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1243 (Fed. Cir. 2002) ("Step two, comparison of the claim to the accused device, requires a determination that every claim limitation or its equivalent be found in the accused device. Those determinations are questions of fact which, when made by a jury, we review for substantial evidence.") (citations omitted).

[6] *Housey Pharm. Inc. v. AstraZeneca UK Ltd.*, 366 F.3d 1348, 1351-52 (Fed. Cir. 2004) (emphasis added; citations and internal quotations omitted); *see also Markman*, 52 F.3d at 986 ("[T]he focus is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean."); *Phillips*, 415 F.3d at 13113 ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question").

[7] *See, e.g., Phillips*, 415 F.3d at 1315, 1317; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

[8] *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1325 (Fed. Cir. 2003), *aff'd in part and rev'd in part on other grounds*, 469 F.3d 1039 (Fed. Cir. 2006).

[9] *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (citation omitted); *see also Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."); *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (explaining that the presumption of ordinary meaning cannot be rebutted "simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history") (citation omitted).

Extrinsic evidence is "less significant" and "less reliable" than intrinsic evidence and cannot be used to vary or expand on the meaning given to claim terms in the intrinsic evidence.[10] Extrinsic evidence must only be considered in the context of the intrinsic evidence and cannot be used to reach a definition contrary to that evidence.[11]

## IV.  MEANS-PLUS-FUNCTION CLAIM LIMITATIONS

Many of the claims at issue contain elements (or limitations) written in "means-plus-function" form.  These limitations are a statutory exception to the rule that claim language carries its ordinary and customary meaning.  Specifically, the patent statute directs that claim limitations using the word "means," followed by a functional recitation, "shall be construed to cover the corresponding structure . . . described in the specification and equivalents thereof."[12]

"The first step in the construction of a means-plus-function claim element is to identify the particular claimed function.  The second step in the analysis is to look to the specification and identify the corresponding structure for that function."[13]  "The statute does not permit limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim.  Nor does the statute permit incorporation of structure from the written description beyond that necessary to perform the claimed function."[14]  Finally, the "corresponding structure ... must actually perform the recited function, not merely enable the pertinent structure to operate as

---

[10] *Phillips*, 415 F.3d at 1317–19; *Vitronics Corp.*, 90 F.3d at 1583–85.

[11] *Phillips*, 415 F.3d at 1319.

[12] *See* 35 U.S.C. § 112, ¶ 6 ("An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification **and equivalents thereof.**") (emphasis added); *Vulcan Eng'g Co. v. FATA Aluminum Inc.*, 278 F.3d 1366, 1376 (Fed. Cir. 2002) ("When the claims include means-plus-function terms in accordance with §112 P6, claim scope necessarily is not limited to the preferred embodiments, but includes equivalents thereof.").

[13] *Medical Instrumentation and Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003) (citing *Micro Chem. Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999), *rev'd in part and vacated in part on other grounds*, 318 F.3d 1119 (Fed. Cir. 2003)).

[14] *Micro Chem.*, 194 F.3d at 1258.

intended."[15]  By statute, the court must then construe the limitation to cover the "corresponding structure" and "equivalents thereof" that perform the "recited function."[16]

## V.      "AUTOMATED EXCHANGE"

| "automated exchange" (All Asserted Claims) | |
| --- | --- |
| **ISE** | **CBOE** |
| An exchange that includes a system that automatically matches incoming orders and quotations with stored orders and quotations. | An "automated exchange" is a fully automated exchange in which no matching or allocating is performed manually in open outcry. |

The parties agree that what is automated in the recited "automated exchange" is the process or system for allocating and/or matching of incoming orders—and not some other process or system such as the billing system.  ISE's proposed construction for "automated exchange" is consistent with the intrinsic evidence and requires only automatic allocation or matching of incoming orders and quotations with stored orders and quotations.  CBOE ignores the express teachings of the intrinsic record and proposes additional limitations that wholly exclude an exchange where any matching or allocating involves a manual step or process.  The claims, specification, and prosecution history each unequivocally recognize that manual processes, systems, or steps may be included as part of an automated exchange.  Thus, CBOE's proposed construction must be rejected.

**The claims and specification support ISE's proposed construction.**  The claims of the '707 Patent explicitly recognize an "automated exchange" may allocate or match incoming orders using manual steps and/or processes.  For instance, each asserted claim requires the step of "**receiving** an incoming order . . . having a size associated therewith."  *See, e.g.*, Ex. B at 29:55–60 (Claim 1) (emphasis added).  The specification discloses this incoming order is entered manually by a user.  *See id.* 7:9–15, 7:46–53.  Moreover, Claim 23 requires "entering a matching quotation at the away market price" if the away market price is better than the best price.  *Id.* 34:2–3.  The specification explains that this quotation-entry step may be performed manually, if a market maker "**chooses** to execute the order."  *Id.* 9:55–57 (emphasis added).

---

[15] *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1371 (Fed. Cir. 2001).

[16] *See IMS Tech., Inc. v. Haas Automation Inc.*, 206 F.3d 1422, 1430 (Fed. Cir. 2000) ("Whether an accused device or method infringes a claim with a § 112, P6 limitation, *i.e.*, whether it performs the identical function with the same structure, materials, or acts described in the  specification or an equivalent thereof, is a question of fact.").

In a strikingly similar case, the Federal Circuit in construing an "automated method" expressly rejected the argument that all steps had to be performed automatically where the claims explicitly recited similar manually performed steps:

> Various limitations of the relevant claims require actions by participants and cannot be "automatically performed via an automated process." For example, as the district court stated in its Markman order, claim 1 contains a limitation requiring that the computer system "**receive** bids on the item from participants." **That step requires that participants enter their bids manually and cannot occur automatically**. Likewise, one step of claim 12 requires that a **seller "establish** a seller's account." **That step also requires that a seller manually enter relevant information into the system**. Accordingly, the district court was correct in holding that not all steps had to be performed by way of an automated process.

*MercExchange, L.L.C. v. eBay, Inc.*, 401 F.3d 1323, 1338 (Fed. Cir. 2005) (emphasis added), *vacated and remanded on different grounds by* 126 S. Ct. 1837 (2006). That the claims of the '707 Patent permit manual order and/or quotation entry, as well as the manual entry of a matching quotation, precludes any finding that an "automated exchange" cannot include manual steps and/or processes for allocating and matching.

In addition to the claims, the specification discloses various processes and systems in the "automated exchange" that can include manual steps. For example, the specification discloses that the exchange allocates and matches incoming "block orders" using manual steps:

> The block order and facilitation process 35 sends a message containing certain information describing the order to the PMM 3 and CMMs 5, 7, as well as to EAMs 9, 11 with proprietary orders at the best price. **The block order and facilitation process 35 allows those participants that received the message to enter individual bids or offers . . .**
>
> **Parties receiving the block order information respond within a limited time period with bids and offer messages.**

Ex. B at 11:49–67 (emphasis added).[17]

The specification further discloses that the "automated exchange" may allocate and match trades manually based upon various decisions of a market maker. Specifically, in discussing the execution of orders originating at an away market, the patent states, under certain

---

[17] The 707 Patent discloses that PMMs, CMMs, and EAMs are market participants. Ex. B at 6:62–7:8.

circumstances, if the best price for an incoming order is not on the "automated exchange," a market participant is alerted and "**can then decide** whether to trade the incoming order at the away market price." *Id.* 24:66–67 (emphasis added). The patent also discloses that when the "automated exchange" does not offer the best price for incoming public customer orders, those orders are stored for later execution; they are "executed if an incoming order or quotation can be matched with [it], the away market 17 no longer has a better price, **or the PMM chooses to execute the order**." *Id.* 9:54–57 (emphasis added). Each of these processes is part of the preferred embodiment disclosed in the '707 Patent. And any proposed construction "that reads out" the preferred embodiment is "rarely, if ever, correct." *See Amgen Inc.*, 314 F.3d at 1349.

As the '707 Patent contemplates that an "automated exchange" may include manual steps or processes as part of the system for allocating and matching, it is not limited to a "fully automated exchange" where "no matching or allocating is performed manually in open outcry."

**The extrinsic evidence supports ISE's proposed construction.** The extrinsic evidence relied upon by ISE is consistent with the intrinsic evidence and provides further support for its proposed construction. The only extrinsic evidence identified by either party that was not created in conjunction with this litigation is the article entitled "A Taxonomy of Automated Trade Execution Systems," Journal of International Money and Finance (1993) by Ian Domowitz ("Domowitz Article"). *See* DeVincenzo Decl. Ex. C. The Domowitz Article provides a list of "automated futures and options exchanges," *id.* 610 and 611, including some floor-based systems for the execution of some trades. Specifically, both CBOE and AMEX are identified as "automated futures and options exchange[s]," despite the presence of floor-based trading on each of those automated exchanges. *Id.*; *see also* Decl. of Dr. Moses Ma ¶ 6 ("Ma Decl."). The Domowitz Article uses the term "automated exchange" in much the same way as ISE's proposed construction. Ma Decl. ¶ 6.

Consistent with the specification and the Domowitz Article, ISE's expert Dr. Ma states that one skilled in the art would have understood the term "automated exchange" to include an exchange that "maintains a **physical trading floor** where trading can occur in a more **manual** fashion." Ma Decl. ¶ 3 (emphasis added). Additionally, Dr. Ma confirms that the '707 Patent and prosecution history are consistent with ISE's proposed construction. *Id.* at ¶ 4.

**CBOE's proposed construction is wrong.** CBOE's proposed construction is nothing more than a blatant attempt to read extraneous, unsupported limitations into the claim language.

CBOE fails to *construe* "automated exchange" and instead merely adds the term "fully" in front of it, together with language after it indicating that no trading may be performed manually in open outcry.  This "reading in" of limitations is expressly forbidden by the Federal Circuit, absent a "clear disavowal of claim scope."  *See Voda v. Corids Corp.*, 536 F.3d 1311, 1320 (Fed. Cir. 2008) (refusing to limit claim scope because no "clear disavowal of claim scope" in specification); *see also Phillips*, 415 F.3d at 1319.  Because CBOE's proposal would "read out" the preferred embodiment, it would require "highly persuasive evidentiary support."  *Amgen Inc.*, 314 F.3d at 1349.  As stated above, the specification does not offer any support for the disavowal CBOE must establish.

In support of its proposed construction, CBOE relies almost exclusively on the Background of the Invention section.  Each cited statement, however, when read in context fails to provide a "clear disavowal of claim scope"; instead, they support ISE's proposed construction. For example, CBOE relies upon a statement indicating that "the invention [is] particularly advantageous over less automated systems because **many** of the routine decisions made by professionals in charge of a series of options **can be** defined in advance and applied automatically."  *See* Ex. A at 2 (citing '707 Patent 6:53–58) (emphasis added).  This explicitly recognizes that while certain routine decisions by a professional could be made in advance and applied automatically, others could not be, and thus had to be handled manually.

To establish an "automatic exchange" cannot include manual steps, CBOE also relies on a statement in the specification that "[a]lthough some processes that take place on these floor-based exchanges have been automated or partially automated, they are not fully integrated and, in fact, many processes continue to function manually."  *See* Ex. A at 2 (citing '707 Patent 1:34–40) (emphasis added).  However, the patent discloses those floor-based systems were not "fully integrated" because they stored public customer orders and professional orders separately:

> A book, more accurately a limit book, is a record of outstanding public customer limit orders that can be matched against future incoming orders.  Professional orders are usually not allowed on the limit book . . . .  **The current systems, however, generally are not integrated with the single quotation systems.**  Because the systems stand apart, the best bid and best offer for quotations is calculated separately from the best bid and best offer for the limit book.

Ex. B at 3:30–40.  As such, the specification makes clear that "fully integrated" is not synonymous with the automated allocating and matching of every trade.

CBOE further relies upon a portion of the specification describing "the disjointed nature" of the "various manual, and sometimes automated, systems which take place on floor based exchanges" as evidence of a disavowal.  *See* Ex. A at 2 (citing '707 Patent at 4:46–51).  This statement explicitly recognizes that floor-based exchanges have "automated systems" and further suggests that it is the "disjointed nature" of the floor-based exchanges, *i.e.* the lack of an single book memory, and not the lack of automation that makes it difficult to access the market depth.

Moreover, each portion of the specification CBOE cites contains precisely the kind of "general statements" concerning the Background of the Invention that the Federal Circuit has repeatedly found to be non-limiting.  *See Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1180 (Fed. Cir. 2006) (refusing to find "general statements" in Background of Invention regarding deficiencies in prior art devices to effect a surrender of claim scope); *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 836 (Fed. Cir. 1991) (reiterating that a court should not use a patent specification's general invention performance goal statement to limit claim language); *E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1370 (Fed. Cir. 2003) ("an invention may possess a number of advantages or purposes, and there is no requirement that every claim directed to that invention be limited to encompass all of them.").

**The prosecution history does not contain any disavowal of a system that includes manual steps.**  CBOE's reliance upon ISE's provisional application and a declaration submitted by Gary Katz, the inventor of the '707 Patent, during prosecution is misplaced.  In fact, the pages of the provisional application relied upon by CBOE distinguish between "completely electronic exchanges" and "floor based" exchanges.  *See* DeVincenzo Decl. Ex. D at ISE0871776–77. Specifically, the provisional application describes ISE's system as "a completely electronic options exchange" and states that such "electronic exchanges" have "no floor brokers."  *Id.* CBOE cites this passage as support for its argument that in an "automated exchange" no orders can be executed in an "open outcry" system.  This is an obvious red herring as the term "electronic exchange," let alone "completely electronic exchange," is not used in the '707 Patent. *See Saunders Group, Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1333 (Fed. Cir. 2007) ("When the purported disclaimers are directed to specific claim terms that have been omitted or materially altered in subsequent applications . . . those disclaimers do not apply."); *Invitrogen Corp. v.*

*Clontech Labs., Inc.*, 429 F.3d 1052, 1078 (Fed. Cir. 2005) ("[T]he prosecution of one claim

term in a parent application will generally not limit different claim language . . . .");

*ResQNet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374, 1383 (Fed. Cir. 2003).

Similarly, the statement in Mr. Katz's declaration submitted during prosecution of the

'707 Patent that ISE "was the first fully electronic exchange" and that "the automated exchange

envisioned by ISE caused transaction costs for options contracts trades to drop" does not

effectuate any intent to equate an "electronic exchange" with an "automated exchange." *See*

DeVincenzo Decl. Ex. E at ISE0000466 (¶8). Instead, the statements concerning "electronic

exchanges" in the prosecution history should be read, consistently with the specification, to mean

that an "electronic exchange" and a "fully electronic exchange" are  examples of an "automated

exchange." *See Amgen Inc.*, 314 F.3d at 1327 (Finding that the prosecution history may not be

used to narrow a claim interpretation absent a clear and unambiguous disavowal of claim

scope.); *Sorensen v. U.S. Int'l Trade Comm'n*, 427 F.3d 1375, 1378-9 (Fed. Cir. 2005)

("Disclaimers based on disavowing actions or statements during prosecution . . . must be both

clear and unmistakable.")

For the reasons stated above, this Court should adopt ISE's proposed construction of

"automated exchange."

## VI.   MEMORY MEANS

### A.   "Book Memory Means"

| "book memory means for storing a plurality of previously received orders and quotations to trade a corresponding plurality of quantities of the instrument" | |
|---|---|
| ISE | CBOE |
| Function:  Storing a plurality of previously received orders and quotations to trade a corresponding plurality of quantities of the instrument.<br><br>Structure:  Memory | Function:  The book memory means, which is separate and distinct from the system memory means and processor means, stores a plurality of previously received orders or quotations to trade a corresponding plurality of quantities of the instrument, the previously received orders and quotations each having a size associated therewith and the previously received orders including public customer orders previously entered for public customers and professional orders or quotations previously entered for one or more professionals.<br><br>Structure:  A general-purpose computer or a network of general-purpose computers. |

The parties agree that this phrase is governed by 35 U.S.C. § 112, ¶ 6.  ISE proposes the recited function for the "book memory means" is "[s]toring a plurality of previously received orders and quotations to trade a corresponding plurality of quantities of the instrument."  This correctly reflects the functional language "explicitly recited" in the claim element—namely, storing previously received orders and quotations.

In contrast, CBOE identifies as part of the function of the "book memory means" the expression following the word "instrument."  These non-functional limitations describe "previously received orders and quotations" *stored in* the "book memory means."  Ex. B at 29:60–67.  As those limitations are directed to the types of orders and quotations stored in the "book memory means"—and not what *stores* the orders and quotations—they are "separate limitations not subject to § 112, ¶ 6."  *See BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC*, 303 F.3d 1332, 1334 (Fed. Cir. 2002) (construing "corona means cooperating with [the attenuator] and positioned for electrostatically charging the filaments" and finding language after "positioned" not part of the recited function and not subject to § 112 paragraph 6); *Micro Chem.,* 194 F.3d at 1254, 1258 (identifying function of "weighing means for determining the weights of selected additives dispensed by said dispensing means from said storage means" as "determining the weights of selected additives"); *Golden Voice Tech. & Training v. Rockwell Fisrtpoint Contact Corp.*, 267 F. Supp. 2d 1190, 1208 (M.D. Fla. 2003).

Of all the positions taken by CBOE, none is more bizarre than its attempt to require the function of various "means" elements, including the "book memory means," be "separate and distinct" from other "means" elements, such as the "system memory means."  First, in contrast to structures, functions are not tangible objects that are separate and distinct from each other and a "separate and distinct" limitation is clearly not part of the recited function.  *Micro Chem.,* 194 F.3d at 1258 ("The statute does not permit limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim.").  Second, CBOE provides the exact same identification of structure for both the "system memory means" and "book memory means"—a general purpose computer—and there is nothing in the specification that could possibly indicate that the system memory and book memory are stored on two separate computers.  Third, had CBOE's construction been directed to the structure of the device, *i.e.* the memory, it would have run afoul of established precedent.  *See NTP, Inc. v. Research in Motion*, *Ltd.*, 418 F.3d 1282, 1309-11 (Fed. Cir. 2005) (finding that elements in a claim are not required

11

to be "separate and distinct" without some "textural hook in the claim language" requiring them to be so); *see also Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 318 F.3d 1143, 1150-51 (Fed. Cir. 2003), *rev'd on other grounds*, 412 F.3d 1284 (Fed. Cir. 2005); *Network Appliance, Inc. v. Bluearc Corp.*, Civ. A. No. 03-5665, 2004 WL 5651036, *30 (N.D. Cal. Nov. 30, 2004) (refusing to read in phrase "distinct from mass storage device" where "no such limitation appears in the language of the claims").

The '707 Patent identifies memory as the structure "storing a plurality of previously received orders and quotations to trade a corresponding plurality of quantities of the instrument." Specifically, it is "book memory 33." *See, e.g.*, Ex. B at 7:60–62, 9:62–66 ("The bid matching process 34 matches buy orders against orders and quotations to sell that are stored in the book memory 33"), 15:35–38, 15:53–54, Fig. 2 (ref no. 33).

The '707 Patent prosecution history also supports ISE's proposed construction for the corresponding structure. Original Claim 35 recited "storing a plurality of professional orders to trade the instrument in the book memory." DeVincenzo Decl. Ex. F at ISE0871726. Moreover, the prosecution history explicitly states previously received orders and quotations are stored in memory: "The present invention is directed to an automated exchange that receives orders and quotations for the purchase or sale of a financial instrument from public customers and professional trades and **accumulates these orders and quotations in a memory**." DeVincenzo Decl. Ex. G at ISE000599 (emphasis added). Accordingly, ISE's proposed construction for the "book memory means" is supported by the intrinsic evidence. By contrast, CBOE's proposed corresponding structure—a "general purpose computer or a network of general purpose computers"—simply ignores the express teachings of both the specification and the prosecution history.

Accordingly, memory is the corresponding structure of the "book memory means." *See B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997) ("[S]tructure disclosed in specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the [recited] function.").

12

B.      "System Memory Means"

| "system memory means for storing allocating parameters for allocating trades between the incoming order or quotation and the previously received orders and quotations" | |
| --- | --- |
| ISE | CBOE |
| Function: Storing allocating parameters.<br><br>Structure: Memory | Function:  The system memory means, which is separate and distinct from the book memory means and processor means, stores allocating parameters for allocating trades between the incoming order or quotation and the previously received orders and quotations.<br><br>Structure: A general-purpose computer or a network of general-purpose computers. |

The parties agree that this phrase is governed by 35 U.S.C. § 112, ¶ 6.  Like the "book memory means," ISE correctly proposes the function of this claim element is what is "explicitly recited" in the claim element—namely, "storing allocating parameters."  *See Micro Chem.*, 194 F.3d at 1258.  Again, CBOE's proposed construction reads additional limitations into the recited functional phrase.  Specifically, CBOE asserts the function should be construed as "stor[ing] allocating parameters for allocating trades between the incoming order or quotation and the previously received orders and quotations."  Ex. A at 4.  CBOE's proposal incorrectly adds limitations defining the type of allocation parameter stored in the "system memory means."  Just as similar limitations in the "book memory means" claim element were not subject to § 112, ¶ 6, so too these limitations are not subject § 112, ¶ 6.  *See* Section VI.A.

The corresponding structure for performing the function of "storing allocating parameters" is memory.  The '707 Patent makes clear that at least one of the functions performed by "system memory 26" is storing allocating parameters:

> When the incoming order is for more than the predetermined PMM small order preference size, the bid matching process 34 and the offer matching process 36 ***allocate*** the trade among the professional orders and quotations at the best price ***according to an algorithm stored in the system memory 26***.

Ex. B at 15:26–31 (emphasis added); *see also id.* Fig. 2 (ref no. 26).  Moreover, the prosecution history of the '707 Patent further supports ISE's position that the corresponding structure for "system memory means" is memory.  Specifically, the prosecution history states that "parameters stored in the system memory are used to allocate portions of an incoming order or quotation, amended claims 1 and 35 recite this as an 'allocating' parameter."  DeVincenzo Decl.

13

Ex. H at ISE0000243 (emphasis added).  Thus, the structure disclosed for storing the allocating parameters is the memory of the general purpose computer and not just the general purpose computer.

For similar reasons as stated for "book memory means," CBOE's proposed corresponding structure is incorrect and should be ignored.  *See* Section VI.A.

## VII.   COMPUTER IMPLEMENTED MEANS

The '707 Patent discloses that an exchange that may be implemented on "a general purpose computer," "a network of general purpose computers," or a "system of interconnected parallel processors" under the control of "software."  Ex. B at 8:44–52.  The patent further discloses various algorithms which detail "processing done by the exchange."  *See, e.g.*, *id.* 6:34–35, 14:50–19:7.  When construing a means plus function element that requires a computer or microprocessor executing an algorithm, the corresponding structure for the element is the general purpose computer programmed with the disclosed algorithm.  *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348–49 (Fed. Cir. 1999); *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005).  The algorithm may be expressed in any "understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure."  *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008).  The "structure" required by § 112, ¶ 6, is only that which is necessary to perform the function of the clause—*i.e.*, matching, allocating, etc.  *See Micro Chem.*, 194 F.3d at 1258 (reversing district court for defining the "structure" with too many features, stating Section 112, ¶ 6 does not "permit incorporation of structure from the written description beyond that necessary to perform the claimed function.")[18]

In *Harris Corp.*, the Federal Circuit construed the function of a "time domain processor means" for "simulating the time domain effect . . . by deducing prescribed characteristics" and "for producing estimates . . . ."  417 F.3d at 1253.  The Federal Circuit first identified the portions of the specification where an algorithm was disclosed for performing the identified function.  *Id.* at 1254 (finding that the algorithm is described "in Figures 8A, 8B, and 9 and described at col. 7, l. 18 – col. 8, l. 38; col. 13, l. 45 – col. 14, l. 20; and col. 15, l. 2 – col. 16, l.

---

[18] *See also Generation II Orthotics Inc. v. Medical Tech. Inc*., 263 F.3d 1356, 1365 (Fed. Cir. 2001); *Northrop Grumman Corp. v. Intel Corp*., 325 F.3d 1346, 1352 (Fed. Cir. 2003) ("A court may not import into the claim features that are unnecessary to perform the claimed function"); *Acromed Corp. v. Sofamor Danek Group, Inc*., 253 F.3d 1371, 1382 (Fed. Cir. 2001).

11"). The Federal Circuit went on to determine the necessary steps or processes of the algorithm to perform the function. *Id.* (noting that "[a]spects of this algorithm can vary based on implementation, as the specification implies" and that the algorithm was not limited to the specific Equation disclosed in the specification). Finally, the court determined that of the three figures and detailed text disclosed the proper construction was limited to a two-step process for performing the recited function. *Id.*; *see also Superspeed, L.L.C. v. IBM*, Civ. A. No. 2-07-CV-89, 2009 WL 383255, *9–10 (E.D. Tex. Feb. 11, 2009) (rejecting accused infringer's attempt to read entire Figures into claims based upon *Harris Corp.*). Consistent with the Federal Circuit's construction of computer-implemented claim terms, courts in this circuit similarly determine the steps necessary to perform the recited function and restate those steps in a manner that is understandable to a jury. *See, e.g.*, *Borgwarner, Inc. v. New Venture Gear, Inc.*, 237 F. Supp. 2d 919, 933 (N.D. Ill. 2002); *Garmin LTD. v. TomTom, Inc.*, Civ. A. No. 06-C-0062-C, 2006 WL 6005801, *32 (W.D. Wisc. Aug. 24, 2006) (finding that party "correctly identified each of the steps . . . necessary to perform the recited function" of the disclosed algorithm).

Whereas ISE's proposed constructions precisely follow precedent, CBOE's constructions ignore the teachings of the specification, including the formulas provided. Instead, CBOE identifies whole figures as the disclosed algorithms with complete disregard to the steps necessary to perform the recited functions.

### A.    "Means for Matching . . . on a Pro Rata Basis"

| "means for matching the remaining portion with professional orders or quotations in the book memory means on a pro rata basis" | |
| --- | --- |
| ISE | CBOE |
| Function:<br>Matching the remaining portion with professional order or quotations in the book memory means on a pro rata basis.<br><br>Structure:<br>A general purpose computer, a network of general purpose computers, or a system of interconnected parallel processors including an algorithm comprising the step of matching the remaining portion based on a percentage of the size of a professional's order or quotation with reference to the total size of the professional orders and quotations at the same price. | Function:<br>Matching the remaining portion with professional orders or quotations in the book memory means on a pro rata basis.<br><br>Structure:<br>A general-purpose computer or a network of general-purpose computers, but there is no disclosure of the steps such general purpose computer(s) would perform. |

15

The parties agree that the proposed function is "matching the remaining portion with professional orders or quotations in the book memory means on a pro rata basis."  The parties further agree that this function is performed by a general purpose computer or a network of general-purpose computers.  However, CBOE's proposed corresponding structure fails to include "a system of interconnected parallel processors," which is expressly disclosed in the specification as a structure that can perform the described processes.  Ex. B at 8:49–52.[19] Moreover, CBOE's allegation that the '707 Patent contains "no disclosure of the steps" to perform this function is inaccurate.

ISE's proposed corresponding structure is the algorithm disclosed in the '707 Patent for matching on a pro rata basis.  Specifically, the specification discloses "matching the remaining portion on a pro rata basis" as follows:

> The remainder of the order is filled by the professional, PRO #1 and PRO #2 on a pro rata basis.  Although PRO #1 has time priority, PRO #2 has a greater size so his share is computed first. PRO #2 has 20 out of the 30 contracts of the orders placed by the two professionals at the lowest offer and is entitled to 66% of the 6 remaining contracts, or 4 contracts.  The remaining 2 contracts are traded by PRO #1.

*Id.* 18:1–8; *see also id.* 18:61-19:5.  The specification further discloses that "the pro rata allocation can be modified by, for example, weighting factors that favor PRO #1 or PRO #2." *Id.* 17:64–66.  The procedure for matching on a pro rata basis described in the specification is accurately described as matching a "percentage of the size of a professional's order or quotation with reference to the total size of the professional orders and quotations at the same price." *See id.* 18:1–8.  Thus, there is adequate structure disclosed in the '707 Patent for performing the recited function of this claim element.  *See AllVoice Computing PLC v. Nuance Communs., Inc.*, 504 F.3d 1236, 1245 (Fed. Cir. 2007) ("[A]lgorithms in the specification *need only disclose adequate defining structure* to render the bounds of the claim understandable to one of ordinary skill in the art.") (emphasis added).

---

[19] For each of the structures that require a general purpose computer or a network of general-purpose computers CBOE failed to include a system of interconnected parallel processors.  As this system is disclosed as an alternative system, it should be identified for each of the means elements that require operation on a computer.

### B.      "Means for Matching . . . [With a] Minimum Allocation Percentage"

| "means for matching the remaining portion based on a formula that allocates the minimum allocation percentage of the remaining portion to the quotation identified with the primary market maker" (Claims 3 and 4) | |
| --- | --- |
| ISE | CBOE |
| Function:<br><br>Matching the remaining portion based upon a formula that allocates the minimum allocation percentage of the remaining portion to the quotation identified with the primary market maker.<br><br>Structure:<br>A general purpose computer, a network of general purpose computers, or a system of interconnected parallel processors including an algorithm that matches a minimum allocation percentage to a primary market maker comprising the following steps: (1) calculating a primary market maker's minimum allocation percentage of the remaining portion; (2) calculating the primary market maker's pro rata allocation of the remaining portion; and (3) matching the greater of the two to the quotation identified with the primary market maker. | Function:<br>Claim 3<br>Matching the remaining portion based upon a formula that allocates the minimum allocation percentage of the remaining portion to the quotation identified with the primary market maker.<br><br>Structure:<br>A general purpose computer or a network of general-purpose computers programmed to perform the steps of FIG. 4(b) for bids and FIG. 5(b) for offers. |

This second "means for matching" is recited in asserted Claims 3 and 4.  As such, ISE's construction of this claim term is identical for both claims.  *See Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir. 1995) (stating that a phrase "cannot be interpreted differently in different claims because the claim terms must be interpreted consistently").  The parties agree on the proposed function of this means clause of Claim 3.  The parties further agree that the general purpose computer includes an algorithm for performing the steps.

ISE's proposed corresponding structure is consistent with the specification.  The specification discloses three almost identical equations for "matching a remaining portion based upon a formula that allocates the minimum allocation percentage of the remaining portion to the quotation identified with the primary market maker."  *See* Ex. B at 16:35–36 (Equation #1), 17:52–53 (Equation #2); 18:45–46 (Equation #3).  Those equations are expressed generally as: $\{X\% = Max[Z\%, Siz[pmm]/Siz[pmm] + Siz[pro]]\}$ where $Z\%$ is a specific allocation percentage, "siz[pmm] is the size of the offer of the PMM 3 [primary market maker]" and

"siz[pro] is the size of the combined orders of the [other] professionals." *Id.* 16:35–42.  The specification explicitly states that "a minimum percentage greater or smaller than [Z]% may be used." *Id.* 16:56–58, 17:64–65, 18:55–58.  Furthermore, the formulas may be modified so the "allocations [are not] 'straight-line' pro rata [, as disclosed in the formula,] but . . . include weighing factors." *Id.* 16:57–59; *see also id.* 17:64–65, 18:56–58.  Consistent with these teachings, ISE's proposed construction properly identifies the necessary steps to perform the recited function—determining a "minimum allocation percentage," determining a pro rata allocation, and allocating to the primary market maker the greater of the two.  This recognizes that the recited function may be performed using any "minimum allocation percentage," "straight line pro rata," or other "weighting factors."  *See Harris Corp.*, 417 F.3d at 1253–54 (finding the algorithm is not limited to the specific formula where the specification indicates alternatives may be used).

By contrast, CBOE's proposal completely ignores the teaching of the '707 Patent and identifies entire figures that each includes three formulas.  *See* Ex. B at Fig. 4(b), 5(b).  Those figures include algorithms for performing tasks other than "matching the remaining portion based on a formula."  Specifically, they identify the number of professionals and, depending on that number, a specific minimum allocation percentage and three separate formulas or algorithms for allocating an incoming order.  Ex. B at Fig. 5(b) (ref nos. S222, S226, S230, S234).  These steps are not "necessary" to match based upon a minimum allocation percentage.  This is a requirement of Claim 5.  *Id.* 31:1–4; *see Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1305 (Fed. Cir. 1999) ("Had [the patentee] intended or desired to claim [the additional function] as a function of the positioning means in the asserted claims, it could have done it explicitly, as in Claim 11.  The absence of such explicit language, however, shows that claims 3, 5, and 8 do not include the [additional function].");  *see also Harris Corp.*, 417 F.3d at 1253–54.

Oddly, CBOE's construction of the identical means clause in Claim 4 fails to identify any algorithm for performing the recited function.  This is likely due to CBOE's identification of function for the second "means for matching" of Claim 4 that includes numerous extraneous limitations.  Claim 4 recites:

> **means for matching the remaining portion based on a formula that allocates the minimum allocation percentage of the remaining portion to the quotation identified with the primary market maker**, and wherein the minimum allocation percentage is

> N% and the percentage of the remaining portion allocated to the
> order identified with the primary market maker is . . . .

Ex. B at 30:55–61 (emphasis added). The language after "and wherein" is not part of the recited

function. Instead, it provides an additional non-functional limitation concerning the minimum

allocation percentage and formula to be used. *See BBA Nonwovens*, 303 F.3d at 1334

(construing "corona means cooperating with [the attenuator] and positioned for electrostatically

charging the filaments" and finding language after "positioned" not part of the recited function

and not subject to § 112 paragraph 6); *Micro Chem.,* 194 F.3d at 1254, 1258 (identifying

function of "weighing means for determining the weights of selected additives dispensed by said

dispensing means from said storage means" as "determining the weights of selected additives");

*Transclean Corp. v. Bridgewood Services, Inc.*, 290 F.3d 1364, 1375 (Fed. Cir. 2002) (finding

phrase which "further defines characteristics" of function not part of recited function); *Golden*

*Voice*, 267 F. Supp. 2d at 1208 (construing phrase "first operational means for storing a plurality

of prescribed response messages, each of which, when played back, effectively corresponds

. . . ." and finding "[t]he function of the 'first operational means' is simply 'storing a message,'

and the subject phrase merely describes the message that is being stored"). ISE agrees that the

language after the wherein clause is a limitation of Claim 4; however, such limitation is not part

of the recited function. As such, when properly construed the function of this claim element—

and thus the identical structure—is identical to the function of the same means element in Claim

3. *See Southwall Techs.* , 54 F.3d at 1579.

### C. "Means for Matching a First Portion . . . and a Remaining Portion"

| "means for matching a first portion of the incoming order or quotation against customer orders and a remaining portion of the incoming order or quotation against professional orders and quotations" | |
| --- | --- |
| ISE | CBOE |
| Function:<br>Matching a first portion of the incoming order or quotation against customer orders and a remaining portion of the incoming order or quotation against professional orders and quotations | Function:<br>Matching a first portion of the incoming order or quotation against customer orders and a remaining portion of the incoming order or quotation against professional orders and quotations. |
| Structure:<br>A general purpose computer, a network of general purpose computers, or a system of interconnected parallel processors including an | Structure:<br>A general-purpose computer or a network of general-purpose computers programmed to perform the steps of FIG. 4(a) for bids and |

| algorithm that matches a first portion of an incoming order or quotation against customer orders and a remaining portion of the incoming order or quotation.  Wherein the algorithm comprises the steps of:<br><br>1) determining whether there are customer orders stored in the book memory means, and if so;<br>2) matching a first portion of the incoming order or quotation against customer orders;<br>3) determining whether there are any remaining portions of the incoming order, and if so;<br>4) matching a remaining portion (after step 2) against professional orders and quotations. | FIG 5(a) for offers. |
|---|---|

The parties agree this "means for matching" has two requirements:  (1) match a first portion of an incoming order or quotation with customer orders and (2) match a remaining portion against professional orders and quotations.  Significantly, in contrast to the other "means for matching" (discussed above), the function of this element places no limitation on how to match "a remaining portion against professional orders and quotations."  Thus, consistent with the language of the claims, ISE describes the steps "necessary" to perform the recited function—in particular, steps S150, S166, and S170 of Figure 4(a) and steps S200, S216, and S218 of Figure 5(a).

Claim 4 contains an additional "means for matching" that provides for matching a remaining portion.  *See* Section VII.B.  Both parties' proposed constructions recognize no specific formula is required for matching the remaining portion as part of this claim element.

CBOE's proposed corresponding structure identifies the entirety of Figures 4(a) and 5(a), which include steps that are not necessary to perform the recited function, such as the optional process of dealing with "a small order preference" for primary market makers.  Ex. B at Figs. 4(a), 5(a), 6:4–8 ("According to another **option**, where the size of an incoming order is less than a small order preference limit, the portion of the order not matched with public customer orders . . . is matched with a primary market maker . . . .") (emphasis added).  Thus, CBOE's proposed construction should be rejected.  *See Harris Corp.*, 417 F.3d at 1254 (where specification indicates an equation or algorithm is optional it is not a required part of the identified structure); *Micro Chem.*,194 F.3d at 1258 (finding that section 112, ¶ 6 does not "permit incorporation of structure from the written description beyond that necessary to perform the claimed function.").

D.      "Processor Means"

| "Processor means for allocating portions of the incoming order or quotation among the plurality of previously received orders and quotations in the book memory means based upon the allocation parameters in the system memory" (Claims 1, 4 and 22) | |
| --- | --- |
| ISE | CBOE |
| Function:<br>Allocating portions of the incoming order or quotation among the plurality of previously received orders and quotations based upon the allocation parameters in the system memory | Function:<br>Allocates portions of the incoming order or quotation among the plurality of previously received orders and quotations based upon the allocation parameters in the system memory |
| Structure:<br>A general purpose computer, a network of general purpose computers, or a system of interconnected parallel processors including an algorithm that divides the incoming order and quotation among the previously received orders and quotations. | Structure:<br>A general-purpose computer or a network of general-purpose computers programmed to perform the steps of FIG. 4(a) for bids and FIG. 5(a) for offers. |

The parties largely agree on the function for the "processor means" of Claim 1.[20]  But the parties disagree about what steps or formulas the "processor means" uses to allocate an incoming order and quotation according to the allocation parameters.  The crux of this dispute is over what steps are necessary to perform that function.

ISE's proposed construction of the corresponding structure is an algorithm that divides the incoming order and quotation among the previously received orders and quotations.  The specification discloses this may be done by identifying the previously received orders and quotations in the "book memory means" at the best price and apportioning the incoming order or quotation among such previously received orders and quotations.  *See, e.g.*, Ex. B at Fig. 4(a) (ref nos. S150, S166), 4(b) (ref nos. S180, S184, S182, S186, S188, S189).  Notably, how an incoming order is apportioned among previously received orders is not part of the recited function.

The allocation parameter (or the algorithm executed by the "processor means") is specifically defined in Claim 1 as including two steps:  (1) "allocating a first portion of the incoming order or quotation against previously received customer orders" and (2) "allocating a

---

[20] CBOE's proposed identification of the function for Claims 1, 4, and 22 improperly grafts a structural requirement that the function be "separate and distinct" from the system memory means and book memory means.  As detailed above, this is plainly improper.

remaining portion of the incoming order or quotation preferentially against professional orders and quotations with larger size."  However, such structural limitations are not a part of the § 112, ¶ 6, claim element.  *See Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1352 (Fed. Cir. 2003) ("The signals that are monitored by the 'means for monitoring' cannot be part of the structure that does the monitoring.").  Where a specifically identified algorithm—such as the identified allocation parameter—is to be executed by a general purpose computer, the specific algorithm is not required to be part of the structure for executing itself.  *See, e.g.*, *Network Appliance, Inc. v. Bluearc Corp.*, Civ. A. No. 03-5665, 2005 WL 6225197, *6 (N.D. Cal. Jan. 7, 2005) (construing means for executing programs as not requiring the specific program defined in the claim).

CBOE's proposed construction of the "processor means" once again ignores the functional language of the claims and attempts to read in the entirety of Figures 4(a) and 5(a).  As discussed above, many of the steps identified in those figures are "option[al]."  *See* Section VII.C., above.  Because those figures include steps unnecessary to perform the recited function, their entirety should not be included as the corresponding structure for the "processor means."  Ex. B at 6:4–8 (describing "small order preference limit" as an "option"); *see Micro Chem.*, 194 F.3d at 1258; *Harris Corp.*, 417 F.3d at 1254.  Furthermore, Figures 4(a) and 5(a) are merely examples of allocation parameters; as such, they are not the only way described in the patent for performing the function of the "processor means."

With respect to Claim 22, as it does with respect to many of the asserted items, CBOE grafts functions onto the "processor means" that are not part of element's functional language.  Specifically, in addition to the language identified above for Claims 1 and 4, Claim 22 further recites that the "processor means" "determines a best price for an instrument and compares the best price with the away market price, and if the best price is as good or better than the away market price the processor means executes the trade."  Because this language is not functional, it is not part of § 112 ¶ 6, "processor means."  *See BBA Nonwovens*, 303 F.3d at 1344.  Regardless, the parties generally agree that this additional structure is performed by step S37 of FIG. 3(b), step S39 of FIG. 3(c), or steps S108 and S112 of FIG. 3(d).  Ex. A at 23.  These steps compare the best price on the exchange with the away market price, determine if the price on the exchange is as good or better than the away market price, and if so, execute the trade at the best price.  *See* Ex. B at 9:39–43, 9:58–62, 14:18–22.

22

E.      "Away Market Querying Means"

| "away market querying means for determining an away market price for the instrument" (Claim 22) | |
|---|---|
| ISE | CBOE |
| Function: Determining an away market price for the instrument. | Function: Determines an away market price. |
| Structure: A general purpose computer, a network of general purpose computers, or a system of interconnected parallel processors including an algorithm comprising the steps of querying a reporting entity for an away market price for an instrument and receiving an away market price for such instrument. | Structure: A general-purpose computer or a network of general-purpose computers. |

The parties largely agree on the function of the "away market querying means" of Claim 22.[21]  The parties also agree that the structure is performed by a general purpose computer or a network of general purpose computers.  ISE's proposed construction identifies the algorithm disclosed in the specification necessary for performing this function.  The specification indicates that the order process "checks the price on the away market" prior to trading an incoming order. Ex. B at 9:38–42.  When the price is "checked" the exchange "receives price information from the reporting entity."  *Id.* 24:30–31; *see also id.* at Fig. 9 (S340), which "collects price and size data for all options traded on exchanges in the United States and provides this data to subscribers."  *Id.* 7:54–60.  This is consistent with ISE's proposed construction, which includes an algorithm comprising the steps of querying a reporting entity for an away market price for an instrument and receiving an away market price for such instrument.

CBOE's proposed construction does not include any structure beyond "a general purpose computer or a network of general purpose computers."  As shown above, any assertion that the '707 Patent does not disclose steps for performing the recited function ignores the plain, unambiguous teachings of the specification, and thus is incorrect.

---

[21] CBOE's identification of function further indicates that the "away market querying means" must be separate and distinct from the processor means.  As detailed above, this is plainly improper.

F.     "Away Market Process Means"

| "away market process means for entering a matching quotation at the away market price if the processor means determines that the away market price is better than the best price" (Claim 23) | |
| --- | --- |
| ISE | CBOE |
| Function:<br>Entering a matching quotation at the away market price if the processor means determines that the away market price is better than the best price on the automated exchange.<br><br>Structure:<br>1) A general purpose computer, a network of general purpose computers, or a system of interconnected parallel processors including an algorithm comprising the steps of:<br>A) determining the price difference between the away market price and the best price;<br>B) determining the number of contracts that a market maker is willing to execute at the price differential determined in Step 1; and<br>C) if the size of the incoming order or quotation is less than or equal to the number identified in Step 2, execute the trade for the number of contracts at the away market price.<br>OR<br>2) Computer workstations, personal computers, minicomputers, mainframe computers, personal digital assistants, or web TV boxes. | Function:<br>Entering a matching quotation at the away market price if the processor means determines that the away market price is better than the best price.<br><br>Structure:<br>A general-purpose computer or a network of general-purpose computers programmed to perform the steps of Fig. 9. |

The parties agree on the function of "the away market process means" of Claim 23.  ISE identifies an algorithm with only those steps necessary to perform the recited function.  This is consistent with the specification, which discloses the number of contracts that a market maker is willing to execute at the price differential determined, *see* Ex. B at Fig. 9 (Step 342 and 344), 24:45–49 ("[D]etermines a matching size that is the number of contracts that the PMM 3 is willing to execute at the better price equal to the away market for a range of price differentials[.]"), and, if the size of the incoming order or quotation is less than or equal to the number identified in Step 2, execute the trade for the number of contracts at the away market price.  *See id.* at Fig. 9 (Step 344), 24:59–62 ("If the volume of the order is less than the volume of the order shown in the away market matching table, then step S348 automatically trades the order against the PMM 3 at the away market price.").  CBOE's proposed construction makes no

effort to identify the steps "necessary" to perform the recited function nor does it read the disclosure contained in Figure 9 in light of the specification which describes the algorithm. *See Harris Corp.*, 417 F.3d at 1253–54. Specifically, Figure 9 requires the retrieval of an "away market matching table" despite the fact that this step is not required to enter a matching quotation. Instead, the "away market matching table" is identified as a separate limitation in Claims 25, 26, 59 and 60. As such, it should not be included as part of the structure of Claim 23. *See Rodime PLC*, 174 F.3d at 1305.

The specification also discloses a primary market maker may enter an away market quote at a matching price using a data terminal. If the trade can not be automatically matched, "step S346 alerts the PMM 3 of the price differential between the exchange 1 and the away market 17. The PMM 3 can then decide whether to trade the incoming order at the away market price." Ex. B at 24:64–67. The specification also discloses that the PMM 3 "enters quotations in particular options classes." *Id*. 6:65–66. The structure disclosed for entering a matching quote by the "PMM 3" at the away market price is "computer workstations, personal computers, minicomputers, mainframe computers, personal digital assistants, [or] web TV boxes." *Id*. 8:28–30. CBOE's failure to recognize this second alternative structure for entering a matching quotation is not surprising, as this embodiment alone precludes a finding that the term "automated exchange" can not involve manual processes.

Accordingly, the corresponding structure for the "away market process means" includes both the algorithm described above and the data terminals disclosed in the specification. *See Creo Prods. v. Presstek, Inc.*, 305 F.3d 1337, 1345 (Fed. Cir. 2002) (finding where more than one disclosed structure performs the recited function the claim should be construed to require either alternative structure).

### G.     "Alerting Means"

| "alerting means for generating an alert signal if the size is greater than the matching size" (Claim 27) | |
|---|---|
| ISE | CBOE |
| Function:<br>Generating an alert signal if the size is greater than the matching size<br><br>Structure:<br>A general purpose computer, a network of general purpose computers, or a system of interconnected parallel processors including an algorithm that comprising the steps of determining whether the size of the incoming order or quotation is greater than the matching size and sending a notification message if that is the case. | Function:<br>Generating an alert signal if the size is greater than the matching size<br><br>Structure:<br>A general-purpose computer or a network of general-purpose computers<br><br>The phrase "matching size" lacks antecedent basis. |

The parties agree on the function performed by the "alerting means" of Claim 27. But there is a dispute over the element's corresponding structure. CBOE fails to identify any algorithm in the specification for performing the identified function. By contrast, ISE discloses an algorithm consistent with the teachings of the specification. The specification discloses the following steps for generating an alert signal:

> At step S344 the volume of the incoming order is compared with the maximum volume for the price differential given in the away market matching table . . . . If the volume of the incoming order is greater than the volume given by the away market matching table, then step S346 alerts the PMM 3 of 65 the price differential between the exchange 1 and the away market 17.

Ex. B at 24:56–67; *see also id.* Fig. 9 (Step 346). ISE's proposed construction modifies this language to include only those steps necessary to perform the recited function (*e.g.*, the claim does not require the use of a matching table to determine that the order or quote size is greater than the matching size). *See id.* 9:49–51, 24:62–67. Thus, this Court should adopt ISE's proposed construction, which is consistent with the specification.

## VIII.   ADDITIONAL TERMS

### A.      "Professional Order"

| "Professional order" (All Asserted Claims) | |
|---|---|
| ISE | CBOE |
| Orders entered on behalf of registered broker-dealers. | Orders entered on behalf of registered broker-dealers, including Primary Market Makers (PMMs), Competitive Market Makers (CMMs) and Electronic Access Members (EAMs) |

The parties do not dispute that a "professional order" is an order made by a "broker-dealer."  There is, however, a dispute about whether the term "broker-dealer" should be construed as "including Primary Market Makers (PMMs), Competitive Market Makers (CMMs) and Electronic Access Members (EAMs)."  The specification recognizes that EAMs communicate "public customer, professional and FARMM orders to the exchange." Ex. B at 7:48–50.  Additionally, while EAMs, CMMs, and PMMs are each disclosed in the specification, those "names, types and arrangements of participants . . . are used as examples for purposes of illustration . . . [and] the particular arrangement of participants and orders may be varied and remain within the scope of invention." *Id.* 7:16–20.  Because EAMs may communicate "public customer" orders to the exchange, defining "professional order" in the manner CBOE proposes could lead to confusion.

### B.      "Allocating a Remaining Portion . . ."

| "allocating a remaining portion of the incoming order or quotation preferentially against professional orders and quotations with larger size" (Claim 1) | |
|---|---|
| ISE | CBOE |
| Allocating a remaining portion of the incoming order or quotation in a preferred manner against professional orders or quotations that are larger in size than other professional orders or quotations in the book memory means. | Allocating larger portions of the remaining incoming order or quotation to professionals quoting or ordering larger size |

ISE's proposed construction is consistent with the language of the claim.  By contrast, CBOE's attempts to change "a remaining portion" to "the remaining incoming order or quotation."  Claim 1 explicitly recites how portions of an incoming order or quotation are allocated amongst a plurality of previously received orders and quotations—"a first portion" of the incoming order or quotation is allocated "against previously received customer orders" and "*a remaining portion*" is allocated preferentially against professional orders and quotations with

27

larger size.  Ex. B at 30:9–12.  Because the claim recites "a remaining portion"—not "the remaining portion" or "the entire remaining portion"—it is not limited to a single remaining portion.  *See KCJ Corp. v. Kinetic Concepts, Inc.* 223 F.3d 1351, 1356 (Fed. Cir. 2000) ("This court has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transition phrase comprising.").  Thus, CBOE's proposed construction directly contradicts the language of Claim 1 and is improper.  *Phillips*, 415 F.3d at 1312 ("It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude.") (internal quotations omitted).

C.      **"Pro Rata"**

| **"Pro rata" (Claims 2 and 36)** | |
|---|---|
| **ISE** | **CBOE** |
| Based on a percentage of the size of a professional's order or quotation with reference to the total size of the professional orders and quotations at the same price. | In proportion according to size |

ISE's proposed construction is consistent with the use of "pro rata" in the '707 Patent.  In contrast, just as with its other proposed claim constructions, CBOE's proposed construction of "pro rata" ignores the express teachings of the '707 Patent and limits the term to a particular disclosed embodiment—namely, a "straight-line" pro rata calculation (or one based on only the size of the previously received orders and quotations).  The '707 Patent describes "pro rata" broadly, explicitly teaching allocating an incoming order using "straight-line" pro rata or weighted pro rata—that is, using a percentage or other weighting factor along with size.  *See, e.g.,* Ex. B at 16:57–59, 17:64–66, 18:54–58.  CBOE wrongly relies on dictionary definitions that contradict the plain teaching of the specification.  *See Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1305 (Fed. Cir. 2005) (dictionary definitions may be useful "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents").

### D.    Allocating/Matching

| "Allocating" and "Matching" (All Asserted Claims; "Matching" Not in Claim 1) | |
|---|---|
| ISE | CBOE |
| Allocating<br>Dividing the incoming order or quotation among the previously received orders and quotations.<br><br>Matching<br>Identifying a counterpart previously received order or quotation for receiving a portion of an incoming order or quotation. | Allocating<br>Dividing portions of the incoming order or quotation among the previously received orders and quotations. It is a distinct process from "matching."<br><br>Matching<br>Identifying a counterpart order or quotation for an incoming order or quotation based on price. It is a distinct process from "allocating." |

The parties' constructions of "allocating" and "matching" are similar.  The key differences are CBOE proposes to graft an additional limitation onto each, requiring allocating and matching to be separate and distinct processes.[22]  That directly conflicts with the specification, the prosecution history, CBOE's own proposed constructions, as well as established Federal Circuit precedent.

Any suggestion that the terms allocating and matching are used to describe separate processes is directly contradicted by the specification.  "The bid matching process 34 and the offer matching process 36 allocate the trade among the professional orders and quotations at the best price according to an algorithm stored in the system memory 26."  Ex. B at 15:28–32.  Moreover, "FIGS. 4(a)-4(b) illustrate an embodiment of bid matching according to the invention [and] FIGS. 5(a)-5(b) illustrate an embodiment of offer matching according to the invention."  *Id.* 15:32–35.  Thus, in direct contrast to CBOE's construction, the specification discloses these processes as a single process with two figures identifying the various steps of the process.  That the "bid matching process" and "offer matching process" are described in two separate figures does not make it two separate processes.  *See Gart v. Logitech Inc.,* 254 F.3d 1334, 1342 (Fed. Cir. 2001) (refusing to read in limitation from drawing where "written description does explicitly limit the subject matter of the patent").

---

[22] To the extent CBOE's construction implies that "allocating" only concerns "dividing portions" of an incoming order and not an entire incoming order, such construction directly contradicts the teachings of the specification and must be rejected.  Ex. B at 1:13–17 ("The invention . . . allocates trades among market professionals and assures liquidity), 30:2–4 ("allocating trades between the incoming order or quotation and the previously received orders and quotations").

As the parties' proposed constructions would suggest, the specification describes the process of dividing an incoming order among previously received orders or quotations and identifying a counterpart order for receipt of a portion of the incoming order as intertwined. Specifically, the specification discloses that an "allocation formula [is provided] for matching, Ex. B at 16:24–27, the "bid matching process" allocates, *id.* 10:6–7, 16:24–25, and "[t]he exchange allocates the matching of orders." *Id.* at Abstract.  In fact, both Figure 4(b) of the "bid matching process" and Figure 5(b) of the "order matching process" are entitled "allocation algorithm."  This renders absurd any suggestion that allocating and matching must be distinct.

Furthermore, any construction of matching that requires it to be a separate process from allocating would directly conflict with the language of the claims.  Claim 32 specifically requires that "the step of second matching further comprises allocating the remaining portion among the plurality of professional orders."  And, CBOE itself identifies the same figure for performing the allocating of the "processor means" of Claim 1 and the "means for matching" of Claim 4— namely, Figures 4(a) and 5(a).  *Compare* Ex. A at 21 *with id.* at 15.  As CBOE's own constructions recognize that the process for allocating and matching are identified in the same figures, CBOE's construction of these terms as separate processes must fail.  *See, e.g.*, *Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l*, 389 F.3d 1370, 1377 (Fed. Cir. 2004) (courts should "construe[] claim terms in a manner that renders the patent internally consistent").


Dated: July 8, 2009

|  | s/Michael S. DeVincenzo |
|---|---|
| Michael D. Huber | Parker Bagley |
| Cray Huber Horstman Heil & Van Ausdal LLC | Michael S. DeVincenzo |
| 303 W Madison, Suite 2200 | GOODWIN PROCTER LLP |
| Chicago, IL  60606 | The New York Times Building |
| Telephone No.:  (312) 332-8450 | 620 Eighth Avenue |
| Facsimile No.:   (312) 332-8451 | New York, New York  10018 |
|  | Tel.:  212.813.8800 |
|  | Fax:  212.355.3333 |
|  | *Attorneys for Defendant International Securities Exchange, LLC* |

### CERTIFICATE OF SERVICE

The undersigned certifies pursuant to Fed.R.Civ.P. 5 and L.R. 5.5, that a true and correct copy of the foregoing document was filed on July 8, 2009 with the Clerk of the Court using the CM/ECF system, which will send notice to counsel of record.


s/Michael S. DeVincenzo
Michael S. DeVincenzo