# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

Chicago Board Options Exchange, Inc.,

        Plaintiff,

v.

International Securities Exchange, LLC,

        Defendant.

Civil Action No. 07-cv-623

The Hon. Joan H. Lefkow, U.S.D.J.
The Hon. Jeffrey Cole, U.S.M.J.

## DEFENDANT INTERNATIONAL SECURITIES EXCHANGE, LLC'S
## CLAIM CONSTRUCTION REPLY BRIEF

COUNSEL FOR DEFENDANT
INTERNATIONAL SECURITIES EXCHANGE, LLC

Michael D. Huber
Cray Huber Horstman Heil & Van Ausdal LLC
303 W Madison, Suite 2200
Chicago, IL  60606
Telephone No.:  (312) 332-8450
Facsimile No.:   (312) 332-8451

Parker Bagley
Michael S. DeVincenzo
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York  10018
Tel.:  212.813.8800
Fax:  212.355.3333

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................1

II.     RESTATEMENT OF CLAIM CONSTRUCTION PRINCIPLES ....................................2

III.    "AUTOMATED EXCHANGE" ..............................................................................4

IV.     ALLOCATING/MATCHING ...............................................................................8

V.      MEMORY MEANS..........................................................................................11

        A.      "Book Memory Means".........................................................................11

        B.      "System Memory Means" ......................................................................15

VI.     COMPUTER-IMPLEMENTED MEANS .................................................................16

        A.      "Means for Matching . . . on a Pro Rata Basis" ......................................17

        B.      "Means for Matching . . . [With a] Minimum Allocation Percentage" .................19

        C.      "Means for Matching a First Portion . . . and a Remaining Portion".....................21

        D.      "Processor Means"...............................................................................23

        E.      "Away Market Querying Means" ...........................................................25

        F.      "Away Market Process Means" .............................................................26

        G.      "Alerting Means" .................................................................................27

VII.    ADDITIONAL TERMS ....................................................................................29

        A.      "Professional Order"...........................................................................29

        B.      "Allocating a Remaining Portion . . ."....................................................29

        C.      "Pro Rata" .........................................................................................30

## TABLE OF AUTHORITIES

**Cases**

*AllVoice Computing PLC v. Nuance Communs., Inc.*,
  504 F.3d 1236 (Fed. Cir. 2007) ................................................................................. passim

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
  314 F.3d 1313 (Fed. Cir. 2003) ........................................................................................ 7

*Applied Medical Resources Group v. U.S. Surgical Corp.*,
  448 F.3d  1324 (Fed. Cir. 2006) ..................................................................................... 10

*Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*,
  521 F.3d 1328 (Fed. Cir. 2008) ...................................................................................... 20

*Atmel Corp. v. Info. Storage Devices, Inc.*,
  198 F.3d 1374 (Fed. Cir. 1999) ........................................................................................ 2

*BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC*,
  303 F.3d 1332 (Fed. Cir.2002) .......................................................................... 13, 21, 24

*Borgwarner, Inc. v. New Venture Gear, Inc.*,
  237 F. Supp. 2d 919 (N.D. Ill. 2002) .......................................................................... 16, 17

*Budde v. Harley-Davidson, Inc.*,
  250 F.3d 1369 (Fed. Cir. 2001) .............................................................................. 14, 19, 27

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*,
  424 F.3d 1293 (Fed. Cir. 2005) ...................................................................................... 30

*Energizer Holdings Inc. v. Int'l Trade Comm'n*,
  435 F.3d 1366, 77 USPQ2d 1625 (Fed. Cir. 2006) ................................................... 28

*Epistar Corp. v. Int'l Trade Comm'n*,
  566 F.3d 1321 (Fed. Cir. 2009) ........................................................................................ 7

*Finisar Corp. v. DirecTV Group, Inc.*,
  523 F.3d 1323 (Fed. Cir. 2008) ...................................................................................... 16

*Garmin LTD. v. TomTom, Inc.*,
  Civ. A. No. 06-C-0062-C,
  2006 WL 6005801 (W.D. Wisc. Aug. 24, 2006)........................................................... 16

*Golden Voice Tech. & Training v. Rockwell Fisrtpoint Contact Corp.*,
  267 F. Supp. 2d 1190 (M.D. Fla. 2003)......................................................................... 13

*Harris Corp. v. Ericsson Inc.*,
    417 F.3d 1241 (Fed. Cir. 2005) ................................................................................ passim

*Honeywell Int'l Inc. v. ITT Indus., Inc.*,
    452 F.3d 1312 (Fed. Cir. 2006) ........................................................................................ 5

*Housey Pharm. Inc. v. AstraZeneca UK Ltd.*,
    366 F.3d 1348 (Fed. Cir. 2004) ........................................................................................ 2

*Howmedica Osteonics Corp. v. Wright Med. Tech.*,
    540 F.3d 1337 (Fed. Cir. 2008) ................................................................................... 3, 8

*In re Am. Acad. of Sci. Tech. Ctr.*,
    367 F.3d 1359 (Fed. Cir. 2004) ........................................................................................ 7

*In re Guess*,
    2009 WL 1598475 (Fed. Cir. June 9, 2009) ................................................................... 13

*KCJ Corp. v. Kinetic Concepts, Inc.*
    223 F.3d 1351 (Fed. Cir. 2000) ...................................................................................... 30

*Kenali Mfg. Co. v. Genlyte Thomas Group LLC*,
    439 F. Supp. 2d 854 (N.D. Ill. 2006) ....................................................................... 14, 27

*Lampi Corp. v. Am. Power Prods., Inc.*,
    228 F.3d 1365 (Fed. Cir. 2000) ...................................................................................... 12

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004) .......................................................................................... 3

*MercExchange, L.L.C. v. eBay, Inc.*,
    401 F.3d 1323 (Fed. Cir. 2005), *vacated and remanded on different grounds by*
    126 S. Ct. 1837 (2006) ...................................................................................................... 7

*Micro Chem. Inc. v. Great Plains Chem. Co.*,
    194 F.3d 1250 (Fed. Cir. 1999),
    *rev'd in part and vacated on other grounds*, 318 F.3d 1119 (Fed. Cir. 2003) ................. passim

*Network Appliance, Inc. v. Bluearc Corp.*,
    Civ. A. No. 03-5665, 2004 WL 5651036, (N.D. Cal. Nov. 30, 2004) ..................................... 12

*NTP, Inc. v. Research in Motion, Ltd.*,
    418 F.3d 1282 (Fed. Cir. 2005) ...................................................................................... 12

*Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003) ......................................... 12

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ........................................................................................ 3

*Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*,
   318 F.3d 1143 (Fed. Cir. 2003),
   *rev'd on other grounds*, 412 F.3d 1284 (Fed. Cir. 2005) ....................................... 12

*Rodime PLC v. Seagate Tech., Inc.*,
   174 F.3d 1294 (Fed. Cir. 1999) ........................................................... 12, 20, 27, 28

*S3 Inc. v. Nvidia Corp.*,
   259 F.3d 1364 (Fed. Cir. 2001) ...................................................................... 14, 27

*Saunders Group, Inc. v. Comfortrac, Inc.*,
   492 F.3d 1326 (Fed. Cir. 2007) ................................................................................ 7

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
   242 F.3d 1337 (Fed. Cir. 2001) ............................................................................... 5

*Southwall Techs., Inc. v. Cardinal IG Co.*,
   54 F.3d 1570 (Fed. Cir. 1995) ........................................................................... 8, 19

*Tel-Lock, Inc. v. Thomson Consumer Elecs.*,
   Civ. A. No. 03-C-320, 2005 WL 741930, (N.D. Ill. March 30, 2005) ..................... 6

*Transclean Corp. v. Bridgewood Servs., Inc.*,
   290 F.3d 1364 (Fed. Cir. 2002) ............................................................................. 21

*Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173 (Fed. Cir. 2006) ........................ 6

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ........................................................................... 3, 8

*Voda v. Corids Corp.*,
   536 F.3d 1311 (Fed. Cir. 2008) ............................................................................... 4

*Wenger Mfg., Inc. v. Coating Machry. Sys., Inc.*, 239 F.3d 1225 (Fed. Cir. 2001) ..................... 12

*WMS Gaming, Inc. v. Int'l Game Tech.*,
   184 F.3d 1339 (Fed. Cir. 1999) ..................................................................... passim

**Statutes**

35 U.S.C. § 112....................................................................................................... passim

## I.   INTRODUCTION

Defendant International Securities Exchange, LLC ("ISE") respectfully submits this brief in response to Chicago Board Options Exchange, Inc.'s ("CBOE") Opening Claim Construction Brief ("CBOE's Brief" or "CBOE Br."), pursuant to the Court's February 10, 2009 Scheduling Order.  CBOE makes three principal errors in support of its proposed claim constructions.  First, CBOE briefs claim construction as if this Court and the Federal Circuit have not established any rules for doing so, ignoring without justification scores of well-established principles of claim construction.  Second, CBOE misreads or misinterprets the intrinsic evidence, leading to its proposal of clearly erroneous—and, at times, contradictory—constructions.  Third, CBOE baselessly asserts claims to be invalid as indefinite, ignoring the presumption of validity and the burden of proving invalidity by clear and convincing evidence.

Contrary to the basic principles of claim construction, CBOE indiscriminately reads limitations of a preferred disclosed embodiment into almost every claim term, ignores an express disclosure of a generic embodiment that is not so limited and disregards the well-established controlling precedent prohibiting such actions.  Additionally, CBOE's application of the law concerning means-plus-functions elements, in general, and computer-based means-plus-function elements, specifically, directly contradicts established Federal Circuit precedent.  Lastly—and perhaps most egregiously—CBOE relies heavily on alleged "inventor testimony against interest," which it incorrectly states is "particularly probative" to claim construction, but this too is contrary to Federal Circuit precedent.

In addition to its blatant disregard of established legal precedent, CBOE relies on a misreading or a misinterpretation of the intrinsic evidence, as demonstrated by the numerous conflicting—and, at times, contradictory—statements in its brief.  For instance, CBOE asserts that the "means for matching . . . on a pro rata basis" of Claim 2 is invalid as indefinite because the '707 Patent allegedly fails to disclose an algorithm for doing so.  CBOE Br. 22.  Yet, in support of its proposed construction of the term "pro rata," CBOE cites and quotes verbatim large portions of the specification that explicitly describe an algorithm for matching on a "pro rata basis."  CBOE Br. 14.  CBOE also argues that the specification requires "matching" and "allocating" to be "separate and distinct" functions, yet later concedes that the same algorithms that disclose "matching" also disclose "allocating."  *See infra*, Section IV; CBOE Br. 17 and 26 (identifying Figures 4A-5B as disclosing algorithms for both matching and allocating).  CBOE

further argues that the patent limits "matching" to matching "based upon price," despite express disclosures to the contrary, and claim language which requires "matching . . . on a pro rata basis." *See infra* Section IV. These confusing and contradictory statements cannot be reconciled with each other, let alone with the specification of the '707 Patent.

Finally, CBOE wrongly alleges that various asserted claims are invalid as indefinite because the '707 Patent does not disclose structure for performing the function of certain means-plus-function claim elements. As a general matter, patent claims are presumed valid, and overcoming that presumption requires a showing of clear and convincing evidence. Moreover, whether a patent discloses sufficient structure to support a means-plus-function limitation is determined in view of the understanding of one skilled in the art. *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1379 (Fed. Cir. 1999). CBOE offers no evidence—let alone clear and convincing evidence—that the algorithms identified by ISE fail to "*disclose adequate defining structure* to render the bounds of the claim understandable to one of ordinary skill in the art." *See AllVoice Computing PLC v. Nuance Communs., Inc.*, 504 F.3d 1236, 1245 (Fed. Cir. 2007) (reversing district court finding of indefiniteness). Instead, CBOE merely makes conclusory assertions that the algorithms identified by ISE are insufficient. This, without more, fails to satisfy CBOE's burden on invalidity. *Id.*

Each of these errors manifests a fundamental flaw in CBOE's Brief—an avoidance of controlling precedent established to guide the claim construction process. In fact, these errors infect CBOE's brief to such an extent that ISE feels obligated to provide herewith a restatement of certain claim construction principles, with examples of CBOE's misapplication of them.

In the remainder of this brief, ISE responds to each of CBOE's proposed constructions in detail. And for the reasons set forth in ISE's Opening Claim Construction Brief ("ISE Br.") and in this reply brief, ISE respectfully requests that its constructions be adopted.

## II.    RESTATEMENT OF CLAIM CONSTRUCTION PRINCIPLES

**CBOE ignores the ordinary and customary meaning of the claim terms.** "When construing patent claims, there is a **heavy presumption** that the language in the claim carries its ordinary and customary meaning amongst artisans of ordinary skill in the relevant art at the time of the invention." *Housey Pharm. Inc. v. AstraZeneca UK Ltd.*, 366 F.3d 1348, 1351-52 (Fed. Cir. 2004) (emphasis added). CBOE does not dispute that "[t]he claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope

using **words or expressions of manifest exclusion or restriction**." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (emphasis added).  Despite this, CBOE seeks to add the words "separate and distinct" to many claimed functions and adds a requirement that matching must be "based upon price," without identifying a single alleged disavowal contained in the '707 Patent.  Additionally, in arguing that a "disavowal" is present in the specification with respect to the term "automated exchange," CBOE completely fails to explain how the statements it relies upon could possibly effectuate the broad disclaimer it seeks.

**CBOE improperly relies on extrinsic evidence.**  In an effort to read various limitations into claim terms—e.g., "automated exchange" and "matching"—CBOE incorrectly relies upon extrinsic evidence to vary or expand on the meaning given to claim terms in the intrinsic evidence.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317-19 (Fed. Cir. 2005); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583-85 (Fed. Cir. 1996).  Specifically, CBOE cites to the deposition of Mr. Katz liberally throughout its opening brief and argues that this inventor evidence is "particularly probative when it is against interest."  CBOE Br. 4, 9.  Not only are CBOE's characterizations of Mr. Katz's testimony factually inaccurate, but the Federal Circuit has held such testimony irrelevant to claim construction—unless the inventor is prepared to give expert testimony—regardless of whether it is against interest.  *See Howmedica Osteonics Corp. v. Wright Med. Tech.*, 540 F.3d 1337, 1346 (Fed. Cir. 2008).  But Mr. Katz was not offered—and did not testify at his deposition—as an expert.

**CBOE's construction of means-plus-function elements is plainly improper.**  The parties agree generally that a term must be construed under 35 U.S.C. § 112, ¶6, by first identifying the recited function and then identifying the disclosed structure for performing that function.  Yet, in proposing its constructions, CBOE deviates substantially from this two-step process.  In identifying recited functions, CBOE repeatedly adds a limitation requiring that the claim elements be "separate and distinct" from each other.  By adding this limitation, CBOE completely ignores that 35 U.S.C. § 112, ¶ 6 "does not permit limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim." *Micro Chem. Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999), *rev'd in part and vacated on other grounds*, 318 F.3d 1119 (Fed. Cir. 2003).  Furthermore, when the disclosed structure for a "means" element is an algorithm, CBOE repeatedly "incorporat[es] . . . structure

from the written description beyond that necessary to perform the claimed function." *Id.*  In fact, CBOE fails to even allege that it has incorporated the necessary portions of identified algorithms.

CBOE's treatment of computer-implemented "means" elements is particularly egregious as it selectively ignores algorithms disclosed in the specification, evidently relying on a mistaken and unsupported presumption that an "algorithm" may be disclosed only as part of a patent figure, and that its steps are limited to a verbatim recitation of the language contained in the specification or provided by a figure.  This is simply not the case.  *See Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253-54 (Fed. Cir. 2005) (construing six columns of text and three figures as a two-step algorithm); *see also WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348-49 (Fed. Cir. 1999) (construing a picture of a gaming wheel as a four step algorithm).  As with many of its positions detailed above, CBOE cites no case law supporting this position.

## III.   "AUTOMATED EXCHANGE"

| "automated exchange" (All Asserted Claims) | |
|---|---|
| **ISE** | **CBOE** |
| An exchange that includes a system that automatically matches incoming orders and quotations with stored orders and quotations. | An "automated exchange" is a fully automated exchange in which no matching or allocating is performed manually in open outcry. |

The parties agree that what is automated in the recited "automated exchange" is the process or system for allocating and/or matching of incoming orders.  ISE Br. 5-10; CBOE Br. 5-6.  The parties also agree that, for CBOE's proposed construction to be plausible, CBOE must point to "an intentional disclaimer or disavowal" of claim scope within the intrinsic evidence.  *See* CBOE Br. 5.  The only issue for this Court to decide is whether the two statements CBOE relies on represent a clear disavowal of an exchange where any trades are matched or allocated manually.  They do not.  Nowhere is it stated—let alone "stated *directly* [in] the specification of the '707 Patent," as asserted by CBOE, (CBOE Br. 5 (emphasis in original))—that an automated exchange must match and allocate every single trade without any manual steps.

**CBOE's proposed construction is contrary to the teachings of the '707 Patent.**  To find a disavowal, courts require an explicit statement of intent to disclaim, *see Voda v. Corids Corp.*, 536 F.3d 1311, 1320 (Fed. Cir. 2008) (refusing to limit claim scope because no "clear disavowal of claim scope" in specification), or as CBOE recognizes, "repeated derogatory statements in the specification denigrating one previously used material in favor of another."

CBOE Br. 5.  Indeed, in the cases CBOE relies on, the Federal Circuit found a disclaimer based upon **numerous unambiguous** statements throughout the specification about the **specific subject matter** at issue.  *See Honeywell Int'l Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1320 (Fed. Cir. 2006) (defining "electronically conductive fibers" to exclude "carbon fibers" based upon repeated and explicit statements denigrating "carbon fibers"); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,* 242 F.3d 1337, 1344 (Fed. Cir. 2001) (finding disclaimer where written description contained specific denigration of prior art and "**many** statements" supporting such denigration) (emphasis added).  In contrast to this precedent, CBOE fails to identify a single statement evidencing the specific intent to exclude from the claimed invention an exchange that executes any trades manually.  Instead, it relies on two innocuous statements characterizing prior art systems in the Background of the '707 Patent.  *See* CBOE Br. 5-6.  This is not surprising as the specification recognizes that trades can be matched and allocated manually as part of an automated exchange.  *See* ISE Br. 8-9.  In fact, it recognizes that an "automatic allocation system" may include a system that provides a "guaranteed market for [only] incoming smaller sized public customer market orders."  Ex. B at 2:25-32.[1]

      The first statement CBOE relies upon from the Background of the '707 Patent states: "Although some processes that take place on these floor-based exchanges have been automated or partially automated, they are not fully integrated and, in fact, many processes continue to function manually."  CBOE Br. 5-6 (quoting Ex. B at 1:37-40).  Contrary to CBOE's assertions, this statement does not equate "fully integrated" with "fully automated."  *See* ISE Br. 8-9.  Nor does it disavow any system with a manual process, let alone all such systems.  *Id.*  Instead, that statement refers to the integration of stored public customer orders and professional orders as part of the book memory.  Ex. B at 3:30-40.  Notably, CBOE does not dispute this.  In fact, it urges the Court to consider—and even quotes—the testimony of Katherine Simmons, who testified that the phrase "fully integrated" referred to "[prior art] exchanges ha[ving] floor-based crowd trading that was not integrated with the electronic books, if they had any."  CBOE Br. 6.  Ms. Simmons's testimony is consistent with the specification and the '707 Patent prosecution history, which states that "[b]y storing distinct customer and professional orders and quotations, and by allocating trades based on a predetermined allocating parameter, an exchange according to the invention can fairly and rapidly allocate trades and can provide an incentive for

_____

[1] All exhibits referred to herein are attached to the Declaration of Charles Wizenfeld, submitted herewith.

professionals to quote larger sizes . . . ."  Ex. C at ISE0000243; *see also* ISE Br. 8-9.  Thus, far from equating "fully automated" with "fully integrated," Ms. Simmons statement as well as the intrinsic evidence recognize that a deficiency of floor-based exchanges with "automated or partially automated" processes or systems was the lack of a common book memory.[2]

Similarly, CBOE mistakenly relies on a second statement from the Background indicating that "the invention [is] particularly advantageous over less automated systems because **many** of the routine decisions made by professionals in charge of a series of options **can be** defined in advance and applied automatically."  CBOE Br. 6 (citing Ex. B at 6:53-58) (emphasis added).  This statement explicitly recognizes that while certain routine decisions by a professional can be made in advance and applied automatically, others can not be, and thus have to be handled manually.  *See* ISE Br. 8.  Indeed, the specification later gives examples of decisions that are not "defined in advance and applied automatically" but instead are applied manually.  *See* ISE Br. 6-7.  For example, the '707 Patent discloses that, upon receipt of a block order by the automated exchange, professionals are "sent a message," allowed "to enter individual bids and offers," and "respond within a limited time period."  Ex. B. at 11:49-67; ISE Br. 6.  Similarly, where the best price for an incoming order is not on the "automated exchange," the exchange permits market participants to "decide" whether to match the order, and to "choose to execute the order" as part of the matching process.  Ex. B. at 9:54-57; 24:66-67; ISE Br. 7.

Moreover, when read in context with the entire '707 Patent, CBOE's "intentional disclaimer" argument is tenuous, at best.  As detailed above, each statement CBOE relies on is consistent with defining "automated exchange" as an exchange that includes a system for automatically matching and allocating trades.  Hence, at most, they describe general improvements and advantages of the disclosed invention over the prior art systems disclosed.  Such "general statements [regarding prior art systems], without more," do not effect a disavowal of claim scope.  *See Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1180-1181 (Fed. Cir. 2006) (finding that "general statements, without more, will not be interpreted to disclaim every feature of every prior art device discussed in the 'BACKGROUND ART' section

---

[2] ISE recognizes that Ms. Simmons's testimony is irrelevant to claim construction because she is neither one skilled in the art qualified to opine on the '707 Patent nor a patent attorney.  *See Tel-Lock, Inc. v. Thomson Consumer Elecs.*, Civ. A. No. 03-C-320, 2005 WL 741930, *7 (N.D. Ill. March 30, 2005) (Lefkow, J.) ("Generally, testimony from a patent attorney, not skilled in the art, as to how to construe the language of the patent will not be helpful and may be excluded.").  But CBOE's reliance on that testimony reflects its general misunderstanding of how the term "integrated" is used in the '707 Patent.

of the patent" where they characterize prior art devices as "limited in their performance and unable to satisfy the needs for automated, high precision immunohistology" and describe the invention as "a device which provides more rapid, reliable and more reproducible results than standard methods"); *see also Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1334-36 (Fed. Cir. 2009); *In re Am. Acad. of Sci. Tech. Ctr.*, 367 F.3d 1359, 1367-69 (Fed. Cir. 2004).

Indeed, both the claims and the specification explicitly recognize that an "automated exchange" may allocate or match incoming orders using manual steps and/or processes. *See* ISE Br. 8-9. For instance, the asserted claims require "**receiving** an incoming order" and "**entering** a matching quotation . . . having a size associated therewith." *See* Ex. B at 29:55-60 (Claim 1), 7:9-15, 7:46-53 (Claim 23) (emphasis added); *MercExchange, L.L.C. v. eBay, Inc.*, 401 F.3d 1323, 1338 (Fed. Cir. 2005), *vacated and remanded on different grounds by* 126 S. Ct. 1837 (2006) (affirming district court construction of "automated method" to include a method with manual steps, where claims require a computer system to "receive bids" and "establish a seller's account"). Similarly, contrary to CBOE's arguments, the specification discloses various processes and systems in the "automated exchange" that can include manual steps. *See, e.g.,* Ex. B at 11:49-67 (block order process), 9:54-57 (away market process), 24:66-67 (same). Because each of those processes is part of the preferred embodiment disclosed in the '707 Patent, any proposed construction not encompassing them would be "rarely, if ever, correct." *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1349 (Fed. Cir. 2003).

**CBOE reliance on the prosecution history to buttress its argument is similarly misplaced.** The statement in the provisional application that CBOE relies on concerns an "electronic exchange," (CBOE Br. 6), and cannot be read as a disclaimer with respect to an "automated exchange." *See* ISE Br. 9-10; *Saunders Group, Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1333 (Fed. Cir. 2007) ("When the purported disclaimers are directed to specific claim terms that have been omitted or materially altered in subsequent applications . . . those disclaimers do not apply."). Moreover, the provisional application relied upon by CBOE explicitly states that the "away market process" of the automated exchange may include manual steps: "The away market process 28 **either trades the order automatically** . . . or else alerts the PMM . . . **so that the PMM 3 can handle the order manually**." Ex. D at ISE0871772 (second emphasis added); *see also id.* at ISE0871826 (indicating that the primary market maker may choose to "handle [an incoming order] manually").

7

**CBOE incorrectly relies on irrelevant extrinsic evidence, including inventor testimony and conclusory expert opinions.**  CBOE's reliance upon Mr. Katz's testimony is legally irrelevant and factually inaccurate.  First, CBOE incorrectly states that inventor testimony arising to "admissions against interest are particularly probative of a proper claim construction." CBOE Br. 4.  However, that is not the case; in fact, inventor testimony is of "little or no probative weight," regardless whether "it is against the inventor's interest."  *See Howmedica*, 540 F.3d at 1346.  Second, although largely irrelevant, Mr. Katz testified for two days and unequivocally defined the term "automated exchange" numerous times to include an exchange with an automated system for allocating and matching.  Ex. E at 33, 48-51, 70-76, 261-64, 271-73.  Thus, CBOE's reliance on a single, legally irrelevant statement, taken out of context in an attempt to equate "automated exchange" with "fully electronic exchange," cannot effectuate the unambiguous disavowal it seeks.

CBOE's expert's declaration should be wholly discarded, as it is merely a conclusory statement of support for CBOE's position.  *See Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1577-78 (Fed. Cir. 1995) (finding "conclusory legal opinion" regarding meaning of claim term irrelevant to proper construction).  Furthermore, CBOE may not rely upon expert testimony to demonstrate that an unambiguous disclaimer exists because, by definition, expert testimony is irrelevant where the statement in the specification is unambiguous.  *See Vitronics Corp.*, 90 F.3d at 1584 ("[W]here the patent documents are unambiguous, expert testimony regarding the meaning of a claim term is entitled to no weight.").

## IV.    ALLOCATING/MATCHING

| "Allocating" and "Matching" (All Asserted Claims; "Matching" Not in Claim 1) | |
|---|---|
| **ISE** | **CBOE** |
| Allocating<br>Dividing the incoming order or quotation among the previously received orders and quotations. | Allocating<br>Dividing portions of the incoming order or quotation among the previously received orders and quotations. It is a distinct process from "matching." |
| Matching<br>Identifying a counterpart previously received order or quotation for receiving a portion of an incoming order or quotation. | Matching<br>Identifying a counterpart order or quotation for an incoming order or quotation based on price. It is a distinct process from "allocating." |

The terms "allocating" and "matching" each concern how an incoming order or quotation is distributed among previously received orders and quotations.  The parties largely agree

"allocating" refers to dividing an incoming order or quotation, or portions of an incoming order or quotation, among the previously received orders and quotations. "Matching" refers to identifying previously received orders and quotations for receiving a portion of the incoming order or quotation.[3] The principal dispute is whether, as CBOE argues, the '707 Patent requires "allocating" and "matching" to be two distinct processes, with "matching" limited to matching based on price. The clear answer is "no."

First, the '707 Patent explicitly discloses that "allocating" and "matching" are part of the same process—the bid matching/offer matching process—and are thus necessarily interrelated:

> **The bid matching process 34 matches** buy orders against orders and quotations to sell that are stored in the book memory 33. **The offer matching process 36 matches** incoming sell orders against orders and quotations to buy stored in the book memory 33 . . . After public customer orders in the book memory 33 are executed, **the bid matching process 34 and the offer matching process 36 apply an algorithm that allocates** the remaining size of an incoming order among the professional orders and quotations at the best price.

Ex. B at 9:62-10:7 (emphasis added). As expected, the bid matching process and offer matching process match incoming orders. *Id*. 9:62-66. As part of this matching process, incoming orders are **allocated** amongst previously received orders and quotations, (*see id*. 10:3-7, 16:24-25), and ultimately **matched** with particular counterpart previously received orders. *See id*. 16:26-28 ("FIG. 4(b) shows an **allocation formula for matching** incoming orders against quotations and professional orders at the best price"), 16:64-67 (stating that after applying allocation algorithm, "[t]he bid matching process 34 determines . . . that the order has been completely filled and sends the **matches** to the execute trade process 27"). CBOE even recognizes that "matching" and "allocating" are part of the same process. For example, while CBOE argues "matching" and "allocating" are distinct processes, it admits Figures 4A-5B depict a process that allocates and matches incoming orders. *Compare* CBOE Br. 10 ("the only 'algorithms for allocating' . . . are

---

[3] CBOE's complaint that ISE failed to provide any basis for not including a construction for the term matching as part of its second preliminary proposed constructions is directly contradicted by CBOE's acknowledgment that ISE indicated it was an inadvertent oversight. CBOE Br. 11. Furthermore, each party specifically reserved the right to amend, modify and/or alter their second preliminary proposed constructions as part of the claim construction process. *See* Ex. F at 1 and Ex. G at 1.

the steps of FIGS. 4A-5B.") *and* 17 *with* 26 ("the only 'algorithms' disclosed for 'matching . . .' are the steps of FIGS. 4A-5B").

The parties agree "matching" and "allocating" have different meanings, but that does not mean they are required to be two distinct processes.  CBOE's reliance on *Applied Medical Resources Group v. U.S. Surgical Corp.*, 448 F.3d  1324, 1333 n.3 (Fed. Cir. 2006), for a contrary proposition, (CBOE Br. 8), is misplaced.  There, the court held that different claim terms are presumed to have different meanings, not that each claim term must be structurally different, separate or distinct.  *Id*.  Similarly, CBOE's argument that "allocating" and "matching" must be distinct processes because the claims recite a "means for allocating" in independent Claim 1 and a "means for matching" in dependent Claim 2 is baseless.  CBOE Br. 8, 12.  The "means for matching" of Claim 2 requires a specific limitation not included in Claim 1— "matching on a pro rata basis."  When read together, the precise process of "allocating a remaining portion . . . preferentially against professional orders" of claim 1 is what is further defined as "matching . . . on a pro rata basis" in Claim 2.  Ex. B at 30:10-20.  Thus, any construction that segregates allocating and matching into two distinct processes would not only be inconsistent with the specification but would also plainly contradict the language of the claims themselves.

Unable to demonstrate any portion of the specification defining "allocating" and "matching" as two distinct processes, CBOE again wrongly relies on and mischaracterizes Mr. Katz's deposition testimony. As stated above, Mr. Katz's deposition testimony is irrelevant to claim construction, *see* Section III., above; it is also consistent with ISE's proposed constructions:  Mr. Katz testified the disclosed invention both matches incoming orders based on price and also "matches and allocates the orders based on the size of the quotation and orders that are on the book as described in the patent." Ex. E at 164:13-16.

**Based upon price.**  CBOE's proposed construction of "matching" incorrectly limits it to matching "based on price."  To be sure, the '707 Patent discloses incoming orders are matched with previously received orders, at least in part, based on price.  However, there is no basis for limiting "matching" to just that.  In fact, the patent discloses multiple other criteria used to match incoming orders with previously received ones, such as the type of market participant, order size, and time priority.  *See* Ex. B at 6:1-3 ("professional orders and quotations are **matched on a pro rata basis**") (emphasis added), 14:60-64 ("If more than one public customer order is on the book

at the same price, **priority is assigned on the basis of entry time** and **trades are done on a first in, first serve basis**. That is, public customer orders received earliest are traded first.") (emphasis added), 18:63-66 ("In this case, PRO #1 and PRO #2 have the same *size*, which is greater than PRO #4.  Because PRO #1 has **time priority over PRO #2, PRO #1 gets matched first**.") (emphasis added).  Thus, any construction of "matching" that requires only matching "based upon price" should be rejected as directly contradictory to the intrinsic evidence.

## V.    MEMORY MEANS

### A.    "Book Memory Means"

| "book memory means for storing a plurality of previously received orders and quotations to trade a corresponding plurality of quantities of the instrument" | |
|---|---|
| **ISE** | **CBOE** |
| Function:  Storing a plurality of previously received orders and quotations to trade a corresponding plurality of quantities of the instrument.<br><br>Structure:  Memory | Function:  The book memory means, which is separate and distinct from the system memory means and processor means, stores a plurality of previously received orders or quotations to trade a corresponding plurality of quantities of the instrument, the previously received orders and quotations each having a size associated therewith and the previously received orders including public customer orders previously entered for public customers and professional orders or quotations previously entered for one or more professionals.<br><br>Structure:  A general-purpose computer or a network of general-purpose computers. |

ISE's proposed function of the "book memory means" is what is explicitly recited in the claim—"storing a plurality of previously received orders and quotations to trade a corresponding plurality of quantities of the instrument."  CBOE, however, incorrectly proposes a function deviating from the recited function.  For instance, CBOE improperly includes in its proposed function a requirement that the "book memory means" is "separate and distinct from the system memory means and processor means" and other non-functional limitations.  The Court should reject CBOE's erroneous proposed function and adopt ISE's proposed construction.

***Separate and Distinct.***[4]  As part of the recited function for many of the disputed means-plus-function limitations, CBOE incorrectly includes a requirement that they are "separate and

---

[4] CBOE makes the identical conclusory argument for each of the claim limitations wherein it attempts to add a requirement that certain functions be "separate and distinct."  As such, ISE incorporates its discussion of "separate and distinct" laid out herein in response to each of CBOE's identical arguments.

distinct" from other elements.  Neither the law nor the '707 Patent supports such a construction.
As an initial matter, because the phrase "separate and distinct" is not recited in the "book
memory means"—or any other claim—it is plainly improper to construe the function of the
element to include such a limitation.  *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314,
1322 (Fed. Cir. 2003) ("When construing the functional statement in a means-plus-function
limitation, we must take great care not to impermissibly limit the function by adopting a function
different from that explicitly recited in the claim."); *Wenger Mfg., Inc. v. Coating Machry. Sys.,
Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001); *Micro Chem.*, 194 F.3d at 1258.

        The mere fact that the "book memory means," "system memory means," and "processor
means" are separately recited in the claims and separately depicted in the drawings is insufficient
to require them to be "separate and distinct" structures.  *See Rodime PLC v. Seagate Technology,
Inc.*, 174 F.3d 1294, 1305 (Fed. Cir. 1999) ("[A] particular means may perform more than one
function."); *Lampi Corp. v. Am. Power Prods., Inc.*, 228 F.3d 1365, 1374 (Fed. Cir. 2000)
(noting "[i]t is perfectly permissible for the front sides of the first interior sleeve to provide both
support for the fluorescent tube [thus meeting "support means . . ." limitation] and electrical
connections for the tube contacts [thus meeting "electrical means . . ." limitation].").  Likewise,
that two claim limitations are different does not require that the limitations be physically
"separate and distinct."  *See NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1309-11 (Fed.
Cir. 2005) (finding that elements in a claim are not required to be "separate and distinct" without
some "textural hook in the claim language" requiring them to be so); *see also Prima Tek II,
L.L.C. v. Polypap, S.A.R.L.*, 318 F.3d 1143, 1150-51 (Fed. Cir. 2003), *rev'd on other grounds*,
412 F.3d 1284 (Fed. Cir. 2005); *Network Appliance, Inc. v. Bluearc Corp.*, Civ. A. No. 03-5665,
2004 WL 5651036, *30 (N.D. Cal. Nov. 30, 2004) (refusing to read in phrase "distinct from
mass storage device" where "no such limitation appears in the language of the claims").

        CBOE argues that a "separate and distinct" limitation is required to ensure that the
"processor means," "book memory means," and "system memory means" have different
meaning.  This too is incorrect.  Again, CBOE incorrectly relies *Applied Medical Resources
Group* for this proposition, but as with "allocating" and "matching," the parties agree that the
recited function of each claim element is different.  *See* Section IV., above.

        **Additional non-functional limitations.**  CBOE also improperly identifies as part of the
function for the "book memory means" numerous non-functional limitations that are recited in

the same claim paragraph.  This position, that the entire paragraph must be part of the recited function, is unsupported by a single case citation, contradicts controlling precedent, and is inconsistent with the language of Claim 4 which unambiguously recites two "means" clauses in a single paragraph.  *See* Ex. B at 30:49-56 (indicating that the "means for matching a first portion" and "means for matching the remaining portion" are part of the same paragraph).  Specifically, the non-functional limitations that CBOE attempts to add to the recited function describe the "previously received orders and quotations" *stored in* the "book memory means," (Ex. B at 29:60-67), not the function performed by the "book memory means."  Thus, these limitations are "separate limitations not subject to § 112, ¶ 6" and properly excluded from the function of the "book memory means."  *See BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC*, 303 F.3d 1332, 1334 (Fed. Cir. 2002) (construing "corona means cooperating with [the attenuator] and positioned for electrostatically charging the filaments" and finding language after "positioned" not part of the recited function and not subject to § 112 paragraph 6); *In re Guess*, 2009 WL 1598475 (Fed. Cir. June 9, 2009) (identifying function of "a means for producing musical tones from said playing surface in which a musician is able to contact and smoothly slide a finger relative to said playing surface in order to produce and change said musical tones thereby" as "producing musical tones."); *Micro Chem.,* 194 F.3d at 1254, 1258; *Golden Voice Tech. & Training v. Rockwell Fisrtpoint Contact Corp.*, 267 F. Supp. 2d 1190, 1208 (M.D. Fla. 2003).  As such, the recited non-functional limitations are not part of the recited function and CBOE's proposed construction should be rejected.

      **CBOE also incorrectly argues that the '707 Patent fails to disclose a corresponding structure for the "book memory means."**  As detailed in ISE's Opening Brief, the specification clearly links the function of "storing . . ." to "book memory,"  which ISE identified as "memory" in its proposed construction.  *See* ISE Br. 10-12.  For instance, the '707 Patent discloses "[t]he bid matching process 34 matches buy orders against orders and quotations to sell that are stored in the **book memory** 33."  Ex. B at 9:62-66; *see also id.* 7:60-62, 15:35-38, 15:53-54, Fig. 2 (ref no. 33).  The specification further indicates that "book memory," as identified in Figure 2, may be implemented on "a general purpose computer," "a network of general purpose computers," or a "system of interconnected parallel processors."  Ex. B at 8:55-61.  In fact, the specification specifically recognizes that "FIG. 2 is a detailed block diagram illustrating the exchange of FIG. 1" and "book memory" is explicitly identified as part of the exchange in Figure

2.  Ex. B at 6:32-34, FIG. 2 (item 33).  Similarly, the '707 Patent prosecution history states that the exchange stores "orders and quotations in a memory." *See* Ex. H at ISE0000599.  As such, the specification clearly links the recited function to memory, a component of the disclosed general purpose computer.

Despite these teachings, CBOE argues the patent does not link a "generic 'memory'" structure—or the "general-purpose computer or a network of general-purpose computers" it identifies—to the recited function of the "book memory means." CBOE Br. 20-21.  This argument is absurd in light of CBOE's concession that "one of skill in the art would understand" a general-purpose computer or network of general-purpose computers running the exchange to include a memory.  CBOE Br. 20.[5]  As detailed above, the specification explicitly indicates that such memory performs the recited function of the "book memory means."  Nothing more is needed to clearly link memory to the recited function of the "book memory means."  *See Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376 (Fed. Cir. 2001) (holding specification's reference to a "commercially available" vacuum sensor sufficient structure because one skilled in the art would understand its capability to perform the recited function); *S3 Inc. v. Nvidia Corp.*, 259 F.3d 1364, 1370 (Fed. Cir. 2001) (holding specification's reference to a "selector" sufficient structure because it is a well-known structure); *Kenali Mfg. Co. v. Genlyte Thomas Group LLC*, 439 F. Supp. 2d 854, 870 (N.D. Ill. 2006) ("[T]o meet the definiteness requirement, the patentee need not explicitly disclose details of structures well known in the art; rather, the specification need only imply a structure that would be understood by those skilled in the art as performing the function recited in the means-plus-function limitation.").

---

[5] CBOE inexplicably ignores the disclosure that the exchange may also be implemented on a "system of interconnected parallel processors." *See* CBOE Br. 20; Ex. B at 8:55-61.

### B.   "System Memory Means"

| "system memory means for storing allocating parameters for allocating trades between the incoming order or quotation and the previously received orders and quotations" | |
| --- | --- |
| ISE | CBOE |
| Function: Storing allocating parameters.<br><br>Structure: Memory | Function:  The system memory means, which is separate and distinct from the book memory means and processor means, stores allocating parameters for allocating trades between the incoming order or quotation and the previously received orders and quotations.<br><br>Structure: A general-purpose computer or a network of general-purpose computers. |

Like the "book memory means," ISE correctly proposes the function of this claim element is what is "explicitly recited" in the claim element—namely, "storing allocating parameters."[6]  *See Micro Chem.*, 194 F.3d at 1258.  Again, CBOE's proposed construction includes non-functional limitations not part of the recited functional phrase, including "separate and distinct from the book memory means and processor means" and limitations defining the type of allocation parameter stored in the "system memory means."  Just as similar non-functional limitations describing the information stored in the "book memory means" claim element were not subject to § 112, ¶ 6, so too these limitations are not subject § 112, ¶ 6.  *See* Section V.A. above.

CBOE also incorrectly asserts the '707 Patent fails to identify a structure that performs the recited function of the "system memory means."  That is incorrect.  The '707 Patent makes clear that at least one of the functions performed by "system memory 26" is storing allocating parameters.  Ex. B at 15:26-31; *see also id.* Fig. 2 (ref no. 26).  The specification further clearly indicates that the "system memory 26" is part of the general purpose computer.  Ex. B at Fig. 2.  As such, the corresponding structure of "system memory means" is memory.  For similar reasons as stated for "book memory means," CBOE's arguments as to why this limitation renders Claim 1 invalid are incorrect and should be ignored.  *See* Section V.A. above.

---

[6] CBOE disputes ISE's proposed construction of "allocating parameters" because of "ISE's replacement of the word 'parameters' with the word 'algorithms.'" CBOE Br. 9-10.  ISE recognizes that the term "parameters" is used more broadly throughout the specification, but notes that the allocation parameters are the algorithms executed in a general-purpose computer as part of the claims.  As such, ISE is not opposed to using the word "parameters" to reflect the broader use of the term in the specification.

## VI.     COMPUTER-IMPLEMENTED MEANS

The '707 Patent discloses the exchange may be implemented on "a general purpose computer," "a network of general purpose computers," or a "system of interconnected parallel processors" under the control of software.  Ex. B at 8:44-52.  The patent discloses various algorithms for the "processing done by the exchange."  *See, e.g.*, *id.* 6:34-35, 14:50-19:7.  The parties agree that Figures 4(a)-5(b), along with the associated text, disclose a process for allocating and matching incoming orders to previously received orders.  *See* CBOE Br. 10, 24. Despite this, the parties construe the means-plus-function clauses and the disclosed algorithms in a completely different manner.  Whereas ISE follows established precedent by identifying only the steps necessary to perform the numerous algorithms disclosed in the specification and construing those algorithms, CBOE ignores that precedent and improperly reads entire figures into the claim language.  *WMS Gaming,* 184 F.3d at 1348-49; *Harris Corp.*, 417 F.3d at 1253.

**An algorithm may be disclosed as a formula or as part of the written description in the specification.**  CBOE's proposed constructions of the corresponding structures for the computer-implemented means are based on an incorrect insistence that the only source for a disclosed algorithm is the steps depicted in a patent figure not modified by the written description.  This is plainly untrue.  "In software cases, . . . algorithms in the specification *need only disclose adequate defining structure* to render the bounds of the claim understandable to one of ordinary skill in the art."  *AllVoice*, 504 F.3d at 1245.  An algorithm may be expressed in any "understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure."  *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008); *see also Harris Corp.*, 417 F.3d at 1253-54 (identifying disclosed algorithm from various passages in the specification, disclosed equations, patent figures); *WMS Gaming*, 184 F.3d at 1348-49 (identifying disclosed algorithm from a pictorial representation of a gaming wheel in patent figure); *Borgwarner, Inc. v. New Venture Gear, Inc.*, 237 F. Supp. 2d 919, 936 (N.D. Ill. 2002) (construing algorithm based upon disclosed text); *Garmin LTD. v. TomTom, Inc.*, Civ. A. No. 06-C-0062-C, 2006 WL 6005801, *32 (W.D. Wisc. Aug. 24, 2006) (same).

**"Disclosed algorithms" does not mean verbatim recitation of the language from the specification or whole-scale importation of Figures.**  As explained in ISE's Opening Brief, in *Harris Corp.*, the Federal Circuit provided guidance on how to identify and determine the

algorithms disclosed in the specification.  ISE Br. 14-15.  There, the court first identified the portions of the specification disclosing the algorithm performing the recited function, then it identified the steps necessary to perform that function, and construed the disclosed algorithm as a two-step process.  417 F.3d at 1254.

The Federal Circuit in *WMS Gaming*—the only case relied upon by CBOE wherein the Federal Circuit identified an algorithm as part of the structure—identified the disclosed algorithm in a similar way.  There, despite finding the written description of U.S. Pat. No. 4,448,419 (the "'419 Patent") was "devoid of any structure to support the" limitation at issue, court found sufficient "disclosed structure" in figure 6 of the '419 Patent.  *WMS Gaming*, 184 F.3d at 1348-49.  The court did not construe the structure as the entirety of the figure; instead, it explained Figure 6 "assign[s] a plurality of single numbers to stop positions such that: 1) the number of single numbers exceeds the number of stop positions; 2) each single number is assigned to only one stop position; 3) each stop position is assigned at least one single number; and 4) at least one stop position is assigned more than one single number."  *Id.*  The court determined the disclosed algorithm based solely on the figure disclosed above, *see* Ex. I, FIG. 6, '419 Patent, and consistent with the purpose of claim construction, construed the disclosed algorithms in a manner that was understandable to a jury. *See WMS Gaming*, 184 F.3d at 1348-49; *see also, e.g., Borgwarner*, 237 F. Supp. 2d at 933 (relying upon *WMS Gaming* and construing disclosed algorithm).



FIG. 6

A.      "Means for Matching . . . on a Pro Rata Basis"

| "means for matching the remaining portion with professional orders or quotations in the book memory means on a pro rata basis" | |
|---|---|
| ISE | CBOE |
| Function:<br>Matching the remaining portion with professional orders or quotations in the book memory means on a pro rata basis. | Function:<br>Matching the remaining portion with professional orders or quotations in the book memory means on a pro rata basis. |

| Structure: | Structure: |
|---|---|
| A general purpose computer, a network of general purpose computers, or a system of interconnected parallel processors including an algorithm comprising the step of matching the remaining portion based on a percentage of the size of a professional's order or quotation with reference to the total size of the professional orders and quotations at the same price. | A general-purpose computer or a network of general-purpose computers, but there is no disclosure of the steps such general purpose computer(s) would perform. |

The parties agree on the function of this claim element and that the function is performed by a general-purpose computer or a network of general-purpose computers.[7] ISE Br. 16; CBOE Br. 22-23.  But, even though the patent unequivocally discloses an algorithm for matching on a pro rata basis, (*see* ISE Br. 15-16), CBOE incorrectly alleges the '707 Patent contains "no disclosure of the steps" to perform the recited function.  That is not the case.

In fact, CBOE's argument that no algorithm is clearly linked to "matching . . . on a pro rata basis" is directly contradicted by numerous statements in its own brief.  For instance, CBOE concedes Figure(s) 4(a)-5(b) disclose a process for matching incoming orders, CBOE Br. 26 ("algorithms disclosed for matching a first portion . . . and a remaining portion of the incoming order and quotation . . . are the steps of FIGS. 4A-5B."), and the portion of the written description concerning Figure 4(B) "gives two mathematic examples" of matching on a pro rata basis.  CBOE Br. 14; Ex. B at 18:1-8, 18:61-19:4.  Incredibly, CBOE also quotes the following portion of the specification as support of its construction for "pro rata":

> In this case, PRO #1 and PRO#2 have the same size, which is greater than
> PRO#3. . . .  PRO#1 has 40% of the orders among the professionals (20/50) and is
> entitled to 15 contracts, leaving 21 contracts.  PRO#2 now has the largest size
> 66% of the size at the highest bid (20/30) and is **matched** for 14 contracts, leaving
> 7 contracts.

CBOE Br. 14 (quoting Ex. B at 18:61-19:4) (emphasis added).  Besides identifying a formula for matching on a pro rata basis, the '707 Patent also explains that formula "can be modified by, for example, weighting factors that favor PRO #1 or PRO #2."  *Id*. 17:64-66.

Contrary to CBOE's assertions, ISE relies on the explicit algorithms disclosed in the specification (and not the claim language itself) to identify the steps necessary to perform the

---

[7] For the corresponding structure of each computer-implemented-means claim element, CBOE inexplicably ignores the disclosure that the exchange may also be implemented on a "system of interconnected parallel processors."  *See* Ex. B at 8:49-52; ISE Br. 16.

function of the "means for matching . . . on a pro rata basis."  Specifically, ISE properly uses the mathematical formulas disclosed in the patent and the above-quoted text to describe an "algorithm comprising the step of matching the remaining portion based on a percentage of the size of a professional's order or quotation with reference to the total size of the professional orders and quotations at the same price" which is linked to "matching . . . on a pro rata basis." CBOE's unsupported conclusory allegation that no structure is disclosed in the specification for "matching on a pro rata basis" cannot meet the "clear and convincing" evidentiary standard required to demonstrate indefiniteness.  *See AllVoice*, 504 at 1245; *Budde*, 250 F.3d at 1376.  In fact, CBOE does not even allege that the algorithm identified by ISE would not "render the bounds of the claims understandable to one of ordinary skill in the art."  *AllVoice*, 504 F.3d at 1245.  Accordingly, CBOE's indefiniteness argument should be rejected.

### B. "Means for Matching . . . [With a] Minimum Allocation Percentage"

| "means for matching the remaining portion based on a formula that allocates the minimum allocation percentage of the remaining portion to the quotation identified with the primary market maker" (Claims 3 and 4) | |
|---|---|
| ISE | CBOE |
| Function:<br><br>Matching the remaining portion based upon a formula that allocates the minimum allocation percentage of the remaining portion to the quotation identified with the primary market maker.<br><br>Structure:<br>A general purpose computer, a network of general purpose computers, or a system of interconnected parallel processors including an algorithm that matches a minimum allocation percentage to a primary market maker comprising the following steps: (1) calculating a primary market maker's minimum allocation percentage of the remaining portion; (2) calculating the primary market maker's pro rata allocation of the remaining portion; and (3) matching the greater of the two to the quotation identified with the primary market maker. | Function:<br>Claim 3<br>Matching the remaining portion based upon a formula that allocates the minimum allocation percentage of the remaining portion to the quotation identified with the primary market maker.<br><br>Structure:<br>A general purpose computer or a network of general-purpose computers programmed to perform the steps of FIG. 4(b) for bids and FIG. 5(b) for offers. |

The second "means for matching" is recited identically in asserted Claims 3 and 4 and, as such, these terms must be construed identically.  *See Southwall*, 54 F.3d at 1579 (Fed. Cir. 1995). The parties agree on the proposed function of the means clause of Claim 3 and agree that the

general purpose computer includes an algorithm for performing the steps, but there is a dispute as to the steps of that algorithm.

As for Claim 3, CBOE's proposed construction of the corresponding structure reads in the entirety of Figures 4B and 5B. The parties agree these figures disclose a process for matching "one of several 'minimum allocation percentages' depending on the circumstances (*e.g.*, how many other professionals have orders at the same price)." *See* ISE Br. 17-19; CBOE Br. 23-24. The parties also agree Equations 1-3 show the "formulae . . . which allocate[s] the greater of a minimum percentage or a pro rata allocation to a PMM." *See* ISE Br. 17-19; CBOE Br. 24. However, instead of properly indentifying and construing the "formulae" as the disclosed algorithm, CBOE incorporates all of Figures 4B and 5B, which contain "several 'minimum allocation percentages'" and are admittedly dependent on the number of professionals. CBOE Br. 24. These steps are unnecessary to match based upon a minimum allocation percentage and irrelevant to "matching . . . based upon a formula." In fact, both are separate requirements of dependent Claim 5. Ex. B at 31:1-4; *see Rodime*, 174 F.3d at 1305 ("Had [the patentee] intended or desired to claim [the additional function] as a function of the positioning means in the asserted claims, it could have done it explicitly, as in Claim 11. The absence of such explicit language, however, shows that claims 3, 5, and 8 do not include the [additional function]."); *see also Harris Corp.*, 417 F.3d at 1253-54.

ISE's proposed construction properly identifies the steps necessary to perform the recited function: calculating a minimum allocation percentage, calculating a pro rata allocation and allocating to the primary market maker the greater of the two. CBOE does not dispute ISE accurately characterizes the formula disclosed in the specification; in fact, it characterizes the formula in a similar way. *See* CBOE Br. 24. Instead, CBOE merely alleges that the algorithm identified by ISE is not "disclosed in the specification." *Id.* As stated above, this is due to CBOE's mistaken presumption that a disclosed algorithm may only be expressed as a verbatim recitation of the language in the specification.[8] *See WMS Gaming*, 184 F.3d at 1348-49 (construing disclosed picture of gaming wheel as a four-step algorithm); *Harris Corp.*, 417 F.3d

---

[8] *Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008), the only case relied upon by CBOE for that proposition is completely inapposite. In *Aristocrat*, the Federal Circuit did not find any algorithms "disclosed in the specification" and, as such, there was nothing for it to construe. *Id.*

at 1253-54 (construing numerous columns in specification and three figures as a two-step algorithm).

As for Claim 4, CBOE fails to identify any algorithm for performing the identical "means for matching" clause from Claim 3. CBOE Br. 24-26. The reason CBOE is unable to identify corresponding structure is because it improperly reads into the function of the "means for matching" of Claim 4 numerous non-functional limitations recited in the claim. *Id.* As explained in ISE's opening brief, while the parties agree the function of a means-plus-function element is what is "explicitly recited in the claim," (*see* ISE Br. 4; CBOE Br. 16), it is improper to include such non-functional portions of the claim language as part of such functional recitation. *See BBA Nonwovens*, 303 F.3d at 1334 (construing "corona means cooperating with [the attenuator] and positioned for electrostatically charging the filaments" and finding language after "positioned" not part of the recited function and not subject to § 112 paragraph 6); *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1375 (Fed. Cir. 2002) (finding phrase which "further defines characteristics" of function not part of recited function); *Micro Chem.,* 194 F.3d at 1254, 1258.

### C.    "Means for Matching a First Portion . . . and a Remaining Portion"

| "means for matching a first portion of the incoming order or quotation against customer orders and a remaining portion of the incoming order or quotation against professional orders and quotations" (Claim 4) | |
| --- | --- |
| ISE | CBOE |
| Function:<br>Matching a first portion of the incoming order or quotation against customer orders and a remaining portion of the incoming order or quotation against professional orders and quotations<br><br>Structure:<br>A general purpose computer, a network of general purpose computers, or a system of interconnected parallel processors including an algorithm that matches a first portion of an incoming order or quotation against customer orders and a remaining portion of the incoming order or quotation. Wherein the algorithm comprises the steps of:<br><br>1) determining whether there are customer orders stored in the book memory means, and if so;<br>2) matching a first portion of the incoming order or quotation against customer orders; | Function:<br>Matching a first portion of the incoming order or quotation against customer orders and a remaining portion of the incoming order or quotation against professional orders and quotations.<br><br>Structure:<br>A general-purpose computer or a network of general-purpose computers programmed to perform the steps of FIG. 4(a) for bids and FIG 5(a) for offers. |

21

| 3) determining whether there are any remaining portions of the incoming order, and if so;<br>4) matching a remaining portion (after step 2) against professional orders and quotations. | |

In contrast to the other "means for matching" (discussed above), the function of this element places no limitation on how to match "a remaining portion against professional orders and quotations." As such, consistent with the language of the claims, ISE describes the steps "necessary" to perform the recited function—in particular, steps S150, S166, and S170 of Figure 4A and steps S200, S216, and S218 of Figure 5A. ISE Br. 19-20. The parties recognize that although Figures 4B and 5B (along with the associated text) disclose specific formulas for matching incoming orders with professional orders, the function of this particular "means for matching" is not limited to any particular formula for matching such orders. ISE Br. 20; CBOE Br. 26-27. In fact, Claim 4 contains an additional "means for matching" that provides for the matching of a remaining portion to professionals based on a particular algorithm. *See* ISE Br. 20; Section VI.B., above.

CBOE does not dispute that the algorithm described by ISE is an accurate representation of the necessary steps identified in Figure 4A and 5A. CBOE Br. 27. Instead, CBOE argues that the algorithm identified by ISE is not disclosed using the precise language of the specification. As indicated above, this argument is completely unsupported and demonstrably baseless. *WMS Gaming*, 184 F.3d at 1348-49 (construing disclosed picture of gaming wheel as a four-step algorithm); *Harris Corp.*, 417 F.3d at 1253-54 (construing numerous columns in the specification and three figures as a two-step algorithm).

CBOE's proposed corresponding structure identifies the entirety of Figures 4A and 5A. This construction ignores the fact that many of the steps identified in these Figures are specifically characterized in the specification as optional. ISE Br. 20; Figs. 4(a), 5(a), 6:4-8 ("According to another **option**, where the size of an incoming order is less than a small order preference limit, the portion of the order not matched with public customer orders . . . is matched with a primary market maker . . . .") (emphasis added). *See Harris Corp.*, 417 F.3d at 1254 (where specification indicates an equation or a portion of an algorithm is optional should not be part of the identified structure); *Micro Chem.*, 194 F.3d at 1258. As such, these unnecessary steps should not be found to be part of the disclosed algorithm for performing the recited function. *Id.*

### D.        "Processor Means"

| "Processor means for allocating portions of the incoming order or quotation among the plurality of previously received orders and quotations in the book memory means based upon the allocation parameters in the system memory" (Claims 1, 4 and 22) | |
|---|---|
| ISE | CBOE |
| Function:<br>Allocating portions of the incoming order or quotation among the plurality of previously received orders and quotations based upon the allocation parameters in the system memory | Function:<br>Allocates portions of the incoming order or quotation among the plurality of previously received orders and quotations based upon the allocation parameters in the system memory |
| Structure:<br>A general purpose computer, a network of general purpose computers, or a system of interconnected parallel processors including an algorithm that divides the incoming order and quotation among the previously received orders and quotations. | Structure:<br>A general-purpose computer or a network of general-purpose computers programmed to perform the steps of FIG. 4(a) for bids and FIG. 5(a) for offers. |

The crux of the parties' dispute over the construction of the "processor means" is—what steps are necessary to perform the largely agreed upon function.[9]   ISE's proposed construction of the corresponding structure is an algorithm "that divides the incoming order and quotation among the previously received orders and quotations."   CBOE argues that ISE wrongly relies upon the claim language as support for this construction.   This is not true.   As indicated in ISE's Opening Brief, the specification discloses that allocating according to allocation parameters may be done by identifying the previously received orders and quotations in the "book memory means" and apportioning the incoming order or quotation among such previously received orders and quotations.   ISE Br. 25; *see also, e.g.*, Ex. B at Fig. 4(a) (ref nos. S150, S166), 4(b) (ref nos. S180, S184, S182, S186, S188, S189).   Thus, in contrast to CBOE's argument—and the cases it relies upon—ISE identified the algorithm disclosed in the specification for performing the recited function.   *See Harris Corp.*, 417 F.3d at 1253-54 (construing the algorithm disclosed in the specification to be directly tied to the functional language of the means clause).   If this Court determines that the two step algorithm of identifying previously received orders and apportioning them according to an allocation parameter are each necessary parts of the disclosed structure,

---

[9] CBOE's proposed identification of the function for Claims 1, 4, and 22 improperly imports a requirement that the function of the "processor means" be "separate and distinct" from the "system memory means" and "book memory means."   As detailed above, this is plainly improper.

ISE would not dispute such a construction.  However, the functional language of the claims do not require such a narrow interpretation.

With respect to CBOE's identification of structure, CBOE once again ignores the functional language of the claims and attempts to read in the entirety of Figures 4(a) and 5(a). As discussed above, many of the steps identified in those figures are "option[al]."  *See* Section VI.C., above.  Because those figures include steps unnecessary to perform the recited function, their entirety should not be included as the corresponding structure for the "processor means." Ex. B at 6:4-8 (describing "small order  preference limit" as an "option"); *see Micro Chem.*, 194 F.3d at 1258; *Harris Corp.*, 417 F.3d at 1254.  In addition to including steps unnecessary for performing the recited function, CBOE's proposed construction fails to take into account the descriptions provided in the specification, and wholly fails to construe the algorithm as required by the claim construction process.  *See WMS Gaming*, 184 F.3d at 1348-49 (construing disclosed picture of gaming wheel as a four-step algorithm); *Harris Corp.*, 417 F.3d at 1253-54 (construing numerous portions of the specification and multiple figures as a two-step algorithm).

With respect to Claim 22, as explained in ISE's Opening Brief, CBOE grafts functions onto the "processor means" that are not part of that element's functional language.  ISE Br. 22. Specifically, in addition to the language identified above for Claims 1 and 4, with respect to Claim 22 CBOE asserts that the processor means includes the additional functions of "determin[ing] a best price for an instrument and compar[ing] the best price with the away market price, and if the best price is as good or better than the away market price . . . execut[ing] the trade."  This language is not part of the recited function, *see Micro Chem.*, 194 F.3d at 1258; instead, it further limits the algorithm executed by the processor means—besides "allocating portions of the incoming order." Because this language is not functional, it is not part of § 112 ¶ 6, "processor means."  *See BBA Nonwovens*, 303 F.3d at 1344.  Regardless, the parties generally agree that this additional structure is described in step S37 of FIG. 3(b), step S39 of FIG. 3(c), or steps S108 and S112 of FIG. 3(d).  Ex. A at 23.  To the extent this Court determines that the additional "non-functional" language grafted onto the "processor means" by CBOE requires construction, such structure may be described—consistent with the specification—as comparing the best price on the exchange with the away market price, determining if the price on the exchange is as good or better than the away market price, and if so, executing the trade at the best price.  *See* Ex. B at 9:39-43, 9:58-62, 14:18-22.

E.      "Away Market Querying Means"

| "away market querying means for determining an away market price for the instrument" (Claim 22) | |
| --- | --- |
| ISE | CBOE |
| Function:<br>Determining an away market price for the instrument.<br><br>Structure:<br>A general purpose computer, a network of general purpose computers, or a system of interconnected parallel processors including an algorithm comprising the steps of querying a reporting entity for an away market price for an instrument and receiving an away market price for such instrument. | Function:<br>Determines an away market price.<br><br>Structure:<br>A general-purpose computer or a network of general-purpose computers. |

CBOE asserts—with little or no evidentiary support—that this claim term is indefinite because no algorithm is disclosed for performing the recited function.[10] This conclusory statement falls far short of the "clear and convincing" evidence required to prove that one skilled in the art would be unable to identify an algorithm from the disclosure in the specification. *See AllVoice*, 504 F.3d at 1245.

The algorithm for determining an away market price is discussed in detail in ISE's Opening Brief. ISE Br. at 24. CBOE concedes that the specification indicates that the order process "checks the price on the away market" prior to trading an incoming order. CBOE Br. at 27-28; Ex. B at 9:38-42. However, CBOE ignores that the specification further discloses "receive[ing] price information from the reporting entity," (*Id.* 24:30-31; *see also id.* at Fig. 9 (S340)), which "collects price and size data for all options traded on exchanges in the United States and provides this data to subscribers." *Id.* 7:54-60. The two disclosed steps are all that is necessary to "determine an away market price for an instrument." CBOE's Brief completely fails to provide any evidence, let alone clear and convincing evidence, that one skilled in the art would not recognize and be able to implement the algorithm identified by ISE. *See AllVoice*, 504 F.3d at 1245.

---

[10] CBOE's identification of function further indicates that the "away market querying means" must be separate and distinct from the processor means. As detailed above, this is plainly improper.

F.        "Away Market Process Means"

| "away market process means for entering a matching quotation at the away market price if the processor means determines that the away market price is better than the best price" (Claim 23) | |
|---|---|
| ISE | CBOE |
| Function:<br>Entering a matching quotation at the away market price if the processor means determines that the away market price is better than the best price on the automated exchange.<br><br>Structure:<br>1) A general purpose computer, a network of general purpose computers, or a system of interconnected parallel processors including an algorithm comprising the steps of:<br>A) determining the price difference between  the away market price and the best price;<br>B) determining the number of contracts that a market maker is willing to execute at the price differential determined in Step A; and<br>C) if the size of the incoming order or quotation is less than or equal to the number identified in Step B, execute the trade for the number of contracts at the away market price.<br>OR<br>2) Computer workstations, personal computers, minicomputers, mainframe computers, personal digital assistants, or web TV boxes. | Function:<br>Entering a matching quotation at the away market price if the processor means determines that the away market price is better than the best price.<br><br>Structure:<br>A general-purpose computer or a network of general-purpose computers programmed to perform the steps of Fig. 9. |

CBOE does not dispute that the algorithm identified by ISE is an accurate description of the algorithm disclosed in the specification.  Instead, CBOE holds fast to its misconception of the law and asserts the disclosed algorithm is a verbatim copy recitation of the portions of the specification associated with a particular patent figure.  As explained repeatedly above, this position is plainly incorrect and contrary to Federal Circuit authority.  *WMS Gaming*, 184 F.3d at 1348-49 (construing disclosed picture of gaming wheel as a four-step algorithm); *Harris Corp.*, 417 F.3d at 1253-54 (construing numerous portions of the specification and multiple figures as a two-step algorithm).

As detailed in its Opening Brief, ISE identifies the necessary steps of the algorithm disclosed in Figure 9 as it is described in the specification for performing the recited function.  ISE Br. 24-25.  That is, the specification describes the algorithm as determining the number of contracts that a market maker is willing to execute at the price differential, (*see* Ex. B at Fig. 9 (Step 342 and 344), 24:45-49), and, if the size of the incoming order or quotation is less than or

equal to such number, executing the trade for the number of contracts at the away market price. *See id.* at Fig. 9 (Step 344), 24:59-62.  CBOE makes no effort to identify the steps "necessary" to perform the recited function nor does it read the disclosure contained in Figure 9 in light of the specification which describes the algorithm.  This is improper.  *See Harris Corp.*, 417 F.3d at 1253-54.  Specifically, CBOE's identified structure requires the use of an "away market matching table" which is not required by Claim 23.  Instead, the "away market matching table" is a separate limitation in Claims 25, 26, 59 and 60.  *See Rodime*, 174 F.3d at 1305.

With respect to ISE's identification of data terminals as alternative structure, CBOE does not dispute that the data terminals identified by ISE perform the recited function in addition to the algorithm discussed above.  CBOE Br. 29.  Specifically, CBOE does not dispute that if the trade cannot be automatically matched, under certain circumstance, the primary market maker can "decide whether to trade the incoming order at the away market price" by "enter[ing] quotations in particular options classes."  Ex. B at 24:64-67, 6:65-66.  Instead, CBOE merely asserts that the "computer workstations, personal computers, minicomputers, mainframe computers, personal digital assistants,  [or] web TV boxes" identified by ISE would render the claims invalid.  *Id.* 8:28-30.  CBOE is wrong.  In contrast to many of the "means" clauses discussed above, the structure identified for this function is not a computer "executing an algorithm," it is the computer containing a device for data entry (such as a keyboard) which one of skilled in the art would readily recognize is part of the computer workstations, personal computers, etc.  *See S3 Inc.*, 259 F.3d at 1369-70; *Budde*, 250 F.3d at 1382;  *Kenali*, 439 F. Supp. 2d at 870-871.  CBOE's conclusory allegations of invalidity fail to present any evidence—let alone the requisite clear and convincing evidence—for the position that one skilled in the art would not recognize that a computer contains a device for data entry.  As such, ISE's alternative construction should be accepted.

G.    "Alerting Means"

| "alerting means for generating an alert signal if the size is greater than the matching size" (Claim 27) | |
| --- | --- |
| ISE | CBOE |
| Function:<br>Generating an alert signal if the size is greater than the matching size | Function:<br>Generating an alert signal if the size is greater than the matching size |
| Structure:<br>A general purpose computer, a network of general purpose | Structure:<br>A general-purpose computer or a |

| computers, or a system of interconnected parallel processors including an algorithm comprising the steps of determining whether the size of the incoming order or quotation is greater than the matching size and sending a notification message if that is the case. | network of general-purpose computers.<br><br>The phrase "matching size" lacks antecedent basis. |
|---|---|

While the parties agree on the function of the "alerting means," they dispute the element's corresponding structure.  CBOE alleges Claim 27 is invalid as indefinite because no algorithm is disclosed for performing the recited function and the term "matching size" lacks "antecedent basis." CBOE Br. 27-28.

As an initial matter, indefiniteness would require CBOE to put forth clear and convincing evidence that one skilled in the art would be unable to understand the '707 Patent to disclose an algorithm for performing the recited function and the meaning of "the matching size." *See Energizer Holdings Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 77 USPQ2d 1625 (Fed. Cir. 2006) (finding claim term "zinc anode" not indefinite for lack of antecedent basis and stating "[i]f the scope of a claim would be reasonably ascertainable by those skilled in the art, then the claim is not indefinite")  In place of clear and convincing evidence, CBOE offers conclusory attorney argument.  CBOE Br. 27-28.  This is improper.

The claim language itself, as well as other intrinsic evidence, clearly demonstrate the meaning of "matching size."  Claim 27 depends from Claim 23, and both CBOE and ISE incorporate into their constructions of the "away market processor means" of Claim 23 what is meant by the term "matching size."  Namely, a "matching size" is "the number of contracts that a market maker would be willing to execute at a price differential" between the best price on the exchange and the away market price. *See* Section VI.F.; Ex. B at Fig. 9 (Step 344) ("[T]he maximum volume at the price differential"), 24:45-49.  Furthermore, the specification specifically discloses an algorithm for generating an alert signal based upon a "matching size." It states that "the volume of the incoming order is compared with the maximum volume for the price differential [and]. . . .  [i]f the volume of the incoming order is greater than the volume given by the away market matching table, then step S346 alerts the PMM."  Ex. B at 24:56-67; *see also Id.* at Fig. 9 (Step 346).  ISE's proposed construction modifies this language to include only those steps necessary to perform the recited function (*e.g.*, while claims 25, 26, 59 and 60 require the use of a matching table, such table is not required by claim 27). *See id.* 9:49-51, 24:62-67. *See Rodime*, 174 F.3d at 1305.  CBOE asserts that there is no disclosed algorithm for

performing the recited function.  However, CBOE fails to even allege that the algorithm identified by ISE would not "render the bounds of the claim understandable to one of ordinary skill in the art."[11]  *See AllVoice*, 504 F.3d at 1245.

## VII.   ADDITIONAL TERMS

### A.      "Professional Order"

| "Professional order" (All Asserted Claims) | |
|---|---|
| **ISE** | **CBOE** |
| Orders entered on behalf of registered broker-dealers. | Orders entered on behalf of registered broker-dealers, including Primary Market Makers (PMMs), Competitive Market Makers (CMMs) and Electronic Access Members (EAMs) |

The parties agree that the term "professional" refers to "registered broker-dealers."  The dispute concerns whether the term "broker-dealer" should be further construed as "including Primary Market Makers (PMMs), Competitive Market Makers (CMMs) and Electronic Access Members (EAMs)."  The specification recognizes both that EAMs communicate "public customer, professional and FARMM orders to the exchange" and that the "names, types and arrangements of participants" may be varied.  Ex. B at 7:16-20, 48-50.  As such, defining "professional order" in the manner CBOE proposes could lead to confusion.

### B.      "Allocating a Remaining Portion . . ."

| "allocating a remaining portion of the incoming order or quotation preferentially against professional orders and quotations with larger size" (Claim 1) | |
|---|---|
| **ISE** | **CBOE** |
| Allocating a remaining portion of the incoming order or quotation in a preferred manner against professional orders or quotations that are larger in size than other professional orders or quotations in the book memory means. | Allocating larger portions of the remaining incoming order or quotation to professionals quoting or ordering larger size |

CBOE's proposed construction improperly re-writes the language of the claim, changing "a remaining portion" to "the remaining incoming order or quotation."  *See* CBOE Br. 13.  However, the claim recites "a remaining portion"—not "the remaining portion" or "the entire

---

[11] CBOE complains that ISE's identification of a disclosed algorithm for the "alerting means" is untimely. However, in asserting that the claims are indefinite, CBOE has the burden to show by clear and convincing evidence that no algorithms are disclosed in the specification for performing the recited function.  *See AllVoice*, 504 F.3d at 1245.  As such, CBOE must demonstrate that the algorithm presently identified by ISE and each additional algorithm in the '707 Patent fails to render the claims definite.

remaining portion." Thus, it is not limited to a single remaining portion. *See KCJ Corp. v. Kinetic Concepts, Inc.* 223 F.3d 1351, 1356 (Fed. Cir. 2000). Consistent with the claim language, the specification discloses an embodiment where a first remaining portion is allocated and matched to customers, a second remaining portion is allocated and matched to a primary market maker based upon a minimum allocation percentage, and a third remaining portion is allocated and matched to the remaining professional orders preferentially to orders larger in size. *See* Ex. B at 17:65-18:8. Thus, CBOE's proposed construction should be rejected as inconsistent with the language of the claims and the intrinsic evidence.

C.      **"Pro Rata"**

| **"Pro rata" (Claims 2 and 36)** | |
|---|---|
| **ISE** | **CBOE** |
| Based on a percentage of the size of a professional's order or quotation with reference to the total size of the professional orders and quotations at the same price. | In proportion according to size |

CBOE's proposed construction of "pro rata" ignores the express teachings of the '707 Patent and limits the term to a particular disclosed embodiment—namely, a "straight-line" pro rata calculation (or one based on only the size of the previously received orders and quotations). *See* CBOE Br. 14; ISE Br. 28. CBOE relies on the portions of the specification disclosing a "straight-line pro rata" calculation, (*see* CBOE Br. 14), ignoring the portions that disclose using weighted pro rata—that is, using a percentage or weighting factor along with size. *See,* Ex. B at 16:57-59, 17:64-66, 18:54-58. CBOE's reliance on dictionary definitions that contradict the intrinsic evidence is improper. *See Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1305 (Fed. Cir. 2005). Because CBOE's proposed construction ignores these teachings, it is contrary to the '707 Patent and should be rejected.

Dated: July 21, 2009       s/Michael DeVincenzo
Michael D. Huber         Parker Bagley
Cray Huber Horstman Heil & Van Ausdal LLC Michael S. DeVincenzo
303 W Madison, Suite 2200     GOODWIN PROCTER LLP
Chicago, IL  60606       The New York Times Building
Telephone No.:  (312) 332-8450    620 Eighth Avenue
Facsimile No.:  (312) 332-8451    New York, New York  10018
             Tel.:  212.813.8800 Fax:  212.355.3333
             *Attorneys for Defendant International Securities Exchange, LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies pursuant to Fed.R.Civ.P. 5 and L.R. 5.5, that a true and correct copy of the foregoing document was filed on July 21, 2009 with the Clerk of the Court using the CM/ECF system, which will send notice to counsel of record.


<u>s/Michael DeVincenzo</u>
Michael S. DeVincenzo