UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHICAGO BOARD OPTIONS EXCHANGE, INCORPORATED, | Case No. 07 cv 0623 |
| Plaintiff, | Hon. Joan H. Lefkow, U.S.D.J. |
| v. | Hon. Jeffrey Cole, U.S.M.J. |
| INTERNATIONAL SECURITIES EXCHANGE, LLC, | |
| Defendant. | |

**MEMORANDUM OF CHICAGO BOARD OPTIONS EXCHANGE, INCORPORATED IN SUPPORT OF ITS MOTION UNDER RULE 42(b) FED. R. CIV. P. FOR A NONJURY TRIAL ON THE ISSUE OF INEQUITABLE CONDUCT PRIOR TO A JURY TRIAL ON THE ISSUES OF VALIDITY, INFRINGEMENT AND DAMAGES**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................1

II.   APPLICABLE LAW ...........................................................................................3

    A.   The Court has broad discretion to order bifurcation under Rule
         42(b) for convenience, to avoid prejudice, or to expedite and
         promote efficiency. ........................................................................................3

         1.   The defense of inequitable conduct, being equitable in
              nature, is tried before the Court rather than to a jury. ...............4

    B.   Inequitable conduct can be found when an applicant, with intent
         to deceive the patent examiner, fails to disclose material
         information, submits materially false information, or
         affirmatively misrepresents a material fact to the PTO during
         prosecution. ..................................................................................................4

         1.   "Material information" includes (1) information that a
              reasonable examiner would have considered important
              in deciding whether to allow the application and (2)
              information that refutes or is inconsistent with a position
              taken by the applicant in prosecution..........................................5

         2.   Deceptive intent can be inferred from the facts and
              circumstances surrounding the applicant's overall
              conduct. ...........................................................................................6

    C.   35 U.S.C. § 102(f) provides that even private communications
         to the inventor constitute prior art for purposes of determining
         novelty and non-obviousness. ....................................................................7

III.  FACTS ...................................................................................................................8

    A.   William Porter originated the idea for ISE's automated options
         exchange in the United States. ....................................................................8

    B.   The '707 Patent ............................................................................................9

    C.   Pertinent prior art withheld by ISE ........................................................11

         1.   The September 1996 OM CLICK Exchange Product
              Description is withheld prior art. ...............................................11

         2.   The prior art rules of other exchanges, including the use
              of customer priority and pro rata allocation, were also
              withheld from the PTO. ...............................................................12

         3.   The CBOT's Project A...................................................................14

i

IV.   ARGUMENT.............................................................................................15

      A.    Judicial economy is served by trying inequitable conduct first because finding the '707 patent unenforceable obviates the need for a jury trial on validity, infringement and damages..........................15

           1.    The applicant's intentional withholding of the OM September 1996 Product Description is a basis for inequitable conduct. ..............................................................15

                a.    The OM CLICK Exchange Product Description of September 1996 is material and non-cumulative........................................................................16

                b.    The OM CLICK Exchange Product Description of September 1996 was withheld with deceptive intent. ..................................................................17

           2.    The applicant's intentional withholding of the rules of other exchanges, including the use of "customer priority" and "pro rata allocation" is a basis for inequitable conduct. ..............................................................18

                a.    The rules of other exchanges, including the use of "customer priority" and "pro rata allocation" are material....................................................................19

                b.    The rules of other exchanges, including the use of "customer priority" and "pro rata allocation" were withheld with deceptive intent. .........................................20

           3.    The applicant's intentional withholding of information concerning the CBOT's Project A is a basis for inequitable conduct. ..............................................................21

                a.    The information concerning the CBOT's Project A is material.................................................................21

                b.    Information concerning the CBOT's Project A was withheld with deceptive intent..............................22

      B.    Trying inequitable conduct first does not prejudice ISE. ....................22

      C.    Trying inequitable conduct first does not violate the Seventh Amendment...........................................................................22

V.   CONCLUSION........................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Agfa Corp. v. Creo Prods.*,
    451 F.3d 1366 (Fed. Cir. 2006)...............................................................................4

*Baxter Int'l, Inc. v. McGaw, Inc.*,
    149 F.3d 1321 (Fed. Cir. 1998)........................................................5, 6, 7, 17, 19

*Beacon Theaters, Inc. v. Westover*,
    359 U.S. 550 (1959).................................................................................................4

*Bruno Independent Living Aids, Inc. v. Acorn Mobility Servs., Ltd.*,
    394 F.3d 1348 (Fed. Cir. 2005)......................................................................6, 7, 21

*Civix-DDI, LLC v. Cellco Partnership*,
    387 F. Supp. 2d 869 (N.D. Ill. 2005) .....................................................................6

*Digital Control Inc. v. Charles Machine Works*,
    437 F.3d 1309 (Fed. Cir. 2006)...............................................................................5

*Dippin' Dots, Inc. v. Mosey*,
    476 F.3d 1337 (Fed. Cir. 2007)...........................................................4, 6, 19, 22

*Elk Corp. of Dallas v. GAF Bldg. Materials Corp.*,
    168 F.3d 28 (Fed. Cir. 1999)............................................................................6, 17

*Fox Indus., Inc. v. Structural Preservation Sys., Inc.*,
    922 F.2d 801 (Fed. Cir. 1990).................................................................................5

*Gardco Manufacturing, Inc. v. Herst Lighting Co.*,
    820 F.2d 1209 (Fed. Cir. 1987)...................................................................1, 3, 4, 16

*General Patent Corp. v. Hayes Microcomputer*,
    No. SA CV 97-429, 1997 WL 1051899 (C.D. Cal. Oct. 20, 1997)........................24

*GFI, Inc. v. Franklin Corp.*,
    265 F.3d 1268 (Fed. Cir. 2001)...............................................................................6

*Krocka v. City of Chicago*,
    203 F.3d 507 (7th Cir. 2000) ............................................................................3, 16

*LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n*,
    958 F.2d 1066 (Fed. Cir. 1992)...................................................................7, 22, 24

*MCI Commc'ns Corp. v. AT&T Co.*,
    708 F.2d 1081 (7th Cir. 1983) ............................................................................3

*Merck & Co., Inc. v. Danbury Pharm., Inc.*,
    873 F.2d 1418 (Fed. Cir. 1989).................................................................7, 21, 22

*Monsanto Co. v. Bayer Bioscience N.V.*,
    514 F.3d 1229 (Fed. Cir. 2008)............................................................................5

*OddzOn Prods., Inc. v. Just Toys, Inc.*,
    122 F.3d 1396 (Fed. Cir. 1997)..............................................................7, 8, 12, 19

*Ormco Corp. v. Align Technology, Inc.*,
    463 F.3d 1299 (Fed. Cir. 2006)..........................................................................16

*Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*,
    984 F.2d 1182 (Fed. Cir.1993)............................................................................4

*Perspective Biosystems, Inc. v. Pharmacia Biotech, Inc.*,
    225 F.3d 1315 (Fed. Cir. 2000)...........................................................................6

*Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.*,
    204 F.3d 1368 (Fed. Cir. 2000).......................................................................6, 18

*Trading Techs. Int'l, Inc., v. Espeed, Inc.*,
    507 F. Supp. 2d 870 (N.D. Ill. 2007) ..............................................................4, 25

### STATUTES

35 U.S.C. §§ 102(a) .........................................................................................12, 14, 15

35 U.S.C. § 102(f)......................................................................................7, 8, 12, 17, 19

### OTHER AUTHORITIES

37 C.F.R. § 1.56 (2007) ...........................................................................5, 18, 19, 20, 22

37 C.F.R. § 1.56(a) (2007)...................................................................................................4

Fed. R. Civ. P. 42(b) ...........................................................................................1, 3, 16

# I.    INTRODUCTION[1]

Pursuant to Rule 42(b) Fed. R. Civ. P., the applicable statutory and case law, the deposition testimony, documentary evidence and admissions of record, and particularly in the interests of justice and judicial economy, plaintiff Chicago Board Options Exchange, Incorporated ("CBOE") respectfully moves this Court to conduct a nonjury trial on the issue of inequitable conduct prior to the jury trial on the issues of validity, infringement and damages of United States Patent No. 6,618,707 in suit (the "'707 patent," attached as Exh. 1[2]).

This motion is addressed to the broad discretion of this Court in managing its docket so as to expedite and economize where it deems appropriate, particularly to the Court's discretion in resolving this complex litigation by conducting a prior and separate nonjury trial on the equitable issue of inequitable conduct while preserving the right of the parties to a jury trial as to factual issues so reserved.

As shall appear in this memorandum, the present motion is well-grounded in the applicable procedural and substantive law as well as the pertinent facts, none of which implicate the right to trial by jury.  Most importantly, however, given the unusually substantial merits of the proofs supporting its inequitable conduct defense, CBOE respectfully represents to and urges this Court that the likely finding of unenforceability by reason of inequitable conduct in the prior nonjury trial will resolve this action completely and obviate the need to hold a protracted jury trial on the issues of validity, infringement and damages.

This motion for a prior and separate trial on the issue of inequitable conduct is fully consonant with the decision of the Federal Circuit in *Gardco Manufacturing, Inc. v. Herst Lighting Co*., 820 F.2d 1209 (Fed. Cir. 1987).  Moreover, granting this motion will not impose any additional burden upon the Court or the parties because a nonjury trial on this issue must be held in any event at some point during these proceedings.  Altering the sequence of the trials as CBOE requests promises to obviate the need for this Court ever having to hold the jury trial because a finding of inequitable conduct would be dispositive.

The defense of inequitable conduct is tried to the court, not to a jury.  Here, the determination as to whether the '707 patent is unenforceable can be made without the Court

---

[1] This paper is being concurrently filed with a Motion to Enlarge the Page Limit under L.R. 7.1

[2] "Exh. ___" refers to Exhibits to the Declaration of Brian J. Doyle, Esq., filed herewith.

having to find facts that would usurp the province of the jury. The Court can determine whether the information the applicant for the '707 patent withheld from and the misrepresentations it made to the PTO were "material" within the meaning of the applicable law, and undertaken with the requisite "intent to deceive" so as to find the patent unenforceable, without implicating any factual issue that a jury would decide in determining whether the patent was valid or infringed.

The pertinent facts of record are particularly compelling. The principal founder of defendant International Securities Exchange ("ISE") was William Porter, who, in 1996, came up with an idea of an automated options exchange in the United States as a way to reduce the cost of trading options. Porter knew that such automated exchanges were operating in countries outside the United States, so in early 1997 he enlisted the assistance of OM, a Swedish company that owned several such exchanges and was also in the business of licensing its software. In May 1997, Porter hired David Krell and his subordinate, Gary Katz, the named inventor of the '707 patent; they had been running the options division of the New York Stock Exchange. Mr. Katz's first job on the ISE project was to work with OM, notably a programmer named Peter de Verdier, to adapt the OM commercial software program, known as the CLICK Exchange, for use in the United States.

On May 13, 1997, Mr. Katz met in New York with the head of OM sales, at which time he received an over 100-page document entitled "The OM CLICK Exchange Software Product Description" dated September 1996 which described in detail the CLICK Exchange as it was available for commercial automated options exchanges. Within about one week, Mr. Katz had studied the Product Description and had compiled a list of questions and comments which were sent to OM. By May 30, 1997, Mr. Katz had prepared and sent to OM a 15-page "Functional Specification for Electronic Trading" which contained his initial thoughts as to how the OMX CLICK Exchange software platform could be modified for use in the United States; this "Functional Specification" is being relied upon by the ISE as proof of conception of at least claims 1 and 35 of the '707 patent.

Despite admittedly having derived information from the OM CLICK Product Description prior to his conception, having used the Product Description as the starting point for his invention, and having recognized that he was not the inventor of any of the subject matter of the Product Description, Mr. Katz nevertheless failed to disclose it to the United States Patent and

Trademark Office (the "PTO") – or even to his own patent attorney who had advised him of his duty of candor in the PTO and his obligation to cite relevant prior art.

As a direct result of Mr. Katz's misconduct:

o    The application for the '707 patent was filed with the requisite inventor's declaration which was false because the subject of claim 1 had not been invented by Mr. Katz but was in fact fully anticipated by the OM Product Description; and

o    Mr. Katz's attorney made arguments to the examiner both in describing the invention and distinguishing the cited prior art that would not have been accepted had the examiner known of the far more material OM Product Description as well as other material withheld prior art.

Neither Mr. Katz nor any other ISE witness who has testified by deposition in this case has been able to refute these facts or offer an innocent explanation for this and other conduct which violated the duty of candor owed to the PTO.

Consequently, by reason of the apposite law as applied to the evidence in this case, CBOE respectfully submits that holding a nonjury trial to determine the issue of inequitable conduct at the early convenience of the Court will best serve the interests of judicial economy and expedite the resolution of this case.

## II.    APPLICABLE LAW

### A.    The Court has broad discretion to order bifurcation under Rule 42(b) for convenience, to avoid prejudice, or to expedite and promote efficiency.

Under Fed. R. Civ. P. 42(b), a court has "broad discretion" to separate "issues and claims for trial as part of its wide discretion in trial management." *Gardco Mfg., Inc.*, 820 F.2d at 1212 (where the Federal Circuit endorsed the granting of a prior and separate trial on inequitable conduct). Rule 42(b) provides that a court can order separate trials "[1] [f]or convenience, [2] to avoid prejudice, or [3] to expedite and economize." Fed. R. Civ. P. 42(b). Only one of these conditions needs to be met for the court to order a separate trial. *MCI Commc'ns Corp. v. AT&T Co.*, 708 F.2d 1081, 1166 (7th Cir. 1983). The court may exercise its discretion to bifurcate a trial provided it "(1) serves the interests of judicial economy or is done to prevent prejudice to a party; (2) does not unfairly prejudice the non-moving party; and (3) does not violate the Seventh Amendment." *Krocka v. City of Chicago*, 203 F.3d 507, 516 (7th Cir. 2000).

1.  **The defense of inequitable conduct, being equitable in nature, is tried before the Court rather than to a jury.**

The defense of inequitable conduct is derived from the equitable doctrine of unclean hands, and therefore, does not give rise to the right to trial by jury. *Gardco*, 820 F.2d at 1212; *see also Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1190 (Fed. Cir.1993) (inequitable conduct "being entirely equitable in nature, is not an issue for a jury to decide"); *Trading Techs. Int'l, Inc., v. Espeed, Inc.*, 507 F. Supp. 2d 870, 871-72 (N.D. Ill. 2007) (Moran, J.). Inequitable conduct requires the court to evaluate, among other things, the materiality of withheld prior art. *Agfa Corp. v. Creo Prods.*, 451 F.3d 1366, 1372-73 (Fed. Cir. 2006).

"The Federal Circuit has determined that bifurcation of inequitable conduct, even if tried first, does not violate any rights guaranteed by the Seventh Amendment." *Trading Techs.*, 570 F. Supp. 2d at 872 n.1 (*citing Gardco*, 820 F.2d at 1209). This is because, despite some overlap of relevant *evidence*, inequitable conduct and invalidity do not have "common *issues*" subject to jury resolution. *See Agfa*, 451 F.3d at 1372-73 (analyzing the "common issues" inquiry under *Beacon Theaters, Inc. v. Westover*, 359 U.S. 550 (1959)). As the *Agfa* court aptly summarized, this is because material prior art for purposes of inequitable conduct need not be invalidating prior art (which is an issue for jury determination). 451 F.3d at 1372-73. It is well within this Court's discretion to try CBOE's inequitable conduct claim first. *See Gardco*, 820 F.2d at 1213.

B.  **Inequitable conduct can be found when an applicant, with intent to deceive the patent examiner, fails to disclose material information, submits materially false information, or affirmatively misrepresents a material fact to the PTO during prosecution.**

The PTO imposes a duty of candor and good faith on every individual associated with the filing and prosecution of a patent application. 37 C.F.R. § 1.56(a) (2007).[3] A breach of this duty constitutes "inequitable conduct" which may occur through an affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with intent to deceive or mislead the PTO. *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1345 (Fed. Cir. 2007). The party asserting inequitable conduct must prove a threshold level of materiality and intent by clear and convincing evidence, and the court must

---

[3] Persons owing a duty of candor to the PTO are referred to herein as "applicants."

then determine whether the questioned conduct amounts to inequitable conduct by balancing the levels of materiality and intent, "with a greater showing of one factor allowing a lesser showing of the other." *Digital Control Inc. v. Charles Machine Works*, 437 F.3d 1309, 1313 (Fed. Cir. 2006).

Inequitable conduct with respect to only one claim *is sufficient* to render the entire patent unenforceable. *Monsanto Co. v. Bayer Bioscience N.V.*, 514 F.3d 1229, 1243 (Fed. Cir. 2008). Consequently, a finding of inequitable conduct in this case would relieve the Court from having to address the issues of validity, infringement and damages of all twenty claims asserted in this case.

> **1.    "Material information" includes (1) information that a reasonable examiner would have considered important in deciding whether to allow the application and (2) information that refutes or is inconsistent with a position taken by the applicant in prosecution.**

Information is material "where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent" or if it meets the requirements of 37 C.F.R. § 1.56 (2007). *Digital Control*, 437 F.3d at 1315-16.[4] Information is "material" if it "refutes, or is inconsistent with, a position the applicant takes in: (i) Opposing an argument of unpatentability relied on by the Office, or (ii) Asserting an argument of patentability." 37 C.F.R. § 1.56. Of note, materiality is not determined solely on the basis of the issued claims because the duty of candor extends throughout the entire prosecution history. *Fox Indus., Inc. v. Structural Preservation Sys., Inc.*, 922 F.2d 801, 803-804 (Fed. Cir. 1990) ("a trial court may look beyond the final claims to their antecedents").

While prior art as a whole represents the most general category of potentially material information, there are certain categories of prior art that the Federal Circuit has identified as being particularly material. For example, when the withheld prior art "formed the basis" for the

---

[4] 37 C.F.R. § 1.56, in pertinent part, reads as follows:

> (b) Under this section, information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and (1) It establishes, by itself or in combination with other information, a *prima facie* case of unpatentability of a claim; or (2) It refutes, or is inconsistent with, a position the applicant takes in: (i) Opposing an argument of unpatentability relied on by the Office, or (ii) Asserting an argument of patentability.

claimed invention, such art is considered highly material. *Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1329-30 (Fed. Cir. 1998) ("Plaintiffs may have disclosed to the patent office multitudes of prior art, but they did not disclose the single most relevant piece of prior art that was used extensively in the development of the invention."); *see also Elk Corp. of Dallas v. GAF Bldg. Materials Corp.*, 168 F.3d 28, 31 (Fed. Cir. 1999) (relying on fact that claimed invention was an improvement over withheld art to support the finding of materiality).

Information is not material if it is cumulative of other information already before the patent examiner, but information *is not cumulative* if it discloses more claim features than the art of record. *Baxter*, 149 F.3d at 1328. This is so even if those additional limitations can be found in other references of record. *Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.*, 204 F.3d 1368, 1374 (Fed. Cir. 2000) ("A withheld reference may be highly material when it discloses a more complete combination of relevant features, even if those features are before the patent examiner in other references."); *see also GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1274 (Fed. Cir. 2001).

## 2. Deceptive intent can be inferred from the facts and circumstances surrounding the applicant's overall conduct.

"'Smoking gun' evidence is not required in order to establish an intent to deceive." *Dippin' Dots*, 476 F.3d at 1345 (*quoting Paragon Podiatry Lab., Inc. v. KLM Labs, Inc.*, 984 F.2d 1182, 1189 (Fed. Cir. 1993)). Indeed, the Federal Circuit has recognized that "[i]ntent need not, and rarely can, be proven by direct evidence." *Bruno Independent Living Aids, Inc. v. Acorn Mobility Servs., Ltd.*, 394 F.3d 1348, 1354 (Fed. Cir. 2005); *Civix-DDI, LLC v. Cellco Partnership*, 387 F. Supp. 2d 869, 905 (N.D. Ill. 2005) (St. Eve, J.). Absent a credible explanation, "intent to deceive is generally inferred from the facts and circumstances surrounding a knowing failure to disclose material information." *Bruno Independent Living Aids*, 394 F.3d at 1354; *Civix-DDI, LLC,* 387 F. Supp. 2d at 905.

The nature of the withheld information can form the basis for inferring deceptive intent. For example, where the withheld information is of the sort that the patent examiner has no way of obtaining on his own, deceptive intent can be inferred. *See Dippin' Dots*, 476 F.3d at 1346. Information concerning prior sales, which the PTO does not have in its databases, is an example of information that the examiner cannot obtain absent disclosure by the applicant. *Id.* ("The

concealment of sales information can be particularly egregious because, unlike the applicant's failure to disclose, for example, a material patent reference, the examiner has no way of securing the information on his own.")  Similarly, where the withheld prior art "formed the basis of the claimed inventions," a culpable state of mind has been inferred.  *See, e.g., Baxter*, 149 F.3d at 1329-30.

Deceptive intent has been inferred where the applicant discloses material information to one government agency, but withholds it from the PTO.  Such was the case where an applicant informed the FDA that its medical device is "substantially similar" to prior devices in an effort to receive FDA approval, but withheld information about those prior devices from the PTO.  *Bruno Independent Living Aids*, 394 F.3d at 1352,1354; *see also Merck & Co., Inc. v. Danbury Pharm., Inc.*, 873 F.2d 1418, 1420-22 (Fed. Cir. 1989).

Significantly, deceptive intent has been inferred by the Federal Circuit where an applicant withheld material information and made an argument for patentability that could not have been made had the information been disclosed.  *See GFI*, 265 F.3d at 1275; *LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n*, 958 F.2d 1066, 1076 (Fed. Cir. 1992).

C.      **35 U.S.C. § 102(f) provides that even private communications to the inventor constitute prior art for purposes of determining novelty and non-obviousness.**

A person shall be entitled to a patent unless "he did not himself invent the subject matter sought to be patented."  35 U.S.C. § 102(f).  This means essentially that one may not obtain a patent on that something he obtained from someone else whose possession of that subject matter is inherently "prior."  *OddzOn Prods., Inc. v. Just Toys, Inc.,* 122 F.3d 1396, 1401-02 (Fed. Cir. 1997).  "It does not pertain only to public knowledge, but also applies to private communications between the inventor and another which may never become public."  *Id.*[5]  Material that qualifies

---

[5] The case law is replete with examples of non-public communications found to constitute prior art under 35 U.S.C. § 102(f).  *E.g., OddzOn*, 122 F.3d at 1401 ("two confidential ball designs…which 'inspired' the inventor" are § 102(f) art); *Dale Elec. v. R.C.L. Elec.*, 488 F.2d 382, 386 (1st Cir. 1973) (holding that actual knowledge of invention of another constitutes § 102(f) prior art); *Robinson Labs, Inc. v. Walls Indus., Inc.,* 2003 WL 22272122 (D. Minn. Sept. 30, 2003) at *6 (holding that inventor's conversations with third parties are prior art under § 102(f) and could be relied on to render claims invalid as obvious); *Graco Children's Prods., Inc. v. Century Prods. Co., Inc.,* 1996 WL 421966 (E.D. Pa. July 23, 1996) at *2, *18 (holding that confidential disclosure in context of rights transfer constitutes prior art under § 102(f)); *Ex Parte Yoshino*, 227 U.S.P.Q. 52 (Bd. Pat. App. and Inter. 1985) (holding that foreign patent application known to inventor was prior art under § 102(f) regardless whether it qualifies as prior art

as prior art under §102(f) can invalidate an issued claim by anticipating it (*i.e.*, by disclosing each and every feature of the claim) or can render it obvious, alone or in combination with other prior art. *Id.* at 1403-04 (holding that "subject matter derived from another not only is itself unpatentable to the party who derived it under § 102(f), but, when combined with other prior art, may make a resulting obvious invention unpatentable to that party under a combination of §§ 102(f) and 103.") Because actual knowledge is the touchstone, prior art under § 102(f) is prior art to the party who received the subject matter, but not necessarily to the public at large:

> This result is not illogical. It means that an invention, A', that is obvious in view of subject matter A, derived from another, is also unpatentable. The obvious invention, A', may not be unpatentable to the inventor of A, and it may not be unpatentable to a third party who did not receive the disclosure of A, *but it is unpatentable to the party who did receive the disclosure*.

*Id.* at 1403 (emphasis added).

## III.  FACTS

### A.  William Porter originated the idea for ISE's automated options exchange in the United States.

The '707 patent pertains to a computerized exchange with no floor-based trading.  The idea of developing such an exchange in the United States was that of William Porter, the principal founder of ISE (*see* Exh. 2, Porter Dep. at 34:6-9; 35:19-36:8; Exh. 5, Katz Dep. at 155:21-24), who came up with the idea in 1996 as a way to reduce the cost of trading options. *See id.*, Exh. 2, at 28:9-21; *see also* Exh. 3, Averbuch Dep. at 56:6-19.  Upon visiting numerous electronic exchanges in Europe, Porter learned that OM in Sweden was licensing software for such exchanges; he then ultimately agreed with OM to use their software.  *See* Exh. 2, Porter Dep. at 32:2-33:16; 35:2-18.

Months later, at the beginning of May 1997, Porter hired David Krell and his subordinate, Gary Katz, the named inventor of the '707 patent, to assist in the development of an automated options exchange.  *See* Exh. 4, 30(b)(6) deposition of ISE through Katz Dep. 34:20-35:15; Exh. 3, Averbuch Dep. 63:20-64:10.  Mr. Katz's first job on the ISE project was to work with OM

---

under other sections of 35 U.S.C. § 102).

adapting its commercial software program for use in the U.S. *See* Exh. 5, Katz Dep. at 64:5-66:6.

Mr. Katz used a document he had received from OM on May 13, 1997 entitled "The OM CLICK Exchange Software Product Description" ("the Product Description," attached at Exh. 7) to prepare a list of modifications to OM's commercial software. *See* Exh. 5, Katz Dep. at 108:13-20. On May 30 he sent these modifications to OM in a 15-page document entitled "Functional Specification for Electronic Trading" (attached hereto as Exh. 8). Exh. 5, Katz Dep. at 61:21-25; Exh. 6, ISE's First Supplemental Response to Interrogatory 3. ISE relies on this document as proof of conception of at least claims 1 and 35 of the '707 patent. *See* Exh. 6, ISE's First Supplemental Response to Interrogatory 3.

### B.     The '707 Patent

The '707 patent issued on September 9, 2003 from an application filed on November 2, 1999, and claims priority to a provisional application filed on November 3, 1998. The '707 patent is assigned to defendant ISE, and Mr. Katz is the sole named inventor.

The '707 patent, entitled "Automated Exchange for Trading Derivative Securities," relates to a computerized exchange that "match[es] incoming orders for the purchase or sale of financial instruments, such as options contracts, with previously received orders." *See* Exh. 1, '707 patent at Abstract.

The first two claims of the '707 patent, both asserted against CBOE, are directed to a computerized exchange that includes customer priority and size-based allocation among professionals (these features are boldfaced for clarity)[6]:

> 1.     An automated exchange for trading a financial instrument wherein the trade may be one of a purchase of a quantity of the instrument and a sale of a quantity of the instrument, the exchange comprising:
>
> an interface for receiving an incoming order or quotation to trade the instrument, the incoming order or quotation having a size associated therewith;

---

[6] Claims 35 and 36 are similar to claims 1 and 2, but recite these features in a "method" format. ISE is also asserting claims 35 and 36 against CBOE.

book memory means for storing a plurality of previously received orders or quotations to trade a corresponding plurality of quantities of the instrument, the previously received orders and quotations each having a size associated therewith and the previously received orders including public customer orders previously entered for public customers and professional orders or quotations previously entered for one or more professionals;

system memory means for storing allocating parameters for allocating trades between the incoming order or quotation and the previously received orders and quotations

processor means for allocating portions of the incoming order or quotation among the plurality of previously received orders and quotations in the book memory means based on the allocating parameters in the system memory means, wherein **the allocating parameters include parameters for allocating a first portion of the incoming order or quotation against previously received customer orders and allocating a remaining portion of the incoming order or quotation preferentially against professional orders and quotations with larger size**.

2. The exchange according to claim 1, wherein processor means further comprises means for **matching the remaining portion with professional orders or quotations in the book memory means on a pro rata basis**.

Exh. 1, '707 patent at 29:53-30:18.

Notably, claim 1 as originally filed did not include either of the highlighted limitations. *See* Exh. 9, originally filed claims of '707 patent, SL00104-177 at SL00160. In the inventor's declaration filed with the application, Mr. Katz swore that he was "the original, first and sole inventor . . . of the subject matter that is claimed." *See* Exh. 10, 1/27/00 Katz Declaration and Power of Attorney, ISE0000152-ISE0000156 at 155. But that declaration was false because claim 1 was fully anticipated by the Product Description Mr. Katz had received from OM but never disclosed to the PTO.

**C.  Pertinent prior art withheld by ISE**

**1.  The September 1996 OM CLICK Exchange Product Description is withheld prior art.**

First and foremost among the material prior art withheld from the PTO is the Product Description (Exh. 7), a 100-plus page document that "describe[s] the standard functionality of



the Click system."[7] Exh. 12, DeVerdier Dep. at 37:17-24[8]. ███████████████

████████████████████████████████████████ *See* Exh. 14, ISE0267733 at 33[9]. ████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████ *See* Exh. 5, Katz Dep. at 108:13-20. █████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████ Exh. 5, Katz Dep. at 285:10-19. ████████████

████████████████████████████████████████████████████████████████

████████████ *See id.*, Exh. 5, Katz Dep. at 108:17-109:7; Exh. 4, 30(b)(6) deposition of

ISE through Katz at 108:13-20; Exh. 13, Simmons Dep. 235:7:-236:4. Despite using the Product

Description as a starting point, Mr. Katz never disclosed it to either the PTO or his patent

attorney, Stephen Lieb. *See* Exh. 5, Katz Dep. at 243:19-22; 280:3-281:8. ████████████

████████████████████████████████████████████████████

█████████████████ *See* Exh. 5, *id.* at 285:20-3.

Mr. Katz has admitted that the Product Description describes ████████████████

██████████████████████ Exh. 5, Katz Dep. at 135:2-7, and that it discloses *all* ████

████████████████████ Exh. 5, Katz Dep. 296:7-13; 296:7-13; 298:21-299:3;

299:4-13; 296:14-298:20; 297:25-298:20.

████████████████████████████████████████████████████████████████

████████████████████████████████████[10]

---

[7] OM Click is an "electronic trading system" (*see* Exh. 7 at ISE-MA0000515) upon which the ISE exchange was implemented. Exh. 4, 30(b)(6) Dep. of ISE through Katz 60:20 – 61:4; Exh. 1, '707 patent at 8:46-49. OM Click is an all-electronic trading platform and completely lacks a trading floor. *See* Exh. 11, 1997 OM Annual Report at 24 (indicating that the Australian Stock Exchange's implementation of OM Click meant that "the old trading floor will be closed").

[8] Peter DeVerdier is an OM employee ████████████████████████████████████ Exh. 12, DeVerdier Dep. at 10:2-22. ██████████████████████████████████████ *See id.*, Exh. 12 at 15:4-16:12.

[9] To remove all doubt, ISE confirmed that "Gary" is indeed Mr. Katz. *See* Exh. 14A, ISE's Answer to Request for Admission 184.

[10] Also, "for inequitable conduct purposes 'claims are given their broadest reasonable interpretation in

Mr. Katz received and studied the Product Description before conception, ██████████

████████████████████████████████████████████████████████████████████████████

████████████████ It qualifies as prior art under § 102(f) as to Mr. Katz. *See OddzOn Prods.,*
122 F.3d at 1403.

        **2.**        **The prior art rules of other exchanges, including the use of customer
priority and pro rata allocation, were also withheld from the PTO.**

The trading rules that existed on other United States securities exchanges prior to Mr.

Katz's conception date are prior art. Testimony of Mr. Katz and Kathy Simmons[11] demonstrates

the existence of such rules, which is corroborated by documentary evidence. Ms. Simmons

admitted that she and Mr. Katz reviewed the trading rules of the ████████████████████████

████████████████████████████████████████ (*see* Exh. 13, Simmons Dep. at

108:11-109:18; 203:4-8), ████████████████████████ (*see id.*, Exh. 13 at 102:7-

103:5), and that the ████████████████ had trading rules pertaining to an electronic

system.[12] *Id.*, Exh. 13 at 9:7-10:7; 64:2-7; 109:17-19. Ms. Simmons's study of ████ did not

end with its rule books: ████████████████████████████████████████████████

██████████████████████████████████████████ *Id.*, Exh. 13 at 191:12-19.

The rules of these exchanges, both as published and as implemented in public use in the United

States, are prior art under §§ 102(a) and/or 102(b), yet ISE did not disclose any of them to the

PTO.

The record further shows the existence of prior art pertaining to public customer priority,

sized-based allocation, and pro rata allocation, which are all significant claim limitations in the

'707 patent. But ISE failed to disclose such art to the patent examiner. Mr. Katz admitted that

he did not invent the concept of ████████████████ (*see* Exh. 5, Katz Dep. at 159:23-25;

---

light of the specification.'" *FMC Corp. v. Hennessy Indust., Inc.,* 836 F.2d 521, 526 (Fed. Cir. 1987).

[11] Kathy Simmons is an ISE attorney who ███████████████████████████████ (*see* Exh. 13,
Simmons Dep. 214:10-215:20; 30:22-32:20).

[12] Mr. Katz's and Ms. Simmons's knowledge of these rules is unsurprising given their experience in the
securities industry. From 1986 to 1997 Mr. Katz worked at the New York Stock Exchange where he did
research and development related to options trading. *See* Exh. 5, Katz Dep. at 8:7-22. From 1993 until
1996 Ms. Simmons was a staff attorney at the SEC where she dealt with rule filings from exchanges; in
1996 she joined the law firm of Orrick Herrington where she work in exchange regulatory matters. *See*
Exh. 13 Simmons Dep. at 7:19-13:21.

271:11-272:2; 305:23-307:7; 313:18-23), that he knew other exchanges had practiced ███████  at the time he filed his patent application (*id.*, Exh. 5 at 159:17-22) and that, prior to his conception, options exchanges had practiced ███████ by exchange rule. *See id.*, Exh. 5 at 199:10-17. Ms. Simmons also admitted that ███████ had existed well before May 1997 (*see* Exh. 13, Simmons Dep. 85:18-86:16), that it was the "accepted structure" of options exchanges (*see id.*, Exh. 13 at 111:2-15) and that ███████ *Id.*, Exh. 13 at 188:24-189:7; 121:14-122:13. Consistent with these admitted facts, Porter prepared a report to his investors (*see* Exh. 15, ISE0264270) dated December 1, 1997 which describes the necessity to ███████ *See* Exh. 2, Porter Dep. at 149:2-7; 153:21-154:13.

The record tells a similar story with respect to pro rata allocation: ISE knew that it too existed before Mr. Katz conceived his invention, yet failed to disclose it to the PTO. Ms. Simmons admitted that, in reviewing the rules of other exchanges as part of Mr. Porter's effort to obtain SEC approval for his automated options exchange,[13] ███████ rules that included pro rata allocation (*see* Simmons Dep., Exh. 13 at 206:3-13) and ███████ rules that disclosed pro rata allocation. *See id.*, Exh. 13 at 182:19-185:4. Moreover, Ms. Simmons reviewed a ███████ rule book that included a rule regarding pro rata allocation.[14] *See* Simmons Dep., Exh. 13 at 202:15-206:2. All of these rules and their

---

[13] In 1996, prior to joining ISE as its employee, Ms. Simmons was ███████ *See* Exh. 13, Simmons Dep. at 19:7-16; 21:17-23; 13:19-14:15; 11:10-16. Ms. Simmons admitted that she ███████ *Id.*, Exh. 13 at 25:8-28:15.

[14] In particular, Ms. Simmons reviewed ███████ Rule 8.80(c)(7) states "In executing transactions for his own account as market-maker, the DPM shall (i) accord priority to orders he represents as floor broker over his activity as market-maker, (ii) have a right to ***participate pro rata with the trading crowd*** in trades that take place at the DPM's principal bid or offer." *See* Exh. 16, CBOE001224556-565 at 564 (emphasis added).

It is of note that CBOE's rules from ***1989*** also recited customer priority and pro rata allocation. *See* Exh. 19, Chicago Board Options Exchange, Inc. – 1989 Rules (**Rule 6.45(a)**: "The highest bid shall have priority, but where two or more bids for the same option contract represent the highest price and *one such bid is displayed in the customer limit order book* in accordance with Rule 7.7, s*uch bid shall have priority over any other bid at the post*"; **Rule 8.80(c)(7)**: "In executing transactions for his own account as market-maker, the DPM shall (i) *accord priority to orders he represents as floor broker* over his activity as market-maker, (ii) have *a right to participate pro rata with the trading crowd* in trades that take place

implementations in U.S. exchanges are prior art under §§ 102(a) and/or 102(b). ISE disclosed none of them to the patent examiner.

### 3. The CBOT's Project A

Project A is prior art under 35 U.S.C. §§ 102(a) and/or 102(b) that was not disclosed to the examiner. It is an automated exchange system for trading financial instruments that was operated by the Chicago Board of Trade ("CBOT") at least as early as 1992.[15] Joseph Ferraro, in-house counsel at ISE, admitted that ISE engaged counsel to ███████████████████████ ████████████████████████████████████████████████████████████████████████████ ██████████████████████[16] *See* Exh. 22 Ferraro Dep. at 44:3-50:25. The document (hereinafter "the Project A Document") describes Project A as "an electronic order entry facility" and, notably, describes its trading rule for size-based allocation: "Under quantity allocation, each order is filled based on the percentage of the total quantity that is represented by that order." Exh. 21 at 1 (ISE0261177). Stephen Lieb, the attorney who prosecuted the application for the '707 patent, admitted that ████████████████████████████████████ ███████████████████████ Exh. 24, Lieb Dep. at 266:17-18, and that ███████████████ █████████████ *Id.*, Exh. 24 at 267:22-25.

Mr. Ferraro testified that he provided this document to ████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████on." *See* Exh. 22, Ferraro Dep. at 49:10-51:23. Mr. Lieb reviewed the ████████████████████████████████████████[17]████████████████████████████████ ████████ *See* Exh. 24, Lieb Dep. at 261:7-263:12. Mr. Lieb withheld the reference from the PTO.[18]



---

at the DPM's principal bid or offer.") (emphasis added).

[15] *See* Exh. 20 at CBOE004757, William D. Falloon, *Market Maker: A Sesquicentennial Look at the Chicago Board of Trade*, 279, Board of Trade of the City of Chicago (1998).

[16] Attached hereto as Exh. 21 (ISE0261177) (emphasis added).

[17] Attached hereto as Exh. 23 (SL000201).

[18] ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████

## IV.     ARGUMENT

A court may exercise its discretion in managing its docket provided it "(1) serves the interests of judicial economy or is done to prevent prejudice to a party; (2) does not unfairly prejudice the non-moving party; and (3) does not violate the Seventh Amendment." *Krocka*, 203 F.3d at 516. It is within this Court's discretion to try CBOE's inequitable conduct claim first because "[s]uch a separation is precisely the type contemplated by Rule 42(b) and does not run afoul of the Seventh Amendment." *See Gardco*, 820 F.2d at 1213.

### A.     Judicial economy is served by trying inequitable conduct first because finding the '707 patent unenforceable obviates the need for a jury trial on validity, infringement and damages.

Since a ruling that the '707 patent is unenforceable would be dispositive of this case, a prior trial on that issue would promote judicial efficiency, and avoid the expenditure of time on money on a protracted jury trial. *See* Wright & Miller, 9A Federal Practice and Procedure Civil 3d § 2388 at 100 (2008) (Where an "issue could be dispositive of the case . . ., and resolution of it might make it unnecessary to try the other issues in the litigation, separate trial of that issue may be desirable to save the time of the court and reduce the expense of the parties."). In this case, because the evidence of record makes out a compelling case of inequitable conduct, judicial economy strongly favors trying unenforceability first.

### 1.     The applicant's intentional withholding of the OM September 1996 Product Description is a basis for inequitable conduct.

The Product Description, prior art under at least § 102(f), is a material reference that was withheld by Mr. Katz with deceptive intent. There is no dispute that Mr. Katz, the inventor, was aware of this reference. Mr. Katz was informed of his duty of candor, but chose to disregard it. *See, e.g.,* Exh. 5, Katz Dep. at 286:4–23.[19]

---

[19] As the inventor, Mr. Katz had an independent duty to disclose material information to the PTO; disclosing the information to his patent attorney does not suffice. 37 C.F.R. 1.56(d). Regardless, the record indicates that Mr. Katz did not ███████████████████████████████████ Exh. 5, Katz Dep. at 243:19–22; 280:3–281:8 █████████████████████████████████████████

### a. The OM CLICK Exchange Product Description of September 1996 is material and non-cumulative.

There can be no reasonable dispute that the Product Description is material. It was used by Mr. Katz as the basis for his alleged invention. Exh. 5, Katz Dep. at 108:12 – 109:21; *see also* Exh. 13, Simmons Dep. at 235:11-236:11 ("[A]ll of the inventions are things that we came up with to modify the OM CLICK exchange software.").[20] Information that a patent applicant uses to form the basis for his claimed invention is material. *See Elk Corp. of Dallas*, 168 F.3d at 31 (relying on fact that claimed invention was an improvement over withheld art to support the finding that the withheld art was highly material); *Baxter*, 149 F.3d at 1329-30 (Fed. Cir. 1998) (finding art highly material that "formed the basis" for the claimed invention).

Not only did Mr. Katz derive his invention from the Product Description, he recognized that this reference disclosed ████████████████████████[21] Exh. 5, Katz Dep. at 294:18–296:6 ████████████████████████████████; 296:7–13 ██



; 296:14 – 298:20[22] ████████████████████████████████; 298:21 – 299:3 ████████████████████████████████ 299:4–13 ████████████████████████████████ Because the Examiner never issued an anticipation rejection during prosecution of the '707 patent, but could have if the Product Description had been made

---

[20] Ms. Simmons is an attorney who was involved in the prosecution of the '707 patent, but never disclosed her knowledge of this derivation to the PTO.

[21] On a related point, Mr. Katz admitted that several characterizations of his "invention" made during prosecution of the '707 patent ████████████████████████████ Exh. 5, Katz Dep. at 303:10-304:5; 305:13-22; 310:16-311:22; 355:9-16.

[22] During his deposition, Mr. Katz attempted to ████████████████████████████████ ████████████████ Exh. 5, Katz Dep. at 297:25–298:20. Originally-filed claim 1 recites no such feature, and attempting to read it in to the claim is inconsistent with the principle that the broadest reasonable interpretation of the claims should be used in the inequitable conduct analysis. *See FMC Corp.*, 836 F.2d at 526, (Fed. Cir.1987) ("for inequitable conduct purposes 'claims are given their broadest reasonable interpretation in light of the specification.'").

of record, it is material and non-cumulative.[23]  *See, e.g., Semiconductor Energy Lab.*, 204 F.3d at 1374 ("A withheld reference may be highly material when it discloses a more complete combination of relevant features, even if those features are before the patent examiner in other references.").

Also, Mr. Katz admitted that arguments that his patent attorney made to ████████ ████████████████████████████████████████████████████████████████████████████████████ Exh. 5, Katz Dep. at 306:18–307:7; 308:22–309:9; 321:4–23.  Because the September 1996 Product Description admittedly "refutes, or is inconsistent with, a position" the applicant took in "opposing an argument of unpatentability relied on by the Office" *and* "asserting an argument of patentability," it is presumptively material.  *See* 37 C.F.R. § 1.56.

> **b.**  **The OM CLICK Exchange Product Description of September 1996 was withheld with deceptive intent.**

Deceptive intent can be inferred from the facts and circumstances surrounding the withholding of the Product Description.

Where, as here, the withheld information is of the sort that the patent examiner has no way of obtaining on his own, deceptive intent can be inferred.  *See Dippin' Dots*, 476 F.3d at 1346.  The Product Description is not the type of document that patent examiners have access to in their databases.  Moreover, because the Product Description qualifies as prior art under § 102(f), the examiner would have needed to know whether Mr. Katz had actual knowledge of it before he could have used it to reject the claims.  *OddzOn Prods.,* 122 F.3d at 1403 (information is prior art under § 102(f) to the party who received it).  But the examiner cannot learn this unless the applicant fulfills its duty of candor.  Because (1) the examiner was completely dependent on the applicant to disclose the Product Description (as well as the fact of the applicant's actual knowledge of it) and (2) the reference is highly material, deceptive intent can be inferred.

---

[23] While the Product Description is also highly material to the issued claims (*e.g.*, claims 1 and 35), material information is not determined solely on the basis of the issued claims because the duty of candor extends throughout the entire prosecution history.  *Fox Indus.,* 922 F.3d at 803-04 ("a trial court may look beyond the final claims to their antecedents").  With respect to issued claim 1, Mr. Katz testified that the September 1996 Product Description disclosed ████████████████████████████████████████████████ ██████████████ Exh. 5, Katz Dep. at 135:2-142:21; *see also 800 Adept, Inc. v. Murex Secs., Ltd.,* 2006 WL 5359053 (M.D. Fla. Aug. 25, 2006) at *4 (citing *OddzOn* and noting that, for purposes of inequitable conduct, withheld §102(f) prior art is material because it can be used in a §103 combination).

Also, where the withheld prior art "formed the basis of the claimed inventions," a culpable state of mind has been inferred. *See, e.g., Baxter*, 149 F.3d at 1329-30. Here, Mr. Katz admitted ████████████████████████████████████ *See id.*; Exh. 5, Katz Dep. at 108:12-109:21 (agreeing that the Product Description was the ██████████████████████ Exh. 13, Simmons Dep. at 235:11-236:11 ██████████████████████████████████████████ ████████████████████████.

Deceptive intent has also been inferred where, as here, an applicant withholds material information and makes an argument for patentability that could not have been made had the information been disclosed. *See, e.g., GFI,* 265 F.3d at 1275. Mr. Katz admitted that arguments that his patent attorney made ████████████████████████████████████████ ██████████████████████████████████████ Exh. 5, Katz Dep. at 306:18-307:7; 308:22-309:9; 321:4-23.

**2.    The applicant's intentional withholding of the rules of other exchanges, including the use of "customer priority" and "pro rata allocation" is a basis for inequitable conduct.**

Ms. Simmons had a duty under 37 C.F.R. § 1.56 to disclose information material to the patentability of the application that led to the '707 patent. *See, e.g.,* 37 C.F.R. § 1.56; Exh. 13, Simmons Dep. at 163:11-165:3. Ms. Simmons and Mr. Katz were aware of material information concerning the rules and operations of other exchanges ████████████████████████████████████ ██████████████████████ but did not disclose that information to the PTO. Exh. 13, Simmons Dep. at 85:25-86:16, 87:4-15, 111:2-15 ████████████████████████████████ ████████████████████████████ 189:4-7 ██████████████████████████████████ ██████████████████████████████████ 108:11-22, 183:10-185:4 ████████████████████████████████████████████ ██████████████████████████ 202:15-206:14 ██████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████ Exh. 5, Katz Dep. at 8:7-9; 314:15-22 ████████████████████████████ 159:17-22; 190:10-17. Like Mr. Katz, Ms. Simmons had been informed of her duty of candor, but chose to disregard it. *See, e.g.,* Exh. 13, Simmons Dep. at 164:20-165:3.[24]

---

[24] Ms. Simmons's failure to disclose is all the more egregious because she was present at an in-person

a. **The rules of other exchanges, including the use of "customer priority" and "pro rata allocation" are material.**

The withheld information concerning the rules of other exchanges is material because it discloses that, prior to the conception of the '707 patent, (1) customer priority and pro-rata allocation were well-known and in public use by exchanges in the United States and (2) that the features of customer priority and pro rata allocation had been used together at least at CBOE. Exh. 16, CBOE February 1997 Rule 8.80, CBOE001224556-565 at 564 (disclosing ███████ ███████████████ pro rata allocation); Exh. 13, Simmons Dep. at 206:11-14 ███████████ ███████████████████ This information is relevant to at least issued claims 1, 35, 36 and (given its broadest reasonable interpretation) claim 2.[25] *None* of the art of record in the '707 patent discloses pro rata allocation *or* customer priority (let alone the combination of both); therefore, this information cannot be cumulative. *See GFI,* 265 F.3d at 1274.

The withheld information is material also because it refutes or is inconsistent with a position the applicant took in opposing an argument of unpatentability relied on by the PTO. *See* 37 C.F.R. § 1.56. In arguments made in an amendment (after which the PTO allowed the application), the applicant distinguished the prior art for its failure to disclose a size-based allocation and customer priority. Exh. 30, 8/2/02 Amendment, ISE0000582-622 at 603 (size-based allocation and customer priority "are not found in [the Rickard or Minton patents] separately, and such features are therefore lacking in any combination of the references."). The withheld information discloses these features both alone and together, and therefore the applicant could not have made this argument if the information were of record before the PTO.

---

interview with the patent examiner where claim limitations pertaining to size-based allocation and customer priority were discussed, but she did not ███████████████████████████████ ███████████ *See* Exh. 34, ISE0000401 (Interview Summary); Exh. 13, Simmons Dep. at 249:3-257:6.

[25] As the Court is aware, the parties dispute what is meant by "matching on a pro rata basis" in claim 2. However, given ISE's position that this means no more than "*allocating* on a pro rata basis," CBOE submits that ISE's construction should be encompassed within the broadest reasonable interpretation of the claim for purposes of inequitable conduct. *See FMC Corp.*, 836 F.2d at 526 ("for inequitable conduct purposes 'claims are given their broadest reasonable interpretation in light of the specification'").

**b.** **The rules of other exchanges, including the use of "customer priority" and "pro rata allocation" were withheld with deceptive intent.**

Deceptive intent can be inferred from the facts and circumstances surrounding Mr. Katz's and Ms. Simmon's withholding of information concerning the operations of other exchanges in the United States. There can be no reasonable dispute that this information was intentionally withheld—since ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████

Deceptive intent can be inferred where the applicant discloses material information to one government agency, but withholds it from the PTO. *E.g., Bruno Independent Living Aids*, 394 F.3d at 1352, 1354 ("The fact that an official … chose to disclose [the material reference] to the FDA, but not to the PTO, certainly supports a finding of deceptive intent to withhold the disclosure from the PTO."); *Merck & Co.*, 873 F.2d at 1420-22 (ruling that inference of deceptive intent was supported by "damning" evidence that included applicant having submitted material information to the FDA while simultaneously withholding it from the PTO).

Like the individual in *Bruno Independent Living Aids* who informed the FDA that the claimed medical device is "substantially similar" to prior devices in an effort to receive FDA approval, but withheld information about those prior devices from the PTO, Ms. Simmons was involved in representing to the SEC, to hasten approval, that ISE's exchange would ████████ ██████████████████████ but disclosed nothing of those exchanges to the PTO. *See* Exh. 13, Simmons Dep. at 32:14-20 ████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████ 103:16-21 ████████████████████ ██████████████████████████████████████ Exh. 31, ISE-MA0001581-85 at 85 n.4, 12/18/97 Letter from ISE's counsel to the SEC ████████████████████████ ███████████████████████████████████████████████████████ Ms. Simmons's involvement in representing to the SEC ████ ██████████████████████████████████ ████████████████████████ but at the same time withholding that information from the PTO is compelling evidence of deceptive intent. *See Merck & Co.*, 873 F.2d at 1420-22.

Also, where the withheld information is of the sort that the patent examiner has no way of obtaining on his own, deceptive intent can be inferred. *See Dippin' Dots*, 476 F.3d at 1346.

20

Information about how other exchanges were operating is not the type of information that the patent examiners have access to in their databases. Because (1) the examiner was completely dependent on the applicant to disclose the information about other exchanges and (2) the reference is highly material, deceptive intent can be inferred here.

Moreover, had Ms. Simmons or Mr. Katz disclosed the information about other exchanges to the PTO, the prior art could not have been distinguished on the basis of size-based allocation or customer priority.[26] Exh. 30, 8/2/02 Amendment, ISE0000582-622 at 603. Deceptive intent can be inferred where an applicant withholds material information and makes an argument for patentability that could not have been made had the information been disclosed. *See GFI,* 265 F.3d at 1275; *LaBounty Mfg.*, 958 F.2d at 1076.

### 3. The applicant's intentional withholding of information concerning the CBOT's Project A is a basis for inequitable conduct.

Mr. Lieb prosecuted the application that led to the '707 patent, and therefore had a duty to disclose information material to its patentability. *See, e.g.,* 37 C.F.R. § 1.56; Exh. 24, Lieb Dep. at 64:15-21. With intent to deceive, Mr. Lieb withheld material information relating to CBOT's Project A.

#### a. The information concerning the CBOT's Project A is material.

The withheld information concerning CBOT's Project A is material because it discloses an automated exchange having the feature of pro rata allocation, which is relevant to at least issued claims 1, 35, 36 and (given its broadest reasonable interpretation) claim 2. Exh. 21, ISE ISE0261177-179. This combination of features is not disclosed by *any* of the art of record and therefore cannot be cumulative. *See GFI,* 265 F.3d at 1274 (finding a reference to be non-cumulative "because no reference before the examiner disclosed this combination of required elements"). *None* of the art of record in the '707 patent discloses pro rata allocation.

---

[26] The applicant received a Notice of Allowance after the Examiner's consideration of these arguments. *See* Exh. 32, ISE0000623-629 at 623, Notice of Allowance (noting that it is responsive to the 8/2/02 Amendment, *i.e.*, Paper 23).

**b.** **Information concerning the CBOT's Project A was withheld with deceptive intent.**

Deceptive intent can be inferred from the facts and circumstances surrounding Mr. Lieb's withholding of information concerning CBOT's Project A. Here, this information was intentionally withheld. *See* Exh. 23, SL000201. Moreover, had Mr. Lieb disclosed Project A to the PTO, he could not have distinguished the prior art on the basis of size-based allocation. *See* Exh. 30, 8/02/02 Amendment, ISE0000582-622 at 600-03. Again, deceptive intent can be inferred where an applicant withholds material information and makes an argument for patentability that could not have been made had the information been disclosed. *See GFI,* 265 F.3d at 1275; *LaBounty Mfg.*, 958 F.2d at 1076.

**B.** **Trying inequitable conduct first does not prejudice ISE.**

Trying inequitable conduct first does not prejudice ISE. Any argument that ISE will suffer harm from the expense of two trials is unavailing. First, the issue of inequitable conduct has to be tried regardless. Second, it presumes that resolution of unenforceability will not resolve the case through a ruling in favor of CBOE. The court in *General Patent Corp. v. Hayes Microcomputer*, No. SA CV 97-429, 1997 WL 1051899 at *2 (C.D. Cal. Oct. 20, 1997), rejected a similar argument where, like here, there was a strong showing that the case would be resolved by addressing the threshold issue of unenforceability first. If inequitable conduct is found in connection with *one* claim, the entire '707 patent is rendered unenforceable and ISE benefits by avoiding the cost of a lengthy jury trial on the non-infringement and invalidity of the *twenty* asserted claims.

**C.** **Trying inequitable conduct first does not violate the Seventh Amendment.**

"The Federal Circuit has determined that bifurcation of inequitable conduct, even if tried first, does not violate any rights guaranteed by the Seventh Amendment." *Trading Techs.*, 570 F. Supp. 2d at 872 n.1 (*citing Gardco*, 820 F.2d at 1209). There are no issues in CBOE's inequitable conduct allegations that a jury must decide.

**V.** **CONCLUSION**

For the foregoing reasons, the present Motion should be GRANTED.

Dated: September 16, 2009                    By: _s/Jonathan A. Marshall_____

          Jonathan A. Marshall
          David Francescani
          Michael T. Zoppo
          Brian J. Doyle
          **FISH & RICHARDSON P.C.**
          601 Lexington Avenue – 52nd Floor
          New York, NY 10022
          Telephone: (212) 765-5070
          Facsimile: (212) 258-2291
          *Attorneys for Plaintiff*
          *Chicago Board Options Exchange, Incorporated*

OF COUNSEL:

Joanne Moffic-Silver          Paul E. Dengel
Jordan Newmark          Stacie R. Hartman
**CHICAGO BOARD OPTIONS**          **SCHIFF HARDIN LLP**
**EXCHANGE, INCORPORATED**          660 Sears Tower
400 S. LaSalle Street          233 South Wacker Drive
Chicago, IL 60605          Chicago, IL 60606-6473
Telephone: (312) 786-7909          Telephone (312) 258-5500
          Facsimile (312) 258-5600

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies pursuant to Fed.R.Civ.P. 5 and L.R. 5.5 that a true and correct copy of the foregoing document was filed on July 31, 2009 with the Clerk of the Court using the CM/ECF system, which will send notice to counsel of record

_____
                       Allan Planchard

on September 16, 2009.

30501912_5.doc