UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHICAGO BOARD OPTIONS EXCHANGE, INCORPORATED, | Case No. 07 cv 0623 |
| Plaintiff, | Hon. Joan H. Lefkow, U.S.D.J. |
| | Hon. Jeffrey Cole, U.S.M.J. |
| v. | |
| INTERNATIONAL SECURITIES EXCHANGE, LLC, | |
| Defendant. | |

# EXHIBIT 2

.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CHICAGO BOARD OPTIONS EXCHANGE, INCORPORATED, | |
| Plaintiff, | Civil Action No. 07-cv-00623 |
| v. | Hon. Joan H. Lefkow, U.S.D.J. |
| | Hon. Jeffrey Cole, U.S.M.J. |
| INTERNATIONAL SECURITIES EXCHANGE, LLC, | |
| Defendant. | |

**SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Chicago Board Options Exchange, Incorporated ("CBOE"), for its Second

Amended Complaint, alleges:

**THE PARTIES**

1.      Plaintiff CBOE is a Delaware corporation having its principal place of business at

400 South LaSalle Street, Chicago, Illinois 60605.

2.      Defendant, International Securities Exchange, LLC ("ISE"), is a Delaware

corporation having its principal place of business at 60 Broad Street, New York, New York

10004.

**JURISDICTION AND VENUE**

3.      This action arises under the Patent Laws of the United States, Title 35, United

States Code, Section 1 et seq., and is for a declaratory judgment that United States Patent No.

6,618,707 (the "'707 patent") is not infringed and/or not valid and/or not enforceable against

plaintiff.

4.      This court has jurisdiction of the subject matter hereof under the provisions of Title

28, United States Code, Sections 1338(a), 2201 and 2202.

30507260.30517017.doc

5.     Venue in this judicial district is proper under Title 28, United States Code, 1391(b) and 1391(c) in that a substantial part of the property that is the subject of this action is situated in this judicial district.

## CLAIM FOR RELIEF

6.     CBOE operates a national securities exchange based in Chicago, Illinois that specializes in the trading of standardized securities options.  Among other things, CBOE operates a trading floor in Chicago and maintains and operates a trading system (the "Hybrid System") in Chicago through which members can buy and sell options for their own account, for their employer's account, and for their customers.  CBOE's Hybrid System provides members with the ability to trade options electronically and through an open outcry auction on its exchange.

7.     ISE operates an all-electronic securities exchange that offers trading in securities options.

8.     On November 22, 2006, ISE, by its counsel, sent to CBOE a letter entitled "Notice of Infringement of U.S. Patent No. 6,618,707," a copy of which is annexed hereto as Exhibit A.

9.     In the November 22, 2006 letter, ISE informed CBOE that it owned the '707 patent, a copy of which is annexed hereto as Exhibit B.

10.     Also in the November 22, 2006 letter, ISE informed CBOE that it believed the CBOE Hybrid System infringed the '707 patent; that it had that day filed an action for infringement of the '707 patent in the United States District Court for the Southern District of New York; and that it might be willing to license CBOE under the '707 patent.

11.     The November 22, 2006 letter referred to in Paragraphs 8, 9 and 10 hereof (Exhibit A) represents the first communication between the parties hereto regarding the '707 patent.

12.     By reason of the facts set forth in Paragraphs 6 through 11, inclusive, hereof, a

conflict of asserted rights has arisen between the parties and an actual controversy exists between plaintiff CBOE and defendant ISE with respect to the infringement, validity, scope and enforceability of the '707 patent, in that plaintiff claims the right to use its Hybrid System without further interference from defendant and free from any and all charges of infringement against it.

13.    The '707 patent and each claim of such patent is, on information and belief, not infringed, and/or not valid and/or not enforceable against plaintiff under one or more of the provisions of Title 35, United States Code, Sections 101, 102, 103, or 112.

14.    ~~The~~ As set forth in detail in Paragraphs 15 through 72 hereof, the '707 patent is further unenforceable by reason of inequitable conduct because, on information and belief, the applicant for such patent and/or his authorized representative and/or other persons associated with the preparation, filing and/or prosecution of Provisional Application  No. 60/106,935 and/or Application No. 09/433,613, all of whom had the duty to disclose to the United States Patent and Trademark Office (the "PTO") information material to the patentability of the subject matter claimed in the application for the '707 patent, willfully and knowingly withheld and misrepresented in the proceedings before the PTO, knowledge and information relating to material prior art which would have been pertinent to the examination and evaluation conducted by the PTO that resulted in the issuance of the '707 patent.

15.    The applicant for the '707 patent, his authorized representatives, and other persons associated with the preparation, filing and/or prosecution before the PTO of the application for the '707 patent (collectively, "the applicant") were aware at all relevant times of their duty to cite material information to the PTO during the prosecution of the application for the '707 patent. Despite this awareness, the applicant, with an intent to deceive the PTO, concealed from and/or

misrepresented to the PTO material information during the prosecution of the application for the

'707 patent as set forth in Paragraphs 17 through ~~47~~69 hereof.

16.    The knowing and willful concealment and/or misrepresentation of material

information during the prosecution of the application for the '707 patent before the PTO, referred

to in Paragraphs 17 through ~~47~~69 hereof, renders the '707 patent unenforceable by reason of

inequitable conduct.

### Inequitable Conduct with Respect to
### the OM Product Description

17.    OM Stockholm AB ("OMX") is a Swedish company that developed and

commercialized an automated options exchange at least as early as 1990.

18.    OMX developed the first such automated options exchange for use in its own

options exchange in Stockholm, Sweden.  By at least as early as 1996, OMX had begun licensing

to third party customers its software system for implementing automated options exchanges.  The

OMX software system was known commercially as the "OM Click Exchange System."

19.    By 1996, automated options exchanges running OM Click software were in

operation in several countries including Austria, England, Hong Kong and Italy.

20.    A 100- plus page document entitled "The OM CLICK Exchange Software Product

Description" (the "OM Product Description") dated September 1996 was authored by OMX and

distributed to potential customers.  The OM Product Description is a description of the OM

CLICK Exchange System and its subsystems that describes the automated financial exchange of

the OM CLICK Exchange System and its functionality as it then existed.

21.    On or about May 13, 1997, Patrick Egervall, the head of technology sales at OMX,

while in the United States, provided a copy of the OM Product Description to Gary Katz, the sole

named inventor of the '707 patent in suit.  Mr. Katz used the OM Product Description as the starting point for and the basis of the automated financial exchange disclosed and claimed in the '707 patent. (Katz Tr. 107:25-109:7).

22.    By no later than May 21, 1997,  Mr. Katz had reviewed the OM Product Description, and had prepared and sent to OMX a two-page list of questions and comments about the automated financial exchange disclosed in the OM Product Description.

23.    By no later than May 30, 1997, Mr. Katz had prepared and sent to OMX a fourteen-page document entitled "Functional Specification for Electronic Trading" which is relied upon by ISE in this action as establishing May 30, 1997 as the date of conception of the subject matter claimed in at least claims 1 and 35 of the '707 patent in suit.

24.    The OM Product Description is prior art to the subject matter of the claims of the '707 patent at least under 35 U.S.C. §102(f), as well as §§102(a) and (b).  It was the OM Product Description from which Mr. Katz derived the automated financial exchange disclosed and claimed in the '707 patent from the OM Product Description.

25.    The OM Product Description is material to the claimed subject matter of the '707 patent.  This is demonstrated by the following evidence adduced during discovery in this case, inter alia, through the admissions of Mr. Katz during his June 2009 deposition:

•    25. Claim 1 of the November 1999 application for the '707 patent (the "November 1999 application") as filed, was unpatentable as fully anticipated under 35 U.S.C. §102 by the OM Product Description.  Moreover, the inventor's declaration signed by Mr. Katz is false because Mr. Katz did not himself invent the claimed subject matter, as filed on November 2, 1999 ("claim 1 as filed") reads as follows:

>    1.    An automated exchange for a trading financial instrument, wherein the trade may be one of a purchase a quantity of the

instrument and a sale of a quantity of the instrument, the exchange comprising:

an interface for receiving an incoming order to trade the instrument, the order having a size associated therewith;

- During the course of the prosecution of the November 1999 application, representations and arguments were made by the applicant to the examiner regarding certain deficiencies in the prior art of record. The purpose of such representations was to obtain allowance of at least claims 1 and 35 by distinguishing the subject matter of such claims from the disclosures in the prior art of record. Because the subject matter of at least claims 1 and 35 was not disclosed in the prior art of record but was disclosed in the OM Product Description, the representations and arguments referred to herein would not have succeeded in obtaining allowance of such claims had the examiner been aware of the OM Product Description.

book memory means for storing a plurality of previously received orders to trade a corresponding plurality of quantities of the instrument, the previously received orders being a customer order previously placed by a customer and a professional order previously placed by one or more professionals;

system memory means for storing parameters for allocating trades between the incoming order and the previously received orders; and

processor means for allocating portions of the incoming order among the plurality of previously received orders in the book memory means based on the parameters in the system memory means.

26.     The OM Product Description, at least at pages 7, 11, and 33, discloses an automated exchange for trading a financial instrument.  (*See also* the admissions at Katz Tr. 135:2-7; 294:18-296:6).

27.     The OM Product Description, at least at pages 7, 11, 12, 18, 47 and 73, discloses that the automated exchange includes an interface for receiving an incoming order to trade the instrument, the order having a size associated therewith.  (*See also* the admissions at Katz Tr. 135:8-136:7; 296:7-13).

28.     The OM Product Description, at least at pages 11, 12, 13, 25 and 73, discloses that the automated exchange further includes a book memory means.  (*See also* the admissions at Katz Tr. 140:15-141:20; 296:14-298:20).

29.     The OM Product Description, at least at pages 20, 23 and 24, discloses that the automated exchange further includes a system memory means for storing parameters for allocating trades between the incoming order and previously received order.  (*See also* the admissions at Katz Tr. 141:21-142:9; 298:21-299:3).

30.     The OM Product Description, at least at pages 20, 23 and 24, discloses a processor means for allocating portions of the incoming order among the plurality of previously received orders in the book memory means based on the parameters in the system memory means.  (*See also* the admissions at Katz Tr. 142:10-21; 299:4-13).

31.     With respect to claim 1 as issued, the OM Product Description, at least at pages 7, 11, and 33, discloses an automated exchange for trading a financial instrument.  (*See also* the admissions at Katz Tr. 135:2-7).

32.     With respect to claim 1 as issued, which is reproduced at Paragraph 57 hereof, the OM Product Description, at least at pages 7, 11, 12, 18, 47 and 73, discloses that the automated exchange includes an interface for receiving an incoming order or quotation to trade the instrument, the order or quotation having a size associated therewith.  (*See also* the admissions at Katz Tr. 135:8-136:7; 296:7-13).

33.     With respect to claim 1 as issued, the OM Product Description, at least at pages 11, 12, 13, 25 and 73, discloses that the automated exchange further includes a book memory means.  (*See also* the admissions at Katz Tr. 140:15-141:20).

34.     With respect to claim 1 as issued, the OM Product Description, at least at pages 20, 23 and 24, discloses that the automated exchange further includes a system memory means for storing parameters for allocating trades between the incoming orders or quotations and previously received orders or quotations.  (*See also* the admissions at Katz Tr. 141:21-142:9).

35.     With respect to claim 1 as issued, the OM Product Description, at least at pages 20, 23 and 24, discloses a processor means for allocating portions of the incoming order among the plurality of previously received orders or quotations in the book memory means based on the parameters in the system memory means.  (*See also* the admissions at Katz Tr. 142:10-21).

36.     With respect to issued claim 35 of the '707 patent, the OM Product Description, at least at pages 7, 11, and 33, discloses an automated exchange for trading a financial instrument. (*See also* the admissions at Katz Tr. 135:2-7).

37.     With respect to issued claim 35, the OM Product Description, at least at pages 9, 11, 12, 13, 14, 15, and 35, discloses that the automated exchange "stor[es] a public customer order to trade the instrument in a book memory, the public customer order having a size."  (*See also* the admissions at Katz Tr. 140:15-141:20)

38.     With respect to issued claim 35, the OM Product Description, at least at pages 9, 11, 13, 14, 15, 35 and 73, discloses that the automated exchange "stor[es] a plurality of professional orders or quotations entered for one or more professionals to trade the instrument in the book memory, the professional orders or quotations having a respective plurality of sizes." (*See also* the admissions at Katz Tr. 140:15-141:20)

39.     With respect to issued claim 35, the OM Product Description, at least at pages 13, 15, and 23, discloses that the automated exchange "establish[es] a best price for the instrument."

40.     With respect to issued claim 35, the OM Product Description, at least at pages 20 and 23, discloses that the automated exchange "establish[es] an allocating parameter." (*See also* the admissions at Katz Tr. 141:21-142:9).

41.     With respect to issued claim 35, the OM Product Description, at least at pages 11 and 73, discloses that the automated exchange "receiv[es] an incoming order or quotation for the purchase or sale of the instrument, the incoming order or quotation having a size associated therewith."  (*See also* the admissions at Katz Tr. 135:8-136:7; 296:7-13).

~~26.~~ 42. The OM Product Description is material ~~information~~to the claimed subject matter of the '707 patent because there is ~~at least~~ a substantial likelihood that a reasonable examiner would have considered ~~it~~the OM Product Description important in deciding whether to allow the November 1999 application to issue as a patent.

~~27.~~ 43. The OM Product Description is material prior art because it formed the basis for the invention of the '707 patent, both as claimed in at least claim 1 of the application as filed and claims 1 and 35 of the '707 patent as issued.

44.     As set forth in Paragraphs 26 through 30, inclusive, hereof, the OM Product Description is material because it discloses all of the elements and limitations of at least claim 1 as filed, which is reproduced at Paragraph 25 hereof.  As such, the OM Product Description fully anticipates such claim under 35 U.S.C. §102.  The fact that the PTO never rejected claim 1 as filed under 35 U.S.C. § 102 demonstrates that no prior art reference before the examiner discloses the elements and limitations of claim 1 as filed, much less the complete combination of the relevant claimed features.

45.     ██████████████████████

- 9 -



46.     The OM Product Description is material prior art information because it

establishes a prima facie case of unpatentability of at least claim 1 of the 1999 application as

filed, as well as at least issued claims 1, 2, 35 1 and 3635 of the '707 patent, and it refutes and is

inconsistent with positions taken by the applicant during the prosecution of the November 1999

application in opposing arguments of unpatentability relied on by the PTO and in asserting

arguments of patentability, as set forth in detail in Paragraphs 47 through 49 hereof.

47.     At page ISE 389 of the prosecution history of the application for the '707 patent

(the "'707 prosecution history") (Simmons Ex. 15), Mr. Katz's attorney argued that the present

invention was "not shown or suggested by Minton [the principal prior art reference known to the

examiner] at least because Minton does not show an exchange where portions of an incoming

order are allocated among previously-received orders or quotations based on an allocating

parameter . . ."  The OM Product Description refutes and is inconsistent with the foregoing

position taken by Mr. Katz's attorney.  The foregoing argument could not have been made to

- 10 -

distinguish at least claim 1 as filed and claims 1 and 35 as issued over the OM Product Description because the OM Product Description discloses this feature as set forth at least at Paragraphs 29 and 45 hereof.  Mr. Katz admitted this fact at his deposition (Katz Tr. 315:6-317:3).

48.     At page ISE 389 of the '707 prosecution history, Mr. Katz's attorney, again to distinguish over the Minton reference, argued that "[t]he system according to Minton will not automatically match quotes and orders."  The OM Product Description refutes and is inconsistent with the foregoing position taken by Mr. Katz's attorney.  The foregoing argument could not have been made to distinguish at least claim 1 as filed and claims 1 and 35 as issued over the OM Product Description because the OM Product Description discloses this feature as set forth at least at Paragraphs 26 and 27 hereof.  Mr. Katz admitted this fact at his deposition (Katz Tr. 319:16-320:2).

49.     At page ISE 389 of the '707 prosecution history, Mr. Katz's attorney, again to distinguish over the Minton reference, argued that "there is no suggestion in Minton that where a trade results in the execution of one portion of an order, the remaining position is allocated among other orders."  The OM Product Description refutes and is inconsistent with the foregoing position taken by Mr. Katz's attorney.  The foregoing argument could not have been made to distinguish at least claim 1 as filed and claims 1 and 35 as issued over the OM Product Description because the OM Product Description discloses this feature as set forth at least at Paragraphs 30 and 34 hereof.  Mr. Katz admitted this fact at his deposition (Katz Tr. 321:4-19).

28.     Nevertheless, the OM Product Description was never disclosed to the PTO by the applicant although     50.     Although, as set forth in Paragraphs 20 through 23 hereof, the sole named inventor, Gary Katz became was fully aware of the OM Product Description at a time

- 11 -

prior to ~~the time~~when he conceived the automated financial exchange disclosed and claimed in the '707 patent in suit and had used the OM Product Description as the starting point for and the basis from which he derived such automated financial exchange, he never disclosed the OM Product Description to the PTO.

~~29.~~ 51. At all relevant times, Mr. Katz was cognizant of his duty of candor to the PTO, particularly his duty to disclose to the PTO any relevant prior art of which he was aware. (Katz Tr. 286:4-23). Notwithstanding such awareness, Mr. Katz did not disclose the material prior art OM Product Description to the PTO or his patent attorney who prepared and prosecuted the November 1999 application in the PTO. (Katz Tr. 243:19-22; 280:3-281:8; Lieb Tr. 201:15-203:7).

~~30.~~ 52. Although Mr. Katz knew when he filed the November 1999 application that the subject matter disclosed in the OM Product Description had been created prior to the time he made his invention and that he was not an inventor of any of the subject matter disclosed in the OM Product Description, testifying under oath he could offer no explanation as to why he failed to disclose the OM Product Description to his patent attorney or the PTO. (Katz Tr. 287:5-289:8).

~~31.~~ 53. Absent disclosure by the applicant, the examiner had no way of learning of the existence of the OM Product Description let alone that the named inventor had used the OM Product Description as the starting point for and the basis of the invention claimed in the 1999 application and the '707 patent.

54. By reason of the facts and circumstances set forth in Paragraphs 20 through 53 hereof, there is a clear inference Mr. Katz withheld the OM Product Description from the PTO with deceptive intent.

- 12 -

~~32.    On information and belief, and by~~ ___55.___    By reason of the facts and circumstances set forth in Paragraphs 20 through ~~31~~54 hereof, Mr. Katz, with the intent to mislead and deceive the PTO, withheld from the PTO both the material prior art OM Product Description and the fact that the OM Product Description constituted the starting point for and the basis of the invention claimed in the 1999 application and the '707 patent.

**Inequitable Conduct with Respect to Trade Allocation Mechanisms that Were Being Used By Existing Options Exchanges**

___56.___    Mr. Katz regarded the differences between the automated exchange of his invention as disclosed in the '707 patent and the automated exchanges of the prior art to be as follows:



\*   \*   \*

___57.___    Claim 1 of the '707 patent as issued reads as follows:

1.    An automated exchange for trading a financial instrument wherein the trade may be one of a purchase of a quantity of the instrument and a sale of a quantity of the instrument, the exchange comprising:

an interface for receiving an incoming order or quotation to trade the instrument, the incoming order or quotation having a size associated therewith;

book memory means for storing a plurality of previously received orders or quotations to trade a corresponding plurality of quantities of the instrument, the previously received orders and quotations each having a size associated therewith and the previously received orders including public customer orders previously entered for public customers and professional orders or quotations previously entered for one or more professionals;

system memory means for storing allocating parameters for allocating trades between the incoming order or quotation and the previously received orders and quotations; and

processor means for allocating portions of the incoming order or quotation among the plurality of previously received orders and quotations in the book memory means based on the allocating parameters in the system memory means,

wherein the allocating parameters include parameters for allocating a first portion of the incoming order or quotation against previously received customer orders and allocating a remaining portion of the incoming order or quotation preferentially against professional orders and quotations with larger size.

58.     Claim 1 as issued, reproduced at Paragraph 57 hereof, is virtually identical to claim 1 as filed, reproduced at Paragraph 25 hereof, except that claim 1 as filed was amended during prosecution of the application to include as limitations references to "quotations" and the identification of the particular allocation mechanisms of

allocating a first portion of the incoming order or quotation against previously received customer orders [i.e. customer priority], and

allocating a remaining portion of the incoming order or quotation preferentially against professional orders and quotations with larger size.  [i.e. size-based allocation]

33.  59. Prior to the date of conception of the subject matter disclosed and claimed in the '707 patent, financialoptions exchanges in the United States operated in accordance with certain trading rulesallocation mechanisms.  Such trading rules, both as published andallocation mechanisms, both as disclosed in the rules of prior options exchanges and as implemented in

public use by such prior options exchanges are prior art to the subject matter of the claims of the '707 patent under 35 U.S.C. §§ 102(a) and/or 102(b).

34. 60. The prior art trading rules allocation mechanisms and the prior public use of such allocation mechanisms referred to in Paragraph 33 59 hereof include public customer priority, size-based allocation, and pro rata allocation, alone and in combination. Public customer priority, size-based allocation, and pro rata allocation are not disclosed as prior art in the Background of the Invention section of the '707 patent. Nor do any of the prior art references of record before the PTO disclose any of the foregoing allocation mechanisms.

35. 61. Katherine Simmons is an attorney at law who, beginning in 1996, represented ISE as outside counsel in connection with the efforts of ISE to obtain approval for its automated financial exchange from the United States Securities and Exchange Commission (the "SEC"). Prior to the filing of the November 1999 application, Ms. Simmons became employed by ISE.

36. 62. Ms. Simmons was responsible for writing the trading rules for the ISE. (Simmons Tr. 30:12-17; 102:14-103:12). Sections of the proposed trading rules were reviewed by Mr. Katz prior to finalization. (Simmons Tr. 30:18-21). At all relevant times, Ms. Simmons had knowledge of the trading rules prior public use of allocation mechanisms of existing exchanges, particularly including the material prior art trading rules relating to allocation mechanisms of public customer priority, size-based allocation and pro rata allocation. (See, e.g., Simmons Tr. 85:18-86:16; 111:2-15; 188:24-189:7; 121:14-122:13; 206:3-13; 182:19-185:4; 202:15-206:2; 229:23-230:6). Also, at all relevant times Mr. Katz had knowledge of the trading rules prior public use of allocation mechanisms of existing exchanges, particularly including the material prior art trading rules relating to allocation mechanisms of public customer priority, size-based allocation and pro rata allocation. Mr. Katz was aware when he filed the November 1999 his

patent application that other exchanges were practicing customer priority by exchange rule. (Katz Tr. 159:17-22).  Moreover, prior to his conception of the subject matter claimed in the [1]‘707 patent, Mr. Katz had been an employee of the New York Stock Exchange ("NYSE") options exchange (Katz Tr. 8:7-22), which implemented and published rules concerning size-based allocation and pro rata allocation (Simmons Tr. 182:15-183:23) and where his responsibilities included maintaining a familiarity with the rules of other options exchanges. (Katz Tr. 53:6-12).

    63.    ███████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████

    64.    ████████████████████████████████████

████████████████████████████████████████

███    There is no difference or distinction between the mechanism of public customer priority as claimed in claim 1 of the ‘707 patent and the mechanism of public customer priority that Ms. Simmons admitted that she knew was part of the accepted structure in the prior options exchanges.

    65.    At all relevant times, Ms. Simmons knew that the mechanism of allocating a first portion of an order to public customer orders was something that had been done at existing exchanges (Simmons Tr. 122:17-24).  The foregoing admission tracks the language of claim 1 as issued, which is reproduced at Paragraph 57 hereof.

    66.    At all relevant times, Ms. Simmons knew that the mechanism of allocating a remaining portion of an order (after public customer orders are filled) preferentially against

professional orders or quotations of larger size, was something that had been done at existing options exchanges (Simmons Tr. 122:25-123:13).  The foregoing admission tracks the language of claim 1 as issued, which is reproduced at Paragraph 57 hereof.

67.     The withheld knowledge of prior public uses of allocation mechanisms by other options exchanges is material to the subject matter of at least claims 1 and 35 of the '707 patent because there is a substantial likelihood that a reasonable examiner would have considered such knowledge of such prior public uses important in deciding whether to allow the November 1999 application to issue as a patent.

68.     ███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
████████████████████████████████
███████████████████████████████████
████████████

37.     The withheld trading rules of other exchanges are material.  None of the art of record in the '707 patent69.     The withheld knowledge of prior public uses of allocation mechanisms by other options exchanges and/or the published rules of such exchanges relating to such allocation mechanisms is material because none of the prior art before the PTO discloses the mechanism of size based allocation, pro rata allocation or customer priority (let alone theany combination of boththereof).  Also, the trading rulesknown public uses of allocation mechanisms withheld by

Ms. Simmons and Mr. Katz refute and are inconsistent with positions taken by the applicant during the prosecution of the November 1999 application in opposing arguments of unpatentability relied on by the PTO and in asserting arguments of patentability at least because the applicant distinguished prior art for its failure to disclose a size-based allocation and customer priority.  The applicant made arguments for patentability that could not have been made had the ~~trading rules~~allocation mechanisms of other exchanges and/or the prior public use of such allocation mechanisms of other exchanges been disclosed.

70.     At page ISE 600 of the prosecution history, Mr. Katz's attorney, to distinguish over the Minton reference, referred to in Paragraphs 47 through 49 hereof, argued that "Minton does not show or suggest allocating an incoming order among a plurality of previously received orders on the basis of a stored allocating parameter, or that such an allocating parameter includes parameters for allocating preferentially against professional orders or quotations with larger size, as required by claims 1 and 35."  The OM Product Description referred to in Paragraphs 20, 24 and 26 through 41 hereof, refutes and is inconsistent with the first part of the position taken by Mr. Katz's attorney for the reasons set forth in Paragraph 47 hereof.  The public use of the prior art allocation mechanisms of size-based allocation and pro rata allocation refute and are inconsistent with the second part of the position taken by Mr. Katz's attorney.  The argument regarding the parameter "for allocating preferentially against professional orders or quotations with larger size" could not have been made to distinguish over the prior public use by options exchanges of the known mechanisms of size-based allocation and pro rata allocation.

71.     At page ISE 601 of the prosecution history, Mr. Katz's attorney, to distinguish over the Rickard reference [a second reference being relied upon by the examiner] argued that "[t]he allocation in Rickard is not made preferentially on the basis of the size of the

professional's quotations . . . . .  Rickard does not show or suggest that the allocation is made preferentially, based on the professional's quotation size."  The public use of the prior art mechanisms of size-based allocation and pro rata allocation refute and are inconsistent with the position taken by Mr. Katz's attorney.  The foregoing argument could not have been made to distinguish over the prior public use by options exchanges of the known mechanisms of size-based allocation and pro rata allocation.

72.     At page ISE 603 of the prosecution history, Mr. Katz's attorney, to distinguish over the combination of the Minton and Rickard references, argued that "the features set forth in the amended claims (namely, allocation of quotes and orders via allocating parameters that include allocating first against customer orders and next preferentially against professional orders and quotes with larger size . . . ) in the manner [sic] are not found in either of the references separately, and such features are therefore lacking in any combination of the references."  The public use of the prior art allocation mechanisms of customer priority, size-based allocation and pro rata allocation refute and are inconsistent with the position taken by Mr. Katz's attorney.  The foregoing argument could not have been made to distinguish over the prior public use by options exchanges of the known allocation mechanisms of customer priority, size-based allocation and pro rata allocation.

38.  73. Ms. Simmons participated in the preparation of the November 1998 provisional application for the '707 patent and the preparation of the November 1999 application.  Ms. Simmons also participated in the prosecution of the November 1999 application in the PTO, including appearing in person at an interview with the examiner at which the allocating parameters claimed in claims 1 and 35 were discussed.  Ms. Simmons did not inform the examiner at that time as to her knowledge of the prior public uses of the claimed allocating

parameters or her knowledge of specific rules of other exchanges disclosing such parameters. (Simmons Tr. 250:8-254:14).  (ISE 401).

~~39.~~ 74. At all relevant times, Ms. Simmons and Mr. Katz were cognizant of their duty of candor to the PTO, particularly of their duty to disclose to the PTO any relevant prior art of which they were aware.  Notwithstanding such awareness, Ms. Simmons and Mr. Katz did not disclose the material prior art ~~trading rules~~allocation mechanisms or their knowledge of the public use of prior art allocation mechanisms of public customer priority, size-based allocation, and pro rata allocation to the PTO.

~~40.~~ 75. The strategy of ISE in obtaining SEC approval was to minimize the differences between the proposed ISE trading rules and the trading rules of the existing options exchanges.

~~41.~~ 76. As a representative of ISE before the SEC and a participant in the preparation of the 1998 provisional application, and the preparation and prosecution of the 1999 application for the ~~'~~707 patent, Ms. Simmons was aware at all relevant times that ISE was representing to the SEC that its trading rules and mechanisms were similar to the trading rules and mechanisms of the existing exchanges while at the same time withholding that information from the PTO even though the claimed ~~exchange features~~allocation mechanisms of public customer priority, size-based allocation, and pro rata allocation were being relied upon in arguments to obtain allowance of at least claims 1 and 35 of the 1999 application for the '707 patent.

77.    By reason of the facts and circumstances set forth in paragraphs 56 through 77 hereof, there is a clear inference that Mr. Katz and Ms. Simmons withheld from the PTO their knowledge of the prior public uses at existing options exchanges of the allocation mechanisms of public customer priority, size-based allocation and pro rata allocation and/or the published rules of such exchanges relating to such allocation mechanisms with deceptive intent.

42.    On information and belief, and by    78.    By reason of the facts and circumstances set

forth in Paragraphs 3356 through 4178 hereof, the applicant, and in particular Ms. Simmons and

Mr. Katz, with the intent to mislead and deceive the PTO, withheld from the PTO evidence of

the prior public use of the material prior art trading rulesallocation mechanisms of public

customer priority, size-based allocation and pro rata allocation and/or the published rules of such

exchanges relating to such allocation mechanisms.

43.    Prior to the date of conception of the subject matter disclosed and claimed in the

'707 patent, the Chicago Board of Trade ("CBOT") operated an automated exchange named

"Project A" which had the feature of pro rata allocation.  The public use and knowledge of

Project A, as well as certain publications describing Project A, are prior art to the subject matter

of the claims of the '707 patent under 35 U.S.C. §§102(a) and/or 102(b).

44.    Stephen Lieb is an attorney at law who was responsible for prosecuting the

application for the '707 patent.

45.    Mr. Lieb, before issuance of the '707 patent, received a publication from ISE in-

house counsel regarding Project A (the "Project A document").  Mr. Lieb testified that the

Project A document disclosed a system which allocates orders based on size and has a pro rata

allocation.

46.    Mr. Lieb elected not to disclose the Project A document to the PTO.  A

memorandum, written by Mr. Lieb, indicates that he withheld the Project A document because it

was allegedly cumulative to certain art of record in the application for the '707 patent.

47.    The withheld Project A document is material prior art.  None of the prior art of

record in the '707 patent discloses pro rata allocation.  Also, the Project A document withheld by

Mr. Lieb refutes and is inconsistent with positions taken by the applicant during the prosecution

of the November 1999 application in opposing arguments of unpatentability relied on by the PTO and in asserting arguments of patentability at least because the applicant distinguished prior art for its failure to disclose a size-based allocation.  The applicant made arguments for patentability that could not have been made had the Project A document been disclosed.

48.  79. By reason of the facts and circumstances set forth in Paragraphs 17 through 4780 hereof, the '707 patent is unenforceable by reason of inequitable conduct.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff CBOE demands judgment as follows:

A.      The '707 patent is invalid.

B.      The '707 patent is not infringed by plaintiff.

C.      The '707 patent is unenforceable against plaintiff.

D.      Awarding plaintiff its costs and disbursements in this action.

E.      Awarding plaintiff reasonable attorneys' fees.

F.      For such other and further relief as the Court deems just and proper.

## JURY DEMAND

CBOE respectfully requests a trial by jury as to all issues so triable.

Dated:  December 31, 2009

By:  s/ Jonathan A. Marshall
Jonathan A. Marshall
David Francescani
Michael T. Zoppo
Brian J. Doyle
**FISH & RICHARDSON P.C.**
601 Lexington Ave, 52nd Floor
New York, NY 10022
Telephone: (212) 765-5070
Facsimile: (212) 258-2291

*Attorneys for Plaintiff Chicago Board Options Exchange, Incorporated*

Dated:  November 2, 2009
OF COUNSEL:
Paul E. Dengel
Stacie R. Hartman
Mark E. Ashton
**SCHIFF HARDIN LLP**
6600 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6473
Telephone (312) 258-5500
Facsimile (312) 258-5600

By: _____
Paul E. Dengel
Stacie R. Hartman
**SCHIFF HARDIN LLP**
6600 Sears Tower
233 South Wacker Drive
Chicago, Illinois 60606-6473
(312) 258-5500

Firm ID# 90219

*Attorneys for Plaintiff*
Joanne Moffic-Silver

- 23 -

Jordan Newmark
**CHICAGO BOARD OPTIONS EXCHANGE, INCORPORATED**
400S. LaSalle Street
Chicago, IL 60605
*Chicago Board Options Exchange, Incorporated*Telephone: (312) 786-7909

OF COUNSEL:

Jonathan A. Marshall
David Francescani
**FISH & RICHARDSON P.C.**
601 Lexington Avenue
52nd Floor
New York, NY 10022
Telephone: (212) 765-5070
Facsimile: (212) 258-2291

Joanne Moffie-Silver
Jordan Newmark
**CHICAGO BOARD OPTIONS EXCHANGE, INCORPORATED**
400 S. LaSalle Street
Chicago, IL 60605
Telephone: (312) 786-7909

30507260.

30517017.doc

Document comparison done by DeltaView on Thursday, December 31, 2009 7:29:40 PM

| Input: | |
|---|---|
| Document 1 | file://F:/My Documents/CASES/CBOE v. ISE/Motions & Orders/2nd Motion to amend complaint - Round 2/30507260.doc |
| Document 2 | file://F:/My Documents/CASES/CBOE v. ISE/Motions & Orders/2nd Motion to amend complaint - Round 2/30517017.doc |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 183 |
| Deletions | 98 |
| Moved from | 3 |
| Moved to | 3 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 287 |