**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CHICAGO BOARD OPTIONS EXCHANGE, INCORPORATED,<br><br>　　　　　　　Plaintiff,<br><br>　v.<br><br>INTERNATIONAL SECURITIES EXCHANGE, LLC,<br><br>　　　　　　　Defendant. | Case No. 07-cv-00623<br><br>Hon. Joan H. Lefkow, U.S.D.J.<br>Hon. Jeffrey Cole, U.S.M.J. |

**CHICAGO BOARD OPTIONS EXCHANGE, INCORPORATED'S MEMORANDUM**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**
**OF NON-INFRINGEMENT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

**I.**   INTRODUCTION .................................................................................................1

**II.**   LEGAL STANDARD...........................................................................................1

**III.**   ARGUMENT ......................................................................................................4

    A.   Hybrid Is Not An Automated Exchange ................................................4

        1.   The CBOE Hybrid Trading System................................5

        2.   The SEC-Approved Trading Rules for CBOE's Hybrid Trading System Require Open Outcry Trading ........................................6

        3.   Deposition Testimony Confirms That The Hybrid Trading System is Not Fully Computerized and Uses Open Outcry...........................................8

        4.   Historic Development of Hybrid Trading System .....................................9

        5.   ISE Has Admitted That Hybrid Trading System Is Not "Fully Computerized" and uses "Open Outcry".......................................11

        6.   The Hybrid Trading System does not literally infringe the '707 patent...........................................12

        7.   The Hybrid Trading System does not infringe the '707 patent under the doctrine of equivalents ..................................13

            a.   The Doctrine of Disavowal Limits the Doctrine of Equivalents ..............................................13

            b.   The Doctrine of Vitiation Limits the Doctrine of Equivalents..............................................15

            c.   CBOE's Patents on the Hybrid Trading System are Further Evidence of Non-Equivalence....................................17

    B.   The Hybrid Trading System Does Not Include a "System Memory Means" as Required by the System Claims of the '707 Patent..........................................................17

i

## TABLE OF CONTENTS (cont'd)

**Page**

C.  The Hybrid Trading System Does Not Infringe Method Claims
    35, 36, 43, 45, and 56-58 of the '707 Patent ........................................................ 20

    1.  The Hybrid Trading System Does Not Perform the
    "Matching" Steps of Independent Claim 35 and
    Dependent Claims 36, 43, and 45 ............................................................ 21

    2.  The Hybrid Trading System Does Not Perform the
    "Matching" Steps of Independent Claim 56 and
    Dependent Claims 57 and 58 ................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*,
731 F.2d 831 (Fed. Cir. 1984)................................................................2

*Chiuminatta Concrete Concepts Inc. v. Cardinal Industries, Inc.*,
145 F.3d 1303 (Fed. Cir. 1998)..............................................................20

*Cortland Line Co., Inc. v. Orvis Co., Inc.*,
203 F.3d 1351 (Fed. Cir. 2000)..............................................................18

*Cross Medical Prods, Inc. v. Medtronic Sofamor Danek, Inc.*,
424 F.3d 1293 (Fed. Cir. 2005)..............................................................20

*Edward Lifesciences LLC v. Cook Inc.*,
582 F.3d 1322 (Fed. Cir. 2009)...........................................................3, 14

*Freedman Seating Co. v. American Seating Co.*,
420 F.3d 1350 (Fed. Cir. 2005)..............................................................3

*General Atomics Diazyme Laboratories Div. v. Axis-Shield ASA*,
277 Fed. Appx. 1001 (Fed. Cir. 2008) ....................................................2

*Hoganas AB v. Dresser Industries, Inc.*,
9 F.3d 948 (Fed. Cir. 1993) ...................................................................17

*Honeywell Intern., Inc. v. ITT Industries, Inc.*,
452 F.3d 1312 (Fed. Cir. 2006)..............................................................14

*ICU Medical, Inc. v. Alaris Medical Systems, Inc.*,
558 F.3d 1368 (Fed. Cir. 2009)..............................................................2

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
274 F.3d 1371 (Fed. Cir. 2001)..............................................................20

*J & M Corp. v. Harley-Davidson, Inc.*,
269 F.3d 1360 (Fed. Cir. 2001)..............................................................14

*K-2 Corp. v. Salomon S.A.*,
191 F.3d 1356 (Fed. Cir. 1999)..............................................................2

i

# TABLE OF CONTENTS (cont'd)

**Page**

*L.B. Plastics, Inc. v. Amerimax Home Products, Inc.,*
499 F.3d 1303 (Fed. Cir. 2007)................................................................14

*Moore U.S.A., Inc. v. Standard Register Co.,*
229 F.3d 1091 (Fed. Cir. 2000)...........................................................16, 23

*Netword, LLC v. Centraal Corp.,*
242 F.3d 1347 (Fed. Cir. 2001)..................................................................1

*Nomos Corp. v. Brainlab USA, Inc.,*
357 F.3d 1364 (Fed. Cir. 2004)......................................................18, 19, 20

*Novartis Corp. v. Ben Venue,*
271 F.3d 1043 (Fed. Cir. 2001)..................................................................2

*NTP, Inc. v. Research In Motion, Ltd.,*
418 F.3d 1282 (Fed. Cir. 2005)...........................................................21, 23

*O.I. Corp. v. Tekmar Co., Inc.,*
115 F.3d 1576 (Fed. Cir. 1997)................................................................18

*Odetics, Inc. v. Storage Technology Corp.,*
185 F.3d 1259 (Fed. Cir. 1999)................................................................19

*PC Connector Solutions LLC v. SmartDisk Corp.,*
406 F.3d 1359 (Fed. Cir. 2005)..................................................................3

*Planet Bingo, LLC v. GameTech Int'l, Inc.,*
472 F.3d 1338 (Fed. Cir. 2006)......................................................19, 23, 25

*Realsource, Inc. v. Best Buy Co.,*
282 Fed. Appx. 821 (Fed. Cir. 2008)..........................................................2

*Restaurant Technologies, Inc. v. Jersey Shore Chicken,*
2010 WL 28226 (Fed. Cir. 2010)................................................................2

*RFID Tracker, Ltd. v. Wal-Mart Stores, Inc.,*
342 Fed. Appx. 628 (Fed. Cir. 2009)..........................................................2

*SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.,*
242 F.3d 1337 (Fed. Cir. 2001)................................................................14

*Seachange Int'l, Inc. v. C-COR, Inc.,*
413 F.3d 1361 (Fed. Cir. 2005).......................................................... passim

## TABLE OF CONTENTS (cont'd)

**Page**

*Searfoss v. Pioneer Consol. Corp.*,
374 F.3d 1142 (Fed. Cir. 2004) ...................................................................................16, 17

*Spectrum Intern., Inc. v. Sterilite Corp.*,
164 F.3d 1372 (Fed. Cir. 1998) ........................................................................................13

*TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*,
529 F.3d 1364 (Fed. Cir. 2008) ........................................................................................16

*Ultra-Tex Surfaces, Inc. v. Hill Bros. Chemical Co.*,
204 F.3d 1360 (Fed. Cir. 2000) ..........................................................................................2

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*,
520 U.S. 17 (1997) .............................................................................................3, 16, 24

**STATUTES**

35 U.S.C. § 112 .......................................................................................................18, 19, 20

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 56 ..........................................................................................1

Pursuant to Federal Rule of Civil Procedure 56, plaintiff Chicago Board Options Exchange, Incorporated ("CBOE") moves for summary judgment of non-infringement of U.S. Patent No. 6,618,707 ("the '707 patent").

## I.     INTRODUCTION

The present motion is in three separate parts, each such part being based on a claim limitation construed by the Court.

First and foremost, a ruling by the Court that the accused Hybrid Trading System ("Hybrid") is not an "automated exchange" means that final judgment must be entered in favor of CBOE because that limitation appears in every asserted claim of the '707 patent.

The second and third parts of this motion are in a sense related.  Part two of this motion is based upon the Court's construction of the limitation "system memory means" which is present in all *system claims* asserted by ISE.  And part three is based upon the Court's construction of the limitation "matching," in light of the construction of "allocating" and "allocating parameters," which appears in all *method claims* asserted in this case.  Since taken together, the system claims and the method claims constitute all of the claims of the '707 patent asserted against CBOE by ISE, a ruling by the Court in favor of CBOE with respect to parts two and three provides an additional, independent basis for entering final judgment in favor of CBOE.

## II.    LEGAL STANDARD

Summary judgment of non-infringement is proper when "no reasonable jury could have found infringement on the undisputed facts or when all reasonable factual inferences are drawn in favor of the patentee."  *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1353 (Fed. Cir. 2001).  "Summary judgment is as appropriate in a patent case as in any other.  Where no genuine issue of material fact remains and the movant is entitled to judgment as a matter of law, the court should utilize the salutary procedure of Fed. R. Civ. P. 56 to avoid unnecessary expense to the

1

parties and wasteful utilization of the jury process and judicial resources." *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 835 (Fed. Cir. 1984).

The Federal Circuit routinely upholds summary judgments of non-infringement predicated on the district court's construction of a claim limitation. *See*, *e.g.*, *ICU Medical, Inc. v. Alaris Medical Systems, Inc.*, 558 F.3d 1368, 1376 (Fed. Cir. 2009).[1]

"[I]t is axiomatic that the patentee bears the burden of proving infringement." *Ultra-Tex Surfaces, Inc. v. Hill Bros. Chemical Co.*, 204 F.3d 1360, 1364 (Fed. Cir. 2000). The Federal Circuit takes seriously a patentee's obligation to bring proof of infringement to rebut a motion for summary judgment of non-infringement: "If our previous opinions have not made clear the landscape of summary judgment law in infringement litigation, we do so here. Summary judgment is a trap for the unwary plaintiff." *Novartis Corp. v. Ben Venue,* 271 F.3d 1043, 1054 (Fed. Cir. 2001). Disproving the existence of an infringing product is not the responsibility of the accused infringer; instead, the patentee must show that it can prove infringement at trial. *Id.* at 1050.

"An infringement analysis is a two-step process in which the court first determines, as a matter of law, the correct claim scope, and then compares the properly construed claim to the accused device to determine, as a matter of fact, whether all of the claim limitations are present in the accused device, either literally or by a substantial equivalent." *K-2 Corp. v. Salomon S.A.*,

---

[1] *See also Restaurant Technologies, Inc. v. Jersey Shore Chicken*, 2010 WL 28226 at *8 (Fed. Cir. 2010) ("Based on the claim construction, the court was correct in finding that [the accused infringer] was entitled to summary judgment of non-infringement "); *RFID Tracker, Ltd. v. Wal-Mart Stores, Inc.*, 342 Fed. Appx. 628, 629 (Fed. Cir. 2009) ("Because the district court did not err in its construction, this court affirms the final judgment of noninfringement."); *Realsource, Inc. v. Best Buy Co.*, 282 Fed. Appx. 821, 822 (Fed. Cir. 2008) ("Because we conclude that the district court's construction of the claim term upon which summary judgment primarily rests is correct, we affirm"); *General Atomics Diazyme Laboratories Div. v. Axis-Shield ASA*, 277 Fed. Appx. 1001, 1001 (Fed. Cir. 2008) ("Because we conclude that the district court did not err in its claim construction and thus properly granted summary judgment of noninfringement , we affirm").

191 F.3d 1356, 1362 (Fed. Cir. 1999).  "Summary judgment on the issue of infringement is

proper when no reasonable jury could find that every limitation recited in a properly construed

claim either is or is not found in the accused device either literally or under the doctrine of

equivalents."  *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir.

2005).

 Under the doctrine of equivalents, a "product or process that does not literally infringe

upon the express terms of a patent claim may nonetheless be found to infringe if there is

'equivalence' between the elements of the accused product or process and the claimed elements

of the patented invention."  *Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S.

17, 21 (1997).

 Numerous legal principles constrain the application of the doctrine of equivalents.  For

example, the "all limitations" rule "holds that an accused product or process is not infringing

unless it contains each limitation of the claim, either literally or by an equivalent."  *Freedman

Seating Co. v. American Seating Co.*, 420 F.3d 1350, 1358 (Fed. Cir. 2005).  One implication of

the "all limitations" rule is the principle of vitiation under which "an element of an accused

product or process is not, as a matter of law, equivalent to a limitation of the claimed invention if

such a finding would entirely vitiate the limitation."  *Id.*  The doctrine of equivalents is also

limited by the concept of claim scope disavowal which holds that a patentee cannot recapture as

an equivalent subject matter that it has disclaimed as beyond the scope of the patented invention.

*Edward Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1335-6 (Fed. Cir. 2009).

## III.   ARGUMENT

### A.   <u>Hybrid Is Not An Automated Exchange</u>

ISE accuses Hybrid of infringing the '707 patent.[2]  Every asserted claim in the '707

patent either contains the limitation "automated exchange" or depends from a claim containing

that limitation.  *See* Statement of Facts,[3] ¶ 8.  Hybrid can infringe the '707 patent only if it is an

"automated exchange" or its equivalent as that term is used in the '707 patent.

In the clarification to its *Markman* Order, the Court determined that an "automated

exchange" of the '707 patent is "fully computerized, such that it does not include matching or

allocating through use of open outcry."  D.I. 300.[4]  As shown below, Hybrid simply does not

meet this definition because, unlike a "fully computerized exchange," trades are matched and/or

---

[2] In its eleventh-hour infringement contentions, ISE accuses new parties and trading systems of infringing the '707 patent.  ISE's contentions define "Accused Exchange" to mean "CBOEdirect— CBOE's fully computerized method of executing trades—and CBOE's Hybrid Trading System, which comprises CBOEdirect" and also accuses third parties of acts of infringement.  *See* SOF ¶ 7.  ISE's definition of "Accused Exchange" notwithstanding, Hybrid has been the only "exchange" accused of infringement by ISE.  This attempt (in response to the Court's construction of  "automated exchange") to inject additional "exchanges" and parties into this case is of no avail.  There has been no discovery on them and there is virtually no evidence on the record as to what they are.  Indeed, ISE's expert report on damages is directed solely to Hybrid.  If ISE wants to accuse any or all of these "exchanges," it can do so in another case.  This case is about Hybrid only.

Moreover, the assertion implicit in ISE's definition that the CBOEdirect trade engine and CBOE floor trading are separate exchanges is baseless.  CBOEdirect cannot be both a part of Hybrid (itself an "accused exchange") and a separate exchange.

[3] Hereinafter "SOF."

[4] The Court's Clarification Order explicitly recognized that a *single exchange* can include both automated matching and allocating, as well as open outcry trading.  During the April 1, 2010 status hearing, ISE presented its infringement theory which rests *entirely* on the proposition that the electronic system of Hybrid is an exchange separate from the floor.  Cognizant of the plain import of its construction, the Court characterized ISE's infringement theory as one that would *change*, rather than apply, the Court's construction.  *See* SOF ¶ 10.  ISE's sole basis for trying to separate Hybrid into two exchanges is that it allegedly would then include two "methods" of trading:  open outcry and electronic. But this artifice ignores the Court's Order, which plainly declares that such a combination is no basis for ISE's position.  *See* SOF ¶ 9 ("Stated conversely, *a method* that effects trades of financial instruments by automatically matching and allocating *but also entails* 'oral communications between market professionals at a central location in view of other market professionals' [] is not fully computerized and therefore not 'automated.'") (emphasis added).

allocated in open outcry.  Because ISE cannot meet its burden of proving that Hybrid is an

"automated exchange," summary judgment of non-infringement is appropriate.

### 1. The CBOE Hybrid Trading System

Hybrid is a sophisticated system for trading options contracts.  For purposes of this

motion, the basic features of Hybrid are an electronic trade engine (CBOEdirect) that

incorporates an order routing system and an electronic book ("eBook") for storing orders and

quotations that come from both open outcry and sources remote from the trading floor.  *See* SOF

¶ 29.  The electronic trade engine receives orders and/or quotations both from market makers

who are on the floor as well as electronically from CBOE members.  *See* SOF ¶ 31, 32.  Certain

orders for trading option contracts are routed in whole or in part to the open outcry component of

Hybrid for execution.  *See* SOF 32, 34, 35.  Orders and quotations also may be routed directly

from open outcry to the trade engine component for execution or for storage in the eBook.  *See*

SOF ¶ 34.

Equity options classes that trade at the CBOE are listed as trading on Hybrid; none are

listed as trading solely on its electronic trade engine.  *See* SOF ¶ 39.  Thus, orders in any class on

Hybrid, whether received from open outcry or electronically, are eligible to be executed, in

whole or in part, both in open outcry and electronically.  *See* SOF ¶¶ 35, 38.  In fact, open outcry

and electronic trading are merged to such an extent in Hybrid that, for example, if open outcry

trading were to cease, Hybrid would not function because orders (including electronic orders)

which routinely are routed to open outcry for execution would continue to be so routed even in

the absence of any open outcry trading.  *See* SOF ¶ 28.  With no open outcry, such orders simply

would not execute and the exchange would be rendered inoperable.

For the Court's convenience, a simplified schematic of Hybrid that illustrates how it combines open outcry trading with automatic matching and allocating into one exchange is provided in the Statement of Facts at ¶ 37.

### 2. The SEC-Approved Trading Rules for CBOE's Hybrid Trading System Require Open Outcry Trading

CBOE operates Hybrid under trading rules approved by the Securities and Exchange Commission ("SEC").  *See* SOF ¶ 40.  The rules governing Hybrid also demonstrate how open outcry and electronic trading are embodied in one trading system.  Rule 6.45A, entitled "Priority and Allocation of Equity Options Trades on the CBOE Hybrid System," governs the manner in which trades are allocated in Hybrid.  *See* SOF ¶ 41.  This rule clearly illustrates that electronic and open outcry trading are merged in the Hybrid:

> The term "market participant" as used throughout this rule refers to a Market-Maker, a DPM, an e-DPM, and *a floor broker or a PAR Official representing orders in the trading crowd*. The term *'in-crowd market participant' only includes an in-crowd Market-Maker, in-crowd DPM, and floor broker or PAR Official representing orders in the trading crowd.. . .*  The balance of the electronic order will be eligible to be filled at the refreshed quote either electronically (in accordance with paragraph (a)(i)(B) below) or *manually* (in accordance with Rule 6.45A(b)) and, as such, may receive a split price execution.

*See* SOF ¶ 41 (emphasis added).  Additionally, since its inception, the Hybrid Trading System has operated various algorithms to route electronically-received orders *to the trading floor* for execution through open outcry.  *See* SOF ¶ 30.

The open outcry trading floor and the CBOEdirect trade engine are so intertwined that orders received electronically and from open outcry are entered into a single electronic book, the eBook, and are subsequently matched and allocated.  SOF ¶¶ 29, 38, 43.  As such, even when CBOEdirect performs automatic matching and allocation, open outcry is entailed because the orders and quotations stored in the eBook originate from sources that include open outcry.

6

Similarly, Hybrid allows market participants in open outcry to send orders or quotations to

Hybrid for electronic execution:

> Each "In-Crowd Member" (ICM) can submit individual one-sided bids or offers,
> in the form of BUY and/or SELL orders,[] or a stream of two-sided auto-quotes
> into CBOEdirect, which is the trade engine for [Hybrid].

*See* SOF ¶ 42.

CBOE Rule 6.13 describes the merger of the open-outcry and computerized functionality

of Hybrid:

> The CBOE Hybrid System is a trading platform that allows automatic executions
> to occur electronically and open outcry trades to occur on the floor of the
> Exchange pursuant to the priority and allocation principles contains in Rule
> 6.45A.

*See* SOF ¶ 44.

Similarly, CBOE Rule 6.45A(b), entitled "Allocation of Orders Originating on the Floor"

provides that the priority of bids/offers at the same price is given first to public customers in the

*electronic* book, then to market participants on the trading floor (*open outcry*), and finally back

to broker-dealers in the *electronic* book (where allocation occurs pursuant to Rule 6.45A(a)).

*See* SOF ¶¶ 38, 45.

Moreover, while CBOE's Rules allow a market participant to require that its order be

executed in open outcry, a market participant *cannot* choose to have its order executed

electronically. *See* SOF ¶ 46. Indeed, there are numerous situations where it is impossible to

have electronic execution, such as where the order is too complex or there is inadequate size

available in the electronic book. *See* SOF ¶ 46.

For the Court's convenience, a simplified schematic of the operation of CBOE's Rules

that illustrates how open outcry trading and automatic matching and allocating are merged into

one exchange is provided in the Statement of Facts at ¶ 38.

### 3.     Deposition Testimony Confirms That The Hybrid Trading System is Not Fully Computerized and Uses Open Outcry

During discovery, ISE deposed approximately fifteen CBOE employees and third party witnesses regarding the structure and functionality of Hybrid.  Uniformly, the deponents confirmed that Hybrid is *not* fully computerized, that it uses open outcry for matching and allocating trades consistent with Rule 6.45A, and that Hybrid entails both open outcry and electronic trading in one exchange.

For example, Mark Novak, a vice president in CBOE's Systems Division (*See* ¶ 47), testified:

> Q:  Is it fair to describe the current Hybrid system as an electronic execution system hooked up to a floor system?
> A:  No. []  Because its an integrated system**.**
>  . . .
> Q:  Was there ever a time where classes – where any class of option could not be traded on the floor and could only be traded via either the Hybrid system or the extended trading hour system?  . . . Presently, the Hybrid system allows for certain classes to be traded electronically in addition to being traded on the floor; would you agree with that?
> A:  Well, I – *no, because to me it's an integrated system*.  And electronically means, you know, I've got multiple participants through APIs, but *the floor is always a component there*.

See SOF ¶ 47 (emphasis added).

Eileen Smith, Director of Systems Planning and Corporate Statistics at CBOE who is responsible for developing trading systems, was asked if Hybrid was implemented as two side-by-side exchanges.  SOF ¶ 25.  Her response: "The Hybrid system is one exchange."  *See id*.

Other witnesses provided insight as to why CBOE decided to use a merged approach to implementing electronic trading.  Ed Tilly, Executive Vice-Chairman of CBOE (*see* SOF ¶ 48), explained as follows:

> A Hybrid system [is] one that, you know, uses the benefits of open-outcry, still maintaining an open-outcry presence with electronics that allow[] for multiple streaming quotes, orders, other expressions of interest at given price points *to be*

*consolidated in one, all consolidated together.  Not a side-by-side approach but one point of liquidity.*

*See* SOF ¶ 48 (emphasis added).

When asked why open outcry was part of Hybrid, Philip Slocum, the Executive Vice President for Trading Operations (*see* SOF ¶ 21), emphasized that CBOE considered it to be an asset:

> Q:  Can you identify the other reasons besides political ones why the open outcry or floor-based trading was continued *as part of* the Hybrid system?
> A:  It's one of our strengths.  It was our heritage.  That's what we've done for years.  We were trying to enhance that, not replace it.  That where I came from on Hybrid  . . . to build from that, not take away from it.

*See* SOF ¶ 21 (emphasis added).

As Steve Chodash, the Director of Systems Planning, summed it up, "the two systems [open outcry and electronic] were merged together to provide a new functionality called Hybrid." *See* SOF ¶ 49.  These witnesses only confirm what the SEC-approved trading rules provide:  that Hybrid is aptly named – it is, quite simply, neither a fully open outcry nor a fully electronic trading system but rather a merger of the two in one exchange.

### 4. Historic Development of Hybrid Trading System

CBOE created the options industry in 1973.  *See* SOF ¶ 13.  In October 2001, almost two years before the '707 patent issued, and well before the launch of Hybrid, CBOE experimented with a fully electronic trading system it created called the "Screen Based Trading" or  "SBT" System.  *See* SOF ¶¶ 14, 17.  Although called by the same name, the trade engine used in the SBT System was significantly different from the current version of CBOEdirect.  *See* SOF ¶ 19. Trading on the SBT System was discontinued permanently prior to the start of trading on Hybrid and prior to issuance of the '707 patent.  *See* SOF ¶ 17.

CBOE had been working on the SBT System since at least 1995 (*see* SOF ¶ 15), well before anyone affiliated with ISE had even begun to think about developing an all-electronic exchange.  *See* SOF ¶ 16.  As Ms. Smith testified, the SBT System was—in stark contrast to Hybrid—a fully computerized trading system that was an independent exchange, separate from CBOE's floor:

> Q:  Do you know what is meant by ["Separate Engine"]?
> A:   Yeah. The idea we'd bring up – we have two exchanges.  One would be electronic, and one would be open-outcry or – yeah.  One would be the fully electronic exchange, like on the SBT system, and the other would be the – the exchange as it existed at the time.
> Q:  Okay.  How – how was that distinguished from – from the Hybrid system that ultimately was implemented?
> A:  *The Hybrid system is one exchange.*

SOF ¶ 25.

CBOE had to make substantial modifications to the SBT System's version of the CBOEdirect trade engine so that it would be able to interact with open outcry and, in so doing, produced an exchange that is not fully computerized.  *See* SOF ¶¶ 19, 26.  Anthony Montesano is CBOE's Vice President of Trading Systems Support who, with Ms. Smith, was responsible for developing Hybrid.  *See* SOF ¶ 27.  He testified about the differences between the respective versions of the CBOEdirect trade engines:

> In my mind, the CBOEdirect technology is totally separate, distinct and non-comparable to our screen-based technology [of the abandoned SBT System].  It's – it's not similar at all.  There was just a component of the CBOEdirect trade engine that is used in Hybrid, and the platform is built on the CBOE network, but it's -- it doesn't resemble the SBT System at all.
>
> *     *     *
>
> The Hybrid system blends the elements of open outcry and electronic execution in a way that's totally distinct from a Screen-Based Trading System.  And humans can place bids or offers in the Hybrid model from the pit, and they can represent bids and—bids and offers that are representative of orders, for example, that a broker might be holding.  And they could do that manually.  They can also trade interactively with pit members and the – the electronic bids and offers.  And there

are also orders that require human intervention that are not contemplated in the Screen-Based Trading System, totally different.   Hybrid – the Hybrid market model would not work as a screen-based method.

SOF ¶ 26.  Essentially, CBOE sought to leverage the strengths of time-tested, floor-based open outcry trading by combining it with aspects of electronic trading to create one exchange.  *See* SOF ¶ 20.  To do so, CBOE had to modify the CBOEdirect platform for it to interact with open outcry.  *See* SOF ¶ 19.

CBOE's rejection of the SBT System reflected the concern among its members that floor-based trading had strengths that could not be replicated in a fully computerized exchange.  Some members of the SBT Committee believed that open outcry trading could effectively compete against wholly electronic trading.  *See* SOF ¶ 18.  Yet others favored electronic trading.  *See id*. In fact, members of the CBOE Equity Floor Procedures Committee, which was involved in the development of exchange trading procedures, who believed that fully electronic trading was unappealing, refrained from opposing Hybrid only because it "preserved their open-outcry model."  *See id*.  Hybrid is thus a unique, unified, single exchange that leverages the strengths of both open outcry and electronic trading while satisfying the varying interests of CBOE's members.

### 5.     ISE Has Admitted That Hybrid Trading System Is Not "Fully Computerized" and uses "Open Outcry"

A financial exchange that proposes a new trading system must submit for approval to the SEC the proposed rules under which the new trading system is to operate.  In January 2002, CBOE did just that for Hybrid.  *See* ¶ 40.  After initial approval, the SEC published the new trading rules for comment.  ISE objected to the trading rules proposed by the CBOE.  In written comments to the SEC, ISE disparaged the requirement that certain professional orders in Hybrid would necessarily be routed to a floor broker for execution in open outcry:

11

> The [Hybrid proposed rules] provides that when competing market maker orders are not eligible for automatic execution they *must be routed to a floor broker in the firm's booth*. Upon receipt, *they are printed and handled by the broker manually*, rather than sent to BART, which is available for the routing of other broker-dealer orders and allows a broker to manage orders electronically. *As a result, the [Hybrid proposed rules] requires that orders for the account of a competing market maker be handled in the most inefficient an possibly most expensive (when including floor brokerage charges) of all alternatives otherwise available on the CBOE.*

See SOF ¶ 50 (emphasis added).

ISE thus acknowledged both that Hybrid is not fully computerized and that it requires open outcry be used to handle orders.

Further, in a patent application filed by ISE in September 2005, before this lawsuit was commenced, ISE insisted that there were three different types of exchanges:

> Exchanges may be floor-based, fully electronic, or utilize a *hybrid model that incorporates some floor-based features and some electronic features*. An example of a floor-based exchange is the New York Stock Exchange ("NYSE"). An example of a fully-electronic exchange is the International Securities Exchange ("ISE"). *An example of a hybrid exchange is the Chicago Board Options Exchange ("CBOE").*

SOF ¶ 51. ISE's *ante litem motam* position before the Patent Office is irreconcilable with ISE's litigation-motivated position before this Court that Hybrid is two exchanges, not one.

### 6.   The Hybrid Trading System does not literally infringe the '707 patent

"If even one limitation is missing or not met as claimed, there is no literal infringement." *Spectrum Intern., Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1380 (Fed. Cir. 1998) (affirming summary judgment of no literal infringement). Each asserted claim of the '707 patent either includes the "automated exchange" limitation or depends from a claim that does. Hybrid does not literally infringe the '707 patent because it is not an "automated exchange" in that the method it uses to execute trades is not fully computerized and includes matching or allocating through the use of open outcry. Indeed, as described above, Hybrid inextricably entails open outcry

(even when automatically matching and allocating).  The following conclusions of law based on the Court's *Markman* ruling and undisputed facts establish that Hybrid does not meet the Court's construction of "automated exchange:"

1.  The Court has held that "automated" means fully computerized, such that its protocol does not include matching or allocating through use of open outcry in order to execute trades.  SOF ¶ 9.

2.  The Court has held that a method that effects trades of financial instruments by automatically matching and allocating but also entails "oral communications between market professionals at a central location in open view of other market professionals" ('707 patent, col. 1, ll.24-29) is not fully computerized and therefore not "automated."  SOF ¶ 9.

3.  The Court has held that an "automated exchange" is a method for executing trades of financial instruments that is fully computerized, such that it does not include matching or allocating through use of open outcry.  SOF ¶ 9.

4.  Hybrid effects trades of financial instruments by automatically matching and allocating but also entails "oral communications between market professionals at a central location in open view of other market professionals" ('707 patent, col. 1, ll.24-29).  *See* SOF ¶¶19, 20, 26, 28-35, 37, 38, and 41-51.

5.  The CBOE rules governing the protocol of Hybrid include matching or allocating through the use of open outcry.  *See* SOF ¶¶ 38, and 40-46.

6.  The CBOE rules governing the protocol of Hybrid include an electronic book in which orders and quotations are entered from both open outcry and electronic sources.  *See* SOF ¶¶ 29, 37, 38, 43, and 46.  As such, even automatic matching and allocating entails open outcry because incoming orders match and allocate against orders or quotations from floor brokers and other in-crowd market professionals in open outcry.  *See* SOF ¶¶ 29, 37, 38, 43, and 46.

   7.     **The Hybrid Trading System does not infringe the '707 patent under the doctrine of equivalents**

         a.     **The Doctrine of Disavowal Limits the Doctrine of Equivalents**

Statements in the specification of a patent may limit the scope of equivalents by disclaiming coverage of certain subject matter.  *See J & M Corp. v. Harley-Davidson, Inc.*, 269 F.3d 1360, 1366 (Fed. Cir. 2001).  The Court's holding that ISE disavowed open outcry trading

13

precludes ISE from recapturing it through the doctrine of equivalents.  *See Edward Lifesciences*, 582 F.3d at 1335-6.[5]

In *Edward Lifesciences*, a patent infringement action involving medical devices, the claims at issue required "wires."  The court found that the wires must be malleable but not resilient because "the inventors disparaged prior art resilient wires in their 'background art' section of the specification" and the "[patentee] cannot recapture by the doctrine of equivalents what the inventors disclaimed."  *Id*. at 1333.  Moreover, the court found that because "in the context of the specification, malleable wires and resilient wires are mutually exclusive," the patentee "cannot recapture by the doctrine of equivalents what the inventors disclaimed."  *Id*. at 1334-5.  Here, the '707 patent cites fully automated trading as advantageous over the open outcry trading of the prior art and makes it clear that the two concepts are mutually exclusive.  ISE cannot now recapture through the doctrine of equivalents what it has disavowed.[6]

In its latest infringement contentions, ISE turns a blind eye to the inevitable consequence of its disavowal.  Although ISE does pay lip service to the Court's determination that "the '707 patent disclaimed an open-outcry method of trading," it goes on simply to ignore that ruling,

---

[5] *See also SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337, 1345 (Fed. Cir. 2001) (finding that a patentee who criticized a structure found in the prior art as inferior to the patented invention could not "recapture the excluded subject matter under the doctrine of equivalents without undermining the notice function of the patent.");  *L.B. Plastics, Inc. v. Amerimax Home Products, Inc.*, 499 F.3d 1303, 1309–10 (Fed. Cir. 2007) ("when a specification excludes certain prior art alternatives from the literal scope of the claims and criticizes those prior art alternatives, the patentee cannot then use the doctrine of equivalents to capture those alternatives.");  *Honeywell Intern., Inc. v. ITT Industries, Inc.*, 452 F.3d 1312, 1321 (Fed. Cir. 2006) (affirming summary judgment of non-infringement where equivalent had been disavowed from scope of patent).

[6] In its reply memorandum in support of its motion for "clarification" of the Court's claim construction, ISE asserts that "CBOE wholly ignores that this Court's [*Markman*] Order does not identify any disclaimer."  But the Order granting ISE's motion could not more clearly confirm that the '707 patent disclaims floor-based trading for the reasons presented by CBOE:  "The court accepts the argument of CBOE that the patent disavows floor-based trading."  *See* SOF ¶ 9.  In that vein, the Court's acceptance that the provisional application for the '707 patent disavows floor brokers (who are essential for open outcry trading) highlights ISE's concerted efforts to purposefully exclude open outcry trading from the '707 patent.

14

concluding that "[b]ecause the Accused Exchange entail [sic] a method that matches and allocates without the use of open outcry method of trading, the Court's finding of disclaimer does not preclude a finding of either literal infringement or infringement under the doctrine of equivalents." *See* SOF ¶ 36. Thus, only by arguing—contrary to logic and the applicable law— that its disavowal is irrelevant, does ISE hope to avoid the inevitable consequence of its disclaimer to which the Court's ruling was directed, namely, that the scope of the '707 patent *excludes trading systems that incorporate open outcry trading*.[7]

### b.      The Doctrine of Vitiation Limits the Doctrine of Equivalents

The doctrine of "vitiation" is a legal limitation on the application of the doctrine of equivalents: "the doctrine of equivalents does not apply if applying the doctrine would vitiate an entire claim limitation." *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1378 (Fed. Cir. 2005). If a theory of equivalence entirely vitiates a particular claim element, the Court should grant summary judgment of non-infringement. *Warner-Jenkinson*, 520 U.S. at 39 n.8.

Here, to consider a trading system that matches and allocates trades in open outcry to be the equivalent of a fully computerized exchange, would require the limitation "automated exchange" to be vitiated of the meaning ascribed to it in the specification of the '707 patent and by this Court. Indeed, the result would that an "automated exchange" would then encompass its very antithesis: an exchange that utilizes open outcry trading.   A number of Federal Circuit cases illustrate this concept.[8]

---

[7] Put another way, ISE's way around the disavowal ruling is to declare without proof that Hybrid is two separate exchanges, and then accuse just the electronic trade engine of infringement, asking the Court to ignore its claim construction ruling on disavowal and the existence of floor-based open outcry trading. Not surprisingly, ISE can cite no law that supports its attempted circumvention.

[8] In *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364 (Fed. Cir. 2008), the phrase "electrically connected" was construed to require an actuating switch that directly connected to two other components. *Id.* at 1375-76. But the accused device connected to only one of those components. *Id.* at 1379. Nevertheless, the patentee argued that the lack of a second connection was "insubstantial" under

For example, in *Searfoss v. Pioneer Consol. Corp.*, 374 F.3d 1142 (Fed. Cir. 2004), both the district court and the Federal Circuit construed the word "connecting" to require a direct physical connection between two components. *Id.* at 1149-50. The accused device, on the other hand, "indisputably lack[ed] any direct, physical, rigid connection." *Id.* at 1151. Rather, the two components at issue were *indirectly* connected by an intermediate material. Left with no viable literal infringement argument, the patentee asserted infringement under the doctrine of equivalents, which the Federal Circuit rejected, stating: "[T]o find . . . that the 'indirect connection' constitutes an equivalent of the direct connection function . . . would, in effect, completely vitiate the connection function." *Id.* at 1150-51 (quoting the district court).

Just as "directly connected" is not equivalent to "indirectly connected," an "automated exchange" is not equivalent to an exchange entailing open outcry trading.

---

the doctrine of equivalents. *Id.* Applying the doctrine of claim vitiation, the Federal Circuit barred application of the doctrine of equivalents. *Id.* at 1380.

Apposite as well is *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1106 (Fed. Cir. 2000) where the asserted patent claimed an envelope with strips of adhesive that extended along the "majority" of a portion of the envelope. The accused envelope had adhesive that extended along a minority of a corresponding portion. *Id.* Finding no infringement under the doctrine of equivalents, the court reasoned that "it would defy logic to conclude that a minority-the very antithesis of a majority-could be insubstantially different from a claim limitation requiring a majority, and no reasonable juror could find otherwise." *Id.*

In *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361 (Fed. Cir. 2005), the Federal Circuit construed the phrase "network for data communications" to mean "those networks in which every processor system is *connected* to every other processor system via *direct, point-to-point, two-way channel interconnections*." *Id.* at 1378 (emphasis added). Because the defendant's processor systems were *indirectly* connected to one another, the patentee had to concede no literal infringement. *Id.* Nevertheless, the patentee argued that the indirect connections were equivalent to the "direct, point-to-point" connections. *Id.* The Federal Circuit disagreed, stating that "equivalents under such a theory would vitiate the requirement that every processor be connected to every other processor point-to-point, and therefore must fail as a matter of law." *Id.*

  **c.**  **CBOE's Patents on the Hybrid Trading System are Further Evidence of Non-Equivalence**

The Patent Office has issued two patents to CBOE relating to Hybrid.[9] *See* SOF ¶¶ 23,

24.  Both patents listed the '707 patent as a prior art reference of record.  *See* SOF ¶ 52.  This

fact can be taken into consideration by the Court in determining that Hybrid does not infringe the

'707 patent under the doctrine of equivalents.  *See Hoganas AB v. Dresser Industries, Inc.*, 9

F.3d 948, 954 (Fed. Cir. 1993) (relying on the grant of a patent on the accused device as relevant

to the issue of equivalence where the patent-in-suit was listed as art of record).

  **B.**  **The Hybrid Trading System Does Not Include a "System Memory Means" as Required by the System Claims of the '707 Patent**

The Court construed the corresponding structure of the "system memory means" to be the

"system memory 26, bid matching process 34 and offer matching process 36."  *See* SOF ¶ 54.

Because this is a means-plus-function limitation, to prove infringement, ISE must prove that

Hybrid performs the identical function of the "system memory means" using the Court's

identified structure, or its equivalent.  *See Nomos Corp. v. Brainlab USA, Inc.*, 357 F.3d 1364,

1369 (Fed. Cir. 2004).  Since ISE cannot meet its burden, summary judgment of non-

infringement of claims 1-6, 9-10, and 22-23 is appropriate.

  ISE does not dispute that the function of "storing parameters of the entity administering

the invention for allocating trades between the incoming order or quotation and the previously

received orders and quotations" is accomplished in Hybrid entirely and solely by "memory."  *See*

SOF ¶¶ 55, 56.  Even if it were possible for a "process" to store parameters, Hybrid does not

---

[9] In the Notice of Allowance for one of the CBOE patents relating to Hybrid, the patent examiner concludes:

> nothing in the prior art [including the '707 patent of record] teaches or even suggests the *integration of traditional open-outcry methods with automated electronic order execution.* The instant invention is patentably distinct over the prior art because of the unique rule-based order routing algorithm which *integrates the features of open-outcry trade execution with electronic order trade execution.*

include processes that perform this function.[10]  *See* SOF ¶ 57.  Because there is no evidence to suggest otherwise, ISE cannot meet its burden of proving infringement.[11]

While 35 U.S.C. § 112, ¶ 6 entitles a patentee to encompass the "equivalents" of the corresponding structure, as a matter of law "memory" cannot be equivalent to "system memory 26, bid matching process 34 and offer matching process 36."  This is because the test for 112, ¶ 6 equivalency is "closely related" to the test under the doctrine of equivalents and focuses on "insubstantiality of the differences." *Cortland Line Co., Inc. v. Orvis Co., Inc.*, 203 F.3d 1351, 1359  (Fed. Cir. 2000) (affirming summary judgment of no infringement).

First, ISE may not rely on equivalents to recapture subject matter excluded by a deliberate and foreseeable claim drafting decision.  *See Planet Bingo, LLC v. GameTech Int'l, Inc.*, 472 F.3d 1338, 1344 (Fed. Cir. 2006).  As the Court has already held, ISE failed to describe the "system memory 26" as being adequate to accomplish the entire claimed function.  *See* SOF ¶ 54.  As such, ISE may not rely on equivalents to argue that "memory" alone in Hybrid can accomplish the entire claimed function.  ISE must live with the consequences of its drafting decision.

Second, no reasonable jury could find that "memory" is insubstantially different from "system memory 26, bid matching process 34 and offer matching process 36."   Structural

---

SOF at ¶ 53.

[10] As discussed at the *Markman* hearing, this peculiar use of the term "process" arises because the '707 patent was poorly drafted, but nonetheless is necessitated by its disclosure.  This fault in the patent renders claims having this limitation invalid as indefinite because for an apparatus element such as "system memory means," a patentee must disclose corresponding *structure*, not steps or a process.  *See O.I. Corp. v. Tekmar Co., Inc.*, 115 F.3d 1576, 1582-83 (Fed. Cir. 1997).

[11] In its most recent infringement contentions, ISE fails even to assert that Hybrid performs the claimed function by using "system memory 26, bid matching process 34 and offer matching process 36," instead alleging generally that Hybrid includes a "bid matching process and offer matching process."  *See* SOF ¶ 58.  Of course, this is inadequate because ISE must prove that Hybrid performs the identical function of the "system memory means" *using the Court's identified structure*, or its equivalent.  *Nomos*

equivalence under § 112, ¶ 6 is met only if the differences are insubstantial—that is, if the allegedly equivalent structure performs the claimed function in substantially the same way to achieve substantially the same result as the corresponding structure described in the specification. *Odetics, Inc. v. Storage Technology Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999). In the '707 patent, the allocating parameter for allocating to professionals is stored in system memory 26, while the allocating parameter for allocating to customers is stored in bid matching process 34 and offer matching process 36. *See* SOF ¶ 60.[12]   It is undisputed that in Hybrid, the rules for allocating to customers and professionals are not stored separately, and that no rules for allocating are stored in a "bid matching process 34 and offer matching process 36." *See* SOF ¶¶ 55, 56. As a matter of law, this is not an "insubstantial" difference. *See, e.g., Nomos Corp.*, 357 F.3d at 1369 (holding that as a matter of law, where structure in the accused device was missing a portion of the corresponding structure, the "way" in which the function is performed by the accused device is substantially different).[13]

The finding of an insubstantial difference is precluded as a matter of law also because the '707 patent discloses a memory, but never discloses that it can perform the function of storing allocating parameters for *both* professional and customer allocation. *See* SOF ¶ 54; *Cross Medical Prods, Inc. v. Medtronic Sofamor Danek, Inc.,* 424 F.3d 1293, 1317 (Fed. Cir. 2005)

---

*Corp.*, 357 F.3d at 1369. ISE's failure to make a legally adequate allegation of infringement is a *de facto* admission of non-infringement.

[12] ISE has previously argued to the Court that the "system memory means" need not store parameters for allocating to customers. *See* SOF ¶ 60. The Court's construction of "system memory means"—which includes the only item in the '707 patent described as storing parameters for allocating to customers—leaves no question, however, that the Court agrees that the "system memory means" must store parameters for allocating to customers.

[13] The subject matter in *Nomos* was ultrasonic imaging devices. The corresponding structure for the limitation of "generating at least one ultrasound image of the lesion in the patient's body" was an ultrasonic probe and a "fixation device." 357 F.3d at 1368. The accused device included an ultrasonic probe, but no fixation device, *i.e.*, it was hand-held. *Id.* at 1368-69. The Federal Circuit held that, as a matter of law, that "the structure of the [accused] device is neither the same nor an equivalent of the corresponding structure." *Id.* at 1369.

("One of the many reasons that we found no equivalents as a matter of law was that the patent at issue discussed the use of [the accused structure] for another function, but never disclosed that [the accused structure] could perform the same function as the [corresponding structure disclosed in the specification].") (characterizing the holding in *Chiuminatta Concrete Concepts Inc. v. Cardinal Industries, Inc.,* 145 F.3d 1303, 1310  (Fed. Cir. 1998)).

Nor can the doctrine of equivalents rescue ISE's infringement theory because a structure that is not an equivalent under 35 U.S.C. § 112, ¶ 6 cannot, as a matter of law, be an equivalent under the doctrine of equivalents.  "[A] finding that a component of an accused product is not a structure 'equivalent' to the corresponding structure of a means-plus-function limitation for purposes of literal infringement analysis *precludes* a finding that the same structure is equivalent for purposes of the doctrine of equivalents, unless the component constitutes technology arising after the issuance of the patent." *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1381 (Fed. Cir. 2001) (emphasis added).  Here, ISE admits that the '707 patent discloses "memory," so there is no dispute that "memory" is not an after-arising technology.  *See* SOF ¶ 59 ("Thus, the structure disclosed [in the '707 patent] for storing the allocating parameters is the memory of the general purpose computer…").  ISE's reliance on the doctrine of equivalents to argue that "memory" is equivalent to "system memory 26, bid matching process 34 and offer matching process 36" is therefore precluded.

C.     The Hybrid Trading System Does Not Infringe Method Claims 35, 36, 43, 45, and 56-58 of the '707 Patent

The Court construed "matching" to mean "Identifying a counterpart order or quotation for an incoming order or quotation based on price.  'Matching' is a process that is distinct from 'allocating.'"  *See* SOF ¶ 62.  The limitation "matching" appears in every method claim in the '707 patent asserted against CBOE.  *See* SOF ¶¶ 12, 63.  "It is well established that a patent for a

method or process is not infringed unless all steps or stages of the claimed process are utilized."

*NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1318 (Fed. Cir. 2005). Because it is

undisputed that Hybrid does not perform the "matching" steps as recited in the asserted method

claims, summary judgment of non-infringement is appropriate.

       1.    **The Hybrid Trading System Does Not Perform the "Matching" Steps of Independent Claim 35 and Dependent Claims 36, 43, and 45**

Claims 35, 36, 43, and 45 recite two matching steps:

> *first matching* a first portion of the incoming order or quotation against the public customer order stored in the book memory based on the allocating parameter; and

> *second matching* a remaining portion of the incoming order or quotation *preferentially against professional orders and quotations with larger size based on the allocating parameter*.

*See* SOF ¶¶ 12, 63.

As an initial matter, it is undisputed that Hybrid matches an incoming order against

public customer orders and professional orders and quotations in a single step. SOF ¶ 68. Claim

35 explicitly requires two distinct matching steps.[14] Because performance of all steps is required

to infringe a method claim, and the plain language of the claim and the prosecution history of the

'707 patent makes clear that these steps are distinct—making the doctrine of equivalents

unavailable as a matter of law—ISE cannot prove that Hybrid infringes independent claim 35 or

---

[14] The inventor's intention that "first" and "second" refer to distinct steps is confirmed by representations made to the Patent Office during prosecution. To overcome a rejection of a method claim reciting "first selecting [based on bids]," "first predicting [based on bids]," "second selecting [based on offers]" and "second predicting [based on offers]," Mr. Katz explained that "The terms 'first' and 'second' are used only to distinguish selecting and predicting based on bids and offers, respectively, *as distinct steps*." *See* SOF ¶ 70.

dependent claims 36, 43 and 45.[15]  *See Seachange Int'l, Inc*, 413 F.3d at 1378 ("the doctrine of equivalents does not apply if applying the doctrine would vitiate an entire claim limitation").

Moreover, ISE cannot prove that Hybrid performs "matching" "preferentially against professional orders and quotations with larger size based on the allocating parameter."  ISE's infringement contentions fail to apply the Court's construction of "matching" and ISE refuses to admit that this construction pertains to adjudicating infringement of claim 35.[16]  Hybrid performs "matching" based solely on price, not an allocating parameter;[17] all counterpart orders or quotations (regardless of their size) for an incoming order or quotation that are price-compatible "match" in Hybrid.  *See* SOF ¶¶ 68, 69, and 76 (explaining that Market Participants quoting at the best bid or offer ("BBO") are entitled to participate in the allocation:  "When more than one market participant is quoting at the BBO, inbound electronic orders shall be allocated pursuant to the following allocation algorithm…").  Any considerations as to size relate to "allocation," a process that the Court explicitly recognizes as *distinct* from matching.  *See* SOF ¶¶ 62, 65 and 69.[18]

As a matter of law, ISE cannot prove infringement under the doctrine of equivalents because to do so, ISE will need to take the position that "matching" is equivalent to "allocating," but the Court has held that these processes are distinct from each other.  *See* SOF ¶¶ 62 and 65.  This is the quintessential "substantial difference."  *See, e.g., Seachange Int'l, Inc.*, 413 F.3d at

---

[15] ISE's infringement contentions offer no evidence that Hybrid performs two distinct "matching steps," as construed by the Court.  *See* SOF ¶ 67.  ISE's failure to make a legally adequate allegation of infringement is a *de facto* admission of non-infringement.

[16] *See* SOF ¶ 67.

[17] The Court construed "allocating parameters" to mean "rules for dividing portions of the incoming order or quotation among the previously received orders and quotations."  *See* SOF ¶ 66.

[18] The concept of matching on a size basis befuddled ISE's counsel ("If you define it as match based on price, then how can it be matched on a pro rata basis?"  *See* SOF ¶ 73) and was regarded as nonsensical by the Court ("it doesn't make a lot of sense to talk about [] matching on a pro rata basis"

1348; *Moore U.S.A., Inc.*, 229 F.3d at 1106.  Further, because ISE easily could have drafted this claim to refer to "allocating" rather than "matching" but elected not to, it may not rely on equivalents to recapture subject matter excluded by a deliberate and foreseeable claim drafting decision.  *See Planet Bingo, LLC*, 472 F.3d at 1344.

> ### 2.   The Hybrid Trading System Does Not Perform the Two Step Process of "Matching" Based on an Allocating Parameter of Independent Claim 56 and Dependent Claims 57 and 58

Claims 56, 57 and 58 recite two matching steps:

> *matching* the incoming order or quotation against the orders and quotations stored in the book memory *based on the allocating parameter*;...
>
> and, if the best market price [on the automated exchange] is as good or better than the away market price, *executing the step of matching*.

*See* ISE ¶¶ 12, 64.

ISE cannot prove that Hybrid performs "matching" "based on the allocating parameter." ISE's infringement contentions fail to apply the Court's construction of "matching" and ISE refuses to admit that it pertains to adjudicating infringement of claim 56.[19]  Hybrid performs "matching" based solely on price, not an allocating parameter:  all counterpart orders or quotations for an incoming order or quotation that are price-compatible "match" in Hybrid.  *See* SOF ¶¶ 68, 69 and 76 (explaining that Market Participants quoting at the best bid or offer ("BBO") are entitled to participate in the allocation:  "When more than one market participant is quoting at the BBO, inbound electronic orders shall be allocated pursuant to the following allocation algorithm…").  Any considerations pertaining to how the order is divided among the previously received orders and quotations relate to "allocation," a process that the Court has

---

*See* SOF ¶ 73).  ISE's Opposition will not only need to prove that Hybrid performs such a function, but it will have to reverse course from its position at the *Markman* hearing that such a function is even possible.

[19] *See* SOF ¶ 75.  ISE's failure to make a legally adequate allegation of infringement is a *de facto* admission of non-infringement.

explicitly recognized is *distinct* from matching.  *See* SOF ¶¶ 62, 65 and 69.  While Hybrid may perform *allocation* based on an allocating parameter, ISE cannot prove that it *matches* based on an allocating parameter.  *See* SOF ¶ 69.

As a matter of law, ISE cannot prove infringement under the doctrine of equivalents because to do so, ISE must take the position that "matching" is equivalent to "allocating," but the Court has held that these processes are distinct from each other.  *See* SOF ¶¶ 62 and 65.  Again, this is the quintessential "substantial difference."  *See, e.g., Seachange Int'l, Inc.*, 413 F.3d at 1348.  Further, because ISE easily could have drafted this claim to refer to "allocating" rather than "matching" but elected not to, it may not rely on equivalents to recapture subject matter excluded by a deliberate and foreseeable claim drafting decision.  *See Planet Bingo, LLC*, 472 F.3d at 1344.

Moreover, as a separate ground for non-infringement, it is undisputed that Hybrid does not perform the two-step process for matching that is required by this claim, *i.e.*, one step in the matching process being independent of the away market price and the second step in the process being dependent on the away market price.  *See* ¶ 68.  Infringement of method claim 56 requires *performance* of all recited steps.  *NTP, Inc.*, 418 F.3d at 1318.  Hybrid determines if the eBook is at the national best bid or offer ("NBBO") and, if so, matches the incoming order against orders and/or quotations resting in the eBook.  *See* SOF ¶¶ 68 and 71.  There is no second "executing" step in the process of matching as required by the claim.[20]  *See* ¶ 68.  Infringement under the doctrine of equivalents is precluded because a finding that the *absence* of the second step in the process of matching is equivalent to *having* the second step in the process of matching

---

[20] Perhaps most revealing is ISE's infringement contention on the second step of the process of matching in claim 56.  ISE's *entire* analysis merely parrots the claim language: "The Accused Process executes the step of matching."  *See* SOF ¶ 75.

("executing the step of matching") step would vitiate the limitation.  *See Warner-Jenkinson*, 520

U.S. at 39 n.8; *Seachange Int'l, Inc.,* 413 F.3d at 1378.


## CONCLUSION

For the foregoing reasons, CBOE respectfully asks this Court to grant summary judgment

of non-infringement of the '707 patent, and enter final judgment in favor of CBOE.

Dated:  April 16, 2010

By:  s/*Jonathan A. Marshall*

Jonathan A. Marshall
David Francescani
Michael T. Zoppo
Brian J. Doyle
**FISH & RICHARDSON P.C.**
601 Lexington Ave, 52nd Floor
New York, NY 10022
Telephone: (212) 765-5070
Facsimile: (212) 258-2291

*Attorneys for Plaintiff Chicago Board
Options Exchange, Incorporated*

Paul E. Dengel
Stacie R. Hartman
**SCHIFF HARDIN LLP**
6600 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6473
Telephone (312) 258-5500
Facsimile (312) 258-5600

Joanne Moffic-Silver
Jordan Newmark
**CHICAGO BOARD OPTIONS
EXCHANGE, INCORPORATED**
400S. LaSalle Street
Chicago, IL 60605
Telephone: (312) 786-7909

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies pursuant to Fed.R.Civ.P. 5 and L.R. 5.5 that a true and correct copy of the foregoing document was filed on April 15, 2010 with the Clerk of the Court using the CM/ECF system, which will send notice to counsel of record

*s/Jonathan Marshall*
Jonathan Marshall

on April 16, 2010.