# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

Chicago Board Options Exchange, Inc.,

               Plaintiff,

               v.

International Securities Exchange, LLC,

               Defendant.

Civil Action No. 07-cv-623

The Hon. Joan H. Lefkow, U.S.D.J.
The Hon. Jeffrey Cole, U.S.M.J.

## INTERNATIONAL SECURITIES EXCHANGE, LLC'S OPPOSITION TO CHICAGO BOARD OPTIONS EXCHANGE, INC.'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT

COUNSEL FOR DEFENDANT
INTERNATIONAL SECURITIES EXCHANGE, LLC

Michael D. Huber
Cray Huber Horstman Heil & Van Ausdal LLC
303 W Madison, Suite 2200
Chicago, IL 60606
Telephone No.:  (312) 332-8450
Facsimile No.:  (312) 332-8451

Parker H. Bagley
Steven R. Gustavson
Michael S. DeVincenzo
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel.: 212.813.8800
Fax: 212.355.3333

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..................................................................................................1

II.  LEGAL AUTHORITY ........................................................................................3

III.  CBOE HAS MADE, USED OR SOLD AN "AUTOMATED EXCHANGE" ..................4

    A.  CBOE Uses A Fully Computerized Method for executing Trades.........................4

        1.  CBOE Operates Two Methods for executing Trades ................................. 4

        2.  One Method for Executing Trades Used By CBOE Is Fully Computerized And Does Not Entail Open Outcry To Match or Allocate Trades ................................................................................. 8

            a.  CBOE*direct* Is an "Exchange"........................................................ 8

            b.  CBOE*direct* Does Not "Entail Open Outcry" To Match or Allocate Trades ............................................................................ 9

    B.  CBOE's Non-Infringement Argument Focuses on Methods for Order Entry, Which Are Not the Focus of the Asserted Claims or the Court's Construction of "Automated Exchange" ...............................................................10

    C.  CBOE's Non-Infringement Argument Also Focuses on Methods for Order Routing, Which Are Not the Focus of the Asserted Claims or the Court's Construction of "Automated Exchange" ...............................................................11

    D.  CBOE's Attempt to Expand the Scope of the Disclaimer is Improper.................13

IV.  CBOE'S "AUTOMATED EXCHANGE" CONTAINS THE "SYSTEM MEMORY MEANS" OF INDEPENDENT CLAIMS 1, 4 AND 22 ...............................14

    A.  CBOE*direct* Contains the Identical Structure Disclosed in the '707 Patent for Performing the Function of the "System Memory Means"............................15

    B.  If CBOE*direct* Does Not Contain the Identical Structure Disclosed in the '707 Patent for Performing the Function of "System Memory Means," It Contains an Equivalent Structure........................................................................16

    C.  CBOE's Arguments Regarding the Disclosed Structure are Fundamentally Flawed.................................................................................................................18

V.  CBOE'S "AUTOMATED EXCHANGE" PERFORMS THE "MATCHING"
    STEPS OF INDEPENDENT CLAIMS 35 AND 56 ......................................................19

    A.  CBOE Does Not Match An Incoming Order Against Public Customers
        and Professionals In One Step ...............................................................................23

    B.  CBOE Infringes Under its Own Application of this Court's Construction ...........24

VI. CONCLUSION.................................................................................................................25

LIBNY/4908527.6

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*AFG Indus., Inc. v. Cardinal IG Co.,*
   375 F.3d 1367 (Fed. Cir. 2004)........................................................................3, 6

*Allen Eng'g v. Bartell Indus., Inc.,*
   299 F.3d 1336 (Fed. Cir. 2002) ……………………………………………………..25

*Armco, Inc. v. Cyclops Corp.,*
   791 F.2d 147 (Fed. Cir. 1986)...............................................................................3

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)...............................................................................................3

*Creo Prods. v. Presstek, Inc.,*
   305 F.3d 1337 (Fed. Cir. 2002)...........................................................................18

*D.M.I., Inc. v. Deere & Co.,*
   755 F.2d 1570 (Fed. Cir. 1985)..............................................................................3

*Graver Tank Mfg. Co. v. Linde Air Prods. Co.,*
   339 U.S. 605 (1950).............................................................................................16

*In re Gabapentin Patent Litig.,*
   503 F.3d 1254 (Fed. Cir. 2007)..............................................................................3

*Intellicall, Inc. v. Phonometrics, Inc.,*
   952 F.2d 1384 (Fed. Cir. 1992).....................................................................14, 19

*Invitrogen Corp. v. Clontech Labs., Inc.,*
   429 F.3d 1052 (Fed. Cir. 2005)...........................................................................13

*KCJ Corp. v. Kinetic Concepts, Inc.,*
   223 F.3d 1351 (Fed. Cir. 2000)...........................................................................13

*Lemelson v. TRW, Inc.,*
   760 F.2d 1254 (Fed. Cir. 1985).........................................................................3, 4

*Markman v. Westview Instruments, Inc.,*
   52 F.3d 967 (Fed. Cir. 1995)..................................................................................1

*Minks v. Polaris Indus., Inc.,*
   546 F.3d 1364 (Fed. Cir. 2008)...........................................................................18

iii

*Odetics, Inc. v. Storage Tech. Corp.*,
  185 F.3d 1259 (Fed. Cir. 1999)..................................................................16, 17, 18

*Rhodia, Inc. v. PPG Indus. Inc.*,
  402 F.3d 1371 (Fed. Cir. 2005).........................................................................3

*Saunders Group, Inc. v. Comfortrac, Inc.*,
  492 F.3d 1326 (Fed. Cir. 2007)........................................................................13

## STATUTES

 35 U.S.C. § 271.......................................................................................9

LIBNY/4908527.6

## I.     INTRODUCTION

CBOE argues that it is entitled to summary judgment of non-infringement because no reasonable jury could find that CBOE operates (1) an "automated exchange" (2) that contains a "system memory means," and (3) that "match[es]" incoming orders against previously received orders or quotations based on an "allocation parameter."  It is black-letter law that application of properly construed claims to an accused device or activity is a question of fact.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995).  Yet, CBOE's motion is based on its own application of the Court's constructions only, and fails to address ISE's competing applications.  As such, CBOE's motion plainly requests the Court invade the province of the fact finder to determine disputed questions of fact concerning the application of the Court's constructions in CBOE's favor.

The question for the Court on summary judgment regarding "automated exchange" is whether a reasonable jury could find that CBOE employs "a method for executing trades of financial instruments that is fully computerized, such that it does not include matching or allocating through use of open outcry."  The answer is yes.  CBOE's internal documents, annual reports and fact witnesses confirm that CBOE uses two methods for executing trades—one of which is fully computerized.  To argue to the contrary, as CBOE does, is to argue that a reasonable jury could not believe CBOE's statements in its own annual reports.  Indeed, over 95% of all trades executed at CBOE are executed using such a method.  These trades are

executed in under a second using CBOE's fully computerized trading system, CBOE*direct*,[1] which does not entail "oral communications between market participants" in the protocol it uses to match or allocate these trades.

Inexplicably, CBOE fails to address CBOE*direct*'s fully computerized method for executing trades, and instead primarily addresses a computerized order routing mechanism used by CBOE to route orders between CBOE's two methods of trade execution, to support its circular argument that the Court must consider the Hybrid System, as a whole, to be one method for executing trades. The Court's ruling on ISE's motion for clarification, however, made clear that the business of a registered exchange may have multiple "exchange[s]," construed by the Court as "methods for executing trades of financial instruments . . .." Basing its argument on the fact that CBOE uses an open outcry method for executing trades, CBOE ignores the Court's clarification that a registered exchange may have more than one "exchange."

As for "system memory means," CBOE does not dispute that CBOE*direct* contains structure ("memory") that performs the recited function of this element. Instead, CBOE argues that CBOE*direct* does not literally satisfy this element because it does not contain a "bid matching process" or an "offer matching process." This argument must fail because CBOE*direct* has a process or algorithm that contains the rules for matching incoming orders or quotations against previously received orders and quotations.

---

[1] CBOE*direct* employs a fully computerized method of executing trades as part of CBOE's Hybrid System and as CBOE's disaster recovery system. (*See* Section II of ISE's Resp. To CBOE's Local Rule 56.1 Statement In Supp. Of Its Mot. For Summ. J. Of Non-Infringement, ISE's Statement Of Additional Material Facts ("ISE SOF") ¶¶ 1-13.) CBOE*direct* was first accused of infringement on January 27, 2009, rendering CBOE's statements regarding belated assertions of infringement objectively baseless. (*See* Ex. 62 to Declaration of Michael S. DeVincenzo, at 4.) Furthermore, CBOE fails to address its back-up trading system, which has no open outcry method of trading, rendering CBOE's suggestion that its motion is outcome determinative incorrect. (*See* ISE SOF ¶ 13.)

Regarding whether CBOE's computerized method of trading performs the "matching" steps recited in the asserted "method claims," CBOE fails to address ISE's application of the Court's construction to the accused step, which is entirely consistent with the patent's use of the term "matching."  Importantly, application of the claims to the accused method is a question of fact.  CBOE's documents and fact witnesses, as well as its own expert report concerning damages, all demonstrate that CBOE first matches a portion of an incoming order to previously received customer orders, and secondly matches to professional orders, as recited in the claims.

## II.   LEGAL AUTHORITY

"Because infringement is itself a fact issue [] a motion for summary judgment of . . . noninfringement should be approached with a care proportioned to the likelihood of its being inappropriate."  *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1573 (Fed. Cir. 1985).  "[A] trial court cannot reach a conclusive finding of noninfringement if the record shows some evidence . . . to the contrary."  *AFG Indus., Inc. v. Cardinal IG Co.,* 375 F.3d 1367, 1371 (Fed. Cir. 2004).  Where the nonmovant "make[s] a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," the moving party is not entitled to summary judgment as a matter of law.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  As infringement is a question of fact, the Federal Circuit routinely reverses district court decisions that improperly apply a construction to an accused product or method.  *See In re Gabapentin Patent Litig.*, 503 F.3d 1254, 1262 (Fed. Cir. 2007); *Rhodia, Inc. v. PPG Indus. Inc.*, 402 F.3d 1371, 1382 (Fed. Cir. 2005); *AFG Indus., Inc. v. Cardinal Co.,* 375 F.3d 1367, 1374 (Fed. Cir. 2004) (reversing summary judgment because of internal documents of accused infringer).

A court is not authorized to resolve factual questions on summary judgment; rather, its task is to determine if any such factual questions exist.  *Armco, Inc. v. Cyclops Corp.*, 791 F.2d 147, 149 (Fed. Cir. 1986).  If they do, and they are material to the claims in issue, the non-

3

moving party has met its burden, and summary judgment is improper.  *Id.*; *Lemelson v. TRW, Inc.*, 760 F.2d 1254, 1260-61 (Fed. Cir. 1985).  "Further, as an additional precaution against denying a party its chance to prove a worthy case, any doubt as to the presence or absence of disputed issues of material fact must be resolved in favor of the presence of disputed issues, or in other words, in favor of the party opposing summary judgment."  *Lemelson*, 760 F.2d at 1261.

## III.   CBOE HAS MADE, USED OR SOLD AN "AUTOMATED EXCHANGE"

The Court has defined the term "automated exchange" as "a method for executing trades of financial instruments that is fully computerized, such that it does not include matching or allocating through use of open outcry."  (D.I. 300.)  Whether CBOE has made, used or sold an "automated exchange" remains a fundamental point of contention between the parties.  ISE alleges that CBOE uses two "exchanges" or "methods for executing trades of financial instruments"—one of which is a fully computerized method.  By contrast, CBOE argues that it uses only one "exchange"—the Hybrid System.  (D.I. 310, CBOE's Mem. In Supp. Of Its Mot. for Summ. J. ("CBOE Br."), at 4-17.)  In arguing that it has one exchange, CBOE ignores the Court's construction of an "exchange" as a method for executing trades.

### A.      CBOE Uses A Fully Computerized Method for executing Trades

#### 1.      CBOE Operates Two Methods for executing Trades

Trades at CBOE may be executed using one of two methods of trade execution—either an automated, fully computerized method; or an open-outcry method.  (*See* ISE SOF ¶¶ 1-8.)  CBOE's Chairman and CEO William J. Brodsky and Vice Chairman Edward T. Tilly both have described the Hybrid System as offering two methods for trade execution:  "CBOE's hybrid system offers customers a choice between [1] **a pure electronic system, offering sub-second execution,** and [2] **open outcry** for those customers preferring the superior liquidity and price discovery found in an open outcry forum.  **So long as customers prefer to choose between the**

**two methods**, we will continue to provide them both."  (Ex. 2 at CBOE000295468 (emphasis added)[2]; ISE SOF ¶ 1.)  CBOE's annual reports, SEC filings and witness testimony, as well as numerous other admissions in this litigation, all confirm that CBOE operates two methods for executing trades.  (*See* ISE SOF ¶¶ 2-9.)



Hybrid Trading System in 2007
Method of Order Execution
All CBOE Products

Electronic — 92%
Open Outcry — 8%

A recent SEC filing by CBOE Holding, Inc.—the parent company for CBOE—states it best:  "[CBOE] [o]ffer[s] market participants an efficient, transparent and liquid marketplace for trading options both **through traditional open outcry methods** and **through our electronic platform**, CBOE*direct*."  (Ex. 3 at 73; Ex. 4 at 117 (emphasis added); ISE SOF ¶ 2.)[3]  That CBOE has two methods for executing trades is a point of emphasis throughout CBOE's annual reports.  (*See* ISE SOF ¶ 3.)  For example, CBOE's 2007 Annual Report specifically identifies CBOE's two distinct methods of trade execution, and information regarding the number of trades executed using each method. (Ex. 8 at 10 ( *see* Chart above); ISE SOF ¶ 3.)  CBOE's 2005 Annual Report explains that "[n]inety-two percent of the orders traded on CBOE's Hybrid Trading System are executed electronically, accounting for 55% of the volume in those classes, while the remaining 8% of Hybrid orders and 45% of the

---

[2] Exhibits 1-71 are attached to the Declaration of Michael S. DeVincenzo.

[3] CBOE's filing of these documents in connection with its impending IPO and the filing of the present motion is not coincidental. The IPO is projected to value CBOE at 2.5 billion dollars, a valuation created in large part by CBOE's long infringement of the '707 patent. CBOE's motion is a last, desperate "Hail Mary" pass to remove this "litigation risk" before the June IPO, in which CBOE's members hope to be unjustly enriched at ISE's expense. CBOE has announced its intentions to dilute its assets by over $300 million by distributing the IPO proceeds to its members. Again, it is not a coincidence that the actual damages calculated by ISE's expert are in the $300 million dollar range (before enhancement for willful infringement).

volume are handled through the **open outcry method of trading**."  (Ex. 6 at CBOE006325; *see also* Ex. 9 at 8 ("At the end of 2008, 92 percent of all CBOE orders were executed electronically; however, the eight percent of orders handled via open outcry . . . **illustrate[es] that customers continue to value both methods**.") (emphases added); ISE SOF ¶ 3.)

In addition to CBOE's public concessions, CBOE's internal documents and correspondence recognize that CBOE employs two methods for executing trades.  (ISE SOF ¶ 4; *see, e.g.,* Ex. 10 at CBOE000257522 ("There are two primary means by which a transaction is effected: electronically, through the trade engine, and open outcry."); Ex. 11 at CBOE000296000 ("[C]ustomers increasingly opt for electronic trading (sub-second electronic execution was realized on 96 percent of CBOE Hybrid orders in 2006) . . ..").)  Hence, CBOE's argument essentially is that no reasonable juror could believe CBOE's contemporaneous public and private statements that it operates two methods for executing trades.  Of course, this is not the case. *See AFG Indus., Inc. v. Cardinal IG Co.*, 375 F.3d 1367, 1373 (Fed. Cir. 2004) (reversing district court's grant of summary judgment where "a document internal to [accused infringer] refers to its product as containing [limitation at issue]"), *rev'd in part on other grounds*, 224 Fed. Appx. 956 (Fed. Cir. 2007).

CBOE's fact witnesses regularly confirmed that CBOE has a method for executing trades that does not entail open outcry.[4]  Mr. Anthony Montesano, CBOE's Vice President of Trading Systems Support, testified:



---

[4] CBOE's argument that the Court must accept as true the testimony offered by CBOE witnesses that its Hybrid System is a single "exchange" (CBOE Br. 8-11), based upon their personal understanding of the term "exchange" is contrary to the standard for summary judgment.

\*      \*      \*



(Montesano Dep., Ex. 59, 62:19-22, 85:4-15; ISE SOF ¶ 6).  Similarly, Ms. Eileen Smith,

CBOE's corporate deponent, testified that CBOE operates a method whereby trades are executed

against incoming orders "████████":

(Smith Dep., Ex. 55, 282:6-14; ISE SOF ¶ 6.)  She further confirmed that "[o]nce it has been

determined where an order goes once it is routed to CBOE*direct*, the trade is executed

electronically."  (Smith Dep., Ex. 54, 48:2-11; ISE SOF ¶ 6)  Similarly, Mr. Tilly also confirmed

that CBOE analyzes its trading activity based upon the percentage of trades "█████████

████████████████."  (Tilly Dep., Ex. 61, 73:11-17 (emphasis added); ISE SOF ¶ 7.)

CBOE not only uses a fully computerized method for executing trades, but it also charges

"a different rate for firm and broker-dealer orders that execute electronically" and maintains

records regarding the method used to execute a trade.  (ISE SOF ¶ 8.)  CBOE produced a

document identifying the trades executed "electronically," as compared to the trades executed

---

[5] CBOE has conceded that RAES was an "automated exchange."  (ISE SOF ¶ 5.)  Importantly, although Mr. Montesano explained why he personally considered the Hybrid System to be one "exchange," he never disputed that the system provides a fully computerized method of executing trades through CBOE*direct*, similar to RAES.

using the open outcry method of trading.  (Ex. 35.)  Consistent with CBOE's witness testimony,

this document evidences that CBOE operates two methods for executing trades.

> 2.    One Method for Executing Trades Used By CBOE Is Fully Computerized
>         And Does Not Entail Open Outcry To Match or Allocate Trades

"The cornerstone of the CBOE hybrid trading model is CBOE*direct*,® CBOE's screen-

based trading system. . . ."  (Ex. 5 at CBOE006235; ISE SOF ¶ 9.)  CBOE*direct* is a group of

distributed processors each containing memory.  (*See* Ex. 17 at CBOE002411900; ISE SOF ¶ 9.)

These processors contain an electronic book that stores orders and quotations entered

electronically by customers and professionals using computer terminals.  (Ex. 17 at

CBOE002411902; ISE SOF ¶ 10.)  CBOE*direct* also contains a computer algorithm used to

execute trades against the previously received orders and quotations stored in the electronic

book.  (Ex. 24 at CBOE001316448; ISE SOF ¶ 10.)  These trades are executed using CBOE's

Ultimate Matching Algorithm ("UMA"), which is an algorithm containing the rules for matching

and allocating trades.  (*See* ISE SOF ¶ 10.)

> a.    CBOE*direct* Is an "Exchange"

The parties agree that the term "exchange" as used in the '707 Patent encompasses

trading systems and/or platforms that employ a method for executing trades.  Despite ISE's

infringement contentions addressing CBOE*direct*, CBOE fails to address *why* a reasonable jury

could not find that CBOE*direct* employs a fully computerized method for executing trades.

CBOE's failure to address the issue of whether CBOE*direct* is an "exchange" is

unsurprising because CBOE's internal documents evidence CBOE*direct* is a trading system, or

trading platform, that employs a method for executing trades.  (ISE SOF ¶ 11; *see, e.g.,* Ex. 25 at

CBOE003348311 ("CBOE*direct*, CBOE's state of the art screen based trading system.  The

system has proven to be one of the most robust trading platforms anywhere in the world.  It is a

highly scalable trading system. . . ."); Ex. 10 at CBOE000257522 ("The CBOE*direct* trade engine is the electronic heart of the exchange."; "Over 92% of total orders and 60% of total volume **is executed in the electronic environment** by the trade engine.") (emphasis added); Ex. 24 at CBOE001316448 ("███████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████ (emphasis added); Ex. 23 at CBOE003311755 (██████████████████ █████████████████████████████████████████████████████████ ").).[6]

   b.   CBOE*direct* Does Not "Entail Open Outcry" To Match or Allocate Trades

The protocol used by CBOE*direct* to execute trades does not "entail open outcry."  If CBOE's open-outcry method of trading ceased to occur, CBOE*direct* would still be capable of executing trades.  (ISE SOF ¶ 14.)  CBOE does not dispute this.  Instead, CBOE carefully argues only that orders "which are routinely routed to open outcry would continue to be so routed even in the absence of any open outcry trading."  (*See* CBOE Br. 5.)  This argument misses the point. The issue is not whether CBOE's open-outcry method for executing trades would continue to operate if open-outcry trading was precluded.  The issue is whether CBOE's fully computerized method for executing trades would continue to execute trades if CBOE's open-outcry method for executing trades was not present.  The answer is yes.  (ISE SOF ¶ 15.)

Tellingly, CBOE admits that its "SBT System," which also used the CBOE*direct* to execute trades, was an "automated exchange."[7]  (Smith Decl., D.I. 311, ¶ 16; CBOE SOF,

---

[6] CBOE not only uses CBOE*direct* as the "trading platform" for the Hybrid System but it has also made and/or sold CBOEdirect for use by OneChicago Exchange, CBOE Futures Exchange, and CBOE Stock Exchange.  (ISE SOF ¶ 12.)  Each of these makes and/or sales also constitute infringement.  *See* 35 U.S.C. § 271 (a) (2006).

[7] ISE does not accuse CBOE's "SBT System" of infringing the '707 Patent because CBOE's making and use of that system occurred before the patent issued.

D.I. 316, ¶ 14; ISE SOF ¶ 16.)  Despite this, CBOE argues this fact is irrelevant because it made

substantial changes to CBOE*direct* when configuring CBOE*direct* for use within its Hybrid

System.  (CBOE Br. 10-11.)  CBOE ignores the fact that, when all the changes were complete,

the actual trade execution component—the computerized method for executing trades—

remained the same.  Mr. Montesano confirmed this point at his deposition:



(Montesano Dep. 69:8-21; ISE SOF ¶ 16).

    Accordingly, a reasonable jury could (and certainly should) find that CBOE has made,

used or sold an "automated exchange," because the CBOE*direct* trading system employs a fully

computerized method for executing trades of financial instruments that does not include

matching or allocating through use of open outcry.  To state that a factual question exists, is an

understatement.

**B.      CBOE's Non-Infringement Argument Focuses on Methods for Order Entry, Which Are Not the Focus of the Asserted Claims or the Court's Construction of "Automated Exchange"**

    CBOE argues that the Court's construction precludes infringement because some orders

entered electronically into CBOE*direct* are from individuals located on CBOE's trading floor

using computer terminals.  (CBOE Br. 6-7.)  CBOE alleges such activity allegedly entails "open

outcry."  (*Id.*)  But neither the Court's construction nor the plain language of the asserted claims

concern a method of order entry.  Instead, both are directed to trade execution.  The location of

where an order is entered electronically does not somehow convert CBOE's fully computerized

method of trade execution to an open outcry method.  Moreover, in CBOE*direct*, ██████

████████████████████████████████████████████████████████████

████████████████████████████████████ (Ex. 16 at

CBOE001761582; ISE SOF ¶ 4.)  CBOE's argument also contradicts CBOE's arguments during

claim construction. (*Compare* D.I. 148, CBOE Opening Claim Construction Br. *and* D.I. 164,

CBOE's Reply Claim Construction Br. *with* D.I. 310.)  CBOE conceded that "decisions related

to the entry of orders . . . involv[ing] human interaction is irrelevant to the" term automated

exchange.  (D.I. 164 at 4.)  Furthermore, the parties agreed that the '707 Patent expressly teaches

a common, integrated electronic book that includes previously received orders and quotations,

regardless of their source.  (*See* Markman Hr'g Tr. 117:9-17.)

### C. CBOE's Non-Infringement Argument Also Focuses on Methods for Order Routing, Which Are Not the Focus of the Asserted Claims or the Court's Construction of "Automated Exchange"

CBOE's second non-infringement argument focuses on CBOE's Hybrid System's order

routing or order handling system, not on the methods for executing trades used by CBOE, as a

registered exchange—much less, the method employed by the CBOE*direct* trading system.

(CBOE Br. 6-7.)  The Court's construction of the term "automated exchange" requires "a method

for *executing trades* of financial instruments that is fully computerized . . ."; it does not require

the routing or handling of *all orders* to or within a fully computerized method for executing

trades.  Likewise, the asserted claims are directed to trade execution, not order routing.

CBOE argues that if any portion of an order can be *routed* to the floor, a jury must find

that CBOE operates one method for executing trades, and a fully computerized method for

executing trades cannot exist as a matter of law.  (*Id.* 6-7.)  To articulate this is to refute it.  *See*

ISE SOF ¶ 17.  Order routing determines where an order will go, or into which method of trade

execution ("exchange") an order will be sent for execution.[8]  Order routing *is not* part of the

trade execution process itself.  (ISE SOF ¶ 17-18.)  As CBOE's corporate deponent, Ms. Smith

agreed to this point, stating that the order routing process "████████████████," and as

such, is ██████ from CBOE's method for executing trades.  (Smith Dep. 218:16-219:9.)

Consistent with CBOE's documents, a reasonable jury could find that CBOE's ORS routes

orders between CBOE's two methods for executing trades, and thus, does not evidence the use of

a single method for executing trades by CBOE.  (*See* ISE SOF ¶¶ 2-4, 17.)

CBOE's reliance on its SEC rules governing the routing of orders to the trading floor (*see*

CBOE Br. 6-7) is similarly misplaced.  Rule 6.13 is entitled "CBOE Hybrid System's Automated

Execution Feature," and states that "[o]rders eligible for automatic execution through the CBOE

Hybrid System may be automatically executed in accordance with the provisions of this Rule..."

(ISE SOF ¶ 18.)  "CBOE Rules 6.45A and 6.45B set forth, among other things, the manner in

which electronic Hybrid System trades in options are allocated. Paragraph (a) of each rule

essentially governs **how incoming orders received electronically by the Exchange are**

**electronically executed** against interest in the CBOE quote."  (Ex. 36 at 2 (emphasis added);

ISE SOF ¶ 19.)  As such, CBOE's SEC rules expressly recognize that CBOE has a fully

computerized method for executing trades in addition to an open outcry method.

By focusing on "order routing" instead of "trade execution," CBOE sidesteps the Court's

ruling that a registered exchange may include multiple methods for executing trades.  (D.I. 300.)

However, neither the claims nor the Court's construction require an automated method for

executing trades in which every single order is entirely executed.  The asserted claims recite "an

---

[8] Notably, Exhibit B to the Declaration of Ms. Eileen Smith, is entitled "Handling of Incoming Orders" and not "trade execution."  (*See* D.I. 311 at Ex. B.)

**automated exchange** for executing **a trade of a financial instrument**."[9]  (emphasis added.)

Similarly, the words "all" and "every" do not appear in the Court's construction.  As such, any

argument that an "automated exchange" is required to execute all of each incoming order *routed*

to CBOE, as a registered exchange, would contradict well-established Federal Circuit precedent.

*See KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) ("This court has

repeatedly emphasized that an indefinite article "a" or "an" in patent parlance carries the

meaning of "one or more" ....).  The '707 Patent and the Court's construction only require a

method for *executing trades* of financial instruments that is fully computerized, such that it does

not include matching or allocating through the use of open outcry.

### D.    CBOE's Attempt to Expand the Scope of the Disclaimer is Improper

ISE has never admitted or stated that CBOE does *not* operate a fully computerized

method of trade execution.  ISE's statement in a patent application, which is not asserted here,

that Chicago Board Options Exchange, *i.e.*, the registered exchange entity, is a hybrid

Exchange—meaning, it operates both a trading floor and an automated exchange—is entirely

consistent with the Court's construction, as well as with ISE's infringement contentions.  By

contrast, CBOE's litigation-focused position that it operates a single "method for executing

trades" directly contradicts CBOE's numerous unequivocal admissions recognizing—indeed,

trumpeting—that it uses two methods for executing trades.[10]  (*See* ISE SOF ¶¶ 1-10.)

---

[9] A "trade" is a contract to buy/sell one or more units of a financial instrument, such as an option.
Multiple trades can arise from a single incoming order.  (*See* ISE SOF ¶ 17.)

[10] Any attempt by CBOE to use statements from ISE's provisional patent application, as well as from
ISE's application from September 2005, to expand the scope of the disclaimer beyond the specification of
the '707 Patent would be plainly improper.  *See Saunders Group, Inc. v. Comfortrac, Inc.*, 492 F.3d 1326,
1333 (Fed. Cir. 2007) ("When the purported disclaimers are directed to specific claim terms[, *i.e.*,
electronic exchange] that have been omitted or materially altered in subsequent applications . . . those
disclaimers do not apply."); *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1078 (Fed. Cir.
2005).

Similarly, CBOE's argument that ISE's objection to CBOE's trading rules concerning orders *not eligible for automatic execution* demonstrates that CBOE does not have a fully computerized method for executing trades, strains credibility.  (*See* CBOE Br. 11-12.)  CBOE's handling of orders not eligible for execution using its fully computerized method is outside the scope of ISE's infringement contentions in the present action, as such an order, by definition, is not traded using CBOE's fully computerized method for executing trades.

## IV.    CBOE'S "AUTOMATED EXCHANGE" CONTAINS THE "SYSTEM MEMORY MEANS" OF INDEPENDENT CLAIMS 1, 4 AND 22

The Court construed the function of the "system memory means" of the asserted claims as "storing parameters of the entity administering the invention for allocating trades between the incoming order or quotation and previously received orders and quotations."  (Final Claim Construction, D.I. 286 at 7.)  The Court further determined the corresponding structure was the "system memory 26, bid matching process 34 and offer matching process 35."[11]  (*Id.*)

It is undisputed that CBOE*direct* performs the recited function of the "system memory means" of claims 1, 4 and 22.  (*See* CBOE Br. 17.)  As such, if CBOE*direct* contains the identified structure and structural components, or a structural equivalent, for performing the function, then it satisfies the structure of the "system memory means."  *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388-89 (Fed. Cir. 1992).  To do so, ISE must prove that CBOE has a system memory (which is undisputed) and a bid matching process and an offer matching process that collectively store CBOE's allocating parameters—which they clearly do.

---

[11] ISE argued that the corresponding structure for the "system memory means" was system memory. (D.I. 155, ISE's Opening Claim Construction Br.; D.I. 161 ISE's Reply Claim Construction Br.)  Alternatively, in response to CBOE's invalidity argument, ISE planned to argue that the claim element is not a means-plus-function element—the structure recited in the claim element itself is "system memory."

During the *Markman* process, CBOE argued that the information stored in the system memory should be included as corresponding structure.[12]  Now, CBOE argues that it is entitled to summary judgment of non-infringement because its "matching rules," which admittedly are stored in system memory, are not structure.[13]  (CBOE Br. 17-18, n.10.)  CBOE cannot have it both ways.  Either the information stored is part of the disclosed structure—in which case, CBOE satisfies this element; or it is not—in which case, CBOE still satisfies this element.

A.   **CBOE*direct* Contains the Identical Structure Disclosed in the '707 Patent for Performing the Function of the "System Memory Means"**

As stated above, CBOE*direct* contains "memory" and a bid matching and offer matching process that collectively store parameters used to allocate trades between incoming and previously received orders and quotations.  Specifically, CBOE*direct*'s "memory" stores a method or process that operates for both bids and offers (*see* CBOE Br. 17); contained within that process are the rules for dividing the incoming order or quotation among the previously received ones.  (*See, e.g.,* Smith Dep. 216:13-14, 288:5-289:1; Ex. 38 at ¶ 0032; Ex. 39 at 5:17-20, 35-37; Novak Dep., Ex. 60, 90:9-1; ISE SOF ¶ 22.)

For example, Figure 3 of CBOE's U.S. Patent Application Serial No. 20074/0215538 ("the '538 application") is an accurate illustration of the relevant "matching rules" used by CBOE against incoming orders.  (*See* Carone Dep., Ex. 56, 172:11-175:2 (FIGS.1-3 of Ex. 38 accurately depict configuration and operation of Hybrid System as of date of filing); *see also* Ex. 55 at 164:2-166:11; ISE SOF ¶ 25.)  It illustrates a method or process for matching and

---

[12] CBOE criticized ISE's proposed construction for "system memory means," which identified only "memory" as corresponding structure, because it allegedly failed to identify "the stuff you're storing." (Markman Hr'g Tr. 286:22-24; ISE SOF ¶ 24.)  The structure accepted by the Court, includes both memory and also the bid matching process and the offer matching process.

[13] Although CBOE argues that its "matching rules" do not store, this contradicts CBOE's arguments that the information that is stored is part of the structure for performing the recited function.

allocating orders that is similar to the Figures 4(a) and 5(a) of the '707 Patent, which respectively exemplify the bid and offer matching processes. Each figure discloses "matching" a first portion of an incoming order or quotation against public customer orders, (*compare* Ex. 38 at Fig.3 (ref. nos. 50 and 52) *with* Ex. 1 Fig.4(a) (ref. nos. S150, S168) *and* Ex. 1 Fig.5(a) (ref. nos. S200, S216); ISE SOF ¶¶ 25-27), and then "matching" remaining portions to professional orders or quotations based on allocating parameters. (*Compare* Ex. 38 at Fig.3 (ref. nos. 56, 58) *with* Ex. 1 Figs. 4(a) (ref. no. 166) *and* Ex. 1 Fig.5(a) (ref. no. 214); ISE SOF ¶¶ 25-27.)

CBOE's documents and fact witnesses confirm that CBOE*direct*'s "memory" stores rules that contain parameters for dividing incoming orders and quotations among previously received ones. (ISE SOF ¶¶ 22-23.) CBOE's assertion that CBOE*direct* does not include a bid or offer matching process, at most, demonstrates that there is a dispute of fact concerning the application of the Court's construction. (CBOE Br. 17-18.)

### B.   If CBOE*direct* Does Not Contain the Identical Structure Disclosed in the '707 Patent for Performing the Function of "System Memory Means," It Contains an Equivalent Structure

Even if CBOE*direct* did not include the memory *and* a bid matching process and an offer matching process, there would still be a genuine issue of material fact concerning whether CBOE*direct* literally contains the "system memory means"—namely, if its "memory" and matching process ("matching rules") are structurally equivalent to the disclosed structure. *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999) ("Functional identity and either structural identity or equivalence are both necessary" for finding literal infringement of a means-plus-function element.). Indeed, equivalence is "a determination of fact" and "must be determined against the context of the patent, the prior art, and the particular circumstances of the case." *Graver Tank Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609 (1950).

CBOE's argument that CBOE*direct* does not contain an equivalent structure to the disclosed "system memory 26, bid matching process 34 and offer matching process 45" is based on a fundamental misapplication of the law, followed by spurious logic.  In discussing ISE's equivalency position, CBOE improperly compares the way each disclosed structural component allegedly individually performs the recited function with the way the accused structure performs that function.  (CBOE Br. 18.)  *See Odetics*, 185 F.3d at 1268.  The proper analysis, however, requires a comparison of the way the disclosed structures collectively perform the recited function with the way the accused structures perform that same function.  This point was emphasized by the Federal Circuit in *Odetics* (CBOE Br. 19) where the court reversed a district court's grant of JMOL of no literal infringement because that court misinterpreted Federal Circuit authority to require a "component-by-component analysis" to determine structural equivalence.  *Id.* at 1268.[14]

When analyzed using this proper framework, there is at least a genuine issue of material fact as to whether the disclosed structure (system memory 26, and bid matching process 34 and offer matching process 35) performs the recited function in substantially the same way to achieve substantially the same result as the accused structure ("memory," the bid matching process and the offer matching process in CBOE*direct*)—that is, to determine the degree of similarity between the *way* both structures "stor[e] parameters of the entity administering the invention for allocating trades between the incoming order or quotation and previously received orders and quotations."  The '707 Patent discloses that the "bid matching process 34 and offer matching process 35" contain the particular parameters for performing the recited function, and the system memory stores the allocating parameters. (Ex. 1 at 14:53-58, 15:26-31; Ex. 37 at ISE1398497;

---

[14] As CBOE's memorandum *only* addresses equivalent structures under a "component by component" analysis, any attempt for it to apply the proper standard in its reply memorandum would be improper.

ISE SOF ¶¶ 20-23.)  Similarly, the system memory within CBOE*direct* stores a method or process that operates for both bids and offers ("matching rules"); contained within that process are "allocating parameters" (e.g., price/time, UMA formula).  (*See, e.g.,* Smith Dep. 216:13-14, 288:5-289:1 (██████████████████████████████████████████), July 28 and Oct. 9, 2009; Ex. 38 at ¶ 0032; Ex. 39 at 5:17-20, 35-37; Novak Dep. 90:9-1; ISE SOF ¶¶ 22-23.)  As such, both the accused structure and disclosed structures perform the identical function (storing allocating parameters), in substantially the same way (storing the parameters as part of the matching algorithm or rules), to achieve the identical result (storing parameters used during trade execution).  Thus, they are equivalent structures.  *See Odetics,* 185 F.3d at 1270-71.

Accordingly, a reasonable jury could find that CBOE*direct* performs the identical function of the "system memory means" using either the identical or equivalent structure to that disclosed in the '707 Patent for performing that function.

### C.    CBOE's Arguments Regarding the Disclosed Structure are Fundamentally Flawed

CBOE's argument that the "system memory" of the '707 Patent does not link the recited function (*see* CBOE Br. 19) is incorrect.  It is black-letter law, and undisputed, that the prosecution history can be used to "link" a disclosed structure to the performance of a recited function.  (*See* D.I. 164 at 17; *see also Minks v. Polaris Indus., Inc.*, 546 F.3d 1364, 1377 (Fed. Cir. 2008) ("Structure disclosed in the specification is corresponding structure only if the specification **or prosecution history** clearly links or associates that structure to the function recited in the claim.") (emphasis added).)  There is no dispute that "system memory" is disclosed in the '707 Patent, or that the prosecution history unequivocally states that the "allocating parameters" of claim 1 are "stored in the system memory."  (Ex. 37 at ISE1398497 ("parameters stored in the system memory are used to allocate portions of an incoming order or quotation,

amended claims 1 and 35 recite this as an 'allocating' parameter"); ISE SOF ¶ 20.)[15]  Hence, if anything, the "bid matching process and offer marching process" identified by the Court are alternative structure for storing "allocating parameters."  *See Creo Prods. v. Presstek, Inc.,* 305 F.3d 1337, 1345 (Fed. Cir. 2002) (finding where more than one disclosed structure performs the recited function, the claim requires either alternative structure).  As CBOE admits that it uses memory in CBOE*direct* for storing allocating parameters, it satisfies the system memory means.  *Intellicall*, 952 F.2d at 1388-89.

## V.  CBOE'S "AUTOMATED EXCHANGE" PERFORMS THE "MATCHING" STEPS OF INDEPENDENT CLAIMS 35 AND 56

The Court construed the term "matching" as "[i]dentifying a counterpart order or quotation for an incoming order based on price."  (D.I. 286 at 5.)  In construing the term, the Court also noted that "'[m]atching' is a process that is distinct from 'allocating.'"  (*Id.*)[16]  Claims 35 and 56 recite steps "matching" a portion of an incoming order or quotation against previously received order(s) or quotation(s).  Specifically, the claims recite "matching" a portion of incoming order or quotation against previously orders or quotations "based on an allocating parameter."  (*See* Ex. 1 at 35:40-47, 39:18-26; D.I. 286 at 5.)

It should be undisputed that CBOE performs a "first matching [of] a first portion of the incoming order or quotation against the public customer order . . . based on the allocating parameter."  (*See* CBOE Br. 21-22.)  CBOE first matches an incoming order against customer orders based on time-priority, an allocating parameter disclosed in the '707 Patent:

---

[15] At the time this statement was made, the "allocating parameters" of Claim 1 included both parameters for allocating among previously received customer orders, and parameters for dividing among previously received professional orders and quotations.

[16] In response to the explicit disclosure in the '707 Patent that allocation is part of the "bid matching process" and "offer matching process," CBOE recognized that "distinct," when used in its construction, merely meant that the terms have different meanings—not that they cannot be part of the same process. (*Compare* D.I. 155 at 11-12 *with* D.I. 164, at 7.)

| **'707 Patent** | **CBOE's First Matching of a First Portion** |
|---|---|
| The bid matching process 34 determines at step S150 of FIG. 4(a) that there is a public customer order at the lowest offer.  **The bid matching process 34 trades the incoming order to buy 4 contracts with the public customer order in the book memory 33 at step S168 [("Trade Oder against public customer orders in time priority.")]**  At step S170, the bid matching process determines that all 4 contracts in the incoming order have be[en] matched.  The match between the incoming order and the customer order in the book memory 33 is sent to the execute trade process 27 in step S172.  (Ex. 1 at 16:3-12 (emphasis added), Fig. 3 (ref. no. S168); ISE SOF ¶¶ 26-27.) | If the new order is at the current market price, **any public customer orders maintained in the EBOOK 34 which are at the same price will execute against the incoming order first and be executed in the order that the booked orders arrived at the EBOOK 34 (at steps 50, 52).**  Thus, if both the public customer order to sell on the book and an in-crowd market participant quote or order to sell on the book are at the same price, **the incoming order to buy is first matched against the public customer order** . . ..  (Ex. 38 at ¶0038 (emphasis added), Fig. 3 (ref. nos. 50, 52); Ex. 8:12-20 (emphasis added), Fig. 3 (ref. nos. 50, 52); ISE SOF ¶¶ 25, 28.) |

(*Compare* Ex. 1 at Fig.4(a) (ref. nos. S150, S168) *and* Ex. 1 at Fig.5(a) (ref. nos. S200, S216) *with* Ex. 38 at ¶ 0038, Fig.3 (ref nos. 50, 52) *and* Ex. 39 at 8:7-25, FIG.3 (ref. nos. 50,52); *see also* Ex. 42 at CBOE001754707 (███████████████████████████████████ ████████████████████████████████████████████ ███████"); Smith Dep. 150:11–18, 153:17–25, 290:18-293:10, 299:23-300; Montesano Dep. 108:4–9; Esposito Dep. 47:14–16; Ex. 43 at CBOE000196801; ISE SOF ¶¶ 25-31.).

After performing the first matching step—matching to customers based upon time priority—CBOE performs a second match—this time against professional orders based on an allocating parameter.  The second matching step is performed as part of CBOE's "Ultimate Matching Algorithm," or "UMA," and matches the incoming order preferentially based upon the size of the previously received orders or quotations.  (*See* Smith Dep. 291:23-293:20, 304:14-305:20; Ex. 38 at ¶¶ 0039-44, FIG.3; ISE SOF ¶ 32.)  Initially, UMA performed this match using the following "allocating parameter" (or formula):  $.5(1/\#participants) + .5(participant's\ size/total$

size).[17]  (ISE SOF ¶ 32-33.)  The first component of this formula is the "parity component," and the second portion is the "pro rata component."  (*Id.*)  This "allocating parameter," among other things, "rewards those [professionals] quoting larger sizes at the best price" by "matching" larger portions of incoming orders or quotes to such professionals.  (*Id.*)

An example of how CBOE's matching algorithm applies this "allocating parameter" and performs the second "matching" step against professional was provided in CBOE's damages expert Mr. Beutel's report.  (*See* Ex. 71 at 5-10.)  In that example, an incoming order for 200 contracts was entered into CBOE*direct*, with 80 contracts being matched first to public customers (the "first matching" step discussed above).[18]  After applying the UMA formula (CBOE's allocating parameter), Mr. Beutel states:  "████████████████████████████ ████████████████████████████████████████ ██████████"  (*See* Ex. 71 at 10.)  What CBOE describes as "███████████████," under the Court's construction, is a second match based upon an allocation parameter, UMA.  Specifically, a particular number of contracts of the incoming order (determined using the allocating parameter) is identified based on price ("matched") with previously received orders.  (*Id.* at 10.)

ISE applies the Court's construction, a question of fact, to the accused matching steps in the precise manner in which the term "matching" based upon an allocating parameter is used in the '707 Patent.  The term "matched" is used throughout the '707 Patent to refer to previously received orders being identified at the same price as the incoming order for receiving a specific

---

[17] CBOE rewrote its formula, resulting in "straight" pro rata.  (Ex. 40 at CBOE002301396; *see also* Ex. 49 at CBOE001720232; ISE SOF ¶ 34.)  This change to a pro rata "allocating parameter" does not alter ISE's infringement analysis, and is irrelevant to CBOE's motion which argues only that it does not match "based upon an allocating parameter."

[18] CBOE's expert referred to this "first matching" step as receiving an "allocation," however, the parties agree "matching" and "allocating" have different meanings.  (*Compare* D.I. 155 at 11-12 *with* D.I. 164, at 7.)  As described above, CBOE's documents readily demonstrate that this step is accurately described as "matching . . . according to an allocating parameter."

number of contracts based upon allocation rules, while the term "receiving allocations"—used by CBOE—appears nowhere in the '707 Patent.  (*See, e.g.*, Ex. 1 at 18:65-67 ("PRO #1 gets matched first ... and is entitled to 15 contracts"), 19:1-3 ("PRO #2 …is matched for 14 contracts"), 16:15-17 ("the bid matching process 34 completes step S168 as above, matching 10 contracts of the incoming order with the public customer order"), 18:28-30 ("The offer matching process . . . matches 3 contracts of the incoming order against the CUS order").)

CBOE's matching process or algorithm, and the matching process disclosed in the '707 Patent, both apply a formula ("allocating parameter") to match incoming orders against professional orders and quotations, giving a preference to professionals' orders or quotations with larger size.  (ISE SOF ¶ 32-35.)  The "allocating parameter" disclosed in the '707 Patent is "siz[pmm]/(siz[pmm]+siz[pro])," which determines a professional's pro rata share of an incoming order based upon the total size of professional orders and quotations at the same price. (ISE SOF ¶ 35.)   As stated above, the "allocating parameter" initially used by CBOE also included a pro rata component.  (Ex. 43 at CBOE000196801; *see also* Ex. 47 at CBOE000257523 ("█████████████████████████████████████ █); ISE SOF ¶¶ 32-33.)  Because both matching processes, or algorithms, apply "allocating parameters" that compute a professional's pro rata share of an incoming order compared to that of other professionals at the same price, they both match "preferentially against professional orders and quotations with larger size."

Accordingly, a reasonable jury could find that CBOE*direct* literally contains the "matching" steps of claim 35.  For similar reasons, a reasonable jury could find that CBOE*direct* literally contains the "matching" step of claim 56, which in pertinent part recites:  "matching the incoming order or quotation . . . based on the allocating parameter; . . . if the best market price is

as good or better than the away market price, executing the step of matching." Notably, CBOE admits that it only executes the step of matching, if CBOE is as good or better than the NBBO. (*See* CBOE SOF, D.I. 316, ¶ 71.)

### A. CBOE Does Not Match An Incoming Order Against Public Customers and Professionals In One Step

CBOE's non-infringement position on this issue is based upon a misrepresentation regarding ISE's application of the Court's construction. ISE does not assert that matching "based upon an allocating parameter" is performed when a previously received order is "potentially" identified for an incoming order. Instead, ISE asserts that these steps are performed when CBOE's matching algorithm actually identifies a previously received order based upon CBOE's allocation parameters. CBOE's "evidence" that it only matches based upon price is the declaration of a CBOE employee, contradicts CBOE's filings with the SEC, and other employees' testimony, which all demonstrate that CBOE matches based upon its "allocation parameter." Indeed, in describing CBOE*direct*, CBOE has stated, "The core of the trade engine is the matching algorithm, which is the means by which trades are executed and allocated to market participants." (Ex. 10 at CBOE000257522; *see also* ISE SOF ¶ 29.)

"CBOE's technology and rules allow for the employment of a variety of different matching algorithms, including pro-rata, equal share, market turner and price/time. In most classes, CBOE employs a unique algorithm known as UMA ('Ultimate Matching Algorithm')," which [was] a 50-50 mix of the pro-rata and equal share algorithms."[19] (Ex. 10 at CBOE000257522; *see also* ISE SOF ¶ 29.) CBOE's "███████████████" matches based upon ███████████████████████████████████," not merely based upon price. (Ex. 51 at CBOE002220677; ISE SOF ¶ 37.) Indeed, CBOE's documents illustrate that ISE's patented

---

[19] For certain types of trading ██████████████████████████████████████████████ "███████████████████████████████████." (Ex. 12 at C80E000293550; ISE SOF ¶ 31.)

███████████████████████████████████████████████████████████████

███████████████████████ [20]  (Ex. 51 at CBOE002220677; ISE SOF ¶ 37.)  CBOE's

Competition Task Force recognized in May 2005 that ███████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████"  (Ex. 51 at CBOE002220676; ISE SOF ¶ 37.)

       Consistent with CBOE's documents, CBOE's SEC filings require that CBOE first match

customer orders first (based upon time priority) before the matching of professional orders and

quotations (based upon UMA).  (ISE SOF ¶ 38.).  Furthermore, following completion of a trade,

CBOE is required to report "matching trade information" including the "identity" of the

participants in the trade, the "exercise price," and the "number of option contracts" to clearance

and reporting entities, such as the Options Clearing Corporation.  (Ex. 63; ISE SOF ¶ 38.)  Of

course, it is the number of contracts that is determined by CBOE's allocating parameter.

      **B.**    **CBOE Infringes Under its Own Application of this Court's Construction**

       Although CBOE asserts that it does not perform the step of "matching . . . based on an

allocating parameter," it studiously avoids stating what it means to match "based upon an

allocating parameter," and instead merely argues that the Court's construction results in

confusion.[21]  While ISE agrees that any construction stating that "allocating is a distinct process

than matching" when CBOE conceded that the terms merely have different meanings could

---

[20] As stated above, CBOE's changed UMA allocating parameter (effectively the pro-rata component only) and specialist participation rights (or guarantees) was nearly identical at the time to ISE's.  (*See* Ex. 51 at CBOE002220677; *see also* ISE SOF ¶ 31.)

[21] CBOE appears to argue that it is impossible to match according to an "allocating parameter."  Of course, the Court found that "matching according to a minimum allocation percentage …" was disclosed in Figure 4(b), and CBOE has readily admitted that the "algorithms disclosed for matching … are the steps of FIGS. 4A-5B" of the '707 Patent, which disclose matching according to allocation parameters.  (D.I. 148 at 26; *See, e.g,* Ex. 1 at 16:26-28 ("FIG 4(b) shows an **allocation formula for matching** incoming orders against quotations at the best price ….") (emphasis added), 17:6-24.)

result in juror confusion, CBOE's self-inflicted confusion is not a basis for summary judgment.[22]

Further, even under CBOE's application of the Court's construction, a reasonable jury could find that CBOEdirect performs equivalent steps to the matching steps. CBOEdirect performs substantially the same function as these "matching" steps—namely, CBOEdirect executes trades against a portion of the incoming order or quotation using previously received customer orders and/or professional orders and quotations at the same price to achieve the same incentives as those disclosed in the '707 Patent (public customer protection and rewarding professionals who quote with larger sized). (Compare ISE SOF ¶¶ 25, 27, 34 with ¶¶ 26, 28, 35.) CBOEdirect performs this function in substantially the same way as that described in the '707 Patent—CBOEdirect used a formula that includes a pro rata component to reward professionals who quote at larger size in the same manner as the '707 Patent. (Compare ISE SOF ¶¶ 25, 27, 34 with ¶¶ 26, 28, 35.) Furthermore, substantially same results are achieved—the previously received professional are identified for receiving a pro rata portion of the incoming order. *Id.*

## VI.    CONCLUSION

Because each of the issues presented in CBOE's memorandum are uniquely dependant on the application of the claim language to the accused system, questions of fact abound, and a reasonable jury could find each of these questions in ISE's favor. Importantly, while the Court is required to define the meaning of claim terms in a patent litigation, it is for the jury to decide how that definition should be applied to a claim on infringement. *See Allen Eng'g v. Bartell Indus., Inc.,* 299 F.3d 1336, 1344 (Fed. Cir. 2002). These considerations dictate a denial of the motion at bar.

---

[22] Although CBOE now argues that matching may only be based upon price, at the claim construction hearing CBOE took the opposite position. (*See* Ex. 66, Markman Hr'g Tr., 138:10-13 ("**We don't dispute that there can be other aspects for matching.** But what we do dispute is that it must be based upon price. If it is not based upon price you're not going to have a trade.**") (emphasis added).)

Dated: May 07, 2010

                                                s/Michael S. DeVincenzo
                                                _____
Michael D. Huber                                Parker H. Bagley
Cray Huber Horstman Heil & Van Ausdal LLC       Steven R. Gustavson
303 W Madison, Suite 2200                       Michael S. DeVincenzo
Chicago, IL  60606                              GOODWIN PROCTER LLP
Telephone No.:  (312) 332-8450                  The New York Times Building
Facsimile No.:   (312) 332-8451                 620 Eighth Avenue
                                                New York, New York  10018
                                                Tel.: 212.813.8800
                                                Fax: 212.355.3333
                                                *Attorneys for Defendant International*
                                                *Securities Exchange, LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies pursuant to Fed. R. Civ. P. 5 and L.R. 5.5, that a true and correct copy of the foregoing document was filed on May 07 2010 with the Clerk of the Court using the CM/ECF system, which will send notice to counsel of record.

<u>/s/ Michael S. DeVincenzo</u>
Michael S. DeVincenzo