FILED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHICAGO BOARD OPTIONS EXCHANGE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>INTERNATIONAL SECURITIES EXCHANGE, LLC,<br><br>Defendant. | No. 07 C 0623<br><br>Judge Joan H. Lefkow |

OPINION AND ORDER

Chicago Board Options Exchange, Inc. ("CBOE") filed suit against International Securities Exchange ("ISE") on January 31, 2007, seeking, among other relief, a declaratory judgment that U.S. Patent No. 6,618,707 ("the '707 patent") is invalid and is not infringed by CBOE. ISE is the holder of the '707 patent, entitled "Automated Exchange for Trading Derivative Securities," issued on September 9, 2003. On March 2, 2011, this court entered summary judgment in favor of CBOE. *See Chicago Bd. Options Exch., Inc.* v. *Int'l Sec. Exch., LLC*, 776 F. Supp. 2d 606 (N.D. Ill. 2011). On appeal, the Federal Circuit affirmed in part, reversed in part, vacated the judgment of noninfringement in favor of CBOE, and remanded. *See Chicago Bd. Options Exch., Inc.* v. *Int'l Sec. Exch., LLC*, 677 F.3d 1361 (Fed. Cir. 2012). On remand, this court entered a revised scheduling order, *see* dkts. #396 and #400, and pursuant to this order ISE timely served CBOE with the opening report of Dr. Moses Ma. CBOE now moves to strike portions of Dr. Ma's report arguing that he improperly introduces new theories of infringement under the doctrine of equivalents and new theories related to commercial

1

success, a secondary consideration of nonobviousness. For the reasons discussed herein, CBOE's motions [#405 and #415] will be granted in part and denied in part.

## BACKGROUND

**I.    Doctrine of Equivalents**

CBOE argues that ISE failed to disclose its intended reliance on the doctrine of equivalents to support its infringement contentions for claims 4, 35, 36, and 56. ISE counters that it disclosed its reliance on the doctrine of equivalents in response to CBOE's Interrogatory No. 1 and in its summary judgment brief before this court and, as such, those portions of Dr. Ma's report that rely on the same should stand.

On September 14, 2007, CBOE sent its first round of interrogatories to ISE. Interrogatory No. 1 instructed,

> Interrogatory No. 1
> Separately, for each of the ISE Patents-in-Suit, identify each claim ISE alleges CBOE directly infringes, contributes to the infringement of, and/or actively induces the infringement of, setting forth for each limitation of each such claim all legal and factual bases for such allegation, the identification of the persons having knowledge of the bases for each such allegation, and whether ISE alleges direct infringement, contributory infringement and/or active inducement of infringement for each such claim.

(CBOE Mot. to Strike #405, Ex. A.) ISE first responded to Interrogatory No. 1 on November 7, 2007. It supplemented its response multiple times, including its sixth set of supplemental responses on April 6, 2010. (ISE's Resp. Ex. F.)

**A.    Claim 4**

With respect to claim 4,[1] ISE's April 6, 2010 interrogatory responses included an infringement claim chart that disclosed the following language:

> Initially, the Accused Exchange did not use the formula expressly recited in the claim. Instead, it used a similar formula, which CBOE named Ultimate Matching Algorithm (UMA) . . . . In that formula, the expression ".5(1/#participants)" is a parity component referred as Component A, and the expression ".5(participant's size/total size")" is a pro rata component referred as Component B . . . . It is irrelevant that the Accused Exchange used a formula that included a parity component (Component A) because the '707 Patent teaches that other allocation formulas are possible without departing from the scope of the invention and expressly identifies using formulas that include weighting factors to adjust a pro-rata allocation among the professionals . . . . Notably, this is the purpose of the parity component to UMA.

(*Id.* Ex. F at Ex. A at 20.) ISE also stated in a letter to CBOE on March 30, 2010 that "to the extent CBOE has disputed that claim limitations are literally present in the Accused Exchange, ISE intends to assert the doctrine of equivalents with respect to such limitations." (ISE Resp., Ex. E.)

CBOE requests that the court strike paragraphs 297 through 311 and 315 through 317 of Dr. Ma's report relating to the final limitation of claim 4.[2] Dr. Ma states that "[w]hen CBOE launched Hybrid in June 2003, CBOE*direct* did not use the formula expressly recited in the claim. Instead, it used a similar formula . . . named Ultimate Marching Algorithm" that included a component referred as Component A and a pro rata component referred as Component B. (ISE

---

[1] The final limitation of claim 4 recites in relevant part,

> and wherein the processor means further comprises means for matching the remaining portion based on a formula that allocates the minimum allocation percentage of the remaining portion to the quotation identified with the primary market maker, and wherein the minimum allocation percentage is N% and the percentage of the remaining portion allocated to the order identified with the primary market maker is:
>
> $$X\% = \text{Max}[N\%, \text{siz}[pmm]/(\text{siz}[pmm]+\text{siz}[pro])]$$
>
> where siz[pmm] is the size of the order identified with the primary market maker, and size[pro] is the sum of the sizes of the professional orders not identified with the primary market maker.

('707 patent claim 4.)

[2] CBOE also requests that the court strike Dr. Ma's understanding of law in paragraph 26, 30. Neither CBOE nor ISE included an excerpt of the Ma report containing paragraphs 26, 30, and 32.

Resp., Ex. G ¶ 298.) Dr. Ma concludes that "the presence of the parity component [Component A] in the trade execution algorithm . . . is an insubstantial technical difference with respect to the 'means for matching the remaining portion' . . . claim limitation because the '707 Patent teaches that other allocation formulas are possible without departing from the scope of the invention . . . ." (*Id.* ¶ 299.) Dr. Ma also notes that "on March 27, 2006 CBOE 'change[d] the UMA calculation [used by CBOE*direct*] to a purely pro-rata calculation," but concludes that this calculation "is mathematically equivalent to the formula recited in claim 4." (*Id.* ¶ 303.) For both of CBOE's formulas, Dr. Ma applies the insubstantial differences test and the function/way/result (triple identity) test to determine infringement under the doctrine of equivalents. (*Id.* ¶¶ 300–302, 306–309.) Dr. Ma further analyzes an alternative means-plus-function construction of the "means for matching" limitation under the triple identity test to conclude that CBOE*direct* satisfies the limitation under the doctrine of equivalents. (*Id.* ¶¶ 315–317).

**B.     Claim 35**

With respect to claim 35,[3] ISE stated in its April 6, 2010 interrogatory responses that CBOE's trading system infringed this claim because it "matches the incoming order and quotation among the previously received orders and quotations stored in the 'eBook.'" (ISE Resp. Ex. F at Ex. A at 26.) ISE also stated that "[i]f multiple customer orders exist at the disseminated price, those customers are filled in FIFO [first in, first out] fashion." (*Id.*) In its response to CBOE's motion for summary judgment, which ISE filed on May 7, 2010, it further explained the claim limitation at issue stating,

> [E]ven under CBOE's application of the Court's construction, a reasonable jury could find that CBOEdirect performs equivalent steps to the matching steps. CBOEdirect performs substantially

---

[3] The limitation of claim 35 recites in part, "first matching a first portion of the incoming order or quotation against the public customer order stored in the book memory based on the allocating parameter . . . ." ('707 patent claim 35.)

4

> the same function as these 'matching' steps—namely, CBOEdirect executes trades against a portion of the incoming order or quotation using previously received customer orders and/or professional orders and quotations at the same price to achieve the same incentives as those disclosed in the '707 Patent (public customer protection and rewarding professionals who quote with larger sized) . . . . CBOEdirect performs this function in substantially the same way as that described in the '707 Patent—CBOEdirect used a formula that includes a pro rata component to reward professionals who quote at larger size in the same manner as the '707 Patent . . . . Furthermore, substantially [the] same results are achieved—the previously received professional [sic] are identified for receiving a pro rata portion of the incoming order.

(Dkt. #317, ISE Resp. to Mot. for Summ. J. at 25.)

CBOE has moved to strike paragraphs 358 through 361 of Dr. Ma's report relating to claim 35. In these portions of the report, Dr. Ma states that "CBOE*direct* operates a process that satisfies [the claim limitation of first matching a first portion of the incoming order or quotation against the public customer order . . . based on the allocating parameter] under the Doctrine of Equivalents." (ISE Resp., Ex. G ¶ 358.) He goes onto analyze infringement under the doctrine of equivalents using the insubstantial difference test and the function/way/result test, concluding that "CBOE*direct* has operated and continues to operate a process that satisfies the step of 'first matching an incoming order or quotation to previously received customer orders based on an allocating parameter,' literally or under the Doctrine of Equivalents." (*Id.* ¶¶ 359–61.)

5

## C. Claim 36

With respect to claim 36,[4] in its April 6, 2010 claim chart ISE explicitly referred to infringement under the doctrine of equivalents stating,

> If the Accused Exchange did not literally satisfy this claim element, it did so under the doctrine of equivalents because the patent expressly teaches that other allocation formulas are possible without departing from the scope of the invention and expressly identifies using formulas that include weighting factors to adjust a pro-rata allocation among the professionals.

(ISE Resp. Ex. F at Ex. A at 28.) CBOE has moved to strike paragraphs 375, 376 and 382 of Dr. Ma's report relating to claim 36. In these portions of his report, Dr. Ma states that "[t]here is no substantial technical difference between the UMA formula used by CBOE*direct* during Phase I and a pro rata allocation," and that "[t]he '707 Patent expressly teaches that other allocation formulas are possible without departing from the scope of the invention and expressly identifies using formulas that include weighting factors to adjust a pro-rata allocation among the professionals." (ISE Resp. Ex. G ¶ 376.) Accordingly, Dr. Ma concludes that "CBOE*direct* has always satisfied this limitation of claim 36, either literally or under the Doctrine of Equivalents." (*Id.* ¶ 382.)

## D. Claim 56

With respect to claim 56, the claim limitation at issue recites, "querying an away market to determine an away market price." ('707 patent claim 56.) In its April 6, 2010 claim chart ISE addressed this limitation stating that "[t]he Accused Process queries an away market to determine an away market price." (ISE Resp. Ex. F at Ex. A at 30.) ISE did not elaborate on this the querying limitation nor did its summary judgment brief detail the same.

---

[4] Claim 36 depends from claim 35 and recites, "[t]he process according to claim 35, wherein the step of second matching further comprises allocating the remaining portion among the plurality of professional orders and quotations on a pro rata basis." ('707 patent claim 36.)

CBOE requests that the court strike paragraphs 398 through 401 of Dr. Ma's report relating to claim 56. These portions of Dr. Ma's report analyze the querying limitation of claim 56 under the doctrine of equivalents by applying both the insubstantial difference and the function/way/result tests. Dr. Ma concludes that

> There is no substantial technical difference between "querying an away market to determine an away market price" as recited in claim 56 and checking with a reporting entity, such as OPRA, for price information associated with a given class of security because both require querying (or checking with) an outside entity to determine if the price on the claimed "automated exchange" is as good as or better than the price on the away market.

(ISE Resp. Ex. G ¶ 399.) Thus, "CBOE*direct* achieves substantially the same result (if not the identical result) as if it had contacted the away market directly for the price information." (*Id.* ¶ 401.)

## II. Secondary Considerations of Nonobviousness

CBOE's first round of interrogatories also included Interrogatory Nos. 2 and 7, which related to secondary considerations of nonobviousness. Interrogatory No. 2 instructed,

> Interrogatory No. 2
> For each claim of the ISE Patents-in-Suit that ISE alleges to be valid and enforceable, state all legal and factual bases for ISE's allegation that such claim is valid and enforceable, including the identity of all persons having knowledge of the facts underlying or relating to each such basis.

(CBOE Mot. to Strike #415, Ex. A.) ISE first responded to Interrogatory No. 2 on November 2, 2007, and supplemented its response multiple times, including its seventh set of supplemental responses on August 12, 2010. (ISE Resp., Ex. P.)

In its August 12, 2010 responses, ISE described the nexus between its commercial success and the '707 patent by reference to documents submitted to the United States Patent and

Trademark Office ("USPTO") during prosecution of the '707 patent. (ISE Resp. Ex. P at 36–40.) Specifically, ISE pointed to its August 2, 2002 Office Action Response which stated,

> [t]hese advantages are a direct result of ISE's ability to preferentially 'allocate orders based on predetermined parameters that encourage professionals to quote large size' and on the distinction between entity types such as public customers and professionals, features that are recited in the independent claims 1, 35 and 68. ISE has used these features since it began commercial operation. Thus, there is a clear nexus between the recited claims and ISE's significant commercial success.

(*Id.* at 39 (internal citations omitted)). ISE also referenced the Notice of Allowability it received from the USPTO, in which the examiner noted commercial success as a reason for allowance. (*See id.* at 39–40.) Finally, ISE stated that it "intends to rely upon expert testimony to establish that ISE and CBOE each practice the '707 Patent, and that a nexus exists between the '707 Patent and the commercial success of these exchanges." (*Id.* at 41; *see id.* at 37 ("ISE intends to rely upon expert testimony to demonstrate that it practices each of the identified claim limitations.").)

CBOE's Interrogatory No. 7 also related to secondary considerations of nonobviousness instructing,

> Interrogatory No. 7
> For each claim of the ISE Patents-in-Suit, identify what secondary indicia of non-obviousness (such as, for example, commercial success, long-felt need or copying by others), if any, that ISE intends to rely on to support the validity of such claim, identifying all persons having knowledge of how each such indicium supports the validity of such claim.

(CBOE Mot. to Strike #415, Ex. A.) ISE first responded to Interrogatory No. 7 on November 2, 2007, and supplemented its response multiple times, including its sixth supplemental responses on March 19, 2010. (ISE Resp., Exs. K & M.)

8

ISE first identified commercial success as a secondary consideration of nonobviousness in its original responses dated November 2, 2007. (*See* ISE Resp., Ex K at 12.) In its March 19, 2010 responses, ISE stated, "[t]here is no genuine dispute ISE has experienced tremendous commercial success and praise from industry experts." (ISE Resp., Ex M at 13.) It noted that "success is presumed to be attributed to the claimed invention because, as the '707 Patent discloses, ISE practices the Asserted Claims and the Asserted Claims are directed to the design of the exchange itself that has achieved the success." (*Id.*) ISE also stated that it did not understand CBOE to dispute that ISE practiced the claimed invention. (*Id.* at 14.)

In its March 19, 2010 responses, ISE also disclosed the deposition of Gary Katz, the inventor, and the expert report of Christopher Gerardi as supporting its theory of commercial success. (*Id.*) The Gerardi report stated, "the benefits provided by the '707 patent are a critical component of ISE's success in the market," and "[t]he fact that the ISE was able to capture approximately 30% of the U.S. options market by early 2004 clearly demonstrates demand for a commercial embodiment of the '707 patent." (ISE Resp., Ex. N at 20.) The Gerardi report also discussed the "clear evidence of the demand for the various features claimed in the '707 patent including pro rata allocation, public customer priority, professional participation, small order preference and away market participation." (*Id.* at 21.)

As it relates to secondary considerations of nonobviousness, CBOE requests that the court strike paragraphs 57 through 140 of Dr. Ma's report. In these portions of his report, Dr. Ma opines that ISE practices the claimed invention using an element-by-element analysis

9

comparing each asserted claim to ISE's exchange. (CBOE Mot. to Strike #415, Ex. C.) In paragraphs 134 through 140, Dr. Ma discusses the commercial success of ISE's exchange stating that "[o]ne of the main reasons that ISE was able to succeed . . . is that ISE also provided a beneficial market model, with rules that appealed to market participants, but were blocked or diluted at the incumbent exchanges . . . ." (*Id.* ¶ 136.) Dr. Ma further states that proposed rule filings including allocating orders pro rata "revolutionized the industry and led to ISE's unexpected and phenomenal success." (*Id.* ¶ 137.) Finally, Dr. Ma discusses the success of exchanges that adopted systems like those of ISE and the failures of those that did not. (*Id.* ¶¶ 139–140.)

## LEGAL STANDARD[5]

Under Federal Rule of Civil Procedure 26, a party must timely supplement its interrogatory responses if it "learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). Failure to timely supplement prohibits a party from using that information as evidence unless the failure was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1); *see Musser* v. *Geneva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004). Additionally or alternatively, the court may impose other appropriate sanctions including prohibiting the disobedient party from supporting or opposing designated claims or defenses. Fed. R. Civ. P. 37(c)(1)(C). The court has broad discretion to determine whether a discovery violation was justified or harmless, *David* v. *Caterpillar*, 324 F.3d 851, 857 (7th Cir. 2003), and the following factors should guide the court's discretion "(1) prejudice or surprise to party against whom evidence is offered; (2) ability of party to cure prejudice; (3) likelihood of disruption to trial; and (4) bad faith or willfulness involved in not disclosing evidence at an earlier date." *Tribble* v. *Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012) (citing *David*, 324 F.3d at 857).

---

[5] **Seventh Circuit law applies because the issue of discovery sanctions does not fall within the exclusive jurisdiction of the Federal Circuit. *See Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 647–648 (Fed. Cir. 1994) ("We apply the law of the pertinent regional circuit when the issue to be addressed involves an interpretation of the Federal Rules of Civil Procedure not unique to patent law."); *U.S. Gypsum Co.* v. *LaFarge N. Am., Inc.*, 508 F. Supp. 2d 601, 619 (N.D. Ill. 2007) ("Seventh Circuit law applies in determining an appropriate [discovery] sanction, if any.").**

ANALYSIS

I.      Motion #405: The Doctrine of Equivalents

    A.      The Inapplicability of the Local Patent Rules

As an initial matter, the court must determine whether the Northern District of Illinois Local Patent Rules ("LPRs"), which took effect on October 1, 2009, govern the disposition of the present motion. *See generally* Judge Matthew Kennelly, Edward D. Manzo, *Northern District of Illinois Adopts Local Patent Rules,* 9 J. Marshall Rev. Intell. Prop. L. 202 (Winter 2010). LPR 1.1 states that "[t]hese Rules . . . apply to all cases filed in or transferred to this District after their effective date . . . ." N.D. Ill. L.P.R. 1.1. This case was filed in January 2007 and fact discovery closed in June 2009 before the LPRs took effect. Although the court "may apply all or part of the LPR to any . . . case already pending on the effective date of the LPR," it declines to do so here. *Id*. As such, the Federal Rules of Civil Procedure will govern disposition of the motion. *See Fujitsu Ltd.* v. *Tellabs Operations, Inc.*, Nos. 08 C 3379, 09 C 4530, 2012 WL 2994114, at *3 (N.D. Ill. July 19, 2012) (stating it would be "non-sensical" to retroactively apply LPRs to litigation that had been underway for years); *Rowe Int'l Corp.* v. *Ecast, Inc.*, 586 F. Supp. 2d 924, 933–34 (N.D. Ill. 2008) (applying the Federal Rules of Civil Procedure to resolve discovery dispute in a patent case).

    B.      Sufficiency of ISE's Disclosures and Prejudice to CBOE

Under Rule 37(c)(1), the court shall impose sanctions for non-disclosure unless the failure to disclose was justified or harmless. Fed. R. Civ. P. 37(c)(1). In *United States Gypsum Co.* v. *LaFarge North America, Inc.*, 508 F. Supp. 2d 601 (N.D. Ill. 2007), the court found that the patentee could rely on a doctrine of equivalents theory where the theory was substantially disclosed during discovery and prejudice to the other party is absent. *Id.* at 619–620. Although

the court acknowledged that the patentee had failed to "expressly refer to the doctrine of equivalents" in its interrogatory responses, it allowed the patentee to assert the theory for the first time in its summary judgment brief, finding that the theory had been substantially disclosed. *See id.* at 620 ("[The patentee] made clear in its interrogatory responses that it contends the LNA Method infringes claim 36 even with the edge streams being deposited before the core streams.") In reaching its holding, the court noted that the defendants had failed to identify any prejudice that would result from allowing the patentee to so proceed; nor did defendants "contend that they omitted taking any fact discovery that would have only been necessary if the doctrine of equivalents were at issue" or that "their experts . . . [were] unprepared to opine on the subject of equivalents." *Id.* Thus, the situation was not "sandbagging . . . where one side fails to have an opportunity to prepare for a previously unknown theory," and as such the patentee was allowed to proceed. *Id.* Under the reasoning employed in *Gypsum*, therefore, sanctions are not appropriate where the respondent (1) expressly or substantially disclosed its reliance on the doctrine of equivalents; or (2) the movant will suffer no prejudice should the respondent be allowed to proceed.

### i. Sufficiency of ISE's Disclosures

#### 1. Claims 4, 35, and 36

Although ISE did not expressly reference the doctrine of equivalents in its interrogatory responses, a review of the record demonstrates that it substantially disclosed its reliance on this theory to CBOE. With respect to claim 4, ISE's April 6, 2010 interrogatory responses state, *inter alia*, that "it is irrelevant that the Accused Exchange used a formula that included a parity component . . . because the '707 Patent teaches that other allocation formulas are possible without departing from the scope of the invention . . . ." (ISE Resp. Ex. F at Ex. A at 20.) Dr. Ma's report similarly states that "the presence of the parity component in the trade execution algorithm . . . is an insubstantial technical difference . . . because the '707 Patent teaches that other allocation formulas are possible without departing from the scope of the invention." (ISE Resp., Ex. G ¶ 299.) Although Dr. Ma's report is more detailed, the basic argument is the same.

With respect to claim 35, in its response to CBOE's motion for summary judgment, ISE clearly outlines its theory of infringement under the doctrine of equivalents stating that "a reasonable jury could find that CBOEdirect performs equivalent steps to the matching steps." (Dkt. #317; ISE Resp. to Mot. for Summ. J. at 25.) This brief was filed on May 7, 2010, more than two years before Dr. Ma submitted his report, giving CBOE ample time to supplement its discovery requests, which it declined to do. As such, CBOE cannot now be heard to complain. *See, e.g., Westefer* v. *Snyder*, 422 F.3d 570, 584 (7th Cir. 2005) (affidavits produced in response to summary judgment motion were sufficient to put defendants on notice under "otherwise made known" provision of Rule 26(e)).

14

With respect to claim 36, Dr. Ma's report largely mirrors the language used in ISE's April 6, 2010 interrogatory responses as both documents assert that the relevant formulas are equivalent and that the '707 patent teaches that other allocation formulas are possible. *Compare ISE's April 6, 2010 Resp. to Interrogatory No. 1*, ISE Resp. Ex. F at Ex. A at 28 ("If the Accused Exchange did not literally satisfy this claim element, it did so under the doctrine of equivalents because the patent expressly teaches that other allocation formulas are possible . . . .") *with Dr. Ma's Opening Expert Report*, ISE Resp. Ex. G ¶ 376, ("The '707 Patent expressly teaches that other allocation formulas are possible without departing from the scope of the invention and expressly identifies using formulas that include weighting factors to adjust a pro-rata allocation among the professionals . . . . .").

Thus, as to claims 4, 35, and 36, the court concludes that ISE substantially disclosed its theory of infringement under the doctrine of equivalents through its interrogatory responses and/or summary judgment brief.

2. Claim 56

With respect to claim 56, ISE does not point to any language in its interrogatory responses or summary judgment brief where it referred to the doctrine of equivalents or language that would indicate that it intended to rely on the doctrine to support the querying limitation of this claim; and ISE's claim chart contained few details on this point. (ISE Resp. Ex. F at Ex. A at 30 ("The Accused Process queries an away market to determine an away market price.").) In his expert report, Dr. Ma goes beyond this limited disclosure by analyzing the querying limitation under the doctrine of equivalents and applying the insubstantial difference and triple identity (function/way/result) tests. (*See* ISE Resp., Ex. G ¶¶ 198-401.) Comparing the scope of

15

ISE's disclosure to Dr. Ma's report, the court concludes that ISE did not substantially disclose its intention to rely on the doctrine of equivalents to establish infringement of claim 56.

ii. Prejudice to CBOE

**1. Claims 4, 35, and 36**

In light of ISE's substantial disclosure, the court concludes that CBOE will not be prejudiced by allowing Dr. Ma to opine on a doctrine of equivalents theory in his expert report and at trial. CBOE points to no additional fact discovery that it would need to conduct to adequately defend against these claims. Additionally, because CBOE is alleging invalidity under a nonobviousness theory, it has already likely conducted prior art searches outside the literal scope of the claims. As in *U.S. Gypsum Co.*, ISE substantially disclosed its reliance on the doctrine of equivalents with sufficient time for CBOE to move for additional discovery if needed, which militates against undue surprise to CBOE. *See U.S. Gypsum Co.*, 508 F. Supp. 2d at 620. Although ISE's discovery disclosures were not as detailed as Dr. Ma's report, they disclosed many of the same factual and theoretical arguments that underlie Dr. Ma's conclusions. Thus, the court finds that any resulting prejudice to CBOE is insufficient to warrant striking Dr. Ma's expert report as it relates to claims 4, 35, and 36.

2. Claim 56

Unlike claims 4, 35, and 36, ISE did not substantially disclose the doctrine of equivalents theory for the "querying an away market" limitation of claim 56. As such, claim 56 does not fall squarely within the *U.S. Gypsum Co.* court's analysis. This lack of substantial disclosure contributes to a finding of prejudice in favor of CBOE. The limited nature of ISE's discovery disclosures likely caused CBOE to be surprised by the contents of Dr. Ma's report. Given the late stage of the proceedings, this surprise cannot be easily cured through additional discovery and is likely to prejudice CBOE at trial. Although the court does not believe that ISE acted in bad faith by failing to substantially disclose its reliance, sanctions are nonetheless in order under

Rule 37(c)(1)(C). The court will therefore strike paragraphs 398 through 401 of Dr. Ma's opening expert report, as requested by CBOE.

II.     Motion # 415: Secondary Considerations of Nonobviousness

CBOE has also moved to strike portions of Dr. Ma's report that pertain to commercial success, a secondary consideration of nonobviousness arguing that ISE did not adequately disclose this theory in its interrogatory responses. Specifically, CBOE argues that ISE did not disclose that it (1) practices the claimed invention; or (2) the nature of the nexus between the claimed invention and its commercial success. ISE counters that it disclosed its reliance on the commercial success theory and, even if its disclosures were somehow insufficient, CBOE cannot demonstrate prejudice in part because it bears the burden of proof on the invalidity issue.

   A.     Sufficiency of ISE's Disclosures

A review of the record demonstrates that sanctions are not appropriate under Rule 37(c) because ISE disclosed that it practices the claimed invention and the nature of the nexus between the invention and ISE's commercial success during the discovery process. In its initial discovery responses, ISE stated that it intended to rely on commercial success as a secondary consideration of nonobvious. (*See* ISE Resp., Ex. K at 12 ("ISE identifies Gary Katz and at least commercial success" as one of the secondary indicia of nonobviousness upon which it intends to rely and a person having knowledge of the same.).) During discovery, ISE repeatedly supplemented its interrogatory responses to expand on this theory. (*See, e.g., id*. Ex. Q at 12 (identifying Gary Katz and commercial success on January 27, 2009); *id.* Ex. M at 13–14 (discussing the presumed nexus and pointing to documents describing the nexus on March 19, 2010); *id.* Ex. P at 35–37 (detailing ISE's reliance on commercial success on August 12, 2010).)

18

As to ISE's position that it practices the claimed invention, in its August 12, 2010 responses to Interrogatory No. 2, ISE explicitly stated that it "intends to rely upon expert testimony to demonstrate that it practices each of the identified claim limitations." (ISE Resp., Ex. P at 37; *see id.* at 41.) Similarly, in its March 19, 2010 responses to Interrogatory No. 7, ISE stated that its "tremendous commercial success . . . is presumed to be attributed to the claimed invention because . . . ISE practices the Asserted Claims and the Asserted Claims are directed to the design of the exchange itself that has achieved the success." (ISE Resp., Ex. M at 13.) ISE further stated that it was "ISE's understanding that CBOE does not dispute that ISE practices the inventions of the '707 Patent." (*Id.* at 14.)

As to ISE's position that a nexus[6] exists between the claimed invention and ISE's commercial success, in its August 12, 2010 responses to Interrogatory No. 2 ISE described the relevant nexus by reference to USPTO filings, including an August 2, 2002 Office Action Response that stated, "there is a clear nexus between the recited claims and ISE's significant commercial success." (ISE Resp., Ex. p at 39.) ISE also stated that it "intends to rely upon

---

[6] There are two possible approaches to establishing a nexus. If the commercially successful product or service is coextensive with the claimed invention, a nexus is presumed under the approach articulated in *Ormco Corporation* v. *Align Technology, Inc.*, 463 F.3d 1299 (Fed. Cir. 2006) and *Brown and Williamson Tobacco Corporation* v. *Philip Morris, Inc.*, 229 F.3d 1120 (Fed. Cir. 2000). On the other hand, if the commercially successful product or service is not coextensive with the patented invention, "the patentee must show prima facie a legally sufficient relationship between that which is patented and that which is sold." *Demaco Corp.* v. *F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir 1988). Whether ISE must prove a nexus under *Demaco* or whether it may be presumed under *Ormco* and *Brown* depends on whether ISE can show that its exchange is coextensive with the patented invention.

CBOE argues that ISE indicated in its interrogatory responses that it planned to rely on *Ormco* and *Brown* to demonstrate that the commercial success of ISE's exchange was due to the patented invention, and as such, CBOE would now suffer prejudice should ISE be allowed to establish a nexus under the traditional approach articulated in *Demaco*. A review of the record, however, demonstrates that ISE did not indicate that it intended to rely only on the presumption in *Ormco* and *Brown* to establish the required nexus. Although ISE stated that such a nexus was presumed, *see* ISE Resp. Ex. F at 8, it also pointed to USPTO and other documents to establish the nexus. (*See* ISE Resp. Ex. P at 38–41.) Additionally, ISE stated that it intended "to rely upon expert testimony to establish . . . that a nexus exists between the '707 Patent and the commercial success of these exchanges." (*Id.*) ISE thus provided sufficient indication that it intended to argue there was a nexus, even if a nexus could not be presumed.

19

expert testimony to establish . . . that a nexus exists between the '707 Patent and the commercial success of [ISE's and CBOE's] exchanges." (*Id.* at 41.) The court finds that these disclosures, and those highlighted in ISE's brief, were sufficient to place CBOE on notice that ISE intended to rely on commercial success as a secondary consideration of nonobviousness; specifically, that ISE practices the claimed invention and the nature of the nexus between the claimed invention and its commercial success.

## CONCLUSION AND ORDER

For the foregoing reasons, CBOE's motion to strike [#405] is granted in part and denied in part. The motion is granted as to claim 56 and the following sections of Dr. Ma's report are hereby stricken: paragraphs 398 through 401. The motion is denied as to claims 4, 35 and 36. CBOE's motion to strike [#415] is denied.

Date: March 6, 2013       Enter: _____
                                 JOAN HUMPHREY LEFKOW
                                 United States District Judge